# IN THE SUPREME COURT OF MISSISSIPPI

**JEFFREY KEITH HAVARD,**                                         *Petitioner*

**v.**                                                    **No.  2013-DR-01995-SCT**

**STATE OF MISSISSIPPI,**                                         *Respondent*

---

## RESPONSE TO MOTION FOR RELIEF FROM JUDGEMENT OR LEAVE TO FILE SUCCESSIVE PETITION FOR POST-CONVICTION RELIEF

---

## I.  INTRODUCTION

This matter is before the Court on Motion for Relief from Judgement or Leave to File Motion for Post-Conviction Relief in the Circuit Court of Adams County, Mississippi, pursuant to the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution; Article 3, Sections 14 and 28 of the Constitution of the State of Mississippi; the Mississippi Uniform Post-Conviction Relief Act ("UPCCRA") at: Miss. Code Ann. § 99-39-1, *et seq*; Miss. R. App. P. 22; and, Miss. R. Civ. P. 60(b). The State ("the Respondent") submits Havard ("petitioner") is entitled to neither collateral relief under the UPCCRA or extraordinary relief under Rule 60(b).

## II.  PROCEDURAL HISTORY

The successive petition at bar comes to this Court from a case originating in the Circuit Court of Adams County, Mississippi, wherein petitioner was convicted of the crime of capital murder during the commission of sexual battery

EXHIBIT 1

upon a six month-old infant, Chloe Britt.

On June 17, 2002, petitioner was indicted for the willful, unlawful and felonious killing and murder of Chloe Britt, a human being, with or without design to effect death, while engaged in the commission of the crime of sexual battery and/or felonious abuse and/or battery of a child in violation of Miss. Code Ann. § 97-35-39.  A jury was empaneled on December 17, 2002, and convicted petitioner of the charged offense on December 18, 2002.  After the jury found petitioner guilty, a sentencing hearing was held and the jury heard evidence in aggravation and mitigation of sentence.  On December 19, 2002, the jury convicted returned a sentence of death in proper form.  The jury verdict on sentence read as follows:

> We, the jury, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:
>
> A.      1.   That the defendant actually killed Chloe Madison Britt.
> Next, we the jury, unanimously find that the aggravating circumstances of:
>
>  2.   That the capital offense was committed while the defendant was engaged in the commission of, or an attempt to commit, sexual battery.
>
>  3.   That the capital offense was especially heinous, atrocious or cruel.
>
> exist beyond a reasonable doubt and are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we further find unanimously that the defendant should suffer death.

>                              (s)  Cynthia Etheridge
>                              FOREMAN THE JURY

(CP vol. 2 at 216).

After being convicted and sentenced to death, petitioner took his direct appeal to this

Court raising the following fifteen (15) claims:

I. WHETHER TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INSURE THAT A JUROR WAS EXCUSED FOR CAUSE AFTER EXHIBITING BIAS.

II. WHETHER TRIAL COUNSEL WERE INEFFECTIVE BY FAILING TO ASK "REVERSE-*WITHERSPOON*" QUESTIONS RELATING TO THE JURORS' POTENTIAL STRONG FEELINGS ABOUT THE DEATH PENALTY.

III. WHETHER HAVARD WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BECAUSE OF THE SEATING OF A JUROR WHO SUPPORTS THE DEATH PENALTY IN ALL MURDER CASES AND THAT JUROR'S FAILURE TO ANSWER THE TRIAL COURT'S QUESTION ON POINT.

IV. WHETHER HAVARD WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DUE TO COUNSEL'S FAILURE TO ADEQUATELY SUPPORT THE DEFENSE STRATEGY.

1. Failure to obtain DNA evidence
2. Failure to secure a pathologist
3. Failure to include a lesser offense instruction

V. WHETHER HAVARD WAS DENIED HIS CONSTITUTIONAL RIGHT OF A FUNDAMENTALLY FAIR TRIAL BECAUSE OF PROSECUTORIAL MISCONDUCT AT CLOSING ARGUMENT.

VI. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE INTRODUCTION OF VICTIM IMPACT TESTIMONY AT SENTENCING.

VII. WHETHER TRIAL COUNSEL WERE INEFFECTIVE FOR NOT DEVELOPING AND PRESENTING COMPELLING EVIDENCE IN MITIGATION OF PUNISHMENT.

VIII. WHETHER HAVARD WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN CLOSING ARGUMENT AT THE SENTENCING PHASE OF TRIAL.

IX. WHETHER THE TRIAL COURT ERRED IN OVERRULING AN OBJECTION TO A PHOTOGRAPH DEPICTING THE VICTIM DURING

HER LIFETIME, THUS CAUSING PREJUDICIAL SYMPATHY.

X.      WHETHER THE TRIAL COURT ERRED IN ANSWERING A QUESTION
        SUBMITTED BY THE JURY IN SUCH A WAY AS TO CAUSE
        SPECULATION OF EARLY RELEASE FROM A LIFE SENTENCE.

XI.     WHETHER THE TRIAL COURT'S LIMITING INSTRUCTION OF AN
        AGGRAVATING CIRCUMSTANCE WAS ITSELF
        UNCONSTITUTIONALLY VAGUE AND OVERBROAD.

XII.    WHETHER THE INDICTMENT FAILED TO CHARGE THE
        NECESSARY ELEMENTS TO IMPOSE THE DEATH PENALTY.

XIII.   WHETHER HAVARD WAS DENIED HIS CONSTITUTIONAL RIGHT
        TO A RELIABLE SENTENCE BECAUSE THE TRIAL COURT
        ALLOWED THE JURY TO CONSIDER AGGRAVATORS TO SUPPORT
        THE SENTENCE OF DEATH.

XIV.    WHETHER AGGREGATE ERROR IN THIS CASE REQUIRES
        REVERSAL OF THE CONVICTION AND DEATH SENTENCE.

XV.     WHETHER ANY STATUTORILY REQUIRED ISSUES HAVE MERIT,
        INCLUDING WHETHER THE SENTENCE WAS
        DISPROPORTIONATE TO THE PENALTY IN SIMILAR CASES.

*Havard v. State*, 928 So.2d 771, 780-804 (Miss. 2006).

On February 9, 2006, this Court affirmed the conviction and sentence in a written opinion.

*Havard*, 928 So.2d 771.  A timely petition for rehearing was filed and later denied on May 25, 2006.

Petitioner filed a petition for Writ of *Certiorari* with the Supreme Court of the United States,

presenting a one (1) question:

I.      IN A DEATH PENALTY CASE INVOLVING A CHARGE OF SEXUAL
        ASSAULT, DOES COUNSEL RENDER INEFFECTIVE ASSISTANCE OF
        COUNSEL WHERE HE FAILS TO REMOVE A PROSPECTIVE JUROR
        WHO STATES ON *VIOR DIRE* THAT AS A RESULT OF THE RAPE OF
        A FAMILY MEMBER SHE CAN NOT BE FAIR AND IN FACT SERVES
        ON THE JURY THAT FINDS THE DEFENDANT GUILTY AND
        SENTENCES HIM TO DEATH?

4

The U. S. Supreme Court denied *Certiorari* on January 8, 2007.  *Havard v. Mississippi*, 549 U.S. 1119, 127 S.Ct. 931, 166 L.Ed.2d 716 (2007).  No petition for rehearing was filed.

On May 25, 2007, petitioner filed an Application for Leave to Proceed in the Trial Court and Motion for Other Relief.  Petitioner's application for post-conviction relief was denied on May 22, 2008.  *Havard v. State*, 988 So.2d 322 (Miss. 2008).  This Court denied all fourteen (14) of the claims raised, summarizing them as:

I.      INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO ADOPT DEFENSE STRATEGY DURING GUILT PHASE.

        A) Failure to obtain DNA evidence.
        B) Failure to secure a pathologist.
        C) Failure to include a lesser-offense instruction.

II.     INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO INVESTIGATE, DEVELOP AND PRESENT MITIGATION EVIDENCE DURING THE PENALTY PHASE.

III.    INEFFECTIVE ASSISTANCE OF FOR FAILING TO DEVELOP AND PRESENT COMPELLING EVIDENCE OF HAVARD'S CHILDHOOD AND FAMILY LIFE IN MITIGATION OF PUNISHMENT.

IV.     INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO DEVELOP AND INTRODUCE HAVARD'S SUCCESSFUL ADAPTATION AT CAMP SHELBY AS MITIGATION EVIDENCE DURING THE PENALTY PHASE.

V.      INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO ASK POTENTIAL JURORS "REVERSE-*WITHERSPOON*" QUESTIONS DURING VOIR DIRE.

VI.     INEFFECTIVE ASSISTANCE OF COUNSEL DURING CLOSING ARGUMENT AT THE PENALTY PHASE.

VII.    PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT AT THE GUILT PHASE.

VIII.   VICTIM IMPACT TESTIMONY.

IX.     WHETHER THE TRIAL COURT IMPROPERLY RESPONDED TO A QUESTION FROM THE JURY DURING THE SENTENCING PHASE.

X.      LIMITING   INSTRUCTION   OF   ESPECIALLY   HEINOUS,
        ATROCIOUS, OR CRUEL AGGRAVATING CIRCUMSTANCE.

XI.     FAILURE   OF   THE   INDICTMENT   TO   CHARGE   A   DEATH-
        PENALTY-ELIGIBLE OFFENSE.

XII.    JURY CONSIDERATION OF AGGRAVATING CIRCUMSTANCES.

XIII.   COMPETENCY OF TRIAL COUNSEL.

XIV.    CUMULATIVE ERROR.

*Havard*, 988 So.2d 322.  A motion for rehearing was filed on July 7, 2008.  The petition was denied

on August 28, 2008.

On April 10, 2009, petitioner filed a Petition for Writ of Habeas Corpus with United States

District Court for the Southern District of Mississippi, Western Division.  *Havard v. Epps*, *et al.*,

2010 WL1904852, 5:08-cv-0275-KS (S.D. Miss. 2010).  The respondent filed its Answer on May

8, 2009.  Petitioner filed his Memorandum in Support of Petition for Issuance of the Writ of Habeas

Corpus on July 31, 2009.  The respondent filed, in due course, its Memorandum in Support of

Answer to Petition for Issuance of Writ of Habeas Corpus on November 13, 2009.

On April 12, 2011, petitioner filed his first, successive post-conviction petition.  This Court

denied the petition for relief from judgement or leave to file successive petition for post-conviction

relief on March 8, 2012.  *Havard v. State*, 86 So.3d 896 (Miss. 2012).  This Court denied all five (5)

of those claims raised, summarizing them as:

I.      THE STATE VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS
        TO A FAIR TRIAL AND DUE PROCESS OF LAW AS GOVERNED BY
        *NAPUE V. ILLINIOS,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959),
        AND RELATED AUTHORITY;

II.     THE STATE WITHHELD EXCULPATORY INFORMATION IN
        VIOLATION OF *BRADY V. MARYLAND*, 373 U.S. 83, 83 S.Ct. 1994,
        10 L.Ed.2d 215 (1963), AND ITS PROGENY;

III.     ALTERNATIVELY TO THE IMMEDIATELY PRECEDING ISSUE,
         PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING
         TO UTILIZE THE VIDEOTAPED STATEMENT AT ISSUE IF IT WAS
         DISCLOSED OR PRODUCED PRIOR TO TRIAL;

IV.      NEWLY-DISCOVERED EVIDENCE DEMONSTRATES THAT
         PETITIONER IS INNOCENT OF THE UNDERLYING FELONY OF
         SEXUAL BATTERY-WHICH ALONE MADE PETITIONER'S CASE A
         CAPITAL MURDER CASE AND PETITIONER ELIGIBLE FOR
         THE DEATH SENTENCE THAT WAS IMPOSED; AND

V.       NEWLY DISCOVERED EVIDENCE FURTHER DEMONSTRATES
         THAT PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN
         FAILING TO CHALLENGE THE UNDERLYING FELONY OF SEXUAL
         BATTERY.

*Havard*, 86 So.3d at 899.  A timely petition for rehearing was filed and later denied, as modified, on

May 10, 2012.

On November 25, 2013, petitioner filed this second, successive post-conviction petition,

Cause Number: 2013-DR-01995-SCT, in this Court.  The same day, petitioner filed a companion

motion in the U. S. District Court for Mississippi's Southern District moving the district court to stay

and abate the proceedings of petitioner's federal habeas corpus petition proceedings pending the

disposition of this petition.  *Id.*  With the respondent's submission, the matter is ready for decision.


### III.  STATEMENT OF FACTS

On direct review, the Mississippi State Supreme Court affirmed petitioner's conviction and

sentence in *Havard v. State*, 928 So.2d 771 (Miss. 2006).  For the convenience of the Court, the facts

of the opinion appear below.

Jeffrey Havard was living in Adams County with Rebecca Britt, the mother of

six-month old Chloe Britt.  Havard was not Chloe's father.  Havard and Britt had been dating for a few months when Britt and Chloe moved in with Havard in his trailer located on property owned by Havard's grandfather.  Around 8:00 p.m. on February 21, 2002, Havard gave Britt some money and asked her to go to the grocery store to get supper.  Britt returned to find Chloe bathed and asleep.  Havard told Britt he had given Chloe her bath and put her to bed.  Havard had also stripped the sheets off the bed and told Britt he was washing them.  Before that night, Havard had never bathed Chloe or changed her diaper.  After Britt checked on Chloe, Havard insisted that Britt go back out to the video store to rent some movies.  When Britt returned, Havard was in the bathroom, and Chloe was blue and no longer breathing.  Britt performed CPR on Chloe in an attempt to resuscitate her.  Britt and Havard drove Chloe to Natchez Community Hospital, where Britt's mother worked.   The pathologist who prepared Chloe Britt's autopsy report would later testify that some of her injuries were consistent with penetration of the rectum with an object.  Other injuries of the child included abrasions and bruises inside her mouth and internal bleeding inside her skull consistent with shaken baby syndrome.  Both the hospital staff and the Sheriff observed anal injuries on Chloe as well, but no one at Chloe's day care had ever noticed bruises or marks on Chloe.  No anal injuries or anything unusual about the child's rectum was noticed by the day care staff earlier on the day of February 21st Chloe was pronounced dead at the hospital later that night.

In the course of the investigation, Havard was charged with capital murder.  In a videotaped statement two days after Chloe's death, Havard denied committing sexual battery on Chloe, but instead claimed he accidentally dropped her against the commode after bathing her, shook her in a panic, and then rubbed her down with lavender lotion before putting her to bed.  The State presented DNA evidence which had been collected from the bed sheet.  This evidence matched the DNA of both Havard and Chloe.  A sexual assault kit testing for any of Havard's DNA in Chloe's rectum or vagina produced negative results.  Havard offered no explanation for Chloe's injuries other than the possibility that he wiped her down too vigorously when preparing her for bed.  Because Havard was indigent at trial, counsel was appointed to represent Havard, who also has court-appointed counsel for this appeal.  Various events in the trial proceedings give rise to Havard's issues on appeal.  In a pre-trial motion, defense counsel requested that any victim impact statement be excluded; and, the trial judge granted the motion as to the guilt/innocence phase of the trial.  During the trial court's voir dire concerning any personal relationships jurors may have had with Havard, one juror stated she felt she could not be fair because her niece had been raped.  The trial court later questioned the potential jurors to ascertain whether any one juror would either automatically vote for the death penalty, or would be unable to vote for the death penalty in the sentencing phase of the trial, regardless of the evidence presented at trial.  One juror, who would later swear in a post-trial affidavit that he felt the death penalty was always appropriate in murder cases, was selected as a juror for the trial of this case.  Trial counsel's defense

strategy was to defend against any allegations of the underlying felony of sexual battery, consistent with Havard's version of the events of that night . . . .

*Id.* at 778-79 (internal citations omitted).

## IV.  PRELIMINARY MATTERS

Petitioner, herein, seeks successive post-conviction relief resting his claims on what he deems is newly discovered evidence.  The Mississippi Uniform Post-Conviction Collateral Relief Act, Section 99-39-1, states that:

> [t]his act, by its express terms, was created to . . . revise, streamline, and clarify the rules and statutes pertaining to post-conviction collateral relief law and procedures, to resolve any conflicts therein and to provide the courts of this state with an exclusive and uniform procedure for the collateral review of convictions and sentences.

Miss. Code Ann. § 99-39-1(1).

Thus, petitioner is bound totally by the terms of and prerequisite conditions contained in the UPCCRA.  This Court has held that "[r]ealistically, the act is a codification of the law existing in Mississippi for many years." *Evans v. State*, 485 So.2d 276, 280 (Miss. 1986); *Dufour v. State*, 483 So.2d 307, 308 (Miss. 1985).  *See Neal v. State*, 525 So.2d 1279 (Miss. 1988); *Cabello v. State*, 524 So.2d 313 (Miss. 1988); *Wiley v. State*, 517 So.2d 1373 (Miss. 1987); *Johnson v. State*, 511 So.2d 1333 (Miss. 1987); *Johnson v. State*, 508 So.2d 1126 (Miss. 1987); *Irving v. State*, 498 So.2d 305 (Miss. 1986); *Stringer v. State*, 485 So.2d 274 (Miss. 1986); *Wilcher v. State*, 479 So.2d 710 (Miss. 1985); *Tokman v. State*, 475 So.2d 457 (Miss. 1985); *Leatherwood v. State*, 473 So.2d 964 (Miss. 1985); *Culberson v. State*, 456 So.2d 697 (Miss. 1984); *Johnson v. Thigpen*, 449 So.2d 1207 (Miss. 1984); *Gilliard v. State*, 446 So.2d 590 (Miss. 1984); *Pruett v. Thigpen*, 444 So.2d 819 590 (Miss. 1984); *Callahan v. State*, 426 So.2d 801 (Miss. 1983); *In re Evans*, 441 So.2d 520 (Miss. 1983);

*Smith v. State*, 434 So.2d 486 (Miss. 1983); *Edwards v. State*, 433 So.2d 906 (Miss. 1983); *Wheat v. Thigpen*, 431 So.2d 486 (Miss. 1983); *Holloway v. State*, 261 So.2d 799 (Miss. 1979); *Auman v. State*, 285 So.2d 146 (Miss. 1973); *In re Broom's Petition*, 251 Miss. 25, 168 So.2d 44 (1964).

The Court in *Wiley v. State*, stated that:

Issues E, F, H, I, J, K, L and M were assigned as error on direct appeal and decided adversely to Wiley's position. *This Court does not consider on a petition of this nature, issues raised and decided on the original appeal, even though theories for relief different from those urged at trial and on appeal are now asserted.* Miss. Code Ann. § 99-39-21(2), (3); *Johnson v. State*, 511 So.2d 1333, 1336, (Miss. 1987). *Dufour v. State*, 483 So.2d 307, 311 (Miss. 1985).

. . . .

Because this Court has considered all these points on their merits on the direct appeals by Wiley, Wiley cannot now be allowed to relitigate the same issues. *Wilcher v. State*, 479 So.2d 710 (Miss. 1985); *Callahan v. State*, 426 So.2d 801 (Miss. 1983). The issues were decided against Wiley's position and he is not entitled to an evidentiary hearing on the same subject matter. On these points, the motion is denied as to Issues E, F, H, I, J, K, L, and M.

IV.

Issues C, D, G, N, O, P, Q and R were not raised on direct appeal or at the trial court. Thus, the claims are procedurally barred and not subject to further review by this Court, under Miss. Code Ann. § 99-39-21. *Wilcher v. State*, 479 So.2d 710 (Miss. 1985).

Additionally, claims which were available, but not previously asserted on direct appeal, are waived, and on this additional ground these claims are not subject to further review.

[F]or the above reasons, the enumerated claims cannot be litigated; an evidentiary hearing on Issues C, D, G, N, O, P, Q, and R is denied.

517 So.2d 1373 (emphasis added).

Finally, the Court held in *Cabello v. State*:

In conclusion, the Court wishes to draw counsel's attention to Miss. Code Ann. § 99-39-3(2) (Supp. 1987), which reads:

> direct appeal shall be the principal means of reviewing all criminal
> convictions and sentences, and the purpose of this chapter is to provide
> prisoners with a procedure, limited in nature, to review those
> objections, defenses claims, questions, issues or errors which in
> practical reality could not be and should not have been raised at
> trial or on direct appeal.

Although the Court is aware of counsel's responsibilities, especially given the sentence in this case, it is pointless to relitigate issues previously asserted or waived.

555 So.2d 323.

Further, this Court's decisions in *Wiley v. State*, 842 So.2d 1280 (Miss. 2003); *Woodward v. State*, 843 So.2d 1 (Miss. 2003), *McGilberry v. State*, 843 So.2d 21 (Miss. 2003) and *Brown v. State*, 798 So.2d 481 (Miss. 2001), reiterate that the Mississippi Uniform Post Conviction Collateral Relief Act, Miss. Code Ann. §§ 99-39-1 to -29, applies with full force and effect to this successive post-conviction application.  While petitioner contends that the procedural bars do not apply to him, the precedent of this Court is to the contrary.  It is clear from the rulings of this Court that the Post-Conviction Collateral relief Act is constitutional and the procedural limitations found in §99-39-5(2), §99-39-27(9), §99-39-23(6) and § 99-39-21 (1), (2) & (3) apply with full force and effect to the claims raised in this successive petition.

In his second, successive post-conviction petition, petitioner raises two claims which he believes entitles him to collateral relief.  First, petitioner claims that:

> NEWLY-DISCOVERED EVIDENCE DEMONSTRATES THAT PETITIONER IS
> INNOCENT OF CAPITAL MURDER OR AT LEAST PRESENTS GRAVE
> DOUBTS CONCERNING GUILT, AS THE STATE'S THEORY THAT [C. B.]
> DIED FROM SHAKEN BABY SYNDROME HAS BEEN DISAVOWED BY THE
> STATE'S SOLE EXPERT WITNESS AND IS CONTRADICTED BY THE
> NEWLY-AVAILABLE OBJECTIVE MEDICAL EVIDENCE . . . [AND
> BECAUSE,] THIS CLAIM INVOLVES NEWLY DISCOVERED EVIDENCE AND
> A FUNDAMENTAL RIGHT, . . . [IT] IS THUS EXCEPTED FROM ANY TIME
> BARS AND THE PROHIBITION AGAINST SUCCESSIVE WRITS.

(Petitioner's Motion at 30-38).  Petitioner supports this claim with the affidavits of Drs.:  Steven T. Hayne, Pathologist; Michael M. Baden, Pathologist; Janice Ophoven, Pathologist; Dr. George Nichols, Pathologist; and, Chris Van Ee, Ph.D. in Biomedical Engineering. (Pet'r's Ex. "A"-"E"). This newly discovered evidence claim, he touts, is precisely the type intended for post conviction review.  Petitioner contends that he must be given a meaningful opportunity to present this evidence. Otherwise, his fundamental rights will be violated.

The respondent disagrees and submits this newly discovered evidence is not "new."  His arguments in regards to this "evidence" are by no means novel.  Accordingly, this second, successive petition is barred from consideration pursuant to the time bar in Miss. Code § 99-39-5(2) and the successive writ bars found in Miss. Code §§ 99-39-23(6) and 99-39-27(9).  These bars as well as those bars found in Miss. Code Ann. § 99-39-21(1)-(3) apply with full force and petitioner makes no valid argument which would allow him to overcome these bars.

Next, petitioner claims he is:

ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE, OR IN THE ALTERNATIVE, LEAVE TO FILE A SUCCESSIVE PETITION FOR POST-CONVICTION RELIEF IN THE TRIAL COURT.

(Pet'r's Mot. at 38-42).  Alternatively, petitioner seeks relief from judgment under Rule 60(b) of the Mississippi Rules of Civil Procedure.  He argues that justice requires this Court to tap the Rule's equitable authority and vacate his conviction and sentence.  If not, he will be denied his fundamental rights.  (Id.).  He is mistaken.

Petitioner is not entitled to extraordinary relief.  Extraordinary relief  is strictly reserved for exceptional or compelling circumstances.  Petitioner has failed to demonstrate any exceptional or compelling circumstance to justify granting him extraordinary relief under Rule 60(b) of the

Mississippi Rules of Civil Procedure.  The respondent submits petitioner's newly discovered evidence and fundamental rights violation claims are not exceptional or compelling.

## V.  GROUNDS FOR DISMISSING PETITIONER'S MOTION FOR POST-CONVICTION RELIEF.

Petitioner's second, successive petition is barred from consideration pursuant to the time bar in Miss. Code § 99-39-5(2); the successive-writ bars found in Miss. Code §§ 99-39-23(6) and 99-39-27(9); and, the bars found in Miss. Code Ann. § 99-39-21(1)-(3).  Additionally, petitioner's fundamental rights violation claim does not satisfy the exception provided by this Court in *Rowland v. State*, 98 So.3d 1032 (Miss. 2012).  Petitioner makes no valid argument which would allow him to overcome these bars.  Each of the aforementioned bars apply with full force and precludes further review of the claims raised in this petition.

**A.**     **Petitioner's Second, Successive Petition is Procedurally Barred by the UPCCRA.**

The claims in this second, successive petition are barred by the statute of limitations found in Section 99-39-5(2), and do not fall within the exceptions to that bar.  Section 99-39-5(2) reads:

(2)   A motion for relief under this article shall be made within three (3) years after the time in which the petitioner's direct appeal is ruled upon by the Supreme Court of Mississippi or, in case no appeal is taken, within three (3) years after the time for taking an appeal from the judgment of conviction or sentence has expired, or in case of a guilty plea, within three (3) years after entry of the judgment of conviction.  Excepted from this three-year statute of limitations are those cases in which the petitioner can demonstrate either:

(a)(i)   That there has been an intervening decision of the Supreme Court of either the State of Mississippi or the United States which would have actually adversely affected the outcome of his conviction or sentence or that he has evidence, not reasonably discoverable at the time of trial, which is of such nature that it would be practically conclusive that had such been introduced at trial it would have caused a different result in the

conviction or sentence; or

(a)(ii) That, even if the petitioner pled guilty or nolo contendere, or confessed or admitted to a crime, there exists biological evidence not tested, or, if previously tested, that can be subjected to additional DNA testing that would provide a reasonable likelihood of more probative results, and that testing would demonstrate by reasonable probability that the petitioner would not have been convicted or would have received a lesser sentence if favorable results had been obtained through such forensic DNA testing at the time of the original prosecution.

(b) Likewise excepted are those cases in which the petitioner claims that his sentence has expired or his probation, parole or conditional release has been unlawfully revoked. Likewise excepted are filings for post-conviction relief in capital cases which shall be made within one (1) year after conviction.

Miss. Code Ann. § 99-39-5(2).

On May 25, 2006, rehearing of petitioner's direct appeal was denied. *Havard*, 928 So.2d 771. This second, successive post-conviction petition was filed on November 25, 2013, well-beyond the time for filing a post-conviction petition. Petitioner's claims do not fall under any of the exceptions to the time bar. His claims are therefore barred from consideration. *Havard*, 86 So.3d at 899 (citing Miss. Code Ann. § 99-39-5(2)(b)).

Additionally, petitioner's newly discovered evidence claim amounts to a successive writ. *Havard*, 86 So.3d at 899, 910 (quoting *Knox v. State*, 75 So.3d 1030, 1036 (Miss. 2011) (citing Miss. Code Ann. §§ 99-39-23(6) and -39-27). This claim does not satisfy any exception to the successive-writ bars. His newly discovered evidence claim is successive and procedurally barred by Section 99-39-27(9), which reads:

(9) *The dismissal or denial of an application under this section is a final judgment and shall be a bar to a second or successive application under this article.* Excepted from this prohibition is an application filed under Section 99-19-57(2), raising the issue of the offender's supervening mental illness before the execution of a sentence of death. A dismissal or denial of an application relating to mental

illness under Section 99-19-57(2) shall be *res judicata* on the issue and shall likewise bar any second or successive applications on the issue.  Likewise excepted from this prohibition are those cases in which the prisoner can demonstrate either that there has been an intervening decision of the Supreme Court of either the State of Mississippi or the United States that would have actually adversely affected the outcome of his conviction or sentence or that he has evidence, not reasonably discoverable at the time of trial, that is of such nature that it would be practically conclusive that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence.  Likewise exempted are those cases in which the prisoner claims that his sentence has expired or his probation, parole or conditional release has been unlawfully revoked.

Miss. Code Ann. § 99-39-27(9) (emphasis added).

On February 9, 2006, this Court affirmed petitioner's conviction and sentence on direct appeal.  *Havard*, 928 So.2d 771.  A timely petition for rehearing was filed and later denied on May 25, 2006. This Court denied petitioner's application for post-conviction relief on May 22, 2008. *Havard*, 988 So.2d 322.  A timely petition for rehearing was filed and later denied on August 28, 2008.  On March 8, 2012, this Court denied petitioner's first, successive post--conviction petition. *Havard*, 86 So.3d 896.  A timely petition for rehearing was filed and later denied on May 10, 2012. These claims do not fall under any of the exceptions to the bar found in Miss. Code Ann. § 99-39-27(9).  Therefore, the claims are barred from consideration.

Further, review of petitioner's newly discovered evidence claim is procedurally barred by Section § 99-39-21.  The Section states that:

(1)  Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.

(2)   The litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories shall constitute a waiver of all other state or federal legal theories which could have been raised under said factual issue; and any relief sought under this article upon said facts but upon different state or federal legal theories shall be procedurally barred absent a showing of cause and and actual prejudice.

(3)   The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal.

(4)   The term "cause" as used in this section shall be defined and limited to those cases where the legal foundation upon which the claim for relief is based could not have been discovered with reasonable diligence at the time of trial or direct appeal.

(5)   The term "actual prejudice" as used in this section shall be defined and limited to those errors which would have actually adversely affected the ultimate outcome of the conviction or sentence.

(6)   The burden is upon the prisoner to allege in his motion such facts as are necessary to demonstrate that his claims are not procedurally barred under this section.

Miss. Code Ann. § 99-39-21(1)-(6).  "The procedural bars of waiver, different theories, and res judicata and the exception thereto as defined in  Miss. Code Ann. § 99-39-21(1-5) are applicable in death penalty PCR Applications."  *Havard*, 988 So.2d at 333 (citations and internal quotations omitted); *see Havard*, 86 So.3d at 901.

Petitioner's claims challenge Chloe Britt's cause-of-death.  (Pet'r's Mot. at 30-35).  This challenge could have been, but was not raised at trial.  As will be demonstrated below, petitioner's present claims regarding Shaken Baby Syndrome are not new.  Petitioner's experts have testified in cases, knew of, and / or wrote papers on Shaken Baby Syndrome long before trial in the case *sub judice*.  Since Dr. Hayne testified at trial concerning Chloe Britt's injuries, petitioner was afforded

a fair opportunity to cross-examine Dr. Hayne on cause-of-death.[1]  *Havard*, 988 So.2d at 345 (citing Miss. Code Ann. § 99-39-21(1)).  Petitioner chose to cross-examine Dr. Hayne on the underlying felony of sexual battery.

Petitioner waived a challenge to cause-of-death.  Petitioner could certainly have raised the issue on direct appeal, in application for post-conviction relief or in his first successive petition.  He did not.  Petitioner's claims do not  fall within any of the exceptions to the bar found in Miss. Code Ann. § 99-39-21(1).   Therefore, his claims are precluded from further consideration by the procedural bar found in Miss. Code Ann. § 99-39-21(1).

Further, petitioner's newly discovered evidence and fundamental rights violation claims challenge Chloe Britt's cause-of-death under a different legal theory–that Shaken Baby Syndrome has been debunked.  (Pet'r's Mot. 30-35).[2]  "The litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories shall constitute a waiver of all other state or federal legal theories which could have been raised under said factual issue; and any relief sought under this article upon said facts but upon different state or federal legal theories shall be procedurally barred absent a showing of cause and actual prejudice."   Miss. Code Ann. § 99-39-21(2).

The cause of Chloe Britt's death was raised and subsequently abandoned at the time of trial.

---

[1]At the very least, petitioner sought to pursue a different cause of death rather than one consistent with Shaken Baby Syndrome based on his request for medical records.  Petitioner's motion requesting Chloe Britt's medical records and the related trial court order are attached hereto as Resp's Ex. "A" and "B."

[2]Chloe Britt's cause-of-death, Shaken Baby Syndrome, has been raised, litigated and decided by the trial court and by this Court.  (CP vol.1 at 92, 94).  Petitioner's original motion and the trial court's order are attached hereto as Resp's Ex. "A" and "B" respectively.

When he abandoned that challenge, petitioner waived any subsequent attempts to litigate cause-of-death. According to this Court, the trial court did not abuse its discretion when it refused to grant the funding necessary to secure an independent pathologist to provide "assistance in interpreting the autopsy reports."[3] *Havard*, 928 So.2d at 788-789 (finding "no abuse of discretion in the trial court's actions so as to deny Havard a fundamentally fair trial.").

Similarly, petitioner has consistently attacked trial counsels' performance. This Court found those challenges without merit. *Havard*, 988 So.2d at 330-333 (rejecting the assertion that rejected trial counsel were ineffective for failing to secure a pathologist for purposes of developing a defense); *Havard*, 86 So.3d at 908 (describing petitioner's claim as nothing more than yet another "attempt to rehabilitate failed claims that already have been addressed by this Court."). On direct review in 2006, petitioner argued trial counsel failed to obtain experts, including a pathologist, for the purpose of developing a defense. *Havard*, 928 So.2d at 788-789. In 2008, this Court rejected petitioner's argument that trial counsel was ineffective for failing to secure a pathologist for purposes of developing a defense.[4] *Havard*, 988 So.2d at 330-331. Specifically, this Court found "trial counsel made the request based on the need for assistance in interpreting the autopsy reports." *Id.* at 330. In 2012, this Court rejected subsequent evidence in the form of deposition testimony given by Dr. Hayne as nothing more than a mere "attempt to show that his trial counsel were ineffective

---

[3]*See* Resp's Ex. "A" and "B."

[4]The matter of sexual battery petitioner committed upon Chloe Britt is barred from further consideration by the doctrine of *res judicata*. To the extent petitioner's expert affiants opine as to Dr. Hayne's autopsy report and the testimonies of the treating physicians, medical staff and others, this issue has been decided by this Court on three separate occasions. *See Havard*, 86 So.3d at 910 (finding this issue procedurally barred and without merit); *Havard*, 988 So.2d at 333; *Havard*, 928 So.2d at 788-91.

in their failure to secure an independent pathologist." *Havard*, 86 So.3d at 910.

As he has several times before, petitioner challenges Chloe Britt's cause-of-death.  Here, however, his challenge is based on alleged newly discovered evidence rather than trial court error or ineffective assistance.  "Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of res judicata." *Havard*, 86 So.3d at 910; *see Havard*, 988 So. 2d at 333; *Havard*, 928 So.2d at 788-91 (finding petitioner's theory of ineffective assistance of counsel "claim for failing to secure, or adequately prepar[ing] a motion to secure, a pathologist to investigate the case and defense strategy . . ." was barred) (citing Miss. Code Ann. § 99-39-21(3); *Wiley v. State*, 750 So.2d 1193, 1200 (Miss. 1999), *Foster v. State*, 687 So.2d 1124, 1129 (Miss. 1996); *Wiley v. State*, 517 So.2d 1373, 1377 (Miss. 1987)); *Loden*, 43 So.3d at 388.

Aside from his claims of error, the record reflects petitioner did, as he does here, challenge cause-of-death under a theory that Chloe Britt died from injuries caused by a short, accidental fall.  The following exchange occurred between trial counsel and Dr. Laurie Patterson on cross-examination:

> Defense:  Dr. Patterson, when you were talking about the torn frenulum you talked about – I think you said a lot of times especially in children that a fall will cause that to happen?
>
> Patterson:  Uh-hum.  Yes.
>
> Defense:  Well, even though this child wasn't walking, if this child had fallen from a height of, say, three feet onto a hard surface that could cause that frenulum to burst or to bleed; isn't that correct?
>
> Patterson:  Yes.  Anything that would cause – you know – something, a force type of effect, yes.
>
> Defense:  Like a porcelain toilet top or something like that.  Some solid object like that.
>
> Patterson:  If she fell on to it with her mouth.

. . . .

(Trial Tr. vol. 3 at 409, dated Dec. 16-19, 2002).

The respondent submits that petitioner is procedurally barred from challenging Chloe Britt's cause-of-death.  Chloe Britt's cause of death has been litigated and reviewed several times by this Court.  Therefore, petitioner's claims challenging Chloe Britt's cause-of-death under different legal theories are procedurally barred by Miss. Code Ann. § 99-39-21(2) and (3). *Havard*, 86 So.3d at 907-910 (stating that trial counsel were effective; and, the trial court had not erred in denying petitioner funds to hire an independent pathologist for the purpose of assisting in interpreting the autopsy reports); *see Brown v. State*, 948 So.2d 405, 411 (Miss. 2006); *Howard v. State*, 945 So.2d 326, 361 (Miss. 2006) (citing *Grayson v. State*, 879 So.2d 1008, 1022 (Miss. 2004)).

As for the specific claims put forth by petitioner in this second, successive post-conviction petition and overcoming the procedural bars and preclusive doctrines of waiver and *res judicata*, "an alleged error should be reviewed, in spite of any procedural bar, only where the claim is so novel that it has not previously been litigated, or, perhaps, where an appellate court has suddenly reversed itself on an issue previously thought settled.  Petitioner carries the burden of demonstrating that his claim is not procedurally barred."  *Havard*, 988 So.2d at 333 (quoting *Lockett v. State*, 614 So.2d 888 (Miss. 1992) (internal citations and quotations omitted)).  Petitioner has not carried his burden.

First, no "intervening decision of the Supreme Court of either the State of Mississippi or the United States which would have adversely affected the outcome of [petitioner's] conviction or sentence" exists.  Miss. Code Ann. §§ 99-39-5(2)(a)(ii), -39-23(6), and -39-27(9).  Petitioner cites to the Wisconsin intermediate Court of Appeals case of *State v. Edumds*[5] for the proposition that

---

[5]*But see State v. Cramer,* 351 Wis.2d 682 (Wis. Ct. App. 2013) (unpublished disposition entered on October 15, 2013, appearing in a reporter table).  *State v. Cramer* is attached hereto as

Shaken Baby Syndrome has been debunked; and as, grounds for granting him relief.  (Id. at 34).

Petitioner is mistaken.  *Edmunds* does not stand for that proposition and his reliance on the case is

misplaced.

To begin, the decision was rendered by Wisconsin's intermediate Court of Appeals.  *See*

*State v. Edmunds*, 746 N.W.2d 590 (Wis. Ct. App. 2008).  The Wisconsin State Supreme Court

never entered an opinion in the case of *Edmunds*.  Even if the Wisconsin State Supreme Court had

decided *Edmunds*, the holding would be neither controlling or persuasive authority.  Petitioner's

failure to support this unfounded assertion with relevant authority in and of itself obviates this

Court's consideration. *See Walker v. State*, 913 So.2d 198, 222 (Miss. 2005) (barring further review

of a challenge to the sufficiency of the evidence supporting the defendant's challenge where the

defendant "failed to cite any relevant authority.").  As it concerns the evidence presented in this case

and in *Edmunds*, the same Wisconsin intermediate court noted that in regards to Shaken Baby

Syndrome as a valid cause-of-death:

> [t]here really is no controversy outside the courtroom.  The American Academy of
> Pediatrics, pediatricians, neurosurgeons, it's well accepted that violently shaking a
> baby causes injury to that baby.  *And outside a few limited number of physicians,*
> *most of whom appear as defense witnesses, there's really no controversy about it.*

*State v. Cramer,* 351 Wis.2d 682 (Wis. Ct. App. 2013) (emphasis added) (unpublished disposition

entered on October 15, 2013, appearing in a reporter table) (quoting Thomas Valvano, M. D.).[6]

At any rate, *Edmunds* is not controlling.  Thus, petitioner's claims must fail as he does not

and cannot cite to any relevant authority for the proposition that Shaken Baby Syndrome is junk

---

Resp's Ex. "C" at 3-11.

[6]Resp's Ex. "C."

science.  *Walker*, 913 So.2d at 222.  Mississippi courts have certainly not determined that to be the case.  There is no intervening decision of this Court or the United States Supreme Court that would have an adverse affect on the outcome of petitioner's trial.

Additionally, petitioner's claim is not a novel one.  The respondent would point to the recent case of *Middleton v. State* for support.  *Middleton*, 980 So.2d 351, 356-357 (Miss. Ct. App. 2008); *see generally Kolberg v. State*, 829 So.2d 29, 70-71 (Miss. 2002).

In *Middleton*, the appellant sought a new trial and challenged the evidence supporting his conviction for felonious child abuse.  *Id.* at 353.  Middleton's neighbor testified at trial that on October 24, 2005, he heard a baby crying for approximately one hour when suddenly he heard a thump followed by silence.  *Id.* Immediately after, Middleton was seen leaving the apartment complex with an infant (only months old) in his arms.  *Id.* Middleton found his aunt outside and together the three entered the aunt's apartment.  *Id.* The infant was not breathing.  *Id.* Emergency responders were called and Middleton administered CPR.  *Id.*

At trial, the State introduced three experts who testified that the infant's injuries were permanent and consistent with Shaken Baby Syndrome.  *Id.* The experts included: (1) an emergency room physician who treated the infant; (2) a pediatrician who treated the infant; and, (3) a radiologist, who specialized in pediatric care and who treated the child.  *Id.* Middleton moved for directed verdict when the State rested its case-in-chief, but that motion was denied.  *Id.* Following his conviction, Middleton moved for a new trial; or alternatively, a J.N.O.V.  *Id.* Both were denied. *Id.* The trial court ordered Middleton to serve twenty-five (25) years in the custody of the Mississippi Department of Corrections.  *Id.* Middleton appealed.  *Id.*

On appeal to the  Mississippi Court of Appeals, Middleton raised three challenges to his

conviction claiming the trial court erred in admitting the State's expert testimony. *Id.* As it relates in this case, Middleton took issue with the pediatrician who treated the infant's injuries. *Id.* at 355-56. "Middleton argued that Shaken Baby Syndrome is not a generally accepted theory in the medical community . . . [and] the testimony regarding Shaken Baby Syndrome should . . . have been excluded because [the pediatrician] was not shown to be an expert in that field." *Id.* at 356. "The State argue[d] that [the pediatrician] exhibited sufficient knowledge, skill, and experience to qualify as an expert regarding pediatric trauma . . . [and that] "knowledge was of assistance to the jury . . . ." *Id.*

In finding the trial court had not erred in allowing the testimony, the Mississippi Court of Appeals noted the pediatrician "also testified that the theory of Shaken Baby Syndrome is a widely accepted theory, but he also admitted there are a few well-respected physicians who disagree regarding the theory." *Id.* at 356-357 (citing *Wells v. State*, 913 So.2d 1053, 1057-1058 (Miss. Ct. App. 2005), quoting *Chapman v. Carlson*, 240 So.2d 263, 268 (Miss. 1970)). The Court of Appeals went on to affirm Middleton's conviction after finding no error with admitting the pediatrician's testimony. *Id.* at 360.[7]

Beyond *Middleton* and *Kolberg*, the Respondent would direct the Court's attention to *Cavazos v. Smith*, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) *reh'g denied*, 132 S.Ct. 1077, 181 L.Ed.2d 794 (2012). In *Smith*, the United States Supreme Court affirmed the California State Supreme Court's refusal to set aside a jury verdict where the state's highest court found sufficient evidence supporting a grandmother's conviction for the death of her seven-week-old granddaughter. *Id.* at 3-4.

After the California State Supreme Court affirmed the conviction, Cavacos sought federal

---

[7]The Court of Appeals also noted that "several lay witnesses . . . testified to what they observed on the day [the infant] suffered his injuries." *Middleton*, 980 So.2d at 360.

habeas relief.  *Id.* at 2.  The United States District Court for the Central District of California denied

her petition.  *Id.*  Cavacos appealed to the United States Court of Appeals for the Ninth Circuit.  *Id.*

The Ninth Circuit reversed and remanded.  *Id.*  The state petitioned for a writ of *certiorari* to the

state supreme court and the United States Supreme Court.  *Id.*  The California State Supreme Court

reinstated its opinion.  The U.S. Supreme Court, in *Smith,* affirmed the state court's decision and

reversed the Ninth Circuit.  *Id.*

   In doing so, the *Smith* Court expressly recognized the deference courts of appeal owe to

juries, stating that "it is the responsibility of the jury–not the court–to decide what conclusions

should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict

on the ground of insufficient evidence only if no rational trier of fact could have agreed with the

jury." *Id.* at 4.  Importantly, the *Smith* Court recognized the jury's determination that the victim died

as a result of injuries consistent with Shaken Baby Syndrome.  *Id.* at 8.

   In addition to an absence of any intervening decisions of this Court or the United States

Supreme Court, the respondent submits this claim is not novel.  Without conceding any of the

aforementioned bars, the respondent would show that petitioner's newly discovered evidence claim

is entirely devoid of merit.

   **1.   *Petitioner's Newly Discovered Evidence Claim   Exception to the UPCCRA's Procedural Bars.***

    According to petitioner, recent advances in science and medicine made within this decade

expose scientific flaws of Shaken Baby Syndrome as a mechanism of death.  (Pet'r's Mot. at 2).  He

goes on to state this new evidence was unknown until now, 2013–some eleven (11) following

his December 19, 2002 conviction and sentencing.  (Pet'r's Mot. at 35).  This is utterly false and

further investigation belies that assertion.

Newly discovered evidence is not evidence which is beneficial, advantageous or helpful to petitioner.  Newly discovered is not synonymous with "newly-available."  (Pet'r's Mot. at 30). Rather, newly discovered evidence, as contemplated by the UPCCRA, is "'evidence not reasonably discoverable at the time of trial, that is of such nature that it would be practically conclusive that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence.'" *Havard*, 86 So.3d at 906, 908-910 (quoting Miss. Code  Ann. § 99-39-27(9)).  Petitioner "must show that evidence has been discovered since trial, that it could not have been discovered before trial by the exercise of due diligence, that it is material to the issue, and that it is not merely cumulative or impeaching." *Williams v. State*, 669 So.2d 44, 55 (Miss. 1996).

### i.  *This Evidence Was Capable of Being Raised at Trial and/or on Direct Appeal.*

This evidence, which petitioner touts as newly discovered or newly-available, was "capable of being raised at trial and / or on direct appeal."  *Havard*, 86 So.3d at 901; *see Williams*, 669 So.2d at 55.  The respondent submits this evidence is not newly discovered evidence for purposes of overcoming the UPCCRA's procedural bars.  With reasonable diligence, petitioner could have discovered this evidence and was capable of raising this defense on or before 2006.  "[W]here a party fails to call a witness who was available during trial, the testimony of that witness cannot be considered newly discovered evidence." *United States v. Beasley*, 582 F.2d 337, 339 (5th Cir. 1978).

This science-based, biomechanical evidence was nationally recognized at least as early as **1987**.[8]  The Journal of Neurosurgery first published *The Shaken Baby Syndrome: A Clinical, Pathological, and Biomechanical Study* in **1987**.  *See* Ann-Christine Duhaime, et. al., *The Shaken*

---

[8]Attached hereto as Resp's Ex. "D."

*Baby Syndrome: A Clinical, Pathological, and Biomechanical Study*, 66 J. Neurosurgery 409-415 (1987).[9]  The study's date is significant, because petitioner's expert affiant, Dr. Van Ee, describes this 1987 study as a "landmark" paper which "quantif[ies] the mechanics of shaking[.]" (Pet'r's Ex. "E" at  5, Aff. of Dr. Chris Van Ee, dated Nov. 13, 2013).  Dr. Van Ee cites several other sources dating before petitioner's trial and direct appeal as bases for his short-distance fall theory.[10]  Another "landmark" paper, Dr. Van Ee relies upon, the dissertation of M. Prange, et al., "*Biomechanics of Traumatic Brain Injury in the Infant,*" (Unv. Penn. 2002) was published in **2003**.  (Pet'r's Ex. "E" at  5-6).

Further, Dr. Van Ee has testified as an expert witness in case of *Virginia v. Estrella*, CR03051857-00, (Vir. Cir. Ct. 2004) in **2004**.  The portion of the transcript from *Estrella* in which Dr. Van Ee's testified is attached hereto as Respondent's Exhibit "G."  In *Estrella*, Dr. Van Ee testified that a short-distance fall caused a child's death, which is entirely consistent with his sworn

---

[9]*But see* Cory, C.Z. & Jones, M.D., *Can Shaking Alone Cause Fatal Brain Injury?—A Biomechanical Assessment of the Duhaime Shaken Baby Syndrome Model*, 43 Med. Sci. L. 317, 325-329 (2003), which demonstrated the results of the 1987 study wholly inaccurate and unreliable; *see also* Dr. Sandeep K. Narang, M.D., J.D., *A Daubert Analysis of Abusive Head Trauma / Shaken Baby Syndrome*, 11 Hous. J. Health L. & Pol'y 505, 543-546, 554, 560 (2011) (discussing various studies conducted by Duhaime *et al.*); and Narrang *et al.*, *A Daubert Analysis of Abusive Head Trauma / Shaken Baby Syndrome–Part II: An Examination of the Differential Diagnosis*, 13 Hous. J. Health L. & Pol'y 203, 220-222, 248-254, 284 (Fall 2013) (further discussing Duhaime's studies), attached hereto as Resp's Ex. "E" and "F."

[10]*See* Pet'r's Ex. "E" at 8 (*e.g.*, citing Holbourn, AHS, Mechanics of head injuries. Lancet, ii, 438-441, **1943**; Gurdjan ES. Impact Head Injury, Charles C Thomas, **1975**; McClean Al and Anderson RWG, "Chapter 2: Biomechanics of closed head injury," Head Injury, Chapman and Hall Medical, editors: P. Reilly and R. Bullock, **1997**; Accidental Injury., **2002**; eds. Melvin JW and Nahum AM, Springer Verlag, 637 pgs "Injury Risk Assessments Based on Dummy Responses, author Mertz HJ.) (emphasis added).

statement petitioner currently offers as newly discovered evidence.[11]  *See Beasley*, 582 F.2d at 339.

Concerning forensic pathology, the American Journal of Forensic Pathology published a study in which Dr. John Plunkett[12] concluded that symptoms associated with fatal injuries often times mimic Shaken Baby Syndrome caused by short-distance, accidental falls.  (Pet'r's Ex. "E" at 9) (citing John Plunkett, *Fatal Pediatric Head Injuries Caused by Short-Distance Falls*, 22 Am. J. Forensic Med. Path. 1 (2001)).  This article was published in **2001**.  But even before 2001, Dr. Plunkett's short-distance, accidental fall position was gaining momentum with another one of petitioner's expert affiants, Dr. George R. Nichols, II.

In *State v. Edmunds*, which petitioner improperly cites as legal basis for granting him relief, Dr. Nichols testified as an expert for the petitioner, Edmunds.[13]  *Edmunds*, 746 N.W.2d 590 (Wis. Ct. App. 2008).  In *Edmunds*, Dr. Nichols testified that as early as **1996**, he was  influenced by Dr. John Plunkett, a forensic pathologist and short-distance fall proponent.[14]  Dr. Nichols testified that

---

[11] Dr. Van Ee's testimony in *Estrella* consisted of ten (10) drops of a test dummy from a height consistent with being dropped "from the arms of a five-foot-six-inch male onto a linoleum floor with a hardwood or wood underneath . . . ." (Resp's Ex. "G" at 31:15-18).

[12] Dr. Van Ee also cites to "case studies" published in **2001** by Dr. John Plunkett's as bases for his conclusions.  (Pet'r's Ex. "E" at 3).  It should be noted that Dr. Plunkett is a forensic pathologist.  Dr. Van Ee has no medical education, experience or training.  For additional examples of Dr. Van Ee's testimony, see Resp's Ex. "G1" and "G2."  Dr. Plunkett has also testified as an expert witness. *See In re Green*, 2003 WL 2165472 (Minn Ct. App. 2003) attached hereto as Resp's Ex. "H1."  *See State v. Butts*, 2004 WL 449245 (Ohio Ct. App. 2003) attached hereto as Resp's Ex. "H2."

[13] The portion of the evidentiary hearing transcript in which Dr. Nichols testifies on behalf of the petitioner in *Edmunds* is attached hereto as Resp's Ex. "H."

[14] Dr. John Plunkett reviewed the cases of eighteen (18) reported deaths of children  as old as six years of age who died as a result of short accidental falls related to playground equipment. His review of those cases lead Dr. Plunkett to conclude that serious head injuries such as hematomas could result *if* a child's fall generates sufficient rotational force.  *See John Plunkett, Fatal Pediatric*

"in 1996, I believed that Shaken Baby Syndrome indeed could cause a head injury.  I do not believe that that's true now . . . ."  (Resp's Ex. "H" at 138:4-6, 139:3-13, 142:11,153:16-22).

When asked why his opinion had changed, Dr. Nichols recalled hearing Dr. John Plunkett testify in a **1996** evidentiary hearing concerning Shaken Baby Syndrome.  *Id.* at 137:9-10.  Dr. Nichols was taken aback by Dr. Plunkett's testimony, so much so that Dr. Nichols "went back and did some basic physics" to gain an understanding and an appreciation of published biomechanical studies and their effect on the forensic pathology community.  *Id.* at 137:9-10.  Nichols specifically noted  that since **1996**, "changes reflected in the medical literature that I believe are valid . . . ."  *Id.* at 154:3-8.  Dr. Nichols, as early as **1996**, recognized the effect of biomechanical engineer had in cases involving Shaken Baby Syndrome, which predates petitioner's trial by some six (6) years.  *See Beasley*, 582 F.2d at 339.

Likewise, Dr. Michael Baden has long-held a position which is entirely consistent with his present findings and conclusions.  In a **1998** American Bar Association Journal article, Dr. Baden, who at the time had thirty-five (35) years of experience as a forensic pathologist, was quoted as having "only seen two or three [cases of Shaken Baby Syndrome] in [his] lifetime."  *See* Mark Hansen, *WHY ARE IOWA's BABIES DYING?*, 84 A.B.A.J. 74 (Aug. 1998) (attached hereto as Resp's Ex. "I").  That position continued to evolve as evidenced by an unpublished California Court of Appeals opinion.  *People v. Tison*, 2003 WL 23034287 (Cal. Ct. App. 2003) (attached hereto as Resp's Ex. "J").

In *Tison*, Dr. Baden provided prior testimony entirely consistent with his present findings and

---

*Head Injuries Caused by Short Distance Falls*, 22 Am. J. For. Med. & Path 1 (2001).  Dr. Plunkett's review ranged from **January of 1988** to **June of 1999**.

conclusions–that Chloe Britt's death was caused by blunt-force trauma sustained as a result of a short-distance fall.  The court in *Tison* took note of Dr. Baden's position on Shaken Baby Syndrome as a cause of death.  *Id.* at *5.  Specifically, it noted that "[a]ccording to Dr. Baden, **shaken baby impact syndrome [wa]s impossible to prove**."  *Id.* (emphasis added).  Dr. Baden's present testimony is consistent with his testimony in *People v. Tison*.[15]  *See Beasley*, 582 F.2d at 339.  Again, Dr. Baden's testimony rests on information published at or around the time of Petitioner's trial or direct appeal.

The same is true of Dr. Janice Ophoven, forensic pathologist.  She too provides a sworn statement in which she specifically references material available prior to petitioner's trial.  In her sworn statement, Dr. Ophoven points to a **2001** position paper issued by the National Association of Medical Examiners (NAME).  (Pet'r's Ex. "E" at 17).  She points out that "this paper did not pass peer review, was never endorsed by the membership, and many leading forensic pathologist voiced their opposition to its content."  *Id.*

The respondent would also direct the Court's attention to *State v. Huynh*, in which Dr. Janice Ophoven testified in a manner consistent with the statement she has provided petitioner.  *See Huynh*, 2005 WL 3159704, *2 (Minn. Ct. App. 2005) (Resp's Ex. "K").  The opinion was handed down in late **2005**.

In *State v. Huynh*, Dr. Janice Ophoven provided expert testimony during a post-conviction relief hearing in *Huynh*.  *Id.* at *2.  Dr. Ophoven's testimony identified blunt-force trauma, not Shaken Baby Syndrome, caused a two year-old child's death.  *Id.*  She went on to state that the child

---

[15]For additional examples supporting the respondent's position that Dr. Baden is testifying consistent with his position at the time of petitioner's December 2002 trial, please find attached hereto, Resp's Ex. "J1" and "J2."

could have sustained injuries from some blunt-force trauma up to seventy-two (72) hours prior to death.  *Id.*  Dr. Ophoven opined the child's brain was compensating for swelling, during a lucid interval.  *Id.*  According to her, time of death was a primary issue.  *Id.*  Dr. Ophoven rejected the notion that the injuries sustained by the child could have occurred only minutes before the child's arrival at an emergency room.  On cross, Dr. Ophoven admitted that the child's unresponsiveness could have occurred immediately after sustaining the injuries.  *Id.*

The Minnesota court of appeals characterized Dr. Ophoven's testimony as supporting a theory of "we don't know what happened . . ." and described her as an "inconsistent" expert witness.  *Id.* at *4.  The court went on to state that "[g]iven the possible problems with Dr. Ophoven's testimony on timing, appellant has not met her burden of proving a reasonable probability that the outcome of trial would have been different."  *Id.*

In 2006, the United States Circuit Court of Appeals for the Eighth Circuit, in *United States v. Red Bird*, also commented on testimony given by Dr. Ophoven.  *Red Bird*, 450 F.3d 789, 792 (8th Cir. 2006) (Resp's Ex. "K1").  There, the Eighth Circuit noted that Dr. Ophoven was of the opinion that the infant was incapable of "suffer[ing] traumatic brain injury serious enough to develop symptoms and die ***by virtue of shaking alone***, and that there ***must*** be evidence of impact."  *Id.* at 792 (emphasis added).  It is significant to note that in this case Dr. Ophoven testified as an expert witness in a manner wholly consistent with those statements in her presently attached affidavit.  Clearly, Dr. Ophoven was available as early as 2005 to offer the same opinion petitioner now avers is new.  Further, her current position–that Shaken Baby Syndrome cannot occur absent impact trauma–rests on information available prior to petitioner's 2002 trial.

Among the affidavits attached to petitioner's petition is one given by Dr. Steven Hayne.  In

his July 22, 2013 affidavit, Dr. Hayne clearly states "with a reasonable degree of medical certainty" that Chloe's cause-of-death would be classified "as **shaken baby syndrome** with impact or blunt force trauma."[16]  (Pet'r's Ex. "A" at 2, Aff. of Dr. Steven T. Hayne, dated July 22, 2013) (emphasis added).  Petitioner offers no insight as to why this information was undiscoverable at the time of petitioner's trial and or direct appeal.  After all, Dr. Hayne testified at trial concerning Chloe's injuries and petitioner had an opportunity to cross-examine Dr. Hayne on that issue.  *See Havard*, 988 So.2d at 345.  Additionally, petitioner has deposed Dr. Hayne and hired an independent pathologist in earlier post-conviction proceedings.  *See Havard*, 86 So.3d at 904-910.

One additional source proves the evidence supporting petitoner's short, accidental fall theory was available at the time of petitioner's trial–petitioner.  Petitioner provides the factual predicate supporting this short, accidental fall theory.  His statements prove this evidence was available at trial.  Petitioner, during a video-recorded interview, told law enforcement officials that he accidentally dropped Chloe.  (Pet'r's Ex. "F" at 4).  Petitioner points to the transcript of this interview in this second, successive post-conviction in support of claim for relief.  (Pet'r's Mot. at 6-7).  Yet, he

---

[16]Dr. Hayne's 2002 report of Chloe Britt's autopsy is attached hereto as Resp's Ex. "L." In his report, Dr. Hayne states beneath the "CAUSES OF DEATH & PATHOLOGIC FINDINGS:" at "IMMEDIATE CAUSE OF DEATH:" that Chloe's death was caused by "[c]hanges consistent with shaken baby syndrome *and* closed head injuries" (Resp's Ex. "L") (emphasis added).  The report is unnumbered, but that section appears at the bottom of the report's sixth page. Additionally, Dr. Hayne testified at trial that "[violent] shaking produc[ed] these injuries and, of course, there were other injuries that were identified on the body, but were not participatory in the death of the child." (Tr. vol. 4 at 558:1-4, attached as Resp's Ex. "M").  Those injuries included: "bruises or contusions . . . located on the back of the scalp . . . measuring approximately two and one half inches . . . a bruise located over the nose, measuring approximately one quarter of an inch . . . a contusion to involve the upper lip that measured approximately one half inch, and there was a tear of the frenulum just inside the mouth . . . that measured approximately one quarter of an inch . . . [t]here was also bruising located over the front surface of the right thigh, measuring approximately one inch, and there was also a bruise located over the front surface of the left thigh that . . . measured slightly larger, almost an inch and a half at that site."  *Id.* at 545-46.

offers no explanation for not raising this challenge at trial, on direct appeal or in his application for post-conviction relief. Instead, he demands that he be given an opportunity to present this challenge more than a decade later. The respondent submits this evidence is not new, as evidenced by petitioner's statements made prior to trial.

This is not new evidence as it was "capable of being raised at trial and / or on direct appeal." *Havard*, 86 So.3d at 901; *see Williams*, 669 So.2d at 55; *Beasley*, 582 F.2d at 339. All of the petitioner's expert affiants were either: (a) testifying in a manner entirely consistent with their present sworn statements; (b) relying on "landmark" information published and recognized in the field of biomechanical engineering prior to and / or at the time of petitioner's trial and/or direct appeal; or, (c) both. The fact petitioner has recently discovered it does not make it newly discovered. The respondent submits petitioner cannot carry his burden to prove, with fact, his newly discovered evidence claim overcomes the UPCCRA's procedural bars.

### ii. *Even if This Evidence Had Been Introduced at Trial or on Direct Appeal, It is Not Outcome Determinative of Petitioner's Conviction or Sentence.*

Second, petitioner has not and cannot show this evidence is outcome determinative as to his conviction or sentence. Newly discovered evidence refers to evidence which "is of such nature that it would be practically conclusive that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence." *Havard*, 86 So.3d at 901, 906, 908-910 (quoting Miss. Code Ann. § 99-39-27(9)). Petitioner's latest theory is that Chloe Britt died as a result of a short, accidental fall. He "must show that [this] evidence . . . is material to the issue and that it is not merely cumulative or impeaching." *Williams*, 669 So.2d at 55; *see McCoy v. State*, 111 So.3d 673, 676 (Miss. Ct. App. 2013) (recognizing newly discovered evidence is evidence which is

"outcome determinative . . . " and citing to Miss. Code Ann. §§ 99-39-5(2) and 99-39-23(6)).

Petitioner's expert affiants reach similar conclusions.  Looking to Dr. George R. Nichols' sworn statement, he believes Chloe died as a result of a short, accidental fall.  He notes:

> that subdural hematomas and retinal hemorrhages are not necessarily indicative of abusive shaking; indeed, with only these two symptoms, the classic trial of Shaken Baby Syndrome is not fully established . . . [and] that Chloe's injuries [could not] have been caused by intentional force equivalent to the force of a motor vehicle accident or a fall from a significant height.  It is now generally agreed by most forensic pathologists and biomechanical scientists and engineers that such comparisons are without scientific merit and should not be made.  Falls are random events and it is now generally accepted that some long distance falls do not cause severe injury while other short distance falls may cause significant injury and death. It is further now understood that while most short distance falls do not lead to serious injuries, a subset of short distance falls result in skull fractures and lethal intracranial hemorrhage.

(Pet'r's Ex. "D" at 2, 3, Aff. of Dr. George Nichols, dated Nov. 11, 2013).  Interestingly, Dr. Nichols does not reach any conclusion to a reasonable degree of medical certainty as to Chloe's death.  *Id.* at 2.  Instead, Dr. Nichols chooses to focus on recent changes that have occurred in the fields of forensic pathology and biomechanical engineering since 2002.  *Id.*

Dr. Michael M. Baden, like Dr. Nichols, believes Chloe died as a result of a short, accidental fall.  Dr. Baden states that:

> Chloe's signs and symptoms did not establish the classic triad of Shaken Baby Syndrome - a condition which many forensic pathologists have concluded does not exist; and who now conclude that scientific evidence shows that shaking a baby cannot produce subdural hemorrhages or sufficient brain damage to cause a baby to die.

(Pet'r's Ex. "B" at 2, Declaration of Dr. Michael M. Baden, dated Mar. 13, 2013).  Most recently, Dr. Baden believes that:

> Chloe's autopsy findings are consistent with having occurred as the result of a short accidental fall, as [petitioner] has consistently described, and are not consistent with the baby having been shaken to death . . . ."

(Pet'r's Ex. "B" at 2, Aff. of Dr. Michael M. Baden, dated Nov. 23, 2013).  Dr. Baden attributes Chloe's

death to one of many types of innocent head trauma, such as from short, accidental falls.  *Id.* at 3.

He recognizes Chloe's injuries, including the bruises to her head.  He also states that Chloe did not

present the classic triad of injuries associated with Shaken Baby Syndrome.

> Dr. Baden, unlike Dr. Nichols, concludes:

> to a reasonable degree of medical certainty, based on my education, training and fifty
> years' experience as a forensic pathologist and medical examiner, that Chloe's
> clinical, medical and autopsy findings, including her head bruises, are entirely
> consistent with having resulted from a short accidental fall and are not consistent
> with Shaken Baby Syndrome.

*Id.* at 3.

> Dr. Janice Ophoven generally agrees with Drs. Baden and Nichols that "the child's collapse

was most likely triggered by the short fall described by [petitioner] . . . ."  (Pet'r's Ex. "C" at 2, Aff.

of Dr. Janice Ophoven, dated Nov. 12, 2013).  Her opinion is broader than Dr. Baden's.  She feels

"other predisposing factors may have contributed to . . ." Chloe's death.  *Id.* at 2, 17-18.  Dr.

Ophoven does not end her analysis there.  As it concerns Dr. Hayne's testimony and autopsy report,

Dr. Ophoven lends her expertise to make a legal conclusion.  According to Dr. Ophoven:

> Dr. Hayne did not conclude in his report or testimony that the death was "due to"
> shaking or that the manner of death was homicide but rather stated that the findings
> were "consistent with" shaken baby syndrome and homicide . . . . [I]n medicine most
> findings are "consistent with" a wide array of diagnoses, this wording indicates that
> he did not reach a clear or definitive diagnosis that would support a finding of
> shaking or homicide beyond a reasonable doubt or even by a preponderance of the
> evidence.  Such distinctions are unlikely to be noted by a jury unless the defense
> attorney understands these nuances, most likely through consultation with a medical
> expert.

*Id.* at 17.  Dr. Ophoven believes Chloe died  from injuries sustained as a result of a short, accidental

fall and certain predisposing health issues.  She then critiques the treating physicians and medical

staffs' testimonies.

Based on their statements, the forensic pathologists do not make it practically certain that petitioner's trial would have ended differently. While each believe Chloe's death was caused by a short, accidental fall, the experts reach that conclusion without considering all the evidence.

The jury heard evidence which established that Chloe was fussy, but otherwise alive and well at 8:00 p.m. on February 21, 2002. (Tr. vol. 3 at 325-27; 333-334; 345). By 10:00 p.m., Chloe was near death. The evidence proved Chloe sustained: massive head injuries; retinal hemorrhaging; bruises to her head and thighs; a torn frenelum; a torn, bleeding rectal area; and, other abrasions. (Resp's Ex. "L" 2002 Autopsy Report of Chloe Britt; Tr. vol. 3 at 403-404, 407-408, 418-420). Chloe was in petitioner's exclusive custody for a large portion of that time. (Pet'r's Ex. "F" at 4, transcribed, video-recorded statement of petitioner, dated Feb. 23, 2002).

The evidence presented to the jury demonstrated petitioner was ill-prepared for the responsibility of caring for Chloe. Petitioner had not bathed Chloe prior to and on February 21, 2002. *Id.* at 11. Chloe and Rebecca Britt moved into petitioner's trailer home three weeks earlier. *Id.* at 8. Petitioner was unemployed. (Tr. vol. 3 at 341); *see Havard*, 988 So.2d at 335-336 (noting petitioner's grandfather, William Havard, recalled petitioner quitting his job after buying petitioner a vehicle for the specific purpose of traveling to and from work; and that, petitioner "would have people over using drugs . . . .").

On February 21, 2002, petitioner pre-occupied himself with household chores and television in an effort to avoid caring for Chloe. (Pet'r's Ex. "F" at 4). Though petitioner conveniently ignores this point, the respondent thinks it pertinent to remind this Court that petitioner told law enforcement officials that he was prone to fits of anger; and in fact, experienced a childhood flashback of being

beaten in a bathtub at the time he was bathing Chloe.  *Id.* at 19-20; *see also Havard*, 988 So.2d at 335-36 (noting petitioner's grandfather recognized that Gordon Harrell, petitioner's step-father, was abusive to petitioner during his childhood; and additionally, that petitioner was short-tempered and violent as evidenced by William Harrell's recollection of calling the police to calm petitioner down on multiple occasions).

Additionally, the evidence demonstrated petitioner's intentional efforts to disguise Chloe's injuries.  Petitioner sent Rebecca to a nearby grocery store to fetch dinner.  *Id.*; (Tr. vol. 3 at 341).  After Rebecca left for the store, Chloe began crying and petitioner did not know why.  *Id.*  He decided to change Chloe's diaper on the bed in the master bedroom, but her diaper was clean.  *Id.*  She "kind of spit up and her nose was running." *Id.*  Even though petitioner had never bathed Chloe before, he decided he would while Rebecca was away.  *Id.* at 11, 16-17.  Petitioner spread a towel on the bowl of the commode and planned on lay Chloe there to dry her off.  But, as he was removing Chloe from the tub, she fell.

While these events were unfolding, petitioner had "a flashback of [his] childhood . . . when [he] was in the tub and [he] got beat up." *Id.* at 19-20.  Though he could not be certain, petitioner believed Chloe's "head hit the tank . . . [or her] upper body hit the tank . . . ." *Id.* at 16-17.  He was certain that Chloe's "leg for sure hit the bowl, hit the lid." *Id.* at 5, 12.  Petitioner caught Chloe and shook her several times until she cried.  *Id.* at 5-6, 12-13.  Though uncertain, petitioner *admitted* that he "may have shaken her too hard." *Id.* at 19, 20.  In any event, petitioner was relieved to hear Chloe cry.  *Id.* at 6.  But, he knew Rebecca would be home soon, so he quickly wiped  blood from Chloe's face, rubbed her with lotion, diapered her and dressed her.  *Id.*

Once petitioner placed Chloe in her crib, he began cleaning the mess, but was interrupted.

*Id.* at 23.  He heard Rebecca drive up, so petitioner stopped cleaning, began watching television and

acted as though nothing happened.  *Id.*  Petitioner attempted to keep Rebecca from Chloe by warning

Rebecca not to go into Chloe's room, because she was asleep.  *Id.* at 23.  But, Rebecca "went in there

anyway . . . ." *Id.*  Petitioner watched as Rebecca approached Chloe's crib.  *Id.*  When Rebecca left

the room content, he "guess[ed] that [Chloe] was fine . . ." and did not think telling Rebecca about

the fall was all too important.[17]  *Id.*  He "figured, well, there's nothing wrong . . . I didn't hurt her."

*Id.*

At that point, petitioner sent Rebecca back to rent movies.  *Id.* at 4, 7; (Tr. vol. 3 at 347-48).

Rebecca left, again, and petitioner stripped the sheets from the bed in the master bedroom.  (Pet'r's

Ex. "F" at 7).[18]  Then, he gathered the sheets and clothes off the bed and bundled them together with

the comforter from the master bedroom.  (Tr. vol. 4 at 457-459; 472-473).  Petitioner was barricaded

inside the restroom when Rebecca returned.  (Pet'r's Ex. "F" at 7).  Rebecca knocked on the door,

but it was not clear what petitioner was doing.  *Id*; (Tr. vol. 3 at 348-349).  So, Rebecca walked into

Chloe's room and found her daughter blue and not breathing.   (Tr. vol. 3 at 349).  Rebecca called

out to petitioner for help and began CPR on Chloe.   *Id.*

Petitioner and Rebecca decided to rush Chloe to the nearest emergency room.  *Id.* at 350.

Rebecca and Chloe waited outside in the car while petitioner dressed himself.  *Id.*  He started to drive

---

[17]Ironically, petitioner told law enforcement officials he was "the one that shook her." (Pet'r Ex. "F" at 21).  Petitioner knew Chloe "was like she [wa]s . . . [n]ot breathing."  *Id.*  at 20.

[18]DNA analysis confirmed both Petitioner's DNA and Chloe's DNA and blood werecontained within one spot on the bed sheets Petitioner attempted to wash.  Chloe lived in petitioner's home for approximately 21 days.  It was entirely reasonable for the jury to infer that petitioner took measures to deceive Rebecca Britt by making Chloe's injuries appear accidental.

in the opposite direction, away from the closest hospital.  *Id.*  Rebecca demanded he drive her to Natchez Community Hospital, so he turned around.  *Id.*

At the emergency room, health care providers asked about Chloe's injuries.  Petitioner chose to say nothing, pretending as if he had no idea what happened.  (Tr. vol. 4 at 470-71).  He was "scared they were going to say she had been shaken . . . ."  (Pet'r's Ex. "F" at 21).  And, petitioner knew he was "the one that shook her."  *Id.*  Petitioner knew Chloe "was like she [wa]s . . . [n]ot breathing."  *Id.* at 20.  Law enforcement officials wanted to interview petitioner about his contact with Chloe earlier that night.  (Tr. vol. 4 at 470).  Petitioner reluctantly agreed, but seemed preoccupied.  (Tr. vol. 3 at 437-38).  He repeatedly asked if he could return to the trailer.  *Id.*  He wanted to shower.  *Id.*

Law enforcement officials searched petitioner's trailer in the early hours of February 22, 2002.  Law enforcement found evidence, which tended to show petitioner was in the process of destroying evidence.  Officers found the trailer unlocked, indicating the three left in a hurry.  Officers recovered the bed sheets, a bed comforter, a towel and clothes.  (Tr. vol. 4 at 457-59; 472-73).  They found these items wrapped together on the kitchen floor mere feet from a washing machine and dryer.  *Id.*  Officers also searched the bathroom where petitioner purportedly bathed Chloe, but found no indication that the trailer's bath tub had been used.  *Id.* at 492.  Instead, officers found Chloe's baby tub leaning against a wall of the trailer's bathroom.  *Id.*

The glaring fallacy of petitioner's experts' short, accidental fall theory is that it stands in stark contrast to all the evidence presented at trial.  When viewed in light of all the evidence, the expert affiants' hypothetical conclusions are not outcome determinative on the matter of petitioner's conviction.  Further, their statements do not discredit Dr. Hayne's 2002 testimony and autopsy report.

At trial in 2002, Dr. Hayne was tendered and accepted as an expert in the field of forensic pathology without objection.  (Tr. vol. 4 at 541-42).  Dr. Hayne testified to his observations and conclusions.  He observed Chloe's injuries, which included "the presence of a subdural hemorrhage; and . . . the presence of retinal hemorrhage . . . ."  (Tr. vol. 4 at 556).  In addition, Dr. Hayne observed  no "other potentially lethal causes of death."  *Id.*  His "inclusionary and exclusionary" findings led him to conclude that  Chloe's cause of death "was consistent with the shaken baby syndrome . . . ."  (Tr. vol. 4 at 556); *see Kolberg*, 829 So. 2d at 70-71 (recognizing diagnoses of abuse in fact-specific context).

Dr. Hayne did not testify to any specific amount of force as Dr. Nichols faults.  (Pet'r's Ex. "D").   Instead, Dr. Hayne relied on his experience and observations in having conducted approximately twenty-five thousand (25,000) autopsies, at that time, when describing the extent of Chloe's injuries.  *Id.* at 541.  Dr. Hayne observed Chloe's injuries and found that they "parallel[ed] . . . [those] in motor vehicle crashes, [or] falls from significant heights . . . ."  *Id.* at 557.  He did not equate Chloe's injuries to those of a car wreck or falls from significant heights.  Rather, Dr. Hayne likened the extent of Chloe's injuries to those he had seen in victims of car wrecks and falls. (*i.e.*, extremely violent and catastrophic).

He also opined that Chloe's death "was consistent with homicide . . . ."  *Id.*  Dr. Hayne reached this conclusion based on Chloe's age.  He believed Chloe was  incapable of inflicting the injuries she suffered, herself.  Chloe, a six-month-old infant probably had minimal ability to move, much less walk and thus accidentally fall.  Dr. Hayne noted in his report and testified before that jury that Chloe's frenulum was torn; and, her head and legs were bruised in multiple places.  But based on his observation and experience, Dr. Hayne concluded that Chloe's death was consistent with

shaken baby syndrome with closed head injuries (*i.e.*, trauma).

Recently, Dr. Hayne executed a sworn affidavit in which he clearly states "with a reasonable degree of medical certainty" that Chloe's cause of death would be classified "as **shaken baby syndrome** with impact or blunt force trauma."  (Pet'r's Ex. "A" at 2, Aff. of Dr. Steven T. Hayne, dated July 22, 2013).  Dr. Hayne's most recent affidavit does not discredit his 2002 autopsy report or testimony.  In 2002, Dr. Hayne expressly attributed Chloe's death to "[c]hanges consistent with shaken baby syndrome ***and*** closed head injuries."  (Resp's Ex. "L") (emphasis added).

Dr. Hayne's July 22, 2013, statement is consistent with his 2002 autopsy report findings and trial testimony.  Dr. Ophoven makes note of this in her sworn statement.  She expressly states that "Dr. Hayne did not conclude in his report or testimony that the death was 'due to' shaking or that the manner of death was homicide but rather stated that the findings were 'consistent with' shaken baby syndrome and homicide . . . ."  (Pet'r's Ex. "E" at 17).  Dr. Ophoven then explains that "in medicine most findings are 'consistent with' a wide array of diagnoses, this wording indicates that he did not reach a clear or definitive diagnosis . . . ."  *Id.*

What Drs. Ophoven, Baden and Nichols fail to include in their analyses is that, in addition to Dr. Hayne's testimony and report findings, the jury heard petitioner confess in his video-recorded statement that after dropping Chloe, he shook her, probably too hard–until she cried.  The jury heard petitioner tell police officers that he left Chloe alone and told no one.  He left her and began destroying evidence which would link him to Chloe's injuries.  Considering all the evidence–not just Dr. Hayne's 2002 testimony and autopsy report–petitioner's short, accidental fall theory fails.  His accidental theory does not make it practically certain that had this evidence been introduced at trial, petitioner would have been acquitted.

The evidence is not offered for the purpose of proving petitioner's innocence.  Instead, petitioner offers this evidence solely for the purpose of impeaching Dr. Hayne's 2002 autopsy report findings and trial testimony.  Petitioner offers this evidence "to accuse; to charge a liability upon . . . [t]o dispute, disparage, deny, or contradict . . . " Dr. Hayne's 2002 autopsy report and trial testimony.  BLACK'S LAW DICTIONARY 678 (5th ed. 1979).  In addition to showing that this "evidence . . . is material . . ." petitioner must also show "that it is not merely . . . impeaching." *Williams*, 669 So.2d at 55.  He cannot.  By definition, this evidence is offered to impeach.  "A motion for a new trial based on impeachment evidence discovered after trial should be denied." *Ormond v. State*, 599 So.2d 951, 961-962 (Miss. 1992).

Looking to petitioner's biomechanical expert, Dr. Chris Van Ee  rules out the possibility that Chloe's injuries could have been caused by shaking alone.[19]  His position is that data from scientific testing shows abusive shaking (shaking by an adult), at best, produces, angular accelerations associated with falls of only 1 foot.  Id. at 6.  Dr. Van Ee believes that "[t]o attribute the injuries of this child to shaking and dismissing the reported history of the accidental fall is not supported by current science."[20]  *Id.*

It is worth noting that Dr. Van Ee is not, and has never been, a licensed physician and has not attended medical school.  *Id.*  Importantly, Dr. Van Ee has never seen, treated, diagnosed, at least legally, any living patient.  Lacking that education, experience and background, Dr. Van Ee reaches

---

[19]Again, the evidence presented at trial was not limited to shaking alone.  (Resp's Ex. "L"; Tr. vol. 3 at 403-404, 407-408, 418-420).

[20]*See* Pet'r's Ex. "E" at 9 (citing Prange MT, Coats 13, Duhaime A-C, Marguiles SS. Anthropomorphic simulations of falls, shakes, and inflicted impacts in infants. J Neurosurg; 99:143-50 (2003)) attached hereto as Resp's Ex. "O."

a conclusion based almost entirely on a hypothetical application of theoretical testing published in

"biomechanical literature" and "current data on short distance falls" to exclude Shaken Baby

Syndrome as a cause of Chloe Britt's death.  (Pet'r's Mot. 27-28; Pet'r's' Ex. "E" 1-3, 6) (citing case

studies published by Dr. John Plunckett, forensic pathologist) (Resp's Ex. "G" at 18:15).

"Rather than respond in like, with unsupported generalizations . . . [the respondent would point

to] the various international and domestic medical organizations that have publically acknowledged

the validity of [Shaken Baby Syndrome] as a medical diagnosis . . .":

1) The World Health Organization;
2) The Royal College of Paediatrics and Child Health;
3) The Royal College of Radiologists;
4) The Royal College of Ophthalmologists;
5) The Canadian Paediatric Society;
6) The American Academy of Pediatrics;
7) The American Academy of Ophthalmology;
8) The American Association for Pediatric Ophthalmology and Strabismus;
9) The American College of Radiology;
10) The American Academy of Family Physicians;
11) The American College of Surgeons;
12) The American Association of Neurologic Surgeons;
13) The Pediatric Orthopaedic Society of North America;
14) The American College of Emergency Physicians;
15) The American Academy of Neurology.

Narang, M.D., J.D., *A Daubert Analysis of Abusive Head Trauma / Shaken Baby Syndrome*, 11

Hous. J. Health L. & Pol'y at 574-575.[21]  The Centers for Disease Control and Prevention also

acknowledges the validity of Shaken Baby Syndrome.[22]  In addition, the diagnosis has been widely

---

[21]Find attached hereto as Resp's Ex. "E" at 26.

[22]*See* http://www.cdc.gov/ViolencePrevention/pdf/PedHeadTrauma-a.pdf (last visited Dec. 23, 2013) (citing Parks SE, *et al*., *Pediatric Abusive Head Trauma: Recommended Definitions for Public Health Surveillance and Research*., Atlanta (GA): Centers for Disease Control and Prevention, (2012)), attached hereto as Resp's Ex. "P"; *see* Joëlle Anne Moreno and Brian Holmgren, *Dissent*

studied and tested[23] across a broad spectrum of medical and non-medical disciplines.  *Id.* at 578.

Aside from being internationally recognized:

> there exist at least **700 peer-reviewed**, clinical medical articles, comprising thousands of pages of medical literature, published by over 1000 different medical authors, from at least twenty-eight different countries.  **Additionally, AHT has been peer-reviewed and published in the following disciplines: biomechanical engineering, general pediatrics, neonatology, neurology, neurosurgery, nursing, obstetrics, ophthalmology, orthopedics, pathology (forensic pathology), radiology, and rehabilitative medicine**.  In fact, given its association with significant medical injuries and child fatalities, AHT is the **most peer-reviewed** and **well-published topic** in **child abuse pediatrics**.  Thus, it is difficult for one to assert or argue that the diagnosis of AHT has not been subjected to the rigors of scientific falsifiability, stringently peer reviewed, or  well published.

*Id.* (emphasis added).

Shaken Baby Syndrome is internationally recognized as a serious form of injury, most often related to abuse.  This Court recognizes "diagnoses of abuse in context of specific facts."  *Kolberg*, 829 So.2d at 70-71 (recognizing "child abuse . . . a generally medically accepted diagnosis.") (citing *Crawford v. State*, 754 So.2d 1211 (Miss. 2000) (overruled on other grounds).  "[W]hile this Court has not recognized abuse syndromes, we have recognized diagnoses of abuse in the context of specific facts." *Kolberg*, 829 So.2d at 71 (internal quotations omitted).  By definition, this evidence is offered solely for the improper purpose of impeachment.

The respondent submits that this is not newly discovered as defined by the UPCCRA.  Petitioner's evidence was discoverable at the time of his trial or on direct appeal.  He offers no

---

*Into Confusion: The Supreme Court, Denialism, and the False "Scientific" Controversy Over Shaken Baby Syndrome*, 2013 Utah L. Rev. 153, 155 (2013), attached as Resp's Ex. "Q."

[23]Compare Dr. Narang's total of 700 peer-reviewed, clinical medical articles with petitioner's biomechanical engineering expert, Chris Van Ee, who is the "co-author of **the only peer-reviewed** publication . . . ."  (Pet'r's Mot. at 26).

reasonable explanation for his failure in raising it at trial, on direct appeal; in his application for post-conviction relief; or recently, in his first, successive post-conviction petition.  Even if he had, this evidence is not outcome determinative on petitioner's conviction or sentence.  It is not offered for that purpose.  Petitioner offers this evidence for the improper purpose of impeaching Dr. Hayne's 2002 autopsy report and trial testimony.

As a result, petitioner's claims are barred by the time bar found at Miss. Code Ann. § 99-39-5(2); the successive-writ bars found at Miss. Code Ann. §§ 99-39-23(6) and 99-39-27(9); as well as, those found at Miss. Code Ann. § 99-39-21(1)-(3).  Petitioner's newly discovered evidence claim does not satisfy the newly discovered evidence exception to aforementioned bars.  The evidence he avers as newly discovered is simply not "new."  Therefore, the procedural bars above apply with full force and preclude further consideration of petitioner's second, successive post-conviction petition.

## 2. *Petitioner's Claims Do Not Satisfy This Court's Fundamental Rights Violation Exception to the UPCCRA's Procedural Bars.*

Next, the respondent would show petitioner's fundamental rights violation claim does not satisfy the exception provided by this Court in *Rowland*, 98 So.3d 1032.  The discretionary authority to "regulate procedural burdens [is] subject to proscription under those clauses of the State and Federal Constitutions if they offend[]some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Means v. State*, 43 So.3d 438, 442 (Miss. 2010) (internal quotations omitted) (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 367, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996); *Patterson v. New York*, 432 U.S. 197, 201-202, 978 S.Ct. 2319, 53 L.Ed.2d 281 (1977)); *see Rowland*, 98 So.3d at 1036.  "[This Court has held that] . . . an exception to the procedural bars exists for errors affecting certain constitutional rights." *Rowland*, 98 So.3d

44

at 1036 (citing *Smith v. State*, 477 So.2d 191, 195 (Miss. 1985)).   "[T]he State has neither the authority nor the right to subject a person to double jeopardy. . . illegal sentence . . . [or] den[y him] . . . due process at sentencing." *Id.* (citations omitted).

Petitioner contends this claim is excepted from the UPCCRA's procedural bars under the fundamental rights exception.  (Pet'r's Mot. at 36-38).  He cites and relies primarily on this Court's decision in *Rowland v. State* as legal basis for that proposition.  *Id.* (citing *Rowland*, 43 So.3d 503, 505-507 (Miss. 2010)).  The respondent disagrees with petitioner's interpretation of *Rowland* and his application of the fundamental rights exception to the UPCCRA's procedural bars.  The *Rowland* Court did not carve out a new fundamental rights exception to the UPCCRA's procedural bars.  Instead, this Court clarified confusion surrounding an exception to procedural bars for claims involving error affecting a prisoner's fundamental rights.

The facts in *Rowland* presented this Court with the opportunity to resolve conflicts and inconsistencies concerning this State's reviewing courts' authority to bar claims of error affecting fundamental rights.  Confusion surrounded the limits of those courts' authority to bar claims of fundamental rights violations.  In earlier opinions, the Court extended the discretionary authority to bar claims of alleged error affecting fundamental rights.  The *Rowland* Court found this grant of authority thwarted the purpose underlying the exception–to "be 'faithful stewards' in keeping with the spirit of *Brooks*."  *Rowland*, 42 So.3d at 507 (quoting *Read v. State*, 430 So.2d 832, 836-837 (Miss. 1983)).

In keeping with the spirit of *Brooks*, claims of error affecting a prisoner's fundamental rights must be reviewed.  *Rowland*, 42 So. 3d at 507 (quoting *Smith v. State*, 477 So.2d 191, 195 (Miss. 1985)).  *Rowland* reaffirmed the role to be faithful stewards ensuring that no person "be deprived

of his liberty except by due process of law." *Id.* (quoting *Brooks v. State*, 46 So.2d 94, 97 (Miss. 1950)). "[W]here fundamental and constitutional rights are ignored, due process does not exists, and a fair trial in contemplation of law cannot be had . . . ." *Id.* (quoting *Brooks*, 46 So.2d at 97).

The statutory exceptions to the UPCCRA's procedural bars, in most instances, require the petitioning party to show cause and actual prejudice. Errors affecting a party's fundamental or constitutional rights must be considered in order to ensure the guaranteed right to a fair trial. *Rowland*, 42 So.3d at 507; *see generally Brooks*, 46 So.2d 94. *Rowland* makes clear that a "procedural bar cannot be applied in the face of 'errors affecting fundamental rights,' because it would be 'too significant a deprivation of liberty to be subjected to a procedural bar.'" *Id.* (quoting *Smith*, 477 So.2d at 195.

That said, the respondent does not read *Rowland* as relieving petitioner of his burden to show cause. "Merely asserting a constitutional violation is insufficient to overcome the [UPCCRA's] procedural bars." *Means*, 43 So.3d at 442; *see Chandler v. State*, 44 So.3d 442, 444 (Miss. Ct. App. 2010). Under this Court's precedent, "[t]here must at least appear to be some basis for the truth of the claim **before** the procedural bar[s] will be waived." *Means*, 43 So.3d at 442 (emphasis added). Here, there is no basis supporting petitioner's claim.

Under petitioner's interpretation of *Rowland*, error–or even the remote possibility of error–is unnecessary. Thus, naked assertion mandates consideration. Petitioner's application of *Rowland* elevates the constitutional right from a fair trial to an absolute right of appellate review of any claim which a petitioner deems constitutes a denial of a fundamental right, simply because one makes that argument. That cannot be the case. In keeping with the spirit of *Brooks*, petitioner "'can be deprived of his liberty . . . by due process of law.'" *Rowland*, 42 So.3d at 507 (quoting *Brooks*, 46 So.2d at

97).  A claim for relief based on a fundamental rights violation will be excepted from the UPCCRA's

bars where it appears that "'due process does not exist, and a fair trial . . . cannot be had . . . .'"  *Id.*

(quoting *Brooks*, 46 So.2d at 97).  There must appear to be some merit, some indication of error,

before any bar can be waived.  *Means*, 43 So.3d at 442.  There is no such indication in the present case.

 Petitioner has failed to show cause which would relieve him of his burden to show actual

prejudice.  In fact, this Court, on multiple occasions, has found petitioner received a fair trial.  *See*

*Havard*, 86 So.3d 896; *Havard*, 988 So.2d 322; *Havard*, 928 So.2d 771.  The respondent submits that

petitioner's claim must be denied, because petitioner's fundamental rights violation claim does not

satisfy this Court's exception.  Therefore, the aforementioned procedural bars of the UPCCRA apply

and preclude further consideration of petitioner's claims.

**B.** **Petitioner is Entitled to No Relief from Judgment; or Alternatively, Leave to File a Successive Petition for Post-Conviction Relief in the Trial Court.**

 Alternatively, petitioner seeks relief from judgment under Rule 60(b) of the Mississippi Rules

of Civil Procedure.  (Pet'r's Mot. at 38-40).  He claims justice requires this Court exercise Its

equitable authority to vacate his conviction and sentence.  If not, he will be denied his fundamental

rights.  Petitioner moves this Court pursuant to Rule 60(b) seeking leave to file a successive petition

for post-conviction relief in the trial court so that he may "fully develop the facts surrounding the

issues raised . . . ."  *Id.* at 41-42.  The respondent disagrees.

 As a procedural matter, petitioner fails "'to cite relevant authority [which] obviates the  . .

. [C ]ourt's obligation to review such issues.'"  *Byrom v. State*, 863 So.2d 836, 863 (Miss. 2003)

(barring the defendant's argument that by refusing to reopen a suppression hearing proceedings for

the purpose of allowing defendant the opportunity to call a witness amounted to abuse of discretion)

(quoting *Simmons v. State*, 805 So.2d 452, 487 (Miss. 2001)).  His failure to support his position with any relevant authority obviates this Court from considering this claim.

Without waiving this bar, Rule 60(b) provides that:

[o]n motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

1.  fraud, misrepresentation, or other misconduct of an adverse party;

2.  accident or mistake;

3.  newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

4.  the judgment is void;

5.  the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application;

6.  any other reason justifying relief from the judgment.

The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than six months after the judgment, order, or proceeding was entered or taken.  A motion under this subdivision does not affect the finality of a judgment or suspend its operation.  Leave to make the motion need not be obtained from the appellate court unless the record has been transmitted to the appellate court and the action remains pending therein.  This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court.  Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished.  The procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action and not otherwise.

Miss. R. Civ. P. 60(b).

Rule 60(b) motions indict the integrity of a judgment, order, proceeding with a charge of error.  *Id.*  Where exceptional or compelling circumstances warrant, Rule 60(b) "provides for extraordinary relief granted only upon an adequate showing . . . ."  *Campbell v. State*, 126 So.3d 61,

2013 WL 1883342, *3 (Miss. Ct. App. 2013) (quoting *Perkins v. Perkins*, 787 So.2d 1256, 1261 (Miss. 2001) (citing *King v. King*, 556 So. 2d 716, 722 (Miss. 1990)).  The "Rule . . . is a corrective device . . . [which] allows for the setting aside of a judgment for a number of reasons, [if] the motion is made within a reasonable time and . . . 'is not simply an opportunity to litigate that which is already settled.'" *Montgomery v. Montgomery*, 759 So. 2d 1238, 1240 (Miss. 2000) (quoting *Askew v. Askew*, 699 So.2d 515, 516, 520 (Miss. 1997)).  Petitioner's "gross negligence, ignorance of the rules, or ignorance of the law is not enough." *Id.* (quoting *Perkins*, 787 So.2d at 1261).  He must justify his failure to avoid mistake or inadvertence with exceptional or compelling circumstances. *Id.*

Petitioner has failed to file this motion within a reasonable time.  This motion comes nearly seven (7) years after this Court entered final judgment. "[W]hether a Rule 60(b)(6) motion has been made within a reasonable time is considered on a case-by-case basis." *Carpenter*, 58 So. 3d at 1162 (internal citations omitted); *see Briney v. United States Fid. & Guar. Co.*, 714 So.2d 962, 966-967 (Miss. 1998); *see generally Liljeberg*, 486 U.S. 863, n. 11; *Klapprott*, 335 U.S. at 613.  Any prejudice suffered by the opposing party and the absence of good reasons for delay are relevant to a determination on the time a Rule 60(b)(6) motion is made. *Tyler v. Auto. Fin. Co., Inc.*, 113 So. 3d 1236, 1241 (Miss. 2013) (citing *Briney*, 714 So.2d at 967); *see  Indymac Bank, F.S.B. v. Young*, 966 So.2d 1286, 1290 (Miss. Ct. App. 2007) (citing *Briney*, 714 So.2d at 967).

Petitioner gives no good reason for his seven-year delay.  Petitioner was aware of the charges he faced.  He knew of Dr. Hayne's autopsy report.  Dr. Hayne testified at trial and was  subject to petitioner's cross-examination.  Petitioner did cross-examine Dr. Hayne, but chose to challenge the evidence supporting the underlying felony of his capital murder charge–sexual battery.  Since then,

petitioner has consistently maintained that strategy. But, his "calculated, and deliberate choices . . . cannot be relieved, because hindsight seems to indicate to him that his decision not to appeal was probably wrong." *Lose v. Illinois Cent. Gulf R.R. Co.*, 584 So.2d 1284, 1287 (Miss. 1991) (citing 11 WRIGHT & MILLER FEDERAL PRACTICE AND PROCEDURE § 2864, 214 (1973) citing *Ackermann v United States*, 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950)).

Moreover, the fact that petitioner has only recently discovered this evidence while seeking federal habeas relief is no excuse for his untimeliness. "This [hindsight] principle is no less applicable in situations where the merits have not been adjudicated." *In re Pettle*, 410 F.3d 189, 193 (5th Cir. 2005). Petitioner would have this Court believe that this paradigm-shift surrounding Shaken Baby Syndrome was not reasonably discoverable prior to reading an online article in which Dr. Hayne acknowledges the influence of biomechanics in the field of forensic pathology. The respondent would remind this Court that gross negligence is no basis for relief. *Montgomery*, 759 So. 2d at 1240 (quoting *Perkins*, 787 So.2d at 1261). But even if it were, that statement raises serious concerns about petitioner's science-based evidence. After all, it was only reasonably discoverable–or better "newly available"–upon Dr. Hayne's public recognition. (Pet'r's Mot. at 30).

Petitioner, through reasonable diligence, could have discovered this evidence. Petitioner has previously hired an independent forensic pathologist, Dr. Lauridson, for the purpose of attacking Dr. Hayne's report and testimony. *Havard*, 988 So.2d at 327-333. Petitioner deposed Dr. Hayne for the purpose of discrediting Dr. Hayne's trial testimony. *Havard*, 86 So.3d at 910. Petitioner has also managed to obtain recent affidavits from three physicians and a biomechanical engineer. Yet, petitioner has only recently discovered this science which he claims debunks Shaken Baby Syndrome.

The respondent cannot reconcile petitioner's assertion that this evidence was not reasonably discoverable given petitioner's considerable access to experts and in light of the purported international recognition of science debunking Shaken Baby Syndrome across two global professional communities.  He offers no explanation other than having read Dr. Hayne's statements online.  The only logical conclusion the respondent reaches is that petitioner is merely seeking another opportunity to litigate a decided matter, his guilt.

Petitioner claims this evidence "cast[s] grave doubts on the conviction and death sentence in this case, since a great deal of the scientific testimony from the 2002 is now recognized as incorrect and incomplete."  (Pet'r's Mot. at 35).  In familiar fashion, petitioner offers an affidavit excuted by Dr. Hayne to show that his current opinion is in line with those who believe Shaken Baby Syndrome is incorrect.  *See Havard*, 86 So.3d at 910.

Rule 60(b)(3) of the Mississippi Rules of Civil Procedure is the appropriate provision for claims based on newly discovered evidence.  *See Mitchell v. Nelson*, 830 So.2d 635, 638 (Miss. 2007).  But, petitioner's motion is untimely under the plain language of the Rule's newly discovered evidence provision.  *Id.* at 639 (providing no more than six (6) months following "judgment, order, or proceeding was entered or taken."); *see also Ray v. Ray*, 963 So.2d 20, 23-24 (Miss. 2007) (refusing to grant extraordinary relief).  "It is a well-settled principle that a state may attach reasonable time limitations to the assertion of federal constitutional rights."  *Hester v. State*, 749 So.2d 1221, 1222 (Miss. Ct. App. 1999) (citing *Cole v. State*, 608 So.2d 1313, 1319 (Miss. 1992)).

Petitioner cannot satisfy the newly discovered evidence provision.  Final judgment came on March 10, 2006 after this Court affirmed petitioner's conviction and sentence and denied his motion for rehearing.  *Havard*, 928 So.2d 771.  The present motion was filed on November 25, 2013, well-

beyond the time period.  His untimeliness leaves this Court without discretion to grant relief under Rule 60(b)(3).  *See Carpenter*, 58 So.3d at 1162; *Mitchell*, 830 So.2d at 638.  Petitioner must proceed under Rule 60(b)(6), the catch-all provision.  In doing so, petitioner improperly moves this Court seeking an opportunity to re-litigate his guilt.

To circumvent this procedural hurdle, petitioner claims his fundamental rights will be violated if denied extraordinary relief.  He demands this Court grant him a new trial, or at least an evidentiary hearing, so that he may be afforded a fair opportunity to present this newly discovered evidence.  (Pet'r's Mot. at 39).  Specifically, petitioner argues his conviction and sentence are based upon "insufficient and flawed scientific proof" which "cannot stand because they violate fundamental rights . . .[and] prevent substantial justice."  (Id.).  Petitioner is mistaken.

The plain language of Rule 60(b)(6) and controlling precedent requires petitioner to justify relief on reasons **other than** newly discovered evidence.  *Mitchell*, 830 So.3d 639 (explaining that relief under the catch-all provision "must be based on some reason other than the first five enumerated clauses of the rule.") (citing *Briney,* 714 So.2d at 966); *Montgomery*, 759 So.2d 1240-1241 (following the U.S. Supreme Court in, *Klapprott*, 335 U.S. at 614-515, in finding the phrase "other reasons" as reference to reasons justifying relief other than those "five particularly specified . . . .") (citing *Askew*, 699 So.2d at 516); *see Carpenter*, 58 So.3d at 1162 (finding enumerated provisions mutually exclusive and courts lack discretion to grant relief under Rule 60(b)(6) for reasons specifically enumerated under parts (1)-(5)); *Hartford Underwriters Ins. Co. v. Williams*, 936 So.2d 888, 893-894 (Miss. 2006) (agreeing with Fifth Circuit's application of Rule 60(b)(6) to "cases of extreme hardship not covered under any of the other subsections.") (quoting *Burkett v. Burkett*, 537 So.2d 443, 445 (Miss. 1989), quoting *Smith v. Jackson Tool & Die, Inc.*, 426 F.2d 5

(5th Cir. 1970)).

Rule 60(b)'s exceptional and compelling circumstances standard is a measure designed to balance an individual's interests with the interest of finality. Several factors must be considered when determining whether exceptional and compelling circumstances require relief from judgment. This Court must recognize:

> (1) that final judgments should not lightly be disturbed; (2) that the Rule 60(b) motion is not to be used as a substitute for appeal; (3) that the rule should be liberally construed in order to achieve substantial justice; (4) [whether] the motion was made within a reasonable time; (5) [relevant only to default judgments]; (6) [whether] judgment was rendered after a trial on the merits-the movant had a fair opportunity to present his claim or defense; (7) intervening equities that would make it inequitable to grant relief; and (8) any other factors relevant to the justice of the judgment under attack.

*Carpenter v. Berry*, 58 So.3d 1158, 1162 (Miss. 2011) (quoting *M.A.S. v. Miss. Dep't of Human Servs.*, 842 So.2d 527, 530 (Miss. 2003)).  In addition, this Court must be mindful of the potential for a party's injustice; the same potential in others; and, reaffirming the public's confidence in the judicial process.  *Montgomery*, 759 So.2d at 1240-1241 (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863, 108 S.Ct. 2194, 2204, 100 L.Ed.2d 855 (1988)).  Petitioner's interest in obtaining an opportunity to be heard must be weighed against the interest of finality.  *Mitchell*, 830 So 2d at 639; *see Seven Elves, Inc. v Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981).

Petitioner *is* asking this Court to lightly set aside a final judgment even though he was afforded the opportunity to present this evidence at trial, on direct review and when applying for post-conviction relief.  *See Carpenter,* 58 So.3d at 1162. Petitioner's conviction and sentence have been reviewed, in depth, by a jury and by this Court, multiple times.  Given that petitioner has had ample opportunity to raise this accidental fall theory–on multiple occasions –the respondent submits

there are  no facts indicating the presence of any injustice.  *See Briney* 714 So.2d at 968;  *Noble House, Inc. v. W & W Plumbing & Heating Inc.*, 881 So.2d 377, 383 (Miss. Ct. App. 2004).

On direct review of petitioner's trial, this Court found that trial "counsel [ha]d request[ed] an independent evaluation of the autopsy report based on counsel's lack of medical training and need to develop a defense . . . [but was denied expert assistance] because counsel showed no basis for need . . . ." *Havard*, 928 So.2d at 788.  This Court ruled that "[t]he trial court exercised its discretion in refusing defense counsel's request for an independent evaluation, and . . . [found] no abuse of discretion in the trial court's action so as to deny Havard a fundamentally unfair trial." *Id.* at 789. In 2008, this Court came to the same conclusion and ruled that "trial court did not abuse its discretion by denying the defense's request for an independent expert." *Havard*, 988 So.2d at 330. Recently in 2012, this Court rejected petitioner's ineffective assistance claim based on the assertion that counsel failed to adequately develop a defense for failing to secure an independent pathologist. *Havard*, 86 So.3d at 907-908.  Petitioner now claims newly discovered evidence entitles him to extraordinary relief.

Rule 60(b)(6) "should be liberally construed in order to achieve substantial justice . . . ." *Carpenter,* 58 So.3d at 1162.  That said, substantial justice will not be achieved by granting petitioner extraordinary relief to re-litigate his conviction.  "[E]vidence should not be admitted to reverse the lower court's decision." *Mitchell*, 830 So.2d at 639 (citing *Lose*, 584 So.2d at 1286); *Montgomery*, 759 So. 2d at 1240. The "Rule . . . is a corrective device . . . ." *Montgomery*, 759 So. 2d at 1240.  The respondent contends, as this Court has held, petitioner received a fundamentally fair trial.  Petitioner's relief from judgment under Rule 60(b)(6), which is a corrective device, is improper.

Assuming petitioner were allowed an opportunity to present this testimony, this evidence does not make a different outcome in petitioner's conviction and sentence practically certain. "A motion for a new trial challenges the weight of the evidence." *Hathaway v. Lewis*, 114 So.3d 783, 786 (Miss. Ct. App. 2013) (citing *Bush v. State,* 895 So.2d 836, 844 (Miss. 2005)). A motion for new trial will be denied unless the verdict "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. "[T]he evidence should be weighed in the light most favorable to the verdict." *Id.* (citing *Bush,* 895 So.2d at 844).

Even now, Dr. Hayne opines "with a reasonable degree of medical certainty" that Chloe's cause of death would be classified "as **shaken baby syndrome** with impact or blunt force trauma." (Pet'r's Ex. "A" at 2) (emphasis added). As previously discussed, this evidence does not discredit Dr. Hayne's 2002 autopsy report or his trial testimony; and, does not render Shaken Baby Syndrome junk science. Further, petitioner was not convicted for having shaken Chloe to death. Petitioner was convicted for having actually killed Chloe while engaged in the commission of, or an attempt to commit, sexual battery. (CP vol. 2 at 216). Petitioner's evidence is offered to impeach, not to correct. *See Moore v. Jacobs*, 752 So.2d 1-13, 1017 (Miss. 1999) (finding evidence failed to show clearly and convincingly that newly discovered evidence demonstrated perjury). At no time do petitioner's experts opine on instances, as here, where there are injuries associated with trauma in addition to injuries attributable to Shaken Baby Syndrome.

Petitioner has had ample opportunity to present this evidence. When balancing petitioner's interests with the interest of finality, a balance has been struck. Justice does not require petitioner be permitted an opportunity to impeach the evidence supporting his conviction and sentence when that opportunity has been extended multiple times. The respondent submits that granting relief will

lead to injustice in this case and in other cases while undermining the public's confidence in the judicial process. *Montgomery*, 759 So.2d at 1240-1241 (citing *Liljeberg*, 486 U.S. at 863).

Petitioner's claims raised in his Rule 60(b) motion are identical to those raised under the UPCCRA. Petitioner's repetitiveness is significant as it relates to the relief he seeks. The extraordinary relief reserved under Rule 60(b)(6) is unique and separate from the UPCCRA. *See Montgomery*, 759 So. 2d at 1240 (explaining the rule is "a corrective device . . . ."). Granting relief under Rule 60(b) where relief is denied by the UPCCRA creates a significant risk of undermining the UPCCRA.

In *Gonzalez v. Crosby*, the United States Supreme Court recognized this distinction in the context of federal *habeas corpus* petitions. 545 U.S. 524, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005); *see Wilcher v. Epps*, 203 F. App'x 559, 562-63 (5th Cir. 2006). The Court recognized, that:

> [i]n some instances, a Rule 60(b) motion will contain one or more claims. For example, it might straightforwardly assert that owing to "excusable neglect," Fed. Rule Civ. Proc. 60(b)(1), the movant's habeas petition had omitted a claim of constitutional error, and seek leave to present that claim. *Cf. Harris v. United States*, 367 F.3d 74, 80-81 (C.A.2 2004) (petitioner's Rule 60(b) motion sought relief from judgment because habeas counsel had failed to raise a Sixth Amendment claim). Similarly, a motion might seek leave to present "newly discovered evidence." Fed. Rule Civ. Proc. 60(b)(2), in support of a claim previously denied. *E.g., Rodwell v. Pepe*, 324 F.3d 66, 69 (C.A.1 2003). Or a motion might contend that a subsequent change in substantive law is a "reason justifying relief," Fed. Rule Civ. Proc. 60(b)(6), from the previous denial of a claim. *E.g., Dunlap v. Litscher*, 301 F.3d 873, 876 (C.A.7 2002). **Virtually every Court of Appeals to consider the question has held that such a pleading, although labeled a Rule 60(b) motion, is in substance a successive habeas petition and should be treated accordingly**. *E.g., Rodwell, supra*, at 71-72; *Dunlap, supra*, at 876.
>
> We think those holdings are correct. A habeas petitioner's filing that seeks vindication of such a claim is, if not in substance a "habeas corpus application," at least similar enough that failing to subject it to the same requirements would be "inconsistent with" the statute. 28 U.S.C. § 2254 Rule 11. Using Rule 60(b) to present new claims for relief from a state court's judgment of conviction-even claims

couched in the language of a true Rule 60(b) motion-circumvents AEDPA's requirement that a new claim be dismissed unless it relies on either a new rule of constitutional law or newly discovered facts. § 2244(b)(2).  The same is true of a Rule 60(b)(2) motion presenting new evidence in support of a claim already litigated:  Even assuming that reliance on a new factual predicate causes that motion to escape § 2244(b)(1)'s prohibition of claims "presented in a prior application," § 2244(b)(2)(B) requires a more convincing factual showing than does Rule 60(b).  Likewise, a Rule 60(b) motion based on a purported change in the substantive law governing the claim could be used to circumvent § 2244(b)(2)(A)'s dictate that the only new law on which a successive petition may rely is "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."   In addition to the substantive conflict with AEDPA standards, in each of these three examples use of Rule 60(b) would impermissibly circumvent the requirement that a successive habeas petition be precertified by the court of appeals as falling within an exception to the successive-petition bar. § 2244(b)(3).

*Gonzalez*, 545 U.S. at 530-532 (opinion of Scalia, J.) (emphasis added).

Next, Justice Scalia pointed to several characteristics which serve to prevent undermining

the purpose of the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA).  For example,

[t]he Rule is often used to relieve parties from the effect of a default judgment mistakenly entered against them, *e.g., Klapprott*, 335 U.S., at 615, 69 S.Ct. 384 (opinion of Black, J.), a function as legitimate in habeas cases as in run-of-the-mine civil cases.  The Rule also preserves parties' opportunity to obtain vacatur of a judgment that is void for lack of subject-matter jurisdiction-a consideration just as valid in habeas cases as in any other, since absence of jurisdiction altogether deprives a federal court of the power to adjudicate the rights of the parties.  *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).  In some instances, we may note, it is the State, not the habeas petitioner, that seeks to use Rule 60(b), to reopen a habeas judgment granting the writ.  *See, e.g., Ritter v. Smith*, 811 F.2d 1398, 1400 (C.A.11 1987).

Moreover, several characteristics of a Rule 60(b) motion limit the friction between the Rule and the successive-petition prohibitions of AEDPA, ensuring that our harmonization of the two will not expose federal courts to an avalanche of frivolous postjudgment motions.  First, Rule 60(b) contains its own limitations, such as the requirement that the motion "be made within a reasonable time" and the more specific 1-year deadline for asserting three of the most open-ended grounds of relief (excusable neglect, newly discovered evidence, and fraud).  Second, our cases have required a movant seeking relief under Rule 60(b)(6) to show "extraordinary

circumstances" justifying the reopening of a final judgment. *Ackermann v. United States*, 340 U.S. 193, 199, 71 S.Ct. 209, 95 L.Ed. 207 (1950); accord, *id.*, at 202, 71 S.Ct. 209; *Liljeberg*, 486 U.S., at 864, 108 S.Ct. 2194; *id.*, at 873, 108 S.Ct. 2194 (REHNQUIST, C. J., dissenting) ("his very strict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved"). Such circumstances will rarely occur in the habeas context. Third, Rule 60(b) proceedings are subject to only limited and deferential appellate review. *Browder v. Director, Dept. of Corrections of Ill.*, 434 U.S. 257, 263, n. 7, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978). Many Courts of Appeals have construed 28 U.S.C. § 2253 to impose an additional limitation on appellate review by requiring a habeas petitioner to obtain a COA as a prerequisite to appealing the denial of a Rule 60(b) motion.

*Id.* at 534-535.

*Gonzalez* is particularly insightful. This Court "will routinely look to interpretation from the same federal rule." *Montgomery*, 759 So.2d at 1240-1241 (quoting *Stringfellow v. Stringfellow*, 451 So.2d 219, 221 (Miss. 1984)). For present purposes, *Gonzalez* identifies characteristics distinguishing Rule 60 challenges from collateral attacks and provides significant policy guidance in balancing petitioner's interests with interest of finality.

Petitioner moves this Court under Rule 60(b) motion in form only. Substantively, the claims raised in this petition amounts to a successive collateral attack disguised as a Rule 60 motion. In doing so, petitioner has placed this Court in a precarious position.

Petitioner recognizes the collateral relief claims he raises are procedurally barred under the UPCCRA. A motion seeking relief from judgment, which actually "seek[s] vindication of a claim is, if not in substance a [post-conviction] application, at least similar enough that failing to subject it to the same requirements would be inconsistent with the [UPCCRA]." *Gonzalez*, 545 U.S. at 531-532 (internal quotations omitted). By presenting new evidence in support of a claim already litigated and procedurally defective, petitioner moves this Court in a manner inconsistent with the UPCCRA.

As Justice Scalia identified, "a motion might seek leave to present newly discovered evidence

. . . in support of a claim previously denied." *Id.* at 531 (internal quotations omitted) (citing Fed. Rule Civ. Proc. 60(b)(2), *Rodwell*, 324 F.3d at 69).  Similarly, a motion that presents new evidence in support of a claim already litigated: "[e]ven assuming that **reliance on a new factual predicate** causes [petitioner's] . . . motion to escape [the UPCCRA's] prohibition of claims presented in a prior application . . . ." *Id.* at 531-532 (emphasis added) (internal quotations omitted).  By couching the same claims in the form of a Rule 60(b) motion, he encourages this Court to tap Rule 60(b)(6)'s equitable power to vacate his conviction and sentence in a manner entirely inconsistent with legislative intent underlying the UPCCRA.

In fact, the respondent argues that by allowing petitioner an opportunity to re-litigate his guilt under Rule 60(b)(6) defeats justice in this case, promotes injustice in others and perpetuates endless litigation.  The procedural bars of the UPCCRA, like the requirements of Rule 60(b), are designed to balance the parties' interests.  They do so in a variety of ways, many of which are similar to Rule 60(b)'s.  However, the UPCCRA and Rule 60(b) are not counterparts.  Rule 60(b)(6) is inherently deferential, specifically reserved for exceptional circumstances requiring extraordinary relief.  It would be inconsistent with the UPCCRA to allow petitioner to escape the "prohibition of claims presented in a prior application . . . ." *Gonzalez*, 545 U.S. at 531-32 (internal quotations omitted).  This point is underscored by the fact that petitioner has not and cannot justify the granting of extraordinary relief.

All meritorious claims are encouraged to be raised at trial and on appeal.  Those that cannot reasonably be raised at trial or on direct appeal may be litigated as provided by the UPCCRA. The incentive to vigorously litigate issues at trial and on direct appeal is dampened by an alternate path to relief.  Removing the incentive undermines the public's confidence in the judicial process by

promoting endless litigation and injustice.

Petitioner offers no legal or factual basis which would give the slightest indication this Court should overturn a jury's verdict and this Court's careful consideration. Therefore, petitioner should be denied leave to proceed in the trial court. The respondent submits there is no good reason which would justify granting petitioner extraordinary relief in this case. Therefore, petitioner is entitled to no relief from judgment.

## V.  CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the respondent respectfully requests the Court deny petitioner's Motion for Relief from Judgment or Leave to File Successive Petition for Post-Conviction Relief. The claims raised in this second, successive petition are barred. Alternatively, his claims are entirely devoid of merit. Further, the respondent respectfully requests this Court deny petitioner relief from judgment and / or leave to file in the trial court. Petitioner gives no good reason which would warrant extraordinary relief. For the reasons stated above, petitioner is entitled to no relief.

Respectfully submitted,

**JIM HOOD**
ATTORNEY GENERAL
STATE OF MISSISSIPPI

by:  _s/ Brad A. Smith_

**BRAD A. SMITH**
Special Assistant Attorney General
Miss. Bar No. 104321

s/ *Brad A. Smith*

**BRAD A. SMITH**
Special Assistant Attorney General
Miss. Bar No. 104321

**OFFICE OF THE ATTORNEY GENERAL**
Post Office Box 220
Jackson, Mississippi 39205
Telephone:   (601) 359-3680
Facsimile:   (601) 359-3796
Email:          bsmit@ago.state.ms.us

## CERTIFICATE OF SERVICE

This is to certify that I, Brad A. Smith, Special Assistant Attorney General for the State of Mississippi, have filed this Response to the relief from judgement or leave to file successive petition for post-conviction relief with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Mark D. Jicka                     Graham P. Carner
Watkins & Eager, PLLC            Graham P. Carner, PLLC
P.O. Box 650                     711 N. Congress Street
Jackson, MS 39205                Jackson, MS 39202

This, the 5th day of February, 2014.

Respectfully submitted,
**JIM HOOD**
ATTORNEY GENERAL
STATE OF MISSISSIPPI

by:  s/ Brad A. Smith

**BRAD A. SMITH**
Special Assistant Attorney General
Miss. Bar No. 104321

s/ Brad A. Smith

**BRAD A. SMITH**
Special Assistant Attorney General
Miss. Bar No. 104321

**OFFICE OF THE ATTORNEY GENERAL**
Post Office Box 220
Jackson, Mississippi 39205
Telephone:  (601) 359-3680
Facsimile:   (601) 359-3796
Email:        bsmit@ago.state.ms.us