2003 WL 21652472
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS UNPUBLISHED AND MAY
NOT BE CITED EXCEPT AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.

In the Matter of the CHILD OF Mandy (Miller) GREEN, and Brad Green, Parents.

Nos. C3-03-125, C1-03-205.   |   July 15, 2003.

Clay County District Court, File No. J10250573.

**Attorneys and Law Firms**

Beverley L. Adams, Serkland Law Firm, Fargo, ND, for appellant Mandy Green.

John I. Allen, Weerts Allen, LLC, Fargo, ND, for appellant Brad Green.

Lisa N. Borgen, Clay County Attorney, Michelle C. Winkis, Brian J. Melton, Assistant County Attorneys, Clay County Courthouse, Moorhead, MN, for respondent.

Theresa Quam, Detroit Lakes, MN, for guardian ad litem.

Considered and decided by KLAPHAKE, Presiding Judge, SHUMAKER, Judge, and HALBROOKS, Judge.

**Opinion**

**UNPUBLISHED OPINION**

GORDON W.SHUMAKER, Judge.

*1  In this proceeding for the termination of parental rights, appellants contend that the district court's findings are not supported by substantial evidence or are clearly erroneous, and that the court erred by admitting shaken-baby-syndrome evidence, excluding character evidence, and failing to adopt the guardian ad litem's recommendation. Because the substantial evidence supports the court's order and because we find no evidentiary error, we affirm.

**FACTS**

T.G., born April 30, 2002, is the son of appellant-father Brad E. Green and appellant-mother Mandy M. Green. On May 18, 2002, Sheri Fuller was babysitting T.G. when she noticed he was extremely fussy, had difficulty with bowel movements, and screamed in pain when she changed his diaper. The next day, the parents picked up T.G. from Fuller's home. On May 20, T.G. repeatedly vomited, and on May 21 the child started to "twitch." Appellants took T.G. to the hospital where he was diagnosed as suffering from a brain injury and a broken leg, secondary to shaken-baby syndrome. The county filed a CHIPS petition on behalf of T.G., who was placed in the custody of Clay County Social Services until early June 2002. He was then returned to appellants' care because an investigation by the Moorhead Police Department and Clay County Social Services was inconclusive as to who caused T.G.'s injuries

**352**

EXHIBIT
H1

At 11:30 a.m. on July 25, 2002, T.G. had an appointment with Dr. Hope Yongsmith, an ophthalmologist who had been treating him for retinal hemorrhages associated with shaken-baby syndrome. At the appointment, T.G. was "healthy, content, and was cooing." At around noon, T.G. returned home, and appellants decided to feed him. The mother left the room for approximately 30-45 seconds to retrieve a "burp" rag, and on her return she saw the father holding T.G., who was limp and barely breathing. The father stated that T.G. had been making "bicycling" motions with his legs and suffered a seizure. Appellants brought T.G. to the emergency room where on arrival he was blue, limp, and barely breathing. Dr. Rosaleah Bernardo, a pediatric critical-care doctor who treated T.G., initially diagnosed him as suffering from a spontaneous bleed, but she later changed the diagnosis to non-accidental trauma, seizure disorder, and multiple rib fractures.

Dr. Nathaniel Karlins, a radiologist, examined CT scans taken of T.G.'s brain on May 21 and compared them against CT scans taken on July 25, 2002. Dr. Karlins testified that T.G.'s injuries were suggestive of shaken-baby syndrome, and that T.G.'s hospitalization in July was related to new brain trauma and was not related to T.G.'s injuries of May 2002. Dr. Karlins also testified that T.G.'s broken leg is a type of fracture that is probably caused by grasping and twisting a child's legs during a shaken-baby incident. Dr. Karlins also noted that the child's ribs had been broken. He testified that the rib fractures occurred three weeks before July 25, 2002, and that fractures of that nature are associated with an adult's hands squeezing the chest of an infant and shaking it.

*2  Dr. James Reggin, a board-certified neurologist, testified that T .G.'s brain and leg injuries were non-accidental. Dr. Reggain also testified that T.G.'s (1) injuries were not caused by seizures, (2) injuries of July 25, 2002, were inflicted at some time between T.G.'s appointment with Dr. Yongsmith and prior to arriving at the emergency room, and (3) injuries were consistent with shaken-baby syndrome.

Dr. Ron Miller, a board-certified pediatrician, testified that (1) T.G. was shaken severely in late May 2002, (2) T.G.'s rib fractures were most likely caused by shaking that occurred sometime between May 2002 and July 25, 2002, and (3) T.G. was severely shaken on July 25, 2002, at sometime between his visit with Dr. Yongsmith and T.G.'s arrival at the emergency room. Dr. Miller also testified that resuscitation efforts performed on T.G. would not cause the types of injuries that he suffered on July 25, 2002.

Dr. Ross Pettit, a board-certified neurologist, reviewed T.G.'s medical records but did not examine T.G. Dr. Petit testified in May 2002 that T.G. suffered neurological injuries consistent with shaken-baby syndrome, but that there was a possibility that T.G.'s injuries of July 25, 2002, were caused by a seizure, efforts to resuscitate, or a spontaneous re-bleed of the May 2002 injuries.

Dr. John Plunkett, a board-certified pathologist, testified that T.G.'s injuries must have been caused by an "impact" injury, and that he does not agree with the current medical literature's association of injuries with shaken-baby syndrome. He also testified that the symptoms that T.G. exhibited on July 25, 2002, were the natural consequences of a seizure.

The mother testified that she does not believe that the father was the cause of T.G.'s injuries in either May or July 2002. The mother speculated that Sheri Fuller harmed the child in May 2002, and that the subsequent medical issues in July were caused by seizures, immunizations, or sequelae from T.G.'s injuries in May.

The court made extensive findings of fact, which include that (1) Fuller did not abuse the child; (2) while in the care of appellants during May 16 through 18, 2002, T.G. was violently shaken and thereby suffered a brain injury and broken right lower leg and (3) the child was subject to abuse by appellants in early to mid-July, during which T.G.'s ribs were fractured, and on July 25, when T.G.'s brain was severely injured. The court concluded that it is in the best interests of T.G. for the mother's parental rights to be terminated, because she is unable to protect T.G. from abuse, and that it is in the best interests of T.G. for the father's parental rights to be terminated, because of T.G.'s need to have a safe, healthy, and stable environment. This appeal followed.

# DECISION
## 353

The legislature has established nine criteria that support termination of parental rights. Minn.Stat. § 260C.301, subd. 1(b) (2002). The party petitioning for termination must prove one of the statutory grounds by clear and convincing evidence. *In re Welfare of J.S.*, 470 N.W.2d 697, 701 (Minn.App.1991), *review denied* (Minn. July 24, 1991). The "paramount consideration" in every termination case is the child's best interests. Minn.Stat. § 260C.301, subd. 7 (2002).

## I.

**\*3** Appellants argue that the district court made numerous findings that are not supported by substantial evidence or that are clearly erroneous. When reviewing a district court's findings in a termination of parental rights action, this court

> must determine whether the [district] court's findings address the statutory criteria, whether those findings are supported by substantial evidence, and whether those findings are clearly erroneous.

*In re M.D.O.*, 462 N.W.2d 370, 375 (Minn.1990). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cable Communications Bd. v. Nor-West Cable Communications P'ship*, 356 N.W.2d 658, 668 (Minn.1984). A finding is defined as clearly erroneous when the reviewing court is "left with the definite and firm conviction that a mistake has been made." *In re Guardianship of Dawson*, 502 N.W.2d 65, 68 (Minn.App.1993) (quoting *Gjovik v. Strope*, 401 N.W.2d 664, 667 (Minn.1987)), *review denied* (Minn. Aug. 16, 1993)).

### a. T.G.'s injuries of May 2002

The father argues that there

> is substantial evidence that clearly supports that T.G. did not suffer from shaken-baby syndrome at all, but rather that he sustained an impact injury. * * * The impact injury occurred on or about May 18, 2002.

The district court found that in May of 2002 T.G. suffered "neurological and visual trauma" and a "buckle" fracture to one of his distal tibias as a result of a shaken-baby incident. The district court based its findings on the testimony of (1) Dr. Hope Yongsmith, (2) Dr. Nathaniel Karlins, (3) Dr. James Reggin, and (4) Dr. Ron Miller. All four physicians agreed that T.G. suffered non-accidental trauma in May of 2002 that resulted in the child suffering from shaken-baby syndrome. Furthermore, the district court found that Dr. Ross Petit, who testified on behalf of appellants, agreed that T.G. sustained neurological injuries consistent with shaken-baby syndrome because of a May 2002 incident.

Although one of appellants' witnesses, Dr. John Plunkett, testified that the child's injuries were the result an impact injury instead of shaken-baby syndrome, the district court found his testimony to be not credible because Dr. Plunkett (1) is not a qualified neurologist, (2) has opinions that are based on tests performed on primates or adult human cadavers, not children, and (3) has a theory regarding sudden-impact injuries that "is not generally accepted in the relevant medical/scientific community * * *." *See Goeb v. Tharaldson*, 615 N.W.2d 800, 814 (Minn.2000) (holding that for novel scientific evidence to be admissible it must generally be accepted within relevant scientific community and that particular evidence derived from test has a foundation that is scientifically reliable).

Because the evidence relied on by the district court is adequate to support its conclusion that T.G. suffered from shaken-baby syndrome in May of 2002, its finding is supported by substantial evidence and is not clearly erroneous.

### b. *T.G.'s injuries of July 2002*

**\*4** The father argues that there is not clear and convincing evidence that the injuries suffered by T.G. in July 2002 were the result of shaken-baby syndrome. The district court concluded

## 354

there can be absolutely no other explanation for the occurrence of Child's injuries and symptoms which he exhibited to the ER at Meritcare at 1:30 p.m. on July 25, 2002, other than the that that he was violently shaken [on that day].

The court's finding is supported by the testimony of Dr. Reggin, who testified that T.G.'s injuries of July 2002 were to a reasonable degree of medical certainty non-accidental and caused by violent shaking. Dr. Miller testified that T.G.'s injuries of July 2002 were the result of T.G. being violently shaken on July 25, 2002, and Dr. Karlins testified that T.G.'s injuries of July 25, 2002, are suggestive of injuries caused by shaken-baby syndrome. Furthermore, Dr. Yongsmith testified that the injuries T.G. suffered in July of 2002 could only have been caused by his having been shaken sometime between 12:15 p.m. and 1:30 p.m. on that date. Although Dr. Petit testified that T.G.'s injuries of July 2002 could have been caused by a seizure or by resuscitation attempts, both Dr. Reggin and Dr. Miller testified that T.G.'s injuries of July 2002 were not caused by seizures or resuscitation attempts.

The district court's finding that the injuries suffered by T.G. in July of 2002 were the result of his being violently shaken is supported by substantial evidence and is not clearly erroneous.

### c. Is the district court's finding supported by substantial evidence that T.G.'s parents inflicted the injuries he suffered in May of 2002?

Appellants argue that the district court's finding that they were the cause of injuries suffered by T.G. in May of 2002 is clearly erroneous. The mother argues that the district court cannot make a determination

about when the child suffered abuse in May of 2002, because there is no medical testimony or lay testimony to prove by clear and convincing evidence that [T.G.] was harmed on any specific date.

The district court found that

[T.G.] experienced an incident of child abuse by being violently shaken, which resulted in brain injury and a broken right lower leg, while Child was in the care of Mother and Father sometime in the period of May 16, 2002, to May 18, 2002. The Court is unable to make any specific finding based upon clear and convincing evidence, as to which parent perpetrated said act of child abuse.

The district court's found that the testimony of Sheri Fuller, T.G .'s maternal aunt, showed that T.G. appeared normal on May 16, 2002, but that on May 18 the child was "extremely fussy, had difficulty with bowel movements, and screamed in pain when she would bring his legs up to put the diaper underneath him." The district court found that the child was only in the care of appellants and Ms. Fuller between May 16 and 18 and that Ms. Fuller did not cause the harm to the child; therefore, it concluded that the parents were the perpetrators of the abuse against T.G.

*5 In a civil case,

[i]f the circumstantial evidence furnishes a reasonable basis for inferences by the jury of the ultimate fact that the alleged acts of the defendant caused the injury complained of, it is sufficient proof of causal connection to sustain a verdict.

*Erickson v. Strickler,* 252 Minn. 351, 355, 90 N.W.2d 232, 236 (1958). Although there is no direct evidence that appellants abused the child in May of 2002, the circumstantial evidence that the parents abused T.G., in conjunction with the child's subsequent injuries to his ribs and his brain, constitutes a pattern by which a finder of fact could reasonably conclude that

**355**

appellants committed an act of abuse against T.G. in May of 2002. Therefore, the district court's finding is supported by substantial evidence and is not clearly erroneous.

## II.

The mother argues that the county failed to prove by clear and convincing evidence that the testimony by T.G.'s treating physicians regarding shaken-baby syndrome was admissible because the county failed to show that it met the Frye-Mack standard for novel scientific evidence. The district court determined that the evidence regarding shaken-baby syndrome was properly admitted because

> [t]he medical concept and/or theory that an infant can sustain severe brain injury if violently shaken, even in the absence of outward evidence of trauma, is generally accepted in the medical community by physicians who regularly examine, diagnose, or treat infants who have sustained brain injuries or suffer from brain disease.

A district court's evidentiary ruling on the admissibility of an expert opinion rests within its sound discretion and will not be reversed unless the court's decision is based on an erroneous view of the law or it is an abuse of discretion. *Benson v. N. Gopher Enters., Inc.,* 455 N.W.2d 444, 445-46 (Minn.1990). The district court has "considerable discretion in determining the sufficiency of foundation laid for expert opinion." *Reinhardt v. Colton,* 337 N.W.2d 88, 92 n. 1 (Minn.1983). Expert opinion is admissible "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and if the "witness [is] qualified as an expert by knowledge, skill, experience, training, or education." Minn. R. Evid. 702.

Under the Frye-Mack standard, a novel scientific technique that produces evidence to be admitted at trial must be generally accepted within the relevant scientific community, and the particular evidence derived from the technique and used in an individual case must have a foundation that is scientifically reliable. *State v. Roman Nose,* 649 N.W.2d 815, 818 (Minn.2002). Scientific evidence is considered "novel" if an appellate court has not considered it before and if it is sufficiently different from a previously accepted standard. *Id.* at 821 (stating that "[b]ecause the PCR-STR method is a new scientific technique that this court has never before considered, and because it is sufficiently different from the RFLP method, the evidence obtained from the technique is novel scientific evidence").

*6 Although an expert's methodologies for making a medical diagnosis can constitute novel scientific evidence, *see Goeb,* 615 N.W.2d at 816, shaken-baby syndrome does not constitute "novel" scientific evidence because it has been considered several times by appellate courts previously and is not a "new" scientific standard. *See, e.g., State v. Orfi,* 511 N.W.2d 464, 471-72 (Minn.App.1994) (concluding evidence sufficient to find toddler's death caused by violent shaking), *review denied* (Minn. Mar. 15, 1994); *State v. Olson,* 459 N.W.2d 711, 715 (Minn.App.1990) (concluding evidence sufficient to find infant's fatal brain injury caused by shaking), *review denied* (Minn. Oct. 25, 1990). Therefore, the district court did not abuse its discretion by not first determining whether evidence of shaken-baby syndrome meets the Frye-Mack standard, and the evidence is admissible under Minn. R. Evid. 702 because the witnesses testifying about the diagnosis were recognized as experts by the district court and their opinions could help the district court understand the evidence.

## III.

The father argues that the district court abused its discretion by determining that evidence of appellants' good character "is not admissible for the purpose of proving that said person acted in conformity with said character on a particular occasion." The father acknowledges that character evidence is generally "not admissible in a civil trial unless a person's character is an element

# 356

In re Child of Green, Not Reported in N.W.2d (2003)

_____

of the charge, claim or defense," but he claims that "the nature of the allegations that [he] inflicted T.G. with egregious harm * * * makes [his] character a central element of the allegations."

Generally, character evidence is inadmissible to show the person acted in conformity with a character trait on a particular occasion. Minn. R. Evid. 404(a); *State v. Washington*, 521 N.W.2d 35, 39 (Minn.1994). The district court "has the discretion to refuse to receive inadmissible evidence offered without objection." *St. Croix Eng'g Corp. v. McLay*, 304 N.W.2d 912, 914 (Minn.1981) (citation omitted).

The father's parental rights were terminated pursuant to Minn.Stat. § 260C.301, subd. 1(b)(6), which allows the court to terminate parental rights if the "child has experienced egregious harm in the parent's care." Because the character of the person alleged to have abused a child is not a material element of the statutory ground in question, and because the father seeks to have the disputed evidence admitted in order to show that he acted in conformity with his alleged character traits on the occasions when T .G. was harmed, the district court did not abuse its discretion by excluding the evidence.

### IV.

Appellants allege that the district court was clearly erroneous in not following the recommendations of the guardian ad litem. The guardian ad litem, Theresa Quam, testified that it was not in the best interest of the child for appellants' parental rights to be terminated because she did not believe that T.G. suffered egregious harm while in their care. The court did not adopt Quam's opinions because

> *7 they are inconsistent with the Court's Finding of Fact that [T.G .] did incur egregious harm while in the physical custody of [appellants] on July 25, 2002, on two occasions prior thereto.

The supreme court recently stated, "The importance of the guardian ad litem in the child protection system must be underscored ." *In re Welfare of J.R., Jr.*, 655 N.W.2d 1, 5 (Minn.2003). A guardian ad litem is a party to a termination of parental rights action, Minn. R. Juv. P. 57.01, subd. 1, and is appointed by the court "to protect the interests of the minor" and advocate for the child. Minn.Stat. § 260C.163, subd. 5 (2002).

While the opinion of the guardian ad litem is admissible as evidence, *In re Welfare of R.T.*, 364 N.W.2d 884, 887 (Minn.App.1985), and the guardian shall "present written reports on the child's best interests," Minn.Stat. § 260C.163, subd. 5(b)(5), neither caselaw nor statutory law mandates that the district court adopt the guardian's opinion. Because the guardian ad litem has no greater authority before the court than does any other party, and because a party's opinion is not controlling on a district court's findings or determinations, the district court did not err by rejecting the guardian's opinion.

### V.

The mother argues that her parental rights cannot be terminated because there was neither testimony nor evidence to support the finding that she inflicted bodily harm on T.G. The district court found that T.G. had been subjected to egregious harm on at least three occasions while in the care of appellants: (1) May 2002, from which T.G. suffered severe brain injury and a fracture to his right leg; (2) mid-July 2002, in which T.G. had three of his ribs broken; and (3) July 2002, in which T.G. suffered severe brain injury. The court found that either the mother or the father perpetrated the abuse against T.G. in the May and mid-July of 2002 incidents, and that

> Mother has no insight into the fact that the Child requires protection from abuse by Father. Her inability to recognize the past risk of injury that her Child has been subjected to, and may continue to be subject to in the future should he be returned to her care, renders her unfit to care for him.

**357**

Mandy Green's parental rights were terminated pursuant to the following statutory provision:

> [T]hat a child has experienced egregious harm in the parent's care which is of a nature, duration, or chronicity that indicates a lack of regard for the child's well-being, such that a reasonable person would believe it contrary to the best interest of the child or of any child to be in the parent's care[.]

Minn.Stat. § 260C.301, subd. 1(b)(6). "Egregious harm" does not require that

> the parent has inflicted egregious harm on his or her own child but, rather, that a child has experienced egregious harm in the parent's care which demonstrates the parent's grossly inadequate ability to provide minimally adequate parental care to any child.

**\*8** *In re Welfare of A.L.F.,* 579 N.W.2d 152, 155-56 (Minn.App.1998) (affirming termination of parental rights of child when parent inflicted egregious harm on a child to whom he was not related). The district court found that appellants were caring for T.G. when he suffered three incidents of egregious harm, and Dr. Miller testified that because of the injuries T.G. suffered that he is "likely to have a life-long seizures, learning and behavior problems, mild motor handicaps, * * * possible visual and hearing loss, possible severe mental retardation."

Because the egregious-harm requirement does not necessarily require that the parent inflict egregious harm on his or her own child but that the child suffered egregious harm while under the parent's care, and because T.G. was in the mother's care when he suffered egregious harm on at least three occasions, the district court did not err by determining that the requirements of Minn.Stat. § 260C.301, subd. 1(b)(6), were satisfied so as to justify terminating her parental rights. *See In re Welfare of Maas,* 355 N.W.2d 480, 483 (Minn.App.1984) (supporting that trial court properly considered mother's continued defense of boyfriend's actions when terminating mother's parental rights).

**VI.**

The mother argues that it is not in the child's best interests for her parental rights to be terminated because there is no evidence that she caused him egregious harm. The district court is precluded from terminating parental rights where the record does not show that termination is in the child's best interests, even if one of the statutory prerequisites for termination exists, because a child's best interests are the paramount consideration in proceedings to terminate parental rights. *In re Welfare of M.P.,* 542 N.W.2d 71, 74-75 (Minn.App.1996), *overruled in part on other grounds by In re Welfare of J.M.,* 574 N.W.2d 717, 722-24 (Minn.1998). Three factors guide this court in reviewing the district court's conclusion that termination is in the best interests of the child: (1) the child's interests in maintaining the parent-child relationship; (2) the parent's interests in maintaining the parent-child relationship; and (3) any competing interests of the child. *In re Welfare of R.T.B.,* 492 N.W.2d 1, 4 (Minn.App.1992).

The district court rejected Mandy Green's argument stating that

> termination of parental rights of the non-abusive parent is warranted if the evidence establishes that the non-abusive parent is unable to protect the Child due to a psychological inability to perceive the risk the abusive parent poses to the Child.

The court also found that appellants neglected T.G. when he was a newborn, allowed him to be cared for by a woman whose parental rights had been terminated, ignored calls from the child-care provider who informed them that T.G. was in distress, and that egregious harm would likely continue for an indeterminate period in the future if T.G. was returned.

**358**

In re Child of Green, Not Reported in N.W.2d (2003)

**\*9** Because the district court considered the factors relevant to a child's best interests, and because the district court need not determine that the parent whose rights are terminated directly harmed the child but that the harm occurred while the child was in that parent's care, the district court's determination that it is in T.G.'s best interests for the mother's parental rights to be terminated is supported by substantial evidence and is not clearly erroneous.

## VII.

The father argues that there is no substantial evidence supporting the district court's determination that it is in T.G.'s best interests for the father's parental rights to be terminated. The district court found that the father neglected T.G. during his first three weeks of life by allowing him to be cared for by an individual whose parental rights had been terminated, ignored calls from a care provider informing him that T.G. was in distress, had harmed the child on at least one occasion, and that the child would likely suffer harm in the future if he was returned to his father's care. The district court's determination is supported by substantial evidence, is not clearly erroneous, and considers all of the relevant factors associated with the child's best interests.

**Affirmed.**

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**359**

State v. Butts, Not Reported in N.E.2d (2004)
2004 -Ohio- 1136

2004 WL 449245

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF LEGAL
AUTHORITY.
Court of Appeals of Ohio,
Tenth District, Franklin County.

STATE of Ohio, Plaintiff–Appellee,
v.
Alan J. BUTTS, Defendant–Appellant.

No. 03AP–495.    |    Decided March 11, 2004.

**Synopsis**
**Background:** Defendant was convicted in a jury trial
in the Court of Common Pleas, Franklin County,
No. 02CR02-1092, of murder, involuntary manslaughter,
felonious assault, and two counts of endangering child.
Defendant appealed.

**Holding:** The Court of Appeals, Bowman, J., held that
evidence was sufficient to support convictions.

Affirmed.

West Headnotes (1)

[1]    **Assault and Battery**
⬦ Aggravated or felony assault

**Homicide**
⬦ Cause of death

**Homicide**
⬦ Miscellaneous particular circumstances

Evidence was sufficient to support convictions
for murder, involuntary manslaughter, felonious
assault, and endangering; record demonstrated
that alleged child victim had been in the sole
custody of defendant, and three physicians
testified that the cause of alleged victim's death
was shaken baby syndrome.

1 Cases that cite this headnote

Appeal from the Franklin County Court of Common Pleas.

**Attorneys and Law Firms**

Ron O'Brien, Prosecuting Attorney, and Susan E. Day, for
appellee.

Tyack, Blackmore & Liston Co., L.P.A., and Thomas M.
Tyack, for appellant.

**Opinion**

BOWMAN, J.

*1 {¶ 1} Defendant-appellant, Alan J. Butts, was indicted
on charges of murder, involuntary manslaughter, felonious
assault and two counts of endangering with regard to the death
of Jayden Unger. After a jury trial, appellant was found guilty
of all five counts. Appellant was sentenced to a term of 15
years to life imprisonment on Count 1, murder; six years for
Count 3, felonious assault; six years for Count 4, endangering
children; and four years for Count 5, endangering children, all
to run concurrently. Count 2, involuntary manslaughter, was
merged with Count 1. Appellant filed a notice of appeal and
raises the following assignments of error:

I. THE JUDGMENT OF CONVICTION IN THE WITHIN
CASE IS NOT SUPPORTED BY THE QUANTUM OF
EVIDENCE REQUIRED BY LAW. IT IS THEREFORE,
CONTRARY TO LAW.

II. THE FINDING OF THE JURY IS AGAINST THE
MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 2} Columbus Police Officers Tim Keller and Michael
Holbrook arrived first on the scene on February 13, 2002.
They had been dispatched to an apartment because of a hang-
up of a 911 call, followed by a second call, and found two-
year old Jayden Unger unconscious on the living room floor.
When the police arrived at the address, appellant beckoned
the police inside. Both officers testified Jayden was pale,
cold to the touch and turning blue around his lips and nails.
One officer started CPR, the other questioned appellant, who
told the officer that he had been playing with a Sony Play
Station when Jayden put his arms up in the air, tilted his head
back, and fell over and struck his head on the carpet. Within
minutes of their arrival, and after the officers indicated that
the scene was safe, the paramedics entered the apartment and
took charge of treating Jayden.

**360**

EXHIBIT
H2

State v. Butts, Not Reported in N.E.2d (2004)
_____
2004 -Ohio- 1136

{¶ 3} Jayden's mother, Beth Unger, testified that she has known appellant for two and one-half years, he is her boyfriend and, on February 13, 2002, she lived with appellant and her son. Jayden had been sick for approximately one week. He had been dizzy, not as talkative, not as active, falling more often and just not acting like himself. She had been giving him Triaminic, and had discussed taking Jayden to the doctor but she had not taken him yet. That Saturday, appellant and Jayden took her to work at approximately 1:00 p.m. She received a telephone call while at work that Jayden had fallen and was being lifeflighted to Children's Hospital. Jayden died the next day, on February 14, 2002, after being taken off life support. She stated that appellant acted in a very loving way towards Jayden and treated him as if he were his own son. She never saw appellant do anything abusive or inappropriate, and Jayden called appellant "Dad." (Tr. at 48.)

{¶ 4} Sean Condron, a friend of appellant, testified that he went to appellant's house at approximately 1:00 p.m., to play Sony Play Station with appellant. Jayden was a little "fussy," but Condron saw him eat a cookie and drink some juice before he left at approximately 2:30 p.m. (Tr. at 53.) Appellant put on music for Jayden and let him push buttons on the video game.

**\*2** {¶ 5} Several paramedics testified about Jayden's condition and the treatment rendered. Twelve minutes elapsed from the time of the original dispatch until the time the paramedics began working on Jayden. Upon arrival, Jayden was on the floor on his back and appeared pale, limp, cold, had a blue tint around his lips and was not moving. He had no pulse and no heart rate. As he did not respond to a chest rub, he was intubated and given oxygen, but did not revive. He was given a total of six doses of epinephrine, a drug to start the heart. Three minutes must elapse between each dose. The paramedics were able to restart Jayden's heart, lost the heart beat and started it again. He was taken by Medflight to Children's Hospital. While on Medflight, his heart stopped again and he was given another dose of epinephrine. The Medflight nurse testified that Jayden's pupils were fixed and fully dilated, which is usually an indication of severe brain damage either from an event or anoxia, which is a lack of oxygen to the brain.

{¶ 6} Jayden arrived at Children's Hospital in a life-threatening situation. As explained by the pediatric surgeon and director of the trauma program at Children's Hospital, Dr. Jonathon Groner, when Jayden arrived he was comatose, intubated, had various IVs and his body temperature was

91 degrees, which meant that he either had a very long resuscitation or some interval passed between the time of injury and until he entered the healthcare system. CT scans of his head and abdomen were conducted and an ophthalmologist did an exam. The next afternoon he was taken off life support and died. The final diagnosis was that Jayden died of a head injury believed to be shaken baby syndrome.

{¶ 7} Charles F. Johnson testified as an expert in the area of child abuse. He currently works as a staff physician in the child advocacy program at Children's Hospital and is board certified in pediatrics. He explained how head injuries occur in children, and distinguished the model he used for demonstrative purposes, which was of a newborn, from brain injuries in toddlers or adults. He explained what injuries a doctor would expect to find in a child that had experienced shaken baby syndrome, including subdural bleeding, no external injuries except rarely rib fractures or unusual fractures of the legs, retinal hemorrhages in 85 percent of the cases, and bleeding in the sheath of the nerves from the eyes to the skull which can be detected only during an autopsy.

{¶ 8} Dr. Johnson conducted a consultation of Jayden while he was at Children's Hospital on February 14, 2002. He reviewed the hospital chart, discussed the x-rays with a pediatric neuroradiologist, examined Jayden, spoke to the charge nurse, the mother, the maternal grandparents and two aunts, looked at the x-rays, CT scans and reviewed the laboratory work. Dr. Johnson testified that the CT scan showed edema, which means swelling or fluid; subdural blood, which is bleeding that is under the covering of the brain, between the dura and the brain; and swelling of one side of the brain. Jayden also had hypoxic injury to his lungs and bowels, as the result of oxygen deprivation. Dr. Johnson testified that he would not expect a fall to the floor to cause a child to be unconscious, have a seizure or die, nor would he expect optic nerve hemorrhages, or constellation of subdural hemorrhages and retinal hemorrhages. A standing fall to the floor could not have been the cause of the injuries because there is an insufficient distance to the floor, there was no evidence of external injury, no fracture and no epidural hemorrhage. Dr. Johnson believed the injury occurred after the time that Jayden ate a cookie and juice because, after suffering an injury of this severity, he would not expect a person to be capable of sophisticated neurofunction and believes that Jayden would have been unconscious within seconds or minutes of the injury. Dr. Johnson was asked if

**361**

State v. Butts, Not Reported in N.E.2d (2004)

2004 -Ohio- 1136

Jayden had fallen and hit his head on a porcelain bathtub and experienced several other falls in that prior week, if the cumulative effect of the falls was a concern, and he answered that the cumulative effect would not lead to death. Dr. Johnson concluded that the history that was given to him did not explain the injuries and he believes Jayden experienced a non-accidental head injury with primarily an acceleration-deceleration component, shaken baby syndrome.

*3 {¶ 9} Jayden's treating pediatric surgeon at Children's Hospital, Dr. Groner, was certified as an expert in pediatric medicine. Dr. Groner testified that Jayden's injuries to his brain as seen on his CT scan and injuries to his eyes are not consistent with a fall from standing height. He believed Jayden's injuries would have been immediately incapacitating. He also stated that several falls in the week before Jayden's death would not have caused the optic nerve hemorrhages or the retinal hemorrhages.

{¶ 10} The attending physician at Children's Hospital, Karla Hauersperger, described Jayden's condition upon arrival at the hospital and the procedures which were performed. She stated that the head CT scan showed that there was blood collection around the surface of the brain and into the different folds of the brain, and diffused cerebral edema or swelling of the brain. Jayden also had retinal hemorrhages to both eyes. The paramedics' report listed in the history that Jayden had slipped and fallen, but Dr. Hauersperger testified that history and the degree of injury were incompatible. Her conclusion was that Jayden sustained a non-accidental head injury, most consistent with shaken baby syndrome, and the injury would have been immediately incapacitating.

{¶ 11} The coroner who conducted the autopsy on Jayden testified that Jayden had some bruises, an ill-defined area of hemorrhage into soft tissues around his left ear, an area of hemorrhage that was ill-defined in the right occipital scalp in the back of his head, subdural hematoma or hemorrhage, cerebral edema, hemorrhage around the spinal cord which was probably due to being on his back at the hospital, hemorrhage in the sheath around both optic nerves and hemorrhage into his retina in the left eye. The coroner opined that it was highly unlikely that his injuries could have been caused by a fall because there was no point of impact where he hit his head, and, to cause such injuries by a fall, the fall had to have been from a height greater than five to ten feet. The coroner believed that Jayden's injuries lead to the conclusion that the cause was shaken baby or shaken impact syndrome, where the child hits something while being shaken.

The information about prior falls by Jayden did not alter the coroner's opinion regarding the cause of the injuries because there was no evidence of any significant head trauma from prior falls.

{¶ 12} Appellant testified that Jayden had fallen in the bathtub five to seven days prior to the incident and there was a dramatic change in his behavior after the fall; Jayden did not eat or talk as much and he wanted to be held more often. On February 13, he and Jayden took Beth to work and, after they returned, a friend visited and they played video games. After the friend left, Jayden fell over, and, when appellant investigated, Jayden was nonresponsive. He testified that he loved Jayden and he did not injure, shake or strike him.

*4 {¶ 13} John Plunkett, M.D., a laboratory and medical education director at Regina Hospital in Hastings, Minnesota, who is board certified in anatomic pathology, clinical pathology and forensic pathology, testified on behalf of appellant. Dr. Plunkett reviewed copies of Jayden's medical records from Children's Hospital, the autopsy report, photographs and slides.

{¶ 14} Dr. Plunkett testified that there is a scientific invalidity with the concept of shaken baby syndrome because one does not cause injuries usually associated with shaken baby syndrome by shaking a child. He believes that the theory of retinal bleeding being a sign of shaken baby syndrome is not a valid assessment.

{¶ 15} Dr. Plunkett reviewed the readings of the CT scans, but not the CT scans themselves, and testified it showed a loss of gray/white matter distinction in the brain, something that occurs or is seen 12 to 24 or more hours after an injury or event. He believes that the CT scan strongly suggests that the brain swelling started 12 to 24 hours or more prior to Jayden's admission to the hospital. He believes Jayden's cause of death was brain swelling probably due to impact injury and may have been complicated by pneumonia. He testified that Jayden's behavior the week before, which included not eating, being fussy and lack of coordination, were consistent with a pre-existing head injury possibly suffered from the fall in the bathtub.

{¶ 16} Dr. Plunkett did not think that Jayden died of shaken baby syndrome because appellant would need to generate 2,400 pounds of force to cause such injuries based on Jayden's weight of 30 pounds. Rather, he believes that the brain swelling was the result of hypoxia, which was very long in

**362**

State v. Butts, Not Reported in N.E.2d (2004)
2004 -Ohio- 1136

this case. The police had been dispatched at 4:36 p.m., as the result of a 911 hang-up call and arrived approximately three to five minutes later. The paramedics waited until the police officers indicated the scene was safe before entering, per normal procedure. It took 12 minutes from the dispatch until the paramedics began working on Jayden. The epinephrine that was administered to start Jayden's heart requires three minutes to elapse between doses, and Jayden received six doses before his heart responded. Jayden's heart also stopped again during the Medflight.

{¶ 17} On cross-examination, Dr. Plunkett admitted that his opinion is contrary to what has been taught in medical schools since 1972, is contrary to the views of the American Pediatric Academy and that an overwhelming majority of pediatricians disagree with his opinion.

{¶ 18} The assignments of error are related and shall be addressed together. By the first assignment of error, appellant contends that the judgment of conviction is not supported by sufficient evidence and, by the second assignment of error, appellant contends that the verdict is against the manifest weight of the evidence.

{¶ 19} The standard of review for sufficiency of the evidence is if, while viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.

**\*5** {¶ 20} The test for determining whether a conviction is against the manifest weight of the evidence differs somewhat from the test as to whether there is sufficient evidence to support the conviction. With respect to manifest weight, the evidence is not construed most strongly in favor of the prosecution, but the court engages in a limited weighing of the evidence to determine whether there is sufficient competent, credible evidence which could convince a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. See *State v. Conley* (1993), Franklin App. No. 93AP–387.

* * * Weight of the evidence concerns "the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing

the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*" (Emphasis added.) Black's [Law Dictionary (6th Ed.1990) ] at 1594). *Thompkins,* at 387, 678 N.E.2d 541.

{¶ 21} The three physicians, who had examined or treated Jayden, and the coroner testified that Jayden died as a result of a non-accidental and immediately incapacitating injury, which resulted in the constellation of injuries comprising shaken baby syndrome. First, Dr. Johnson testified concerning the injuries that one would generally expect to find in a child that had experienced shaken baby syndrome, including subdural, not epidural, bleeding, no external injuries except rarely rib fractures or unusual fracture of the legs, retinal hemorrhages in 85 percent of the cases and bleeding in the sheath of the nerves from the eyes to the skull, which can be seen only during an autopsy. In Jayden, the injuries included edema, optic nerve hemorrhages, or constellation of subdural hemorrhages and retinal hemorrhages. Dr. Johnson discounted the possibility that falls the previous week or on February 13 as the cause of death.

{¶ 22} Dr. Groner, Jayden's treating pediatric surgeon at Children's Hospital, testified that Jayden's injuries to his brain, as seen on his CT scan, and injuries to his eyes are not consistent with a fall from standing height. He believed Jayden's injuries would have been immediately incapacitating. He also stated that several falls in the week before Jayden's death would not have caused the optic nerve hemorrhages or the retinal hemorrhages.

{¶ 23} The attending physician at Children's Hospital, Dr. Hauersperger, also stated that the head CT scan showed that there was blood collection around the surface of the brain and into the different folds of the brain, and diffused cerebral edema. Jayden also had retinal hemorrhages to both eyes. The paramedics' report listed the history as Jayden had slipped and fallen, but Dr. Hauersperger opined that history and the degree of injury were incompatible. Her conclusion was that Jayden sustained a non-accidental head injury, most consistent with shaken baby syndrome, and the injury would have been immediately incapacitating.

**\*6** {¶ 24} The coroner testified that Jayden's injuries included hemorrhage in the sheath around both optic nerves and hemorrhage into his retina in the left eye. The coroner opined that it was highly unlikely that his injuries could have

**363**

State v. Butts, Not Reported in N.E.2d (2004)

2004 -Ohio- 1136

been caused by a fall because there was no point of impact where he hit his head, and, to cause such injuries by a fall, the fall had to have been from a height greater than five to ten feet. The coroner believed that the injuries lead to the conclusion that the cause was shaken baby or shaken impact syndrome. The information about prior falls by Jayden did not alter the coroner's opinion regarding the cause of the injuries because there was no evidence of any significant head trauma from prior falls.

{¶ 25} Jayden had the three injuries which comprise the typical shaken baby syndrome injuries, including subdural hemorrhage, retinal hemorrhage and optic nerve hemorrhage. All of these doctors testified that, knowing of Jayden's previous falls, including one in the bathtub, did not change their opinion and conclusion that Jayden died as a result of shaken baby syndrome. They testified that the injuries would be immediately incapacitating.

{¶ 26} Although appellant's expert testified that there is a scientific invalidity with the concept of shaken baby syndrome because one does not cause injuries usually associated with shaken baby syndrome by shaking a child, he admitted that his opinion is contrary to what has been taught in medical schools since 1972, is contrary to the views of the American Pediatric Academy and that an overwhelming majority of pediatricians disagree with his opinion, including the ones that testified for the prosecution.

{¶ 27} Dr. Plunkett testified that Jayden's brain swelling was the result of hypoxia and that the CT scan strongly suggests that the brain swelling started 12 to 24 hours or more prior to Jayden's admission to the hospital. He believes Jayden's cause of death was brain swelling, probably due to impact injury and may have been complicated by pneumonia, not the result of shaken baby syndrome because appellant would need to generate 2,400 pounds of force to cause such injuries since Jayden weighed 30 pounds.

{¶ 28} The existence of conflicting evidence does not render the evidence insufficient as a matter of law. *State v. Murphy*

(2001), 91 Ohio St.3d 516, 543, 747 N.E.2d 765. Similarly, a conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony. *State v. Kendall* (June 29, 2001), Franklin App. No. 00AP–1098. The trier of fact makes determinations of credibility and the weight to be given to the evidence. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 29} It is not unusual that evidence of shaken baby syndrome may be primarily circumstantial, especially where a child is in the sole custody of one adult at the time the injuries are sustained. See *State v. Gulertekin* (Dec. 3, 1998), Franklin App. No. 97APA12–1607, in which this court found sufficient circumstantial evidence to support a conviction of child endangering where an infant suffered injuries consistent with shaken baby syndrome while entrusted to the defendant's care. While appellant presented a credible defense, in this case, when viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. There is sufficient competent, credible evidence which could convince a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. The judgment of conviction is supported by sufficient evidence and the verdict is not against the manifest weight of the evidence. Both of appellant's assignments of error are not well-taken.

*7 {¶ 30} For the foregoing reasons, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

Judgment affirmed.

BRYANT and PETREE, JJ., concur.

**Parallel Citations**

2004 -Ohio- 1136

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**364**

*ABA Journal August, 1998*

Copyright © American Bar Association, 1998.
ABA Journal

August, 1998

84 A.B.A.J. 74

**LENGTH:** 2826 words

**SECTION:** Criminal Justice

**TITLE:** WHY ARE IOWA'S Babies DYING?

**AUTHOR:** Mark Hansen

Mark Hansen is a reporter for the ABA Journal. His e-mail address is markhansen@staff.abanet.org.

**HIGHLIGHT:** Medical examiner Thomas Bennett steadfastly says that adults are shaking them to death. But some lawyers and forensic pathologists find that diagnosis fatally flawed.

**TEXT:**
The case against 21-year-old Melissa Funte in the death of her 3-month-old son was about to go to trial in an Iowa court earlier this year when prosecutors realized they couldn't get the medical experts they needed to prove their case.

Funte, of Charles City in northeastern Iowa, was accused of firstdegree murder and child endangerment. Her son's death in February 1997 was initially diagnosed as Sudden Infant Death Syndrome by Dr. Paul Royer, the family physician. Royer also serves as county coroner and happened to be on call in the emergency room the day the boy died. The SIDS diagnosis meant that there was no sign of trauma and the cause of death could not be determined.

Enter Dr. Thomas Bennett, then the Iowa state medical examiner. Bennett reviewed the autopsy report and concluded that the boy had really been shaken to death. It was not the first time Bennett made such a diagnosis. In several cases over the past few years -- critics would say in too many cases -- Bennett, who left his Iowa position last fall after 13 years, entered rulings of shaken baby syndrome.

And in a number of those instances, controversial pleas or dropped charges have led lawyers and medical experts to insist that Bennett has been overly zealous in his conclusions of shaken baby syndrome.

That certainly could be said of the case against Funte. Just before a jury was sworn in at the start of her January trial the case was abruptly dismissed without prejudice. Prosecutors had scoured the country in vain for a medical expert who would support Bennett's findings in court. They went through five experts before giving up; only one was willing to say the boy could have died from shaking, but that expert was unwilling to exclude natural causes. The other four agreed with the six defense experts who said they saw no evidence of trauma.

The dismissal also came after Funte, who has consistently maintained her innocence, turned down at least three proposed plea agreements with prosecutors, the last of which included a guarantee of probation in exchange for a no contest plea to a misdemeanor charge of involuntary manslaughter.

**365**



Turning down the first two plea offers was easy, says Funte, who says she has never had so much as a traffic ticket, because both deals would have included jail time. But turning down the offer of probation, she says, was the hardest decision she has ever had to make.

"I came really close to accepting it," says Funte, the mother of a 3-year-old girl who was briefly taken from her after her son died. Funte fought to get her daughter back in a civil proceeding, and won. "But I couldn't go into court and say I did something that I didn't do."

Floyd County Attorney Marilyn Dettmer, who charged Funte, says she still has complete confidence in Bennett's work. And she says she still thinks Funte is guilty. "If I didn't, I wouldn't have charged her."

But Cheryl Weber, Funte's cocounsel, says Bennett's eagerness to attribute infant deaths to shaken baby syndrome has made Iowa the laughingstock of the forensic science community. "We're looked at as kind of a joke because of him."

And Minnesota forensic pathologist John Plunkett, who has reviewed about a dozen of Bennett's cases, says he has yet to find one in which he believes the diagnosis was correct. "Everything [Bennett] says is suspect," Plunkett says. "He does not know a crime from Crimea."

Bennett, for his part, dismisses both the criticism and his critics. Now an assistant state medical examiner in Montana, he says shaken baby syndrome is a well-established phenomenon that is relatively easy to diagnose.

And he says his findings are based on principles of sound forensic pathology. "It's not like I'm making it up," he says.

## History Repeats Itself

Mary Weaver might think otherwise. Weaver, of Marshalltown, Iowa, has become something of a poster child for others wrongly accused of baby shaking. She was charged with the 1993 shaking death of an 11-month-old girl for whom she was babysitting. Weaver ended up spending two years of a life sentence in prison for murder before being acquitted of all charges at her third trial last year.

Weaver's first trial had ended in a hung jury, her second in a conviction. But her conviction was overturned in 1996 by the Iowa Supreme Court, which held that Weaver was entitled to a new trial based on newly discovered evidence that the victim had been knocked unconscious after hitting her head on a table in her own home prior to being placed in Weaver's care.

Nor are Funte and Weaver the only Iowans who have been accused of shaking children to death. In October 1997, Joel Engberg and Teresa Engberg-Lehmer, a Council Bluffs couple, were sentenced to 15 years in prison after pleading no contest to involuntary manslaughter and child endangerment charges in the April 1997 death of their 3-month-old son, Jonathan.

Stephen Brennecke, the Grinnell lawyer who is preparing a motion for post-conviction relief on behalf of Teresa Engberg-Lehmer, says the couple have never wavered in their protestations of innocence. They took the plea offered by prosecutors because their trial lawyer advised them they could end up spending the rest of their lives in prison, he says.

The motion, in fact, will allege that Engberg-Lehmer's trial lawyer was ineffective because he advised her that going to trial would be risky and never consulted another expert to review Bennett's diagnosis of shaken baby syndrome, Brennecke says.

The possibility of going to prison is no idle threat. In April, a Mason City woman, Linda Blakely, went to trial for the January 1997 death of her 7-week-old son, Dalton, who Bennett said had alson been killed by shaking.

**366**

Blakely, who prosecutors say admitted shaking and "bumping" her son's head against a wall, was convicted May 1 on involuntary manslaughter and child endangerment charges, for which she was sentenced in June to 12 years in prison.

Blakely, who fell asleep after drinking at a friend's house, may not be the best mother in the world, her lawyer, assistant public defender Susan Flander, concedes. But she is no killer, Flander insists.

Blakely, the mother of two older children, said she left her son in a car seat when she fell asleep, where she found him, not breathing, the next morning. And she, too, had medical experts on her side, three of whom said the boy died of natural causes; the fourth said the cause of death was undetermined.

Still, Flander regards the verdict as a "victory" of sorts because Blakely was looking at a possible life sentence.

Bennett says he stands by all of his findings and invites anyone to review his work. He says both the Funte and Blakely children had bone fractures in addition to their head injuries, for which the defense in each case says there is a plausible explanation. He says Blakely not only confessed to shaking her son, but even demonstrated how she had done it, which the defense says had to be coaxed out of her after a 1 1/2-hour interrogation.

And Bennett says the Lehmer boy's injuries were not only severe but obvious. But Breenecke says the evidence on which Bennett based his findings was inexplicably destroyed after his resignation, along with evidence from eight other homicide cases he worked on.

"It wasn't even a close call," Bennett says now of his diagnosis in the Lehmer boy's death.

Assistant State Attorney General Doug Hammerand, who helped prosecute both Funte and Blakely, says he can't discuss the evidence in the Funte case, which is still open. But he says he has no second thoughts about Bennett's diagnosis in the Blakely case or about the defendant's guilt. "I wouldn't have prosecuted her if I didn't think she did it," he says.

**Theory or Fact?**

Despite the outcry in Iowa, the cases in that state merely mirror the continuing controversy over shaken baby syndrome, the theory of which has been around at least since the early 1970s. While skeptics suggest that its existence has yet to be proven, police and prosecutors have been quick to latch on to it as a way of explaining how a seriously abused child could have died without exhibiting any outward signs of physical injury.

Forensic experts on one side suggest it is extremely rare, if not physically impossible, for someone to -- literally -- shake a baby to death. On the other side are those who insist it is not only possible but relatively common.

Reliable figures on the incidence of shaken baby syndrome are hard to come by. That's because many victims escape with unnoticed minor injuries, experts say, and because even in severe cases, parents and physicians may fail to make the connection between a child's symptoms and the shaking.

One forensic expert estimated that 2,000 children die from abuse each year, 80 percent of them from head injuries.

From the standpoint of a medical examiner, says Dr. Michael Baden, a forensic pathologist and director of the New York State Police medicolegal investigations unit, it doesn't make much difference whether a child has been battered or shaken to death. From the standpoint of a prosecutor, though, it can make all the difference.

For one thing, Baden says, shaken baby syndrome is easier to prove than a battering since it

presumes that the last person in the child's presence when the infant began to lose consciousness is the one responsible for the shaking. It can also go to the degree of culpability, he says, because shaking a baby to death is a capital offense in many states, including Delaware, Massachusetts and New Jersey.

It was in Massachusetts that the debate over shaken baby syndrome exploded into the public spotlight. A jury last year convicted British au pair Louise Woodward of second-degree murder in the shaking death of 8-month-old Matthew Eappen. But the judge reduced her conviction to manslaughter and sentenced her to time served. Both sides appealed, but the judge's action was affirmed June 16 by Massachusetts' highest court.

In the wake of Woodward's trial, 50 doctors who specialize in the diagnosis and treatment of child abuse wrote an open letter to the media complaining the coverage had created the false impression that Woodward was convicted despite overwhelming evidence of her innocence.

"Many in the media and the public have failed to credit the jury in this case with having had the intelligence to understand that the prosecution put forward well-established medical evidence that overwhelmingly supported a violent shaking/impact episode on the day in question, when Matthew was in the sole custody of Ms. Woodward," the letter said.

The letter also called for the creation of a panel of experts to analyze the scientific basis for shaken baby syndrome and to review the medical testimony in the Woodward case, among others, so that guidelines might be drawn up for the admissibility of such evidence in court.

So far, according to Robert Kirschner, a University of Chicago medical school professor and the only forensic pathologist to have signed the letter, there have been no takers.

The debate surfaced again earlier this year, when San Antonio, Texas, chief medical examiner Vincent DiMaio, an outspoken critic of shaken baby syndrome, told other experts at an American Academy of Forensic Sciences meeting in San Francisco he had never seen a baby who had been shaken to death in nearly 30 years of practice.

"It's a nice theory. It might be true for a few cases," DiMaio said at the conference. "But for the majority of cases in which it's been diagnosed, it's not."

Many forensic pathologists tend to agree with DiMaio. Baden, for one, says while he believes it is possible to shake a baby to death, he doesn't think it happens often. "I've only seen two or three [cases] in my lifetime," says Baden, who has spent 35 years as a forensic pathologist. "Some of these younger [medical examiners] are diagnosing 15 or 20 cases a year."

## Accidents Happen

Cyril Wecht, a lawyer and forensic pathologist who is coroner for Allegheny County, Pa., (Pittsburgh), wouldn't suggest that shaken baby syndrome doesn't exist. But he says he believes it is one of the most overdiagnosed and misunderstood concepts in the field of forensic pathology today.

So much so, he says, that he wouldn't allow his kids to babysit somebody else's children. "Accidents happen," he says. "And these kinds of cases tend to take on a life of their own."

Forensic pathologist Plunkett, who serves as the coroner for seven Minnesota counties, says the notion of shaken baby syndrome is based on the premise of a 1972 study that was never proven but was quickly accepted as scientific fact.

That theory, described by the authors of the study as "shakenwhiplash syndrome," postulated that an infant's relatively weak neck muscles and relatively large head made him or her particularly susceptible to brain injuries from shaking, Plunkett says.

Because the theory has become so thoroughly accepted, Plunkett says, practically every time

**368**

a baby has suffered a head injury in the past 26 years, somebody -- usually the last person to have been alone with the child -- ends up being charged with a crime.

To date, though, Plunkett says, no one has ever proved that the force generated by such a shaking is strong enough to cause brain damage. "The bottom line is these child abuse folks have been saying these things as if they were true for the past 25 years, and these poor caretakers keep getting convicted on the basis of this totally bogus science."

But Mary Case, chief medical examiner for St. Louis and three adjoining counties, says the signs of shaken baby syndrome are clear and unmistakable. "There's nothing mysterious about it," she says. "You can see it with the naked eye."

Kirschner agrees. He says any forensic pathologist who has worked with abused children would easily recognize the symptoms of shaken baby syndrome, which are virtually diagnostic of the condition. Those symptoms, which experts call "markers," include brain swelling, subdural bleeding and retinal hemorrhages, he says.

Bennett is willing to rely on **evidence** of brain swelling or retinal hemorrhages alone, according to Cedar Rapids forensic pathologist **Peter Stephens,** who has reviewed several of Bennett's cases.

"He's making it up as he goes along," Stephens says. "He says what [the prosecutors] want to hear."

"This man is dangerous," says David Dutton, Funte's co-counsel along with Weber. "He needs to be stopped."

Medical examiner Case, a firm believer in shaken baby syndrome, says Bennett has a "unique" way of diagnosing it. "He's looking at normal brains at autopsy and seeing tears in the tissue that he says resulted from shaking," Case says. "As far as I know, he's the only one who is doing it that way."

Her opinion proved instrumental in the prosecution's decision to drop charges against Funte. Case also testified on behalf of Blakely, the Iowa woman convicted of killing her 7-week-old son.

Still, prosecutors profess complete faith in shaken baby syndrome. Bradley Allen, an assistant district attorney in Alamance County, N.C., who has prosecuted several shaken baby cases, says the medical basis for it is a matter of common sense.

"It's not like math, where you can say 2 plus 2 equals 4, but I think you can tell that a baby's been shaken because the injuries you get are consistent with the back-and-forth movement of the brain against the skull," he says.

But it's not as if they don't think shaken baby syndrome happens, defense lawyers say. It's that they don't think it happens as often as Bennett says it does.

"He's gone way beyond the pale," says Paul Rosenberg, a defense lawyer in Des Moines who represented Weaver and who now represents the grandmother of a 6-month-old Decorah boy whose December 1996 death was ruled a shaken baby case by Bennett, but for which nobody has ever been charged. "He's coming up with shaken baby cases out of thin air."

Bennett, in fact, sees himself as being at the forefront of an evolving new field of special expertise. "It's recognized now to the point that ridicule is no longer an option," he says. "I think I can safely say that we're now in the stage of violent opposition."

Bennett, who resigned his Iowa position during an investigation unrelated to his forensic abilities, accuses his critics of engaging in personal attacks in the media, and of trying to portray the defendant in a shaken baby case as the victim.

**369**

He even says he is willing to consider the possibility that he might be mistaken.

"If somebody came along and found something in the literature to prove me wrong, I'd change my mind in a heartbeat. But so far, that hasn't happened."

Funte, for one, thinks otherwise. She says she believes Bennett may be looking for an explanation where there really is none. "I think [Bennett] might be getting carried away with [his diagnoses]," Funte says, "because SIDS has no answers."

**GRAPHIC:** Photo 1, With daughter, Cheyenne, at grave of son she was accused of murdering; Photo 2, DR. BENNETT; Photo 3, DR. MARY CASE As medical examiner for the St. Louis area she is a firm believer in shaken baby syndrome but her **opinion** proved instrumental in charges against Funte being dropped; Photo 4, **DR. PETER STEPHENS,** Bennett is willing to rely on brain swelling or retinal hemorrhages alone and is 'making it up' when it comes to his conclusions.

**370**

People v. Tison, Not Reported in Cal.Rptr.3d (2003)

2003 WL 23034287
Not Officially Published
(Cal. Rules of Court, Rules 8.1105 and 8.1110, 8.1115)
Only the Westlaw citation is currently available.

California Rules of Court, rule 8.1115, restricts citation of unpublished opinions in California courts.

Court of Appeal, Third District, California.

The PEOPLE, Plaintiff and Respondent,
v.
Dennis Jay TISON, Defendant and Appellant.

No. C041855.   |   (Super.Ct.No. 01F05294).   |   Dec. 30, 2003.

**Attorneys and Law Firms**

Office of the State Attorney General, Maureen A. Daly, Sacramento, CA, for Plaintiff and Respondent.

Donald H. Heller, Sacramento, CA, for Defendant and Appellant.

**Opinion**

BLEASE, Acting P.J.

*\*1* A jury convicted defendant Dennis Jay Tison of voluntary manslaughter (Pen.Code, § 192, subd. (a))[1], and felony child endangerment (§ 273a, subd. (a)) for killing his 13-month-old daughter Isabel, who was in his sole care when she suffered fatal blunt trauma injuries to her head. The jury found true the special enhancement allegation that defendant caused willful harm or injury resulting in the death of his daughter. (§ 12022.95.)

On appeal, defendant contends the evidence is insufficient to support his conviction for voluntary manslaughter. He also contends the instruction on voluntary manslaughter was erroneous and misleading requiring reversal of the conviction. We find no error requiring reversal and affirm the judgment of conviction.

**FACTUAL BACKGROUND**

**A. Events of January 12, 2001, Leading Up to and Following Isabel's Death**

On January 12, 2001, defendant lived with his wife, Elena Tison, and their 13-and-one-half months old infant daughter, Isabel. Mrs. Tison left the house around 2 p.m. that day, leaving Isabel in defendant's sole care. At that time, Isabel was wearing a long-sleeved shirt and blue jeans.

At 5:07 p.m., defendant made a frantic-sounding telephone call to Mercy Folsom Hospital, indicating his daughter was hurt. He said he was coming into the hospital, and demanded a Life Flight helicopter and a pediatric trauma team. He was told the hospital had no pediatric trauma capability and advised to call 911 for an ambulance. Defendant hung up without responding, but seven minutes later, called a second time. He made the same demands and said he was leaving Orangevale. He was again repeatedly advised that the hospital did not have the necessary facilities and to call 911 for an ambulance.

**371**


EXHIBIT

People v. Tison, Not Reported in Cal.Rptr.3d (2003)

Sometime later that day, defendant walked into the Emergency Department at Mercy Folsom Hospital cradling Isabel against his shoulder. Although it had rained earlier that day and the average temperature was 49 degrees, Isabel was inappropriately dressed in lightweight summer clothing, which was very clean and intact.

Defendant had some blood on his shirt, where the infant's head had been resting and he smelled strongly of alcohol. He began yelling at hospital staff, expressing anger that the helicopter was not there and loudly demanding a trauma team, a neurologist, and a helicopter. Defendant was very agitated and angry, seemed disinterested in his daughter, and told staff that he was both a lawyer and a doctor and threatened to sue the physician and the staff if his child died.

When it was determined Isabel had life-threatening injuries,[2] she was transported by helicopter to the University of California Davis Medical Center where she died during surgery from severe head trauma.

Defendant's basic explanation for Isabel's injuries was that she jumped out an open window located in his second-story office. The details of this explanation varied and evolved as defendant told his story to various individuals.[3] He explained to Folsom Police Detective Robert Challoner that he was seated at his desk in his office looking at something on the Internet while Isabel was playing on his desk. She suddenly lunged at the window, which was open because it was nice weather outside. He did not have time to react as the child went through the screen, falling 20 feet onto the deck below. In his panic, he knocked over a beer bottle which was still half full, spilling the beer all over him. He ran downstairs to the backyard and found Isabel crying and bleeding from her head. He knew she had a traumatic head injury; he picked her up, got into the car, and telephoned the hospital that he was bringing her in.

*2   Sacramento Sheriff's Officer Todd Hengel also spoke to defendant at the hospital during a 90-minute interview. While many of the details were the same as those he told other officers, in this interview, defendant indicated he placed Isabel on the desk next to him, she abruptly stood up, leaned against the screen of an open window, and fell out.

Meanwhile, defendant agreed to take a blood alcohol test which disclosed that at 7:50 p.m. his blood alcohol level was .075 percent and had been .12 percent at 5 p.m. that day. That level indicated defendant had consumed the equivalent of four large bottles of microbrewery beer, which have a higher alcohol content than regular beer.

Defendant told Detective Jason Gay that he smelled "like a brewery" because he had spilled a beer on himself, although his clothing appeared dry. When asked why his blood alcohol level was .075, he responded "I can't explain." Defendant went on to discuss his education, indicating that he graduated from law school, that he had medical training in French Camp, California, and he was a doctor of psychiatry with the University of California at Davis Medical Center.

During this interview, defendant told the detective that while Isabel was playing on his desk directly below his open window, she "crouched down on her haunches and leapt like a cat" at the window or the window screen. When she went out the window, he screamed, jumped up, and things went "flying off the desk," including the beer which he spilled on himself. He ran downstairs where he found Isabel on the deck with the window screen laying on top of her. She was bleeding from her nose, she was lethargic and moaning, but conscious. He threw the screen inside the house, picked up the child, grabbed his car keys, and drove to the hospital.

All the officers and detectives who spoke with defendant that evening testified he appeared calm and displayed little or no emotion.

According to Mrs. Tison, defendant drank three or four beers at a time and drank three or four times a week. At trial she related an incident, which occurred during the summer of 2000, when defendant came home from work and he had been drinking alcohol. He kept trying to hold Isabel, but she would not allow him to do so. The two adults began yelling at each other. Mrs. Tison was angry and told defendant he was not to drink and hold the baby or she would leave him. She testified that defendant

## 372

People v. Tison, Not Reported in Cal.Rptr.3d (2003)

"pushed past" or "brushed by" her during this argument.[4] However, she made it very clear to him she did not want him to take care of the baby when he had been drinking.

**B. The Physical Evidence**
Law enforcement officers arrived at the Tison residence around 8:15 p.m. that evening. Nobody was home, although the front door was unlocked. The officers went upstairs to defendant's office where they observed a desk in front of a window. The window was open no more than three-quarters of an inch and the screen was missing. The window sill was approximately seven inches above the desk and 12 feet, one inch above the wooden deck. A computer located on the desk was turned off. Numerous items covered most of the desk[5] and several of the items were pushed up against the windowsill, including papers, a file folder, and the computer monitor.

**\*3** Nothing on the desk appeared particularly out of place or disturbed. Nor did there seem to be a place on the desk where a 13-month old child could have stood up to go out the window. If the child had been standing on the desk, she would have had to stand on top of the paperwork or other items, such as the calculator or the telephone. A fine layer of dust was visible over the portion of the desk not covered by other objects. No footprint or handprint appeared on the surface of the desk or any other disturbance in the layer of dust. While there were a number of children's toys on the floor of the room, nothing on the floor appeared to have been knocked off the desk. No beer bottle was found in the room, nor was there any odor of beer or other alcohol in the room. A single, empty beer bottle was found in a trash receptacle in the kitchen. Several bottles of beer were found in the refrigerator. They were the same brand as the empty bottle.

A window screen was found in the kitchen area leaning against a bar stool. The screen appeared to fit the upstairs office window which was missing a screen. While there were marks on it consisting of smudges, streaks, and lines, no indentations or discernible fingerprints, handprints, or palm prints were found on the screen. Possible fingerprints were found on the clips used to install the frame however. The metal clips on the sides of the screen appeared intact.

In the backyard, officers observed a small pool of blood on the wooden deck. The officers did not see blood in any other location in the backyard.[6] The blood spot was located nine feet, five and one-half inches from the wall of the house. DNA evidence established the blood belonged to Isabel Tison.

The blood spot was relatively circular. There was no smearing, splashing or spatter patterns. Based upon this pattern, a blood spatter analysis indicated that the blood was probably deposited from a height less than eight inches above the surface and the object that deposited the blood was nearly stationary or still at the time.

Dr. Bahram Ravani, a professor of mechanical engineering at the University of California at Davis, testified that the initial launch speed of Isabel's body as it went out the window had to be approximately five miles per hour for her head to land where the blood was found and that without such launch speed, her body would not have traveled that distance onto the deck.

**C. The Medical Testimony**
Isabel's only real injury and the cause of her death was blunt force trauma to her head. The blow resulted in immediate loss of consciousness. She had a substantial hematoma covering virtually the entire top of the skull, a common finding in blunt force trauma cases involving head injury. There was also a subdural hematoma, or collection of blood between the brain and the membrane covering the brain, a laceration of the brain, and diffuse axonal injury, a very serious type of injury to the nerves making up the substance of the brain, which can lead to death. These injuries indicated a substantial degree of force was applied to the head. Axonal injury is seen in unrestrained victims of vehicle accidents in collisions of perhaps 25 miles per hour, or when such victims are ejected and suffer impact to the head.

**373**

People v. Tison, Not Reported in Cal.Rptr.3d (2003)

**\*4** There was a slight amount of bloody mucoserous secretion in the nose and mouth and several linear abrasion contusions over Isabel's right flank and hip. However, there were no other abrasion-type injuries on her body or other evidence of external trauma, except for a superficial laceration on the tip of her right thumb. Nor was there any injury to the spinal cord, the neck, cardiovascular system, or pulmonary system.

The victim's eyes revealed bilateral optic nerve sheath hemorrhages, a finding commonly found in shaken baby cases where the infant has been shaken so hard that certain potentially lethal brain injuries may result. However, there is an overlap in the injuries produced by blunt force impact and those produced by shaking. Infants who are assaulted by adults often suffer from a combination of being shaken, swung, and slammed into a solid object, or being thrown. These injuries are sometimes referred to as Shaken Impact Syndrome. Optic nerve sheath hemorrhages can result from any kind of rotational force applied to the body, including a fall.

Based upon the large subdural hematomas, the laceration of the brain, the optic nerve sheath hemorrhages, and the diffuse axonal brain injury, the prosecution's medical experts concluded Isabel's injuries were inconsistent with a straight line fall from a distance of 13 feet onto a wooden deck, but were consistent with having been shaken and slammed into a hard surface such as a carpet, desktop, or wooden deck, in a single or multiple impact, or having been propelled at some velocity out of a window onto the wooden deck.

It is unusual for young children to suffer fatal injuries in falls ranging from 15 feet to as much as 70 feet because their bodies are flexible and resilient. Nevertheless, a child who has fallen from a second story building at a height of 13 feet may have a neck or back injury, and the act of picking up that child is a life-threatening act because any movement of the neck or back may sever the spinal cord, causing instant death, paralysis, or respiratory arrest. A person with medical training would have been taught the risk involved in moving a child who has fallen from that height.

The survival rate of a patient with a serious brain injury is significantly increased if she is taken to a trauma center during the first hour following the injury, referred to as the "golden hour." There is also a four-hour window during which treatment may reduce the risk of death or permanent disability by reducing the pressure on the brain from swelling. Beyond that four-hour period of time, there is a dramatic increase in death in such patients.

A videotape, taken the day before Isabel's death, played for the jury demonstrated her general ability to walk. She was able to stand on her feet without holding onto anything for at least a few seconds and was able to take a few steps forward without falling. She could squat down, but when she started to fall over, she was not able to recover by standing up on her own. At the time of her death, Isabel would have been unable to jump a couple of feet forward with both feet, an ability reached at an average age of three years. She was also unable to generate forward momentum on her own, except for falling into something, and was unable to leap or jump forward with any momentum from a flat surface. Additionally, she would not have been able to step from the desk up to the window sill, seven inches above the desk. She also would have been unable to propel herself up and over the stack of file trays or the speaker located on the desk.

**D. The Defense**
**\*5** Defendant did not testify but called several witnesses to establish that he did not abuse Isabel and that she died from injuries sustained in an accidental fall from a height of 13 feet.

Isabel's pediatrician never noticed any indication of child abuse in the course of her care of Isabel since birth. Nor did Ms. Hall, the Tison housekeeper, ever see defendant act abusive around Isabel.

Defendant's next-door neighbor heard a very loud thump at approximately 4:45 p.m. on January 12, 2001. About 10 minutes later, she looked outside and noticed the window on the second level of defendant's home was wide open and the window screen

**374**

People v. Tison, Not Reported in Cal.Rptr.3d (2003)

was missing.[7] At approximately 5 p.m., defendant was seen rushing out of his house holding the baby against his shoulder and entering his vehicle.

Forensic pathologist Michael Baden testified that Isabel died of cardiac arrest due to high potassium during neurosurgery, which is not a normal feature for head injuries. Dr. Baden opined that Isabel's injuries were consistent with a child who fell from a height of 12 to 15 feet and landed on her head, and not from a direct blow to her head with an object. A person falling from a height of 13 feet onto a deck has a vertical speed of 19.7 miles per hour upon impact, while a person who is thrown out a window at sufficient speed to travel a horizontal distance of nine feet, four inches from the house, would skid from the contact point to the resting point.

According to Dr. Baden, shaken baby impact syndrome is impossible to prove. Nevertheless, he concluded this was not a shaken baby case because there was a very severe impact sight which would account for all the medical findings.

## PROCEDURAL BACKGROUND

Defendant was charged in count one with murder (§ 187, subd. (a)), in count two with assault by means of force likely to produce great bodily injury, resulting in the death of a child under the age of eight (§ 273ab), and in count three with felony child endangerment. (§ 273a.) It was further alleged as a special enhancement that defendant caused willful harm or injury resulting in the death of a child. (§ 12022.95.)

The jury found defendant guilty on count one of the lesser included offense of voluntary manslaughter (§ 192, subd. (a)), not guilty on count two, and guilty as charged on count three. It also found true the special enhancement allegation. Defendant was sentenced to a total prison term of six years. He filed a timely notice of appeal.

## DISCUSSION

### I.

### Sufficiency of the Evidence to Support the Conviction for Voluntary Manslaughter

Defendant contends the evidence is insufficient as a matter of law to support the conviction for voluntary manslaughter because no credible evidence of implied malice was presented at trial. In support of this claim, he argues there was no evidence to establish that with conscious disregard for life, he threw, "struck, shook and/or slammed Isabel in the house or anywhere else," or that he was aware that placing Isabel on his desk in front of an open screened window placed her at great risk of death. We agree with respondent that there is substantial evidence to support the verdict.

*6 Defendant argues there was no credible evidence he struck, slammed, or threw Isabel out the window. He places great weight on evidence which supports his theory of the case, and essentially asks us to reweigh the evidence, and ignore the factual and credibility determinations made by the jury. In so doing, he ignores the substantial evidence test. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573]; *People v. Johnson* (1980) 26 Cal.3d 557, 576-577.) Under that test, we consider the entire record in the light most favorable to the judgment and presume the existence of every fact that could reasonably be deduced from the evidence. (*Ibid.*) "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (*People v. Jones* (1990) 51 Cal.3d 294, **375**

People v. Tison, Not Reported in Cal.Rptr.3d (2003)

Criminal homicide is defined by statute and is divided into two classes, murder and manslaughter. (*People v. Rios* (2000) 23 Cal.4th 450, 460.) Murder is defined as "the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).)[8] Manslaughter is defined as "the unlawful killing of a human being without malice." (§ 192.) "The distinguishing feature [between murder and manslaughter] is that murder includes, but manslaughter lacks, the element of malice." (*People v. Rios*, supra, 23 Cal.4th at p. 460.) Manslaughter is further divided into three classes, voluntary manslaughter, involuntary manslaughter, and vehicular manslaughter. (§ 192.)

This case turns on the scienter required for voluntary manslaughter. "[I]ntent to kill is not a necessary element of the crime of voluntary manslaughter...." (*People v. Lasko* (2000) 23 Cal.4th 101, 108-111.)[9] While "a conviction of voluntary manslaughter is supported by proof and findings ... the homicide was unlawful and intentional" (*People v. Rios*, supra, 23 Cal.4th at p. 454, 460),[10] it also may be supported by findings the homicide was unlawful and unintentional, i.e. with conscious disregard for human life. (*People v. Blakeley*, supra, 23 Cal.4th at p. 85; *People v. Lasko*, supra, 23 Cal.4th at p. 111.)

Although the jury acquitted defendant of murder, it found him guilty of voluntary manslaughter. He now claims the evidence is insufficient as a matter of law to support the jury's verdict because there was no evidence of implied malice.[11]

Without citation of authority, defendant asserts that implicit in the jury's verdict acquitting him of count two, which charged him with assault by means of force likely to produce great bodily injury, resulting in the death of a child under the age of eight years (§ 273ab), is the finding he did not strike, shake, or slam Isabel or throw her out the window. We disagree.

*7 "An acquittal of one or more counts shall not be deemed an acquittal of any other count. (§ 954; *People v. Palmer* (2001) 24 Cal.4th 856, 860.) "The law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence." (*People v. Palmer*, supra.) Inconsistent findings by the jury frequently result from leniency, mercy, or confusion. (*United States v. Powell* (1984) 469 U.S. 57, 65 [83 L.Ed.2d 461, 469].)

Defendant does not dispute that the jury was properly instructed on murder, implied malice, and involuntary manslaughter. It was also correctly instructed that voluntary manslaughter is an unlawful killing of a human being without malice aforethought and that he either intended to kill the victim or subjectively acted with conscious disregard for life. Involuntary manslaughter is defined as an unlawful killing "without due caution and circumspection." (§ 192, subd. (b).)[12] The phrase "due caution and circumspection" requires proof of criminal negligence, which is shown by aggravated, gross, reckless conduct. (*People v. Penny* (1955) 44 Cal.2d 861, 879; *Walker v. Superior Court* (1988) 47 Cal.3d 112, 135.) Implied malice may be distinguished from gross negligence by both the higher degree of the risk involved and by the requirement that the risk be subjectively appreciated rather than merely objectively apparent. (*People v. Schmies* (1996) 44 Cal.App.4th 38, 46, fn. 4.)

The defense theory was that Isabel accidentally fell out of an open window and defendant rushed her to the emergency room at Mercy Folsom Hospital. Defendant argued that these facts support at most a conviction for involuntary manslaughter based upon a finding of criminal negligence. By convicting defendant of voluntary manslaughter, the jury rejected defendant's factual and legal theory of the case. The jury's verdict acquitting defendant of assault under section 273ab may be a reflection of the reasonable doubt standard where as here, the evidence did not clearly establish the precise means by which Isabel sustained her fatal injuries.

Nevertheless, there is substantial evidence to support the verdict. (*People v. Johnson*, supra, 26 Cal.3d at pp. 576-577.) As noted, the jury determined Isabel's injuries did not result from an accidental fall from the window due to defendant's criminal negligence. She was in good health when Mrs. Tison left her in defendant's sole care the afternoon of January 12th. A little more than three hours later, defendant brought Isabel into the hospital with fatal head injuries resulting from a traumatic impact. The physical and medical evidence established that he either slammed her against a flat object somewhere on the premises of

**376**

**People v. Tison, Not Reported in Cal.Rptr.3d (2003)**

his residence, or threw her out the window with sufficient force to cause her to land on her head over nine feet from the house, marking the spot with a pool of her blood. Although defendant disputes the fact the blood belonged to Isabel, DNA evidence established the blood was hers.

**\*8** The fact the evidence does not clearly establish which of these two scenarios took place, does not undermine the jury's implied finding defendant caused Isabel's injuries by one of these means and that the killing was unlawful and either intentional or in conscious disregard for her life. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1025 [the jury need only agree that each element of the charged crime has been proved; they need not agree on the theory]; *People v. Pride* (1992) 3 Cal.4th 195, 250; *Schad v. Arizona* (1991) 501 U.S. 624, 631-632 [115 L.Ed.2d 555].)

Moreover, defendant's conduct immediately after Isabel was injured provided additional evidence that her injuries resulted from acts demonstrating a conscious disregard for her life rather than by accident or acts and omissions constituting criminal negligence. The expert testimony established that medical care within the first hour following a traumatic head injury is critical to prevent further brain injury and death. Nevertheless, defendant spent anywhere from 10 to 15 minutes cleaning up the house [13] and changing Isabel's clothing. [14] He failed to call an ambulance, deciding to drive his critically wounded child to the hospital himself although he had to go through rush hour traffic to do so. His stated reason for doing so, he wanted to feel like he was doing something.

There was also evidence the head and neck of a patient with a severe traumatic head injury must be immobilized and that this procedure would be well known by a person with medical training. Nevertheless, defendant admitted he scooped the child into his arms, placed her against his shoulder, and while holding her thusly, ran up and down the stairs, and out of the house, and then drove to the hospital with a blood alcohol level of .12 percent, all the while ignoring the hospital staff's repeated admonishment not to go to Mercy Folsom Hospital because it was not a trauma hospital. This conduct placed Isabel's life in further grave danger and greatly reduced her chance of survival.

By defendant's own admissions, he was trained as a medical doctor and was current in his training on trauma care. In light of this training, his admitted knowledge of the risks of this behavior raise an inference of intentionality regarding his initial unlawful acts resulting in the head injury, as well as establishing an ongoing conscious disregard for Isabel's life and safety. His numerous lies and inconsistent statements indicated a clear consciousness of guilt, and also discredited his version of the events, which were also thoroughly discredited by the physical evidence.

In sum, the evidence was more than enough to support the jury's verdict of voluntary manslaughter. Accordingly, we reject defendant's claim of insufficient evidence.

## II.

### Waiver of Instructional Error

Defendant contends the trial court erroneously gave an instruction on voluntary manslaughter. He argues there was no legal basis for giving the instruction because there was no evidence of provocation, sudden quarrel and/or heat of passion, or imperfect self-defense. He also contends the "conscious disregard for life" language was incorrect because implied malice is not an element of manslaughter. He further contends he did not waive this claim of error by failing to object to the instruction. Respondent contends defendant waived the error and that the instruction was correctly given. We find the error was waived.

**\*9** The jury was instructed under the recently revised version of CALJIC No. 8.40 (2001 Rev.). [15] The trial court gave the revised instruction, leaving out the bracketed second paragraph of the instruction. Defendant does not dispute that he failed to object to the instruction as given.

## 377

Failure to object to a jury instruction waives any claim of error (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1026) unless the defendant's substantial rights are affected. (§ 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7; *People v. Elsey* (2000) 81 Cal.App.4th 948, 953, fn. 2; *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) "Substantial rights" are equated with error resulting in a miscarriage of justice under the harmless error test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Arredondo* (1975) 52 Cal.App.3d 973, 978.) Under that test we must determine whether it appears reasonably probable that a result more favorable to the defendant would have been reached absent the error. (*People v. Watson, supra*, 46 Cal.2d at p. 836 .) For the reasons discussed below, we conclude defendant's substantial rights were not affected and therefore his claim of error is waived.

CALJIC No. 8.40 is the standard jury instruction for voluntary manslaughter. (*People v. Rios, supra*, 23 Cal.4th at p. 463.) [16] In *Rios*, the court held that "neither heat of passion nor imperfect self-defense is an element of voluntary manslaughter that the People must affirmatively prove beyond reasonable doubt in order to obtain a conviction for that offense." (*Id.* at p. 454 .) *Rios* concerned an amended charge of voluntary manslaughter following a trial at which the defendant was acquitted of murder. *Rios* said "[t]he [sole] charge of manslaughter *absolves* the People of proving that malice was present. It does not require the prosecution to establish, beyond a reasonable doubt, that *malice was absent*." (*Id.* at p. 463, italics in original.) Consequently, in a prosecution upon a *sole* charge of voluntary manslaughter, it is proper to give CALJIC No. 8.40 by deleting paragraph two, relating to provocation and imperfect self-defense. (*Id.* at pp. 454, 463.) As we later show, this is a categorical case of harmless error. Thus, a conviction for voluntary manslaughter may be sustained under instructions which require that defendant killed intentionally and unlawfully.

In this case the charge was murder, and voluntary manslaughter was tendered as an included offense. However, there is no duty to give an instruction on a lesser included offense when there is no evidence the offense committed was less than that charged. (*People v. Noah* (1971) 5 Cal.3d 469, 479; *People v. Osuna* (1969) 70 Cal.2d 759, 767.) Voluntary manslaughter is a lesser included offense of murder only when there is evidence of adequate provocation or imperfect self-defense which negates the murder element of malice. (*People v. Breverman, supra*, 19 Cal.4th at pp. 153-154; *People v. Ochoa* (1998) 19 Cal.4th 353, 422.) In a case such as the present one where the defendant is charged with murder and there is no evidence of provocation or imperfect self-defense, it is error to give an instruction on voluntary manslaughter as a lesser included offense of murder.

   **\*10** This error was not cured by deleting paragraph two of CALJIC No. 8.40. When as here, the defendant was charged with murder rather than voluntary manslaughter (compare *People v. Rios, supra*, 23 Cal.4th at pp. 462-463 [defendant charged solely with voluntary manslaughter] ), the instruction as modified may cause the jury to believe the same findings that support a conviction for murder may also support a conviction for voluntary manslaughter. This is because the first paragraph of the instruction (see fn. 15) defines voluntary manslaughter as an unlawful killing with mental states equivalent to express or implied malice. Without the bracketed second paragraph, which instructs on the factual circumstances necessary to negate those mental states, namely sufficient provocation or imperfect self-defense (see *People v. Lasko, supra*, 23 Cal.4th at p. 108; *People v. Lee, supra*, 20 Cal.4th at p. 59; *People v. Barton* (1995) 12 Cal.4th 186, 199), the jury is incorrectly instructed that voluntary manslaughter and murder have the same mental state. As a result, the jury may have been misled to return a verdict of voluntary manslaughter as a lesser included offense of murder even if it found the evidence sufficient to support the greater offense of murder.

Nevertheless, the instruction worked to defendant's advantage and therefore resulted in no prejudice (*People v. Watson, supra*, 46 Cal.2d at p. 836; *People v. Lee, supra*, 20 Cal.4th 47) because the instruction as modified served to increase the prosecution's burden of proof on the lesser included offense by requiring the jury to find a mental state equivalent to murder. In view of the fact the jury convicted defendant of the lesser included offense, the error clearly benefited defendant. (See *People v. Blakeley, supra*, 23 Cal.4th at p. 93, fn. 5.) Moreover, as previously discussed, the jury was properly instructed on murder and involuntary manslaughter and rejected defendant's theory of the case under those properly given instructions. (*People v. Sedeno* (1974) 10 Cal.3d 703, 721, overruled on another ground in *People v.. Breverman, supra*, 19 Cal.4th 142; *People v. Koontz* (2002) 27 Cal.4th 1041, 1085.)

**378**

People v. Tison, Not Reported in Cal.Rptr.3d (2003)

Additionally, as we concluded in Part I, the evidence was sufficient to support the verdict for voluntary manslaughter. Thus, it is not reasonably probable the jury would have reached a verdict more favorable to defendant had the erroneous instruction not been given. (*People v. Watson, supra,* 46 Cal.2d at p. 836.) Accordingly, we find defendant's substantial rights were not affected and that he has waived his claim of error.

### DISPOSITION

The judgment of conviction is affirmed.

We concur: DAVIS and HULL, JJ.

Footnotes

1    All further section references are to the Penal Code unless otherwise specified.

2    She had a large area of bruising and "bogginess," or "squishiness" of the scalp. There was blood in her nose and her ear, and she was exhibiting involuntary flexing and tucking of her thumb, a sign of severe head trauma.

3    Defendant gave three taped interviews to Detective Gay concerning the circumstances surrounding the incident. Two of the interviews were played for the jury, the jury was given a transcript of the third interview.

4    Mrs. Tison acknowledged that she wrote the following words describing the incident: "There is a nondrinking daddy and a drinking daddy. She will never fault me for not staying with you because you keep drinking. She saw you push me, yell, and she could feel me shake and cry. I only hope she forgets."

5    Those items included two computer speakers, a keyboard, a mouse, letters, paperwork, a telephone, wallets, books and pamphlets, a calculator, a four-shelved stacked file, and a large knife in a plastic sheath. Also on the desk was a loaded .375 caliber handgun beneath the computer monitor and a speed loader for the weapon.

6    Mrs. Tison testified she observed blood on the deck just outside the sliding glass door about two or three feet from the door and that there were several areas of blood, which Detective Gay wiped out.

7    Mrs. Ryan thought it was odd that the window was open because it was cold at the time.

8    "[M]alice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) The courts have attempted to provide a more useful definition of implied malice, directing that juries should be instructed "malice is implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87, quoting *People v. Dellinger* (1989) 49 Cal.3d 1212, 1215.)

9    Where an unlawful killing is intentional and therefore generally reflective of malice (*People v. Saille* (1991) 54 Cal.3d 1103, 1113; *People v. Lee* (1999) 20 Cal.4th 47, 59; *People v. Breverman* (1998) 19 Cal.4th 142, 153), the malice may be negated by evidence "the defendant act [ed] upon a sudden quarrel or heat of passion on sufficient provocation (§ 192, subd. (a)), or kill[ed] in the unreasonable, but good faith, belief that deadly force [was] necessary in self-defense." (*People v. Lee, supra,* 20 Cal.4th at pp. 58-59; *People v. Rios, supra,* 23 Cal.4th at pp. 460, 467; *People v. Breverman, supra,* 19 Cal.4th at pp. 153-154; *In re Christian S.* (1994) 7 Cal.4th 768, 777-778.)

10   While heat of passion or imperfect self-defense will reduce an intentional killing to voluntary manslaughter, the Supreme Court has said that "neither ... is an element of voluntary manslaughter that the People must affirmatively prove beyond reasonable doubt in order to obtain a conviction for that offense." (*People v. Rios, supra,* 23 Cal.4th at p. 454.) The reason no doubt is that it was no longer necessary to prove the defeasing conditions.

11   Defendant was charged with both murder and voluntary manslaughter on essentially the same theory that the mental state was implied malice. The acquittal of murder coupled with the finding of voluntary manslaughter thus can be viewed as a matter of jury lenity.

12   An unintentional killing "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection" is involuntary manslaughter. (§ 192, subd. (b).)

**379**

13    By his own admissions, defendant ran upstairs where he got his car keys, closed the window, and grabbed some clothing. He also took time to move the screen that had fallen from the window, eliminated any evidence of alcohol and shut down the computer.

14    Isabel had on different clothing when she arrived at the hospital than she had on when Mrs. left the house at 2 p.m. Because they were clean and intact when she came to the hospital, an unlikely condition if she fell from a height of 12 feet onto an outside wooden deck, the jury could reasonably find defendant changed her clothes before bringing her into the hospital.

15    CALJIC No. 8.40 states in pertinent part as follows:

"Every person who unlawfully kills another human being [without malice aforethought but] either with an intent to kill, or in conscious disregard for human life, is guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision (a).

"[There is no malice aforethought if the killing occurred [upon a sudden quarrel or heat of passion] [or] [in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury].]

"The phrase, 'conscious disregard for life,' as used in this instruction, means that a killing results from the doing of an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his or her conduct endangers the life of another and who acts with conscious disregard for life.

"In order to prove this crime, each of the following elements must be proved:

1. A human being was killed;

2. The killing was unlawful; and

3. The perpetrator of the killing either intended to kill the alleged victim, or acted in conscious disregard for life; and

4. The perpetrator's conduct resulted in the unlawful killing.

[A killing is unlawful, if it was [neither] [not] [justifiable] [nor] [excusable].]"

16    CALJIC No. 8.40 was revised to comport with *People v. Blakeley, supra*, 23 Cal.4th 82 and its companion case *People v. Lasko, supra*, 23 Cal.4th 101. The cases held that "a defendant who, with conscious disregard for life and the knowledge that such conduct endangers the life of another, unintentionally but unlawfully kills in a sudden quarrel or the heat of passion [or "while having an unreasonable but good faith belief in the need to act in self-defense"] is guilty only of voluntary manslaughter rather than murder." (*Blakeley, supra*, 23 Cal.4th at p. 85 [self-defense]; *Lasko, supra*, 23 Cal.4th at p. 104 [sudden quarrel or heat of passion].) These cases overruled a long line of cases which wrongly held or implied that voluntary manslaughter required an intentional killing. The historical explanation for the error can be found in *People v. Cameron* (1994) 30 Cal.App.4th 591, 604, fn. 8.)

---

**End of Document**                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**380**

**Andrews v. State, 372 Md. 1 (2002)**

811 A.2d 282

372 Md. 1
Court of Appeals of Maryland.

Kurt Nichols ANDREWS
v.
STATE of Maryland.

No. 101, Sept.Term 2000.   |   Nov. 14, 2002.

Defendant was convicted in the Circuit Court, Montgomery County, Martha G. Kavanaugh, J., of reckless endangerment by shaking his infant child. He was acquitted of murder, manslaughter, and child abuse. Defendant appealed. The Court of Special Appeals affirmed. Certiorari was granted. The Court of Appeals, Bell, C.J., held that demonstration with doll to show amount of force necessary to produce shaken baby syndrome was irrelevant without a proper foundation that the in-court demonstration would be substantially similar to the events related to death.

Reversed and remanded.

West Headnotes (13)

[1]     **Criminal Law**
        ⟜ Relevancy in General

        The initial determination of whether evidence is relevant is made by the trial judge.

        3 Cases that cite this headnote

[2]     **Criminal Law**
        ⟜ Demonstrative Evidence

        The decision to admit demonstrative evidence rests within the sound discretion of the trial court.

[3]     **Criminal Law**
        ⟜ Demonstrative Evidence

        "Demonstrative evidence" is physical evidence that helps the jurors understand the testimony, but is otherwise unrelated to the case.

[4]     **Criminal Law**

        ⟜ Foundation or Authentication

        A foundation for demonstrative evidence is laid through a witness's testimony that the evidence fairly and accurately depicts what it purports to depict (a subject as to which the witness has the required knowledge) and that it will be helpful to the witness in explaining his or her testimony.

[5]     **Criminal Law**
        ⟜ Demonstrative Evidence

        The court must weigh demonstrative evidence's probative value against the possibility of unfair prejudice or confusion. Md.Rule 5-403.

        5 Cases that cite this headnote

[6]     **Criminal Law**
        ⟜ Experiments and Tests

        In-court demonstrations are permitted with the court's permission, if the pertinent conditions are substantially the same as at the time in question and if the procedure will not be unduly time-consuming, confusing, or likely to arouse unfairly emotional reactions in the jury.

[7]     **Criminal Law**
        ⟜ Replicas and Models; Objects Similar to or Illustrative of Others

        Demonstrative evidence need not be original in order to be admissible, but there must be ample evidence that the item offered as demonstrative evidence is substantially similar to the item that actually played a part in the events at issue.

[8]     **Criminal Law**
        ⟜ Experiments and Tests

        Before a demonstration is admitted, there must be ample evidence that the demonstration would be substantially similar to the event that actually played a part in the events at issue.

        1 Cases that cite this headnote

[9]     **Criminal Law**

**381**



EXHIBIT
I1

Andrews v. State, 372 Md. 1 (2002)
811 A.2d 282

↪ Experiments and Tests

As a threshold matter, the trial court, in ruling on offer of demonstrative evidence consisting of a demonstration intended to show the force necessary to cause shaken baby syndrome, was required to determine whether the state had met its burden to establish that the demonstration would be substantially similar to the event in question, namely, that it would approximate the amount of force an adult would be required to use to inflict the injuries sustained by the child victim.

1 Cases that cite this headnote

[10]   Criminal Law
        ↪ Experiments and Tests

Trial court's decision to allow the state to proceed with a demonstration purporting to show the amount of force necessary to produce shaken baby syndrome, despite a presumption and acknowledgment of dissimilarity between the child victim and the doll used in the demonstration, improperly relieved the state of the burden to establish substantial similarity of the demonstration to the facts at issue in homicide prosecution.

1 Cases that cite this headnote

[11]   Criminal Law
        ↪ Experiments and Tests

The ability to cross-examine is not a substitute for the offering party's burden of showing that a proffered demonstration or experiment offers a fair comparison to the contested events.

[12]   Criminal Law
        ↪ Experiments and Tests

Demonstration with doll intended to show amount of force necessary to produce shaken baby syndrome was irrelevant in homicide prosecution without a proper foundation that the in-court demonstration would be substantially similar to the events related to death.

1 Cases that cite this headnote

[13]   Criminal Law
        ↪ Experiments and Tests

Criminal Law
        ↪ Conduct of Trial in General

Cautionary instruction that the demonstration with doll, intended to show amount of force necessary to produce shaken baby syndrome, was not an accurate re-enactment and only an opinion did not cure all possible prejudice to defendant in homicide prosecution.

**Attorneys and Law Firms**

**283   *3 Geraldine K. Sweeney, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Mary Ann Ince, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J. and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

**Opinion**

BELL, C.J.

The petitioner, Kurt Nichols Andrews, was arrested and tried, in the Circuit Court for Montgomery County, for the *4 death of his infant daughter, Kristin Andrews, [1] which, it was alleged, was caused by "Shaken Baby Syndrome." Shaken Baby Syndrome is characterized by violent acceleration and deceleration forces being applied to an infant, whose head is disproportionately heavy, whose neck muscles are weak, and whose brain is unmyelinated and soft, making it more susceptible to trauma. The petitioner was found not guilty of second degree depraved heart murder, involuntary manslaughter, and child abuse. He was convicted, however, of reckless endangerment, for which he was sentenced to a term of five years imprisonment. After unsuccessfully appealing his conviction to the Court of Special Appeals, the petitioner filed a petition for Writ of Certiorari with this Court, which we granted. *Andrews v. State,* 362 Md. 34, 762

**382**

Andrews v. State, 372 Md. 1 (2002)

811 A.2d 282

A.2d 968 (2000). In this Court, the petitioner argues that the trial court erred by allowing a demonstration, using a doll that did not have the same characteristics as the infant child alleged to have been shaken, to be conducted before **284 the jury for the purpose of showing the amount of force necessary to cause an injury associated with Shaken Baby Syndrome, and by permitting the expert witness, called by the respondent, the State of Maryland, to testify on the basis of that demonstration. We agree. Accordingly, we shall reverse.

## I.

As acknowledged by the State, the facts of the case *sub judice* are largely undisputed. Kristin Andrews was born prematurely, at a gestational age of 23 ½ weeks,[2] weighing only one pound and eight ounces, in Mercy Hospital on May 6, 1997. As a result, she was plagued with severe health complications, including intraventricular brain hemorrhage, sustained at birth, patent ductus arteriosus (a hole in the heart), *5 and Respiratory Distress Syndrome. Kristin required eight blood transfusions as a result of anemia of prematurity. In addition, Kristin suffered from periodic bouts of apnea, a cessation of breathing for 20 seconds or more, and bradycardia, a slowing of the heart rate to less than 100 beats per minute. Kristin was also treated for an e-coli infection and monitored for retinopathy of prematurity, a condition in which blood vessels to the eye develop abnormally, resulting in the eye becoming engorged, possibly leading to detachment of the retina. She was unable to self-feed and required an arterial line to the umbilicus for formula, antibiotics and fluids.

Kristin remained hospitalized for a period of 89 days after birth, requiring during that period, numerous medications and medical equipment. Due to the Respiratory Distress Syndrome caused by the premature development of her lungs, she required an artificial surfactant[3] to prevent lung collapse; medication to stimulate the brain center to breathe; a diuretic to prevent pulmonary edema; a powerful steroid to decrease inflammation of the lungs; and supplemental oxygen to assist her breathing. Her first 28 days of life were spent in the Neonatal Intensive Care Unit. The remainder of Kristin's hospital stay was spent in the Stepdown Unit, which was one level higher than a traditional newborn nursery. Throughout her hospitalization, Kristin was under constant monitoring as a result of apnea and bradycardia attacks. Some of those attacks required medical intervention.

The petitioner and Debbie Young, Kristin's mother and the petitioner's fiance, visited their daughter daily while she was hospitalized. Testimony adduced at trial indicated that both parents bonded strongly with Kristin and that, the petitioner, Ms. Young, Ms. Young's seven-year old son and Kristin appeared to be a caring and loving family.

Kristin was discharged from the hospital on August 2, 1997, about the same time she would have been born at full-term. *6 Although she was allowed to leave the hospital, she continued to have health problems associated with her premature birth: Kristin was diagnosed as having bronchial pulmonary dysplasia, damage to the lungs associated with Respiratory Distress Syndrome in premature infants. Thus, Kristin was sent home with a 24-hour a day monitor and instructions for the continued administration of medication designed to stimulate breathing. **285 Both of her parents were instructed in the use of the monitor and cardiopulmonary resuscitation (CPR) of infants. The record indicates that the leads to the monitor sometimes became detached, which would trigger an alarm. In addition, the monitor would sound an alarm when the memory was full indicating that the monitor required servicing. The alarms resulting from a loose lead or a full memory are different from the alarm sounded when triggered by an apnea event. Nevertheless, whenever an alarm sounded, the petitioner or whoever was caring for her would have to check on Kristin to determine whether the alert from the monitor was a false alarm or a true alarm.

Kristin also required on-going medical evaluation. In one such followup examination, Kristin's doctor noted that she exhibited abnormally rigid muscle tone which suggested a brain injury that may become more apparent as Kristin developed.

As a consequence of Kristin's need for heightened medical care and attention that her parents had been trained to provide, the petitioner and Ms. Young agreed that, because Ms. Young, a nursing assistant, earned a higher salary than petitioner, she would keep her job and the petitioner would quit his employment and care for their daughter full time. As a result, the petitioner acted as Kristin's primary caretaker from the moment she was discharged from the hospital until her death. The record indicates that the petitioner took Kristin to all of her followup examinations with her doctors. During this time, Kristin's weight increased to eleven and-a-half pounds, which was characterized as excellent weight gain. Kristin's last recorded apnea event took place on September 5, 1997.

**383**

Andrews v. State, 372 Md. 1 (2002)

811 A.2d 282

*7 In October of 1997, Ms. Young was offered a position as a medical assistant with Kaiser Permanente. Although the position was located in Towson, Maryland and the family resided in Baltimore County, acceptance of the job was dependent on Ms. Young traveling to Rockville, Maryland for a three-day training seminar. Ms. Young being unfamiliar with the Rockville area, the petitioner and Ms. Young agreed that the petitioner would drive Ms. Young to the training seminar. Due to financial difficulties, however, to avoid wasting gas making the return trip to Baltimore and back to Rockville to pick Ms. Young up at the conclusion of the training and concerned that no one would be available to pick up Ms. Young's seven-year old son after school, the couple also decided that the entire family would accompany Ms. Young to Rockville and would remain there the entire day while Ms. Young attended the training seminar.

The family left for Rockville at about 6:00 a.m. on October 27, 1997 and arrived at the Kaiser Permanente garage at approximately 8:00 a.m. The leads from Kristin's monitor detached several times that morning, causing the monitor to sound an alarm. The petitioner remained in the car with the two children. During a break in the training session, between 9:00 a.m. and 10:00 a.m., Ms. Young returned to the car to check in on the family. She testified that all was well during this visit which lasted approximately fifteen minutes. Ms. Young returned to the car shortly after noon, when she received her lunch break. She testified that, once again, the entire family appeared fine and that no one seemed frustrated by the wait.

The petitioner fed Kristin a bottle and burped her at approximately 2:45 p.m. At the conclusion of the feeding, according to accounts given by the petitioner to medical personnel, Kristin began choking and stopped breathing. Testimony at trial also indicated that the petitioner informed the **286 medical personnel that he had unsuccessfully attempted to resuscitate Kristin by performing CPR and shaking her gently. A passerby in the garage, flagged by petitioner, was able to place a call from the garage office to 911 at 2:54 p.m.

*8 The log on Kristin's monitor indicated that between 11:05 a.m. and 2:59 p.m. the monitor had registered 20 "loose lead" alarms and 16 "full memory" alarms.[4] The last loose lead alarm occurred at approximately 2:47 p.m. and lasted until the monitor was turned off at 2:59 p.m. Emergency medical technician, Captain Michael Prete, arrived at the scene at approximately 2:59 p.m. Captain Prete noticed

that Kristin was lying on the back seat of the vehicle, unconscious, not breathing with some blueness around her lips, indicating a lack of oxygen in the body. Captain Prete unsuccessfully attempted to arouse Kristin by tapping her on the feet. He then covered her nose and mouth with his mouth and blew two breaths of air into Kristin's lungs. At this point, Captain Prete noticed a rise and fall in Kristin's chest and that she began to vomit a milky substance. Unable to detect a pulse, Captain Prete then began CPR and proceeded to transfer her by ambulance to Shady Grove Adventist Hospital. During the ambulance ride, Prete noted that he was able to stimulate a spontaneous pulse in Kristin, however, she never breathed on her own and required the assistance of an "ambu-bag" which contained 100 percent oxygen. Although, Kristin vomited a couple more times in the ambulance, the emergency technicians were able to keep her airways clear. The technician administered epinephrine, a medication designed to increase Kristin's slow ventricular heart rate.

Arriving at the hospital at 3:18 p.m., the hospital personnel immediately suctioned milk and vomitus from Kristin's airways. Kristin's eyes and body were unresponsive to light or touch. She was wheezing and her hands and feet were blue. Dr. Rebecca Salness, a pediatric emergency physician, and Dr. Allison Goodman, a pediatric intensive care physician, unsuccessfully continued CPR and the administration of various medicines for more than two hours. Nevertheless, Kristin never regained consciousness and was pronounced dead at 5:25 p.m. Dr. Salness recorded her diagnostic impression as *9 electro-mechanical disassociation (pulseless electrical activity, and consequently, no circulation), aspiration vomitus (inhaled vomit or milk in the breathing system blocked, totally or partially, the airway); complications of respiratory problems associated with premature birth, disseminated intravascular coagulopathy (clotting problem caused by oxygen deprivation to the brain) and cardiorespiratory arrest (heart and breathing stopped). Dr. Salness testified at trial that the chances of survival for a child after a choking event similar to Kristin's was "very good" if CPR is administered soon after. She further indicated that patients usually respond to the CPR quickly or would "die within 30 minutes or maybe an hour," and that it was unusual to perform CPR on a person for as long as they had on Kristin.

An autopsy was performed on Kristin's body the day after her death. Dr. James Laren Locke was the assistant medical examiner on duty that day. The autopsy of Kristin Andrews was initiated by Dr. Ling Lee, a post graduate

**384**

research pathologist with a special interest in research into Sudden Infant Death Syndrome **287 (SIDS); however, it was completed by Dr. Locke.[5] Dr. Locke testified that a technician cut and removed Kristin's skullcap, and that "40 to 50 milliliters of blood," in fluid form, escaped as the skull cap was removed, a "very little" amount being captured in a specimen cup. Dr. Locke believed the presence of the blood to be evidence of an acute and recent subdural hemorrhage. He also noted a subarachnoid hemorrhage of the brain which he also thought was recent, and bruising along the optic nerve sheath. Dr. Locke did not obtain complete medical records for Kristin and was unaware that she had been diagnosed with intraventricular hemorrhaging in her brain while in Mercy Hospital. He was further unaware that Kristin was evaluated for retinopathy of prematurity and that there had been blood in a spinal *10 tap (which can indicate blood in the subarachnoid space in the brain) done at Mercy Hospital.

Having marked on the death certificate that the cause of death was "pending," Dr. Locke consulted with two pathology specialists, Dr. Juan Troncosa, a neuropathologist and Dr. W. Richard Green, an ophthalmologic pathologist, advising them of what he knew and of his conclusions. On November 12, 1997, without obtaining Kristin's medical records or waiting for the reports from the pathology specialists, he changed the cause of death on Kristin's death certificate from "pending investigation" to "homicide," "head trauma as a result of shaking."[6] The petitioner was subsequently arrested and charged with the murder of his infant daughter.

At the petitioner's trial, Dr. Locke was accepted as an expert witness for the prosecution, over defense objections. He testified that he had determined the cause of Kristin's death to be consistent with "Shaken Baby Syndrome." He further testified that, in his determination, the cause of Kristin's death was inconsistent with any other findings. Although Dr. Troncosa, the neuropathologist, was not called as a witness, Dr. Locke did testify as to the contents of the report that he wrote. That report disagreed with Dr. Locke and, instead, concluded that there was no evidence of a recent subdural hemmorrhage, as Dr. Locke had concluded as a result of the autopsy he conducted. The neuropathology report further concluded that there was no evidence of a swelling, tearing or bruising of the brain or shifting of the brain tissue. Dr. Locke also acknowledged that the neuropathologist had examined the spinal cord and the cervical medullary junction (where the spinal cord meets the brain), two areas susceptible to injury from shaking, but found no signs of injury.

Dr. W. Richard Green, the consulting ophthalmologic pathologist, testified at trial as an expert in ophthalmology and *11 pathology. He stated that, based on the post-mortem examination of Kristin's eyes, he noticed evidence of internal and external hemorrhaging of the optic nerve, hemorrhaging of the retina, and bleeding in the circumferential macula folds of the eyes.[7] Dr. Green testified that the specimen **288 showed massive, diffuse hemorrhages in both eyes, which he believed occurred at least 6 days prior to Kristin's death, perhaps more. Concluding that Kristin's injuries could have resulted in two ways: (i) increased intervascular pressure as a result of chest compressions; or (ii) Shaken Baby Syndrome, Dr. Green's determined that the results of the examination were consistent with a diagnosis of Shaken Baby Syndrome.

Dr. Green did not believe that the chest compressions used in CPR could result in the type of injuries sustained by Kristin, but acknowledged that some studies had shown that CPR compressions can cause retinal hemorrhages in children. Dr. Green discounted the possibility that hemorrhaging found in Kristin's sample were produced by CPR because he had never seen the degree or pattern of hemorrhaging found in Kristin's specimen with any of the cases he examined after "vigorous CPR." Dr. Green acknowledged that in the cases he referred to, the CPR lasted about 30 minutes, whereas the CPR on Kristin lasted almost two and a half hours. He also acknowledged that none of the 76 child eye pathology exams he had done for the medical examiner involved premature infants, and none involved infants with a history of retinopathy of prematurity. Dr. Green further testified that the force of the chest compressions required to cause retinal bleeding would be less on the supple chest of a neonate.

The prosecution called Dr. Barbara Craig as its final expert witness. Accepted as an expert in pediatrics, child abuse and the anatomy and physiology of head injuries in children, Dr. Craig opined that Kristin's death resulted from Shaken Baby Syndrome. She testified that the minimal criteria to justify *12 the forensic medical diagnosis of shaken baby syndrome would be: (i) a baby who was well who suddenly became unconscious; (ii) the subdural hemorrhage described by Dr. Locke and the subarachnoid hemorrhage shown by the autopsy of the brain; and (iii) the absence of any major head injury, such as that caused by, for example, a car accident. She further stated that retinal hemorrhages are not a necessary factor in the diagnosis, but can result from Shaken Baby Syndrome.

**385**

The defense called both fact and character witnesses and three expert witnesses. Dr. Michael Baden was accepted as an expert witness in the area of pathology, forensic pathology and child abuse for the defense. He testified that, in his opinion, to a reasonable degree of medical certainty, Kristin's death was not the result of Shaken Baby Syndrome. Dr. Baden opined that Kristin's death was a result of choking on her formula resulting in an apnea and bradycardia event from which she did not recover.

Dr. Baden's opinion was based on his review of Kristin's complete medical history, including some 700 pages of records from her initial hospitalization at Mercy Hospital following birth, her pediatric records and ophthalmology records, the printouts from Kristin's monitor, the reports from the consulting specialists, the autopsy report, tissue slides, photographs and police reports. From these records, he concluded that Kristin suffered a brain hemorrhage at birth, severe anemia (Kristin had less than a third of the red blood cells that she should have had), abnormal blood vessels in the retina because of the prematurity, and severe episodes of apnea and bradycardia. Dr. Baden submitted that the physicians at Mercy Hospital were able to stabilize Kristin for 89 days and that she lived for an additional 85 days thereafter; however, he concluded that she was nevertheless still a very sick child. Dr. Baden agreed with the conclusion of **289 the emergency room physician, that Kristin's death was a result of cardiac arrest and pulmonary arrest triggered by choking on vomitus. Dr. Baden's conclusions were also consistent with (i) the account given by the petitioner to the emergency room personnel and *13 (ii) the treating physician's attempts to remove vomitus from Kristin's airways.

Dr. Baden expressly disagreed with the conclusion reached by Dr. Locke that Kristin's death was caused by the subdural hemorrhage. He opined that the blood that escaped during the autopsy of Kristin's brain was the result of post-mortem bleeding and not a subdural hemorrhage. Dr. Baden testified that he disagreed with

> "the transient observation of the pathologist who saw the subdural, and in no way documented it, and [in] ... my own experience [of] over 39 years, that it is a common mistake beginners make to misinterpret accumulations of blood in the back of the scalp with a subdural hemorrhage because of the

> post-mortem seepage of blood after the dura is cut."

Dr. Baden noted that subdural hemorrhages do not appear in liquid form at the autopsy, rather they appear as clotted blood, which can be photographed and examined. In addition, a death resulting from a subdural hemorrhage would show signs of swelling. The post-mortem examination, consistent with the observations of the treating emergency room physicians, indicated no evidence of swelling. Dr. Baden concluded that the CPR efforts used to resuscitate Kristin could account for any abnormality in the brain and eyes.

In addition to Dr. Baden's testimony, the defense presented an expert in ophthalmologic pathology and ophthalmological findings associated with Shaken Baby Syndrome and an expert in neurologic traumatic injury of the head and neck. Both experts agreed with Dr. Baden that Kristin's death was not a result of Shaken Baby Syndrome, but rather, was the result of a lack of oxygen caused by choking.

Against this background of conflicting expert testimony, the prosecution was allowed to conduct an in-court demonstration. The demonstration-intended to show the force necessary to cause Shaken Baby Syndrome-was performed before the jury, using a doll designed for infant CPR training, by Dr. Barbara Craig. Defense counsel objected to the use of the CPR doll, arguing that the prosecution had not laid a proper *14 foundation, either a showing of a sufficient similarity between the doll and Kristin or that Dr. Craig possessed the expertise to demonstrate the amount of shaking force required to cause the injuries. The trial court rejected defense counsel's request for an *in camera voir dire* of Dr. Craig. Deferring its ruling until the prosecution had established the foundation, it believed that Dr. Craig's basis of knowledge "would go to the weight rather than the admissibility of any demonstration," and, thus, should be challenged by cross-examination.

Although the prosecutor argued that the foundation for the demonstration had been laid, offering two reasons: (i) the nurse from Shady Grove Hospital who testified had demonstrated a gentle shaking motion which Petitioner had shown her to explain how he had attempted to stimulate Kristin to begin breathing; and (ii) Dr. Craig had already laid a foundation by her testimony about her review of pertinent studies, her attendance at seminars, and her knowledge of biomechanics, the trial court informed him that he had "to ask her how she is able to determine the amount of force, her basis of knowledge." This prompted the prosecutor to inquire:

**386**

Andrews v. State, 372 Md. 1 (2002)

811 A.2d 282

"Q [PROSECUTOR]: And now by way of kind of defining what you mean **290 by violent shaking, I want to ask you a couple of foundational questions.

"When you talk about the shaking that is necessary to cause these injuries, I guess I am getting to the basis of your knowledge for how much shaking would be involved.

"So let me start by saying is that issue, the degree of force necessary to cause injuries like the one you have listed, is that something that is within the literature in the field of child abuse and head injuries in children?

"A [DR. CRAIG]: Yes. It is.

"Q: Is that same issue, the degree of force necessary for these injuries, something that is a topic of scholarly publishing and conversation and debate in the context of national seminars as well as more localized seminars?

"A: Yes. It is.

*15 "Q: Is it an issue that you discuss with your peers in the field?

"A: Yes. It is.

"Q: Is it an issue that you have had some knowledge about from your treatment of surviving children from Shaken Baby Syndrome and the manifestation of injury that they have?

"A: Yes. It is.

"Q: And have you had the occasion to review the findings of the autopsies and studies that stem from autopsies when it comes to the amount of force necessary to cause these types of injuries.

"A: Yes. I have."

The trial judge then ruled, based on this testimony, that Dr. Craig could demonstrate the amount of force necessary to cause Shaken Baby Syndrome by using the CPR doll. Defense counsel renewed his objection, reiterating at a bench conference that he did not believe a proper foundation had been laid. He detailed his reasons:

"[DEFENSE COUNSEL]: There has been no evidence that this doctor has testified about that she is aware of actual studies that show how much force is necessary.

"And, in fact, the only study has [sic] been done again suggests that the force-simply a shaking is not sufficient to cause the injuries she has described.

"She has not testified that Kristin Andrews' physical condition is sufficiently similar to the doll that is going to be used both in her size, weight, and the relationship between her weight and size and her head, the development of the neck in the doll with the neck in Kristin Andrews-all of those factors she has not testified about.

"She has not talked at all about any principles of physics that would lead her to the basis to think that she could have an actual opinion of shaking.

"She has not said that she had people who have shaken children describing how violently they are or that that has been described in the literature.

*16 "She has not done anything [sic] of those things, and for that reason, I do not believe that it is an expert opinion."

The trial judge reiterated her previous ruling: "That would go to the weight of [the expert's] opinion rather than the admissibility of the demonstration."

Thereafter, the following colloquy occurred in front of the jury prior to the actual demonstration:

"Q [PROSECUTOR]: Now we have used this doll, State's exhibit 6, for purposes of talking about CPR. And I want to ask you first of all-and this is compared to babies in general and then compared to Kristin Andrews-can you tell us what the similarities and differences are by the way of weight and flexibility of this doll compared to an **291 actual baby in the condition of Kristin Andrews?

"A [DR. CRAIG]: Can I pick it up?

"Q: Yes please. Sorry. I did not mean to leave it there.

"A: The doll is much lighter than 11 ½ pounds.

"Q. Okay.

"A: This feels like [it] probably weighs about 3 or 4 pounds. So this doll is lighter, and it does not feel as heavy as a baby that would weigh 11 ½, which is how Kristin weighed when she died.

"Q: What about the neck?

## 387

Andrews v. State, 372 Md. 1 (2002)
811 A.2d 282

"A: And this baby's neck does not really move when you-when you gently move it back and forth. Babies' necks are very weak, and their heads are very heavy.

"So if I did this to a baby that was a few months old, their heads would naturally fall all the way back so that the back of the head would almost touch to scalpula, the shoulder blades on either side.

"And if I tip them forward, the baby's head would fall down, and the chin would touch the chest if this were a real baby.

"Q: Is it fair to say that aside from being roughly a third the weight of Kristin Andrews, that the rigidity of the neck will make a demonstration incomplete in terms of the exact *17 arc movement and rotational forces at work within the head?

"A: That is true.

"Q: Okay. Obviously it would not be quite as graphic though either-I mean, by doing it this way?

"[DEFENSE COUNSEL]: Objection

"THE COURT: Overruled

"Q [PROSECUTOR]: By doing it this way, it is not going to be quite as graphic to watch as if the baby's head and neck had the same [sic] portions of Kristin Andrews?

"[DEFENSE COUNSEL]: Objection

"THE COURT: Overruled

"THE WITNESS: That is true.

"Q [PROSECUTOR]: Is that correct? Now when you describe this as violent shaking, and keeping in mind that obviously this doll is lighter, and most significantly that the neck does not have the same consistency, can you demonstrate to the jury the type of movement that an adult would have to have to cause the injuries that caused Kristin's death?

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Overruled for the reasons stated at the bench.

"Q [PROSECUTOR]: Go ahead."

(Witness demonstrates)

Immediately after the demonstration the witness gratuitously added, "[a]lmost more energy than you can do, if you are not-already have your adrenalin flowing."[8]

Defense counsel requested a cautionary instruction. Granting the request, the trial judge told the jury:

> *18 "THE COURT: Well, I will tell the jury this was not an accurate re-enactment, but I think [the prosecutor] made this clear to you. This is Dr. Craig's opinion about the amount of force."

On cross-examination, defense counsel was able to establish that, in addition to the differences in weight and flexibility between the doll and Kristin, there was a difference, as between the doll and Kristin, in the proportional ratio of head to body, **292 both in circumference and weight. Specifically, Dr. Craig acknowledged that based on her "adjusted age" of 3 months, Kristin was in the 90th percentile for head circumference, the 5th percentile for height, and the 60th percentile for weight, signifying an "extremely large disproportion" between the size of her head and the length of her body, and a significant disproportion between the weight of her head and the weight of her body. Dr. Craig also agreed that there was considerable difference between the doll and Kristin in the strength of the neck muscles. Furthermore, Dr. Craig admitted that there had only been one study of Shaken Baby Syndrome using a bio-mechanical model (a doll with sensors in the head to measure the force of various trauma)-the 1992 study by Dr. Christina Duhaime, a neurosurgeon from the Children's Hospital in Philadelphia, Pennsylvania, and Dr. Lawrence Theobald, an expert in physics at the University of Pennsylvania. Dr. Craig admitted that the results of that study were that Shaken Baby Syndrome could not be caused by shaking alone, but rather it must coalesce with some impact trauma to produce such injuries.

Concluding cross-examination was the following exchange:

"Q [DEFENSE COUNSEL]: ... And so what we are left with now is people basing it on their experience and looking at cases and trying to decide how much force is necessary to create these injuries; isn't that right?

## 388

Andrews v. State, 372 Md. 1 (2002)

811 A.2d 282

"A [DR. CRAIG]: And we are looking at the old studies on primates, the mechanical model studies, and then also people who have confessed and demonstrated what they have done yes.

**\*19** "Q: And you yourself have never actually seen a child being shaken, I hope?

"A: No

"Q: Not in a violent way?

"A: No. Not violently, no.

## II.

[1]    We begin our analysis with the proposition that all relevant evidence is admissible. *Pappaconstantinou v. State,* 352 Md. 167, 181, 721 A.2d 241, 248 (1998); *Smallwood v. Bradford,* 352 Md. 8, 27, 720 A.2d 586, 595 (1998). *See* Md. Rule 5-402.[9] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. *See Snyder v. State,* 361 Md. 580, 590-91, 762 A.2d 125, 131 (2000). The initial determination of whether evidence is relevant is made by the trial judge. *Merzbacher v. State,* 346 Md. 391, 404, 697 A.2d 432, 439 (1997); *Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974, 978 (1996); *North River Ins. Co. v. Mayor and City Council of Baltimore,* 343 Md. 34, 89-90, 680 A.2d 480, 508 (1996); *Armstead v. State,* 342 Md. 38, 66, 673 A.2d 221, 235 (1996). Relevant evidence, however, should be excluded by the trial court, if the probative value of such evidence is determined to be substantially outweighed by the danger of unfair prejudice. *See* Md. Rule 5-403.[10] *See* **\*\*293** *also, e.g., Snyder,* 361 Md. at 592-93, 762 A.2d at 132 ("[t]herefore, evidence **\*20** which meets the definition of 'relevant evidence' under Rule 5-401, and which, therefore, would be admissible under Rule 5-402 as having logical relevance, may nonetheless be excluded under Rule 5-403.") *citing Merzbacher,* at 404, 697 A.2d at 439; *Williams v. State,* 342 Md. 724, 737, 679 A.2d 1106, 1113 (1996).

[2]    [3]    [4]    [5]    Likewise, "the decision to admit demonstrative evidence rests within the sound discretion of the trial court." *Ware v. State,* 348 Md. 19, 65, 702 A.2d 699, 721-722 (1997). Our decision in *Ware* illustrates the basis and

proper procedure for admission of demonstrative evidence. We explained:

"Demonstrative evidence has been described as physical evidence that 'helps the jurors understand the testimony, but it is otherwise unrelated to the case.' " JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 1101, at 576 (2d ed.1993); *see, e.g., Grandison v. State,* 305 Md. 685, 731-33, 506 A.2d 580, 603-04 (1986); *Evans v. State,* 304 Md. 487, 520-21, 499 A.2d 1261, 1278-79 (1985). Demonstrative evidence is generally offered for clarification or illustration of the witness's testimony and it need not be original or authentic. "Instead, the theory justifying admission of these exhibits requires only that the item be sufficiently explanatory or illustrative of relevant testimony to be of potential help to the trier of fact." 2 MCCORMICK ON EVIDENCE § 212, at 9 (J. Strong 4th ed.1992).

\* \* \* \* \* \*

"Professor McLain discusses the foundation requirements for demonstrative evidence:

"A foundation simply must be laid through the witness's testimony that the evidence fairly and accurately depicts what it purports to depict (a subject as to which the witness has the required knowledge) and that it will be helpful to the witness in explaining his or her testimony. It is then admissible in the trial court's discretion; if the court determines that the evidence will be helpful to the trier of fact...."

\* \* \* \* \* \*

**\*21** "The court must weigh the demonstrative evidence's probative value against the possibility of unfair prejudice or confusion."

*Id.* (internal citations omitted).

[6]    In-court demonstrations are permitted with the court's permission, if the pertinent conditions are substantially the same as at the time in question, and if the procedure will not be unduly time-consuming, confusing or likely to arouse unfairly emotional reactions in the jury. Lynn McLain, 5 Maryland Evidence, § 403.4 (West Publishing Co.1987). *See also* 4 Wigmore. § 1160 (rev.1972); 2 McCormick on Evidence, § 215 (5th ed., Strong, ed.1999); Joseph F. Murphy, Jr., Maryland Evidence Handbook, 2d Ed., § 105 (The Michie Co., 1993). This Court has applied these

**389**

Andrews v. State, 372 Md. 1 (2002)

811 A.2d 282

general principles to demonstrations involving objects and required that the party seeking to utilize the demonstration make a preliminary showing that what the demonstration is expected to establish is "substantially similar" to the facts and circumstances at issue. *See O'Doherty v. Catonsville Plumbing & Heating Co., Inc.,* 269 Md. 371, 374-75, 306 A.2d 248, 250 (1973).

In *O'Doherty,* this Court, noting the views from other jurisdiction, stated:

> "The courts now very generally permit a party to make or perform an experiment, **294 demonstration, or test in open court before the jury when it will prove, tend to prove, or throw light upon, the issue in the case on trial, *provided such experiment or test are made under similar conditions and like circumstances to those existing in the case at issue.* Demonstrations should ordinarily be conducted within the courtroom if it is practical to do so; if it is not practical to do so, they may be conducted outside, subject to the same conditions and limitations applicable to demonstrations or experiments made in the courtroom...."

*Id.* (emphasis added). *O'Doherty* further held that the mere fact that a demonstration is performed in open court does not denigrate the evidential validity of a demonstration. *Id.* at 374-75, 306 A.2d at 250.

**\*22** **[7]** We have further stated that "demonstrative evidence need not be original in order to be admissible, [however,] there must be '*ample evidence* ' that the item offered as demonstrative evidence is *substantially similar* to the item that actually played a part in the events at issue." *Ware,* 348 Md. at 66, 702 A.2d at 722, (emphasis added), *citing Grandison,* 305 Md. at 732, 506 A.2d at 603. As we see it, the "substantially similar" requirement gives effect to the initial relevance determination required of all evidence by Md Rule 5-402. Without the substantially similar requirement serving as a gatekeeper to the admission of demonstrative evidence, the net effect would be the admission of all demonstrative evidence, whether relevant or irrelevant.

As the petitioner notes in his brief, the "application of the general principle of 'essential similarity of conditions' is

more difficult when what is involved is not objects, but people." (Petitioner's Brief at 30). Illustrating the conflicting decisions, from other jurisdictions, with respect to this area of the law, he draws our attention to *United States v. Gaskell,* 985 F.2d 1056 (11th Cir.1993) and *State v. Candela,* 929 S.W.2d 852 (Mo.App.1996). The petitioner urges this Court to adopt the rule applied in *Gaskell.*

In *Gaskell,* a case with substantially similar facts to the case *sub judice,* Robert Gaskell, the accused, was alleged to have caused the death of his infant daughter, Kristen, as a result of, *inter alia,* Shaken Baby Syndrome. Over the objection of defense counsel, the government was allowed to have its expert witness conduct a demonstration, for the jury, of Shaken Baby Syndrome using a rubber mannequin designed for the practice of infant CPR techniques. On appeal, Gaskell argued that the demonstration using the rubber mannequin was "irrelevant and unfairly prejudicial." 985 F.2d 1056, 1060. After stating the general principle that the "district court has wide discretion to admit evidence of experiments conducted under substantially similar circumstances," the court made clear that the "burden is on the party offering a courtroom demonstration or experiment to lay a proper foundation establishing a similarity of circumstances and conditions." **\*23** *Id., citing Barnes v. General Motors Corp.,* 547 F.2d 275, 277 (5th Cir.1977); *accord Jackson v. Fletcher,* 647 F.2d 1020, 1027 (10th Cir.1981) ("The party introducing the evidence [of an experiment] has a burden of demonstrating substantial similarity of conditions. They may not be identical but they ought to be sufficiently similar so as to provide a fair comparison.").

The 11th Circuit concluded that the government failed to meet its burden of establishing substantial similarity of conditions **295** [11] and that the prejudice resulting from the demonstration outweighed any probative value it might have. *Gaskell,* 985 F.2d at 1061. The court was not persuaded by the government's argument that cautionary instructions to the **\*24** jury cured the prejudice and concluded that "the ability to cross examine is not a substitute for the offering party's burden of showing that a proffered demonstration or experiment offers a fair comparison of the contested events." *Id.* at 1062.

In contrast to the ruling in *Gaskell,* in *Candela* an intermediate appellate court in Missouri held that a demonstration of Shaken Baby Syndrome using a rag doll was properly admitted, where the defense counsel had the opportunity to point out to the jury the differences between the victim

**390**

811 A.2d 282

and the doll. The Missouri court's ruling was based on the determination that the demonstration was for illustrative purposes only and was not admitted for the purpose of showing what was alleged to have actually happened. *See Candela,* 929 S.W.2d at 867. In a similar case, a Georgia court also adopted the rationale of *Candela,* stating:

> "Obviously, a demonstration of how shaken infant syndrome occurs would have to be done with a mannequin or a doll rather than a real infant. Such objects will differ in many respects from a real child. However, any dissimilarity between the conditions of the demonstration and the actual occurrence affects the weight rather than the admissibility of the evidence."

*Powell v. State,* 226 Ga.App. 861, 863-864, 487 S.E.2d 424, 426 (1997). *See also Minor v. State,* 780 So.2d 707 (Ala.Crim.App.1999), in which, finding *Candela* more persuasive, the Supreme Court of Alabama distinguished *Gaskell* as follows:

> "In *Gaskell,* unlike this case, defense counsel specifically objected to the degree of force used in the demonstration; the witness said he based his presentation on a demonstration by a police officer **296 whose knowledge was derived from a father in another case; the witness admitted he displayed a greater degree of force than that required to produce shaken baby syndrome; *Gaskell* had admitted shaking the child, though for resuscitation purposes, making the issue of the amount of force actually used critical; and, the conviction *25 was not reversed solely on the demonstration, but also on two other errors in the trial of the case."

*Id.* at 763-764.

Apparently, agreeing with the reasoning of *Candela* and *Powell,* the trial court, as we have seen, admitted the demonstration. We decline to follow suit, believing the

*Gaskell* holding and rationale to be consistent with Maryland law.

## III.

[8]  [9]  We have stated, *supra,* that before demonstrative evidence is admitted, "there must be '*ample evidence*' that the item offered is *substantially similar* to the item that actually played a part in the events at issue." *Ware,* 348 Md. at 66, 702 A.2d at 722, (emphasis added), *citing Grandison,* 305 Md. at 732, 506 A.2d at 603. The test is the same when, rather than an item, the subject of dispute is an event. Consequently, as a threshold matter, the trial court was required to determine whether the State had met its burden in establishing that the demonstration would be substantially similar to the event in question, namely approximating the amount of force "an adult would be required to use to inflict the injuries sustained by Kristin Andrews." (Respondent's Brief at 8). The trial court abdicated its duty in determining the threshold issue and, instead, after consideration of the holdings in *Gaskell, Candela* and *Powell,* determined that the differences "would go to the weight of [Dr. Craig's] opinion rather than the admissibility of the demonstration."

[10]  [11]  In the case *sub judice,* the trial court allowed the State to proceed with the demonstration with a presumption and acknowledgment of *dissimilarity,* thus relieving the burden on the State to establish the demonstration's substantial similarity to the facts at issue. We conclude that the differences between the doll and the victim were not insignificant, but, rather, were substantially material to the determination of the amount of force necessary to constitute Shaken Baby Syndrome. The net effect of allowing the State to proceed with a presumption of dissimilarity was to weaken the petitioner's *26 ability to challenge the demonstration on cross-examination. The exchange between the prosecutor and Dr. Craig, on direct examination, specifically highlighted and noted the differences of the demonstration.[12] During cross-examination, defense counsel did manage to highlight more specific differences between the doll and Kristin's proportional ratio of head to body, both in weight and circumference; however, the jury had already been fully apprised of the fundamental differences on direct examination. We agree with the *Gaskell* court where it stated "[t]he ability to cross-examine is not a substitute for the offering party's burden of showing that a proffered demonstration or experiment offers a fair comparison to the contested events." *Gaskell,* 985 F.2d at 1062.

**391**

Andrews v. State, 372 Md. 1 (2002)

811 A.2d 282

**\*\*297** The Court of Special Appeals attempted to distinguish the case *sub judice* from *Gaskell* on the basis that the demonstration in petitioner's trial was "not [to] show Kristin's head or neck movements during the shaking, [r]ather, the doctor sought to illustrate the amount of adult force and degree of shaking that she contended was necessary to cause Kristin's injuries." We are not persuaded. That the "federal court based its ruling on the fact that the doctor had to display a greater degree of force than the level required to produce shaken baby syndrome *due to the characteristics of the doll that was used* " rather than supporting the distinction the intermediate appellate court seeks to draw, actually supports the petitioner's argument. Dr. Craig testified on direct examination that the doll's neck "does not really move," consequently, any amount of force used by Dr. Craig to conduct the demonstration was an unfair comparison when viewed in light of the alleged events.

[12]   Finally, the petitioner argues that the demonstration using the doll may have misled the jury. We agree. Without **\*27** laying a proper foundation that the in-court demonstration would be substantially similar to the events related to Kristin's death, the demonstration was irrelevant as a matter of law. As the *Gaskell* decision noted, "several circuits have recognized that demonstrative exhibits tend to leave a particularly potent image in the jurors' minds." *Gaskell,* 985 F.2d at 1061 n. 2, *citing United States v. Wanoskia,* 800 F.2d 235, 237-238 (10th Cir.1986); *Carson v. Polley,* 689 F.2d 562, 579 (5th Cir.1982). That the jurors may

have relied upon this demonstration in their deliberation may have prejudiced the petitioner.

[13]   After taking notice of defense counsel's repeated objection to the demonstration, the trial court issued a cautionary instruction to the jury acknowledging that the demonstration was not an "accurate re-enactment" and only an opinion. We are not persuaded that the cautionary instruction cured any possible prejudice suffered by petitioner.

We conclude that the trial court erred by allowing the demonstration conducted by Dr. Craig without requiring the State to establish the substantial similarity between the in-court demonstration and the event at issue. Accordingly, we reverse.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT, WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND TO THAT COURT FOR NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.

**Parallel Citations**

811 A.2d 282

Footnotes

1   There seems to be a discrepancy in the spelling of the victim's name. For the sake of consistency, we will refer to the victim as "Kristin."

2   Evidence at trial suggested that the earliest survivable gestational age of a premature infant is twenty-three weeks and that the mortality rate for infants born as young as Kristin is about 50%.

3   Surfactant is a natural material produced in the body that lines the air sacs of the lungs and helps keep the lungs open when exhaling. Without surfactant, the lungs tend to collapse with each breath.

4   This level of activity was not unusual because it was difficult to keep the leads attached to Kristin's thin skin.

5   Dr. Lee had worked with Dr. Smylic, the Chief Medical Examiner, on a study of SIDS deaths in Baltimore. Dr. Lee was neither licensed to practice pathology in the State of Maryland, nor specially authorized as an un-licensed practitioner.

6   The neuropathology report was not completed until November 17, 1997 and the ophthalmology report was not completed until December 1, 1997.

7   Dr. Green testified that Dr. Alex Sua, a post graduate fellow, examined the eyes, which had been sent by the medical examiner's office and prepared a report that was reviewed and revised by Dr. Green.

8   The trial was not videotaped, so there is nothing in the record to memorialize the demonstration for the appellate court. Immediately after the demonstration, defense counsel objected, "she has done the demonstration. I think that that is sufficient." The trial judge agreed, "Yes. That is sufficient." and the prosecutor thanked Dr. Craig.

9   Rule 5-402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible.

**392**

Andrews v. State, 372 Md. 1 (2002)

811 A.2d 282

> Except as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible. Evidence that is not relevant is not admissible.

10    Maryland Rule 5-403 provides:

>> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

11    The federal court stated "the conditions of the demonstration ... were not sufficiently similar to the alleged actions of the defendant to allow a fair comparison. As noted by defense counsel in her objection, due to differences in the weight of the doll's head as well as the flexibility and length of the doll's neck, a considerably greater degree of force was required in order to produce the head movement characteristic of shaken baby syndrome. As the party offering the evidence, the burden was on the government to show that the conditions of [the expert's] demonstration were sufficiently similar to the circumstances of the [victim's] death to afford a comparison. Based on the differences enumerated by defense counsel, the government failed to meet its burden. [The expert] admitted that the doll's neck was stiffer than that of a seven-month old infant and that this would affect the degree of force necessary to move the head in the required fashion. [The expert] explained that his presentation was based on a demonstration of shaken baby syndrome by a police officer whose knowledge was derived from the confession of a father in an unrelated case. Although an expert may rely upon hearsay as the basis for his or her opinion if the out of court statements are 'of a type reasonably relied upon by experts in the particular field,' the government did not establish that [the expert's] hearsay knowledge of this unrelated case provided any reliable or accurate basis upon which to draw conclusions regarding [the victim's] death. Further, although [the expert] repeatedly shook the doll before the jury, he was unable to state the number of oscillations required to produce the [victim's] injuries. The conditions of the demonstration were thus substantially *dissimilar;* the government failed to establish that either the degree of force or the number of oscillations bore any relationship to the defendant's actions. Although the presentation did illustrate the path of movement of an infant's head during shaken baby syndrome, this phenomenon could have been demonstrated with equal effectiveness by a direct manipulation of the doll's head, as suggested by defense counsel at sidebar." *Gaskell,* 985 F.2d 1056, 1060-61 (internal citations omitted).

12    Q [Prosecutor]: Is it fair to say that aside from being about roughly a third the weight of Kristin Andrews, that the rigidity of the neck will make the demonstration incomplete in terms of the exact arc of movement and rotational forces at work within the head?

>     A [Dr. Craig]: That is true.

---

**End of Document**                                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# 393

# Au pair accused of murder takes stand, denies guilt

October 23, 1997
Web posted at: 12:47 p.m. EDT (1647 GMT)



Woodward testifies Thursday
(Court TV)

CAMBRIDGE, Massachusetts (CNN) -- The British au pair on trial for murder in the death of a baby in her care took the stand on Thursday and denied the charge. Louise Woodward, 19, is accused of killing 8-month-old Matthew Eappen at his family's Newton, Massachusetts, home.

Prosecutors maintain Woodward was frustrated and angry with the baby's parents who objected to her late nights out and that on February 4, Woodward violently shook and then slammed the baby's head against a hard surface, causing the massive brain damage that led to his death five days later at Children's Hospital in Boston.

"Did you ever shake Matthew Eappen violently?" Woodward was asked by defense attorney Andrew Good. "No," she answered in a soft voice. Good then asked Woodward: Did she ever "hit," or "slam Matthew about the head?" To each question she responded, "No".

Woodward said that on the afternoon of February 4, she found the infant boy "unresponsive in his crib." (🔊 128K/11 sec. AIFF or WAV sound)

The case has attracted the attention of many professional couples who rely on hired help to care for their children, but have anxiety about doing so.

An au pair is an employee who exchanges services such as being a nanny for children in return for room and board.

## Violent shaking, or old injuries?



Matthew Eappen

Earlier Thursday, Dr. Michael Baden, a respected forensic pathologist who appeared as a defense witness in the O.J. Simpson murder trial, said Matthew's injuries -- a skull fracture and a blood clot that had dried and then began to bleed again -- appeared to have happened at the same time, but at least three weeks prior to February 4.

"It didn't happen the way she was being charged," Baden told prosecutor Martha Coakley. "There are no marks on the baby that would support such a possibility," Baden testified Thursday.

**394**



EXHIBIT
IZ

A series of earlier defense witnesses also have testified the baby's injuries were caused by something other than shaking and slamming. Their conclusions conflict with those of prosecution witnesses, including a surgeon who treated the boy.

One of them, Dr. Ayub Ommaya, said Wednesday he had evaluated Eappen's case by reading the autopsy report and other documents. He said his reading led him to believe that Matthew's injuries were old.

Under questioning by Barry Scheck, a defense attorney in the Simpson murder case, Ommaya said a better explanation for the injuries the baby suffered "is that it happened about three weeks ago -- prior to February 4."

But under a forceful cross-examination by Coakley, Ommaya said his first conclusion was that the child's injury occurred 12 to 48 hours before he was rushed to the hospital emergency room -- not three weeks before, as he had testified.

Lawyers for Woodward, who has been held without bail since her arrest eight months ago, also have argued Matthew may have suffered from a genetic disposition making him susceptible to fractures.

The defense has been trying to depict the baby's parents as busy professionals too wrapped up in their careers to closely monitor their child's care. Last week, the boy's sobbing mother, Dr. Deborah Eappen, told the hushed courtroom that Matthew died in her arms. ( 153K/13 sec. AIFF or WAV sound)

On the stand Wednesday, Woodard's mother described Louise as a smart, caring girl. Susan Woodward, from the small English village of Elton in Chester, told the jury that her eldest daughter acted as a "big sister to all the other children" in the family.

If convicted of first degree murder, Woodward faces a sentence of life in prison without parole.

**395**

2005 WL 3159704
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS
UNPUBLISHED AND MAY NOT BE CITED EXCEPT
AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.

STATE of Minnesota, Respondent,
v.
Chanda Thi HUYNH, Appellant.
and
Chanda Thi Huynh, petitioner, Appellant,
v.
State of Minnesota, Respondent.

Nos. A03-1035, A04-2517.   |   Nov. 29,
2005.   |   Review Denied Feb. 14, 2006.

Hennepin County District Court, File No. 02074350.

**Attorneys and Law Firms**

Mike Hatch, Attorney General, St. Paul, MN; and
Amy Klobuchar, Hennepin County Attorney, Jean E.
Burdorf, Assistant County Attorney, Minneapolis, MN, for
respondent.

Steven J. Meshbesher, Meshbesher & Associates, P.A.,
Minneapolis, MN, for appellant.

Considered and decided by MINGE, Presiding Judge;
KALITOWSKI, Judge; and SHUMAKER, Judge.

Opinion

**UNPUBLISHED OPINION**

MINGE, Judge.

*1 Appellant Chanda Thi Huynh challenges her conviction
of second-degree murder on the ground that she was denied
effective assistance of counsel. We affirm.

**FACTS**

On September 12, 2002, appellant lived with her children,
a 3-year-old son and a 2-year-old daughter, K.H.; a man

named Demetrius Willis; and another woman, Viravone
Chindakone. Around 3:00 p.m., appellant and Chindakone
went grocery shopping while Willis watched the children.
The women returned at approximately 4:00 pm. The three
adults agree that as of 4:00 p.m., K.H. appeared to be fine.
By 4:30, K.H. was unconscious and she was rushed to the
hospital.

What happened between 4:00 and 4:30 is disputed.
Chindakone testified that appellant took K.H. into the
bedroom and shut the door. She further testified that appellant
came out of the bedroom crying, then went back, picked K.H.
up off the floor and brought her out of the bedroom. Appellant
stated both that as she was putting away groceries, she found
K.H. lying on the living room floor and that she took K.H.
into her bedroom and shook or spanked her.

When appellant and K.H. arrived at the emergency room,
K.H. was unconscious and hospital staff noted bruising on
K.H.'s face, head, legs and arms. K.H. died at the hospital
early on the morning of September 13. Police were called to
the hospital the evening of September 12 and took appellant
into custody for questioning. Initially, appellant told police
that she did not know what had happened, or why K.H.
was unconscious or injured. After several hours, appellant
admitted to shaking K.H. and stated, "Maybe I shook her
harder than I thought." Appellant was charged with murder
in the second degree.

Trial counsel obtained discovery from the state, including
medical records. Trial counsel did not request additional
records directly from any medical facilities.

At trial, several witnesses provided medical testimony.
Medical examiner Dr. Raymond Rivera testified that "impact
to the head by a blunt object" caused K.H.'s death and that
"the findings were consistent with multiple impacts to the
head." Medical examiner Dr. Mitchel Morey testified that
the "constellation of features is indicative of ... shaken baby
syndrome or shaken impact syndrome," the cause of death
was "head trauma," and the injuries were acute, meaning
"there's no evidence of changes or healing that have occurred
since these injuries occurred." Dr. Ellen DeVries examined
K.H. at the hospital, and testified that K.H.'s injuries were
the result of a "massive degree of force" and were consistent
with shaking and blunt-force trauma to the head. Dr. DeVries
explained how shaking a child can cause head trauma and
indicated that, based on K.H.'s injuries, "[w]e're talking about
forces of shaking that's equivalent to the force of somebody

**396**


EXHIBIT
K

State v. Huynh, Not Reported in N.W.2d (2005)

that's in a head-on car accident." She also testified that, based on the "acuity" of K.H.'s bruising, the injuries were inflicted within a short time before she examined K.H. and that K.H. would not have been able to "walk around for an hour or so" after these injuries.

**\*2** Appellant was convicted and sentenced to 150 months in prison. Appellant filed a notice of appeal, then moved to stay the appeal in order to file a petition for postconviction relief. The postconviction petition asserted that appellant did not have effective assistance of counsel at trial. At the postconviction hearing, Dr. Janice Ophoven testified for appellant. She identified the cause of K.H.'s death as blunt-force trauma to the head. Dr. Ophoven stated that K.H. did not die from "shaking baby syndrome or shaken impact syndrome," but did concede that K.H. could have been shaken in addition to the blunt-force trauma. Dr. Ophoven also testified that the blunt-force trauma could have occurred up to 72 hours before K.H.'s death because the body is able to compensate for the brain swelling for a period of time after the impact itself. Dr. Ophoven added that the injury could not have been inflicted "just minutes" before K.H. arrived at the hospital, due to the amount of urine in K.H.'s bladder and her sodium level. But on cross-examination, Dr. Ophoven conceded that K.H. could have been immediately unresponsive after the injuries. Also, Dr. Ophoven previously stated that there is no medical or forensic method to identify specifically when the injuries occurred.

Trial counsel also testified at the postconviction hearing. He stated that the timing of K.H.'s death was not an issue and that the injury happened when all three adults were in the home because all three adults agreed that K.H. was fine at 4:00 p.m. Trial counsel stated that although he consulted with Dr. Ophoven briefly, once she indicated that the timing of K.H.'s death was the primary issue in the case, trial counsel determined that he did not need to consult her further. Trial counsel instead pursued the theory that there was insufficient evidence to prove beyond a reasonable doubt that appellant, and not one of her roommates, injured K.H. Trial counsel testified that he presented the possibility of blaming the other roommates to appellant, and she became upset and insisted that the death was an accident, so trial counsel proceeded with the argument that "we don't know what happened."

Trial counsel noted at trial that appellant's confession to shaking K.H. was inconsistent with the medical evidence that K.H. died from blunt-force trauma. He argued that therefore appellant must have confessed not because she hurt K.H. but because she felt coerced or wanted to be released from custody. Trial counsel believed that the state's experts' testimony about blunt-force trauma was a sufficient basis for this theory and that appellant did not need her own expert, and for this reason he did not elicit medical testimony on the cause of K.H.'s death.

Attorney Allan Caplan testified for appellant at the postconviction hearing as an expert witness. He stated that in his opinion appellant was denied the effective assistance of counsel because trial counsel failed to educate himself or to provide testimony for the jury on the timing and cause of K.H.'s death.

**\*3** The district court denied appellant's postconviction petition. This appeal follows as both an appeal from the denial of the petition and a direct appeal from the conviction.

## DECISION

The issue before us is whether appellant was denied effective assistance of counsel because trial counsel did not consult a medical expert, did not obtain medical records, and made other errors.

A postconviction decision regarding a claim of ineffective assistance of counsel involves mixed questions of fact and law, which we review de novo. *Opsahl v. State,* 677 N.W.2d 414, 420 (Minn.2004). To prevail on such a claim, appellant must show that trial counsel's performance "fell below an objective standard of reasonableness" and "that a reasonable probability exists that the outcome would have been different but for counsel's errors." *State v. Blanche,* 696 N.W.2d 351, 376 (Minn.2005).

There is a strong presumption that counsel's performance was reasonable. *State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986). Further, the rule for determining effective criminal defense representation has been expressed as follows:

> [A]n attorney's decision regarding trial tactics lies within the proper discretion of the attorney and will not be later reviewed for competence. To that end, we have concluded the determination as to what evidence to present at trial, such as what defenses to raise and what witnesses to call, represents an attorney's

**397**

State v. Huynh, Not Reported in N.W.2d (2005)

decision regarding trial tactics and will
not be reviewed.

*State v. Quick,* 659 N.W.2d 701, 717 (Minn.2003) (citation
omitted).

### I. Failure to use a medical expert

Appellant argues that she was denied effective assistance of
counsel because trial counsel did not adequately consult Dr.
Ophoven or have her testify at trial. Appellant focuses her
argument on the cause and the timing of K.H.'s death.

To prevail on her claim, appellant first has to show that
trial counsel's actions were objectively unreasonable. An
ineffective-assistance claim cannot be based on an "exercise
of tactical judgment," including whether to obtain expert
testimony or pursue a medical defense. *Cooper v. State,* 565
N.W.2d 27, 33 (Minn.App.1997), *review denied* (Minn. Aug.
5, 1997); *see Quick,* 659 N.W.2d at 717.

Appellant contrasts such strategic decisions with failing to
prepare a defense once a strategic decision is made, citing
*Couch v. Trickey,* 892 F.2d 1338 (8th Cir.1989). In that
case, the court held that the trial counsel's decision not to
interview the state's eyewitnesses was a tactical decision. *Id.*
at 1344. Appellant cites *Couch* for the proposition argued
in the dissent: that the decision was not strategic but was
evidence of trial counsel's inadequate preparation. *See id.* at
1345-48 (Lay, J., dissenting). The actual holding in *Couch*
does not support appellant's argument; rather, it supports
denying relief.

The state argues that trial counsel's decision not to call an
additional expert on the cause of death was a trial tactic.
It appears that trial counsel decided that most of the state's
expert witnesses clearly identified the cause of death as
blunt-force trauma. Trial counsel argued for acquittal on
the basis that appellant's confession of shaking the child
was inconsistent with this expert testimony and could not
have been a cause of death. Although trial counsel's closing
argument evidenced some confusion about what the state's
witnesses actually said, counsel did conclude that the autopsy
showed the death was caused by blunt-force trauma. Dr.
Ophoven's testimony may have more definitively identified
blunt-force trauma as the cause of death, but trial counsel's
trial strategy in this regard was not objectively unreasonable.

**\*4** Even if trial counsel's conduct had been unreasonable,
appellant still has to show a reasonable probability that
consultation with and testimony from Dr. Ophoven on the
cause of death would have changed the outcome of the trial.
*Blanche,* 696 N.W.2d at 376. If the state's experts had agreed
that K.H. died from shaking, Dr. Ophoven's testimony might
have had an impact on the outcome. Although the state's
experts gave some mixed answers, they generally identified
blunt-force trauma as the cause of death. This parallels the
testimony Dr. Ophoven might have given. We note that Dr.
Ophoven conceded that, while she believed shaking did not
cause K.H.'s death, she could not determine whether K.H. was
shaken in addition to the blunt-force trauma that she believed
caused K.H.'s death. Under the circumstances, appellant has
not shown a reasonable probability that the trial would have
ended differently if Dr. Ophoven had testified about the cause
of death.

Trial counsel's decision not to further consult Dr. Ophoven
on the timing of the injury is somewhat different because
it does not reflect a trial tactic so much as an assumption
based on the available evidence. Trial counsel assumed that
the fatal injury happened after appellant and Chindakone
returned from grocery shopping, making testimony on timing
unnecessary. But according to Dr. Ophoven, K.H. could have
appeared fine *after* the infliction of the injury, making it
possible that the injury occurred before appellant returned
from shopping, when she was not home. Assuming that Dr.
Ophoven's testimony is accurate, in order to argue this theory
of the case, trial counsel would have had to understand and
present complex medical concepts to the jury. In addition,
the state's witnesses indicated that based on the severity of
the injury and the developing bruising, the injury would
have been immediately debilitating and would had to have
happened shortly before K.H. arrived at the hospital. It is
not clear that appellant's trial counsel could discredit these
adverse witnesses.

Even if the court were to find trial counsel's decisions on the
timing of injury objectively unreasonable, appellant would
still have to show a reasonable probability that the outcome
of the trial would have been different if trial counsel had
consulted with and called Dr. Ophoven to testify regarding
timing. Dr. Ophoven's testimony was inconsistent. Also,
while her testimony may have presented the possibility that
the injuries occurred while appellant was not home, it did
not exclude the possibility that the injuries happened while
appellant was home. Finally, as the district court pointed out,
Dr. Ophoven conceded on cross-examination that K.H. could

## 398

State v. Huynh, Not Reported in N.W.2d (2005)

have become unresponsive immediately after the injury. Given these possible problems with Dr. Ophoven's testimony on timing, appellant has not met her burden of proving a reasonable probability that the outcome of the trial would have been different.

## II. *Failure to obtain all the medical records*

*5 Appellant also argues she was denied effective assistance of counsel because trial counsel did not request any medical records directly from the medical facilities and instead relied on the medical records that he received from the state in discovery

In *Kimmelman v. Morrison,* 477 U.S. 365, 385, 106 S.Ct. 2547, 2588 (1986), trial counsel did not request *any* discovery and trial counsel's conduct was found to be objectively unreasonable. Here, trial counsel requested and received discovery from the state, including medical records, so *Kimmelman* is distinguishable. Appellant also cites the list of documents that Dr. Ophoven stated were necessary to a forensic analysis to show which documents trial counsel should have requested. But appellant does not explain how those records would be helpful. In addition, trial counsel did obtain records from the state through discovery, and appellant does not identify why those records were insufficient. Trial counsel's theory of the case was not focused on medical evidence because he assumed the injury occurred when all three adults were home. Trial counsel's conduct, therefore, was not objectively unreasonable.

Appellant also does not explain how the medical records would have changed the outcome of the case, beyond stating that providing the medical records to Dr. Ophoven would have allowed her to completely review the case. Appellant's arguments about obtaining Dr. Ophoven's testimony are discussed above. This claim fails because appellant did not meet her burden of showing that trial counsel's conduct was unreasonable or prejudicial.

## III. *Other errors*

Appellant also claims she was denied effective assistance of counsel based on several other actions or omissions by trial counsel. Because appellant generally cites no law to support those contentions and does not explain how they meet the standard for an ineffective-assistance claim, we do not further consider those contentions. "An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection." *State v. Modern Recycling, Inc.,* 558 N.W.2d 770, 772 (Minn.App.1997) (quoting *Schoepke v. Alexander Smith & Sons Carpet Co.,* 290 Minn. 518, 519-20, 187 N.W.2d 133, 135 (1971)).

**Affirmed.**

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

**399**

U.S. v. Red Bird, 450 F.3d 789 (2006)

---

450 F.3d 789
United States Court of Appeals,
Eighth Circuit.

UNITED STATES of America, Appellee,
v.
Ursula RED BIRD, Appellant.

No. 05–2319.    |    Submitted: Dec.
12, 2005.    |    Filed: June 15, 2006.

**Synopsis**
**Background:** Defendant was convicted in the United States District Court for the District of South Dakota, Charles B. Kornmann, J., of assault resulting in serious bodily injury, and was sentenced to 67 months' imprisonment, and she appealed.

**Holdings:** The Court of Appeals, Colloton, Circuit Judge, held that:

[1] evidence was sufficient to support conviction;

[2] any error in admission of evidence that defendant violated her conditions of pre-trial release was harmless; and

[3] sentence was not unreasonable.

Affirmed.

West Headnotes (4)

**[1]    Assault and Battery**
          Assault causing, or intended to cause, great bodily harm

Evidence was sufficient to support conviction for assault resulting in serious bodily injury; pathologist who conducted autopsy on defendant's infant son testified that son had traumatic brain injury and retinal hemorrhaging in both eyes that was consistent with head trauma, that there was no evidence of external trauma that could have caused hematomas, and that findings were consistent with shaken baby/shaken impact syndrome, defendant gave conflicting statements about circumstances of son's injury, telling neighbor he fell down stairs, telling hospital workers she left him in bathroom and heard a thud, and telling deputy coroner that son went into bathroom alone and fell, and defendant was the only adult present at time of son's injury. 18 U.S.C.A. § 113(a)(6).

2 Cases that cite this headnote

**[2]    Criminal Law**
          Evidence of other offenses and misconduct

In prosecution for assault resulting in serious bodily injury, any error in admission of evidence that defendant violated her conditions of pre-trial release by failing to maintain contact with her probation officer was harmless; the bulk of the evidence involved medical testimony and circumstantial evidence as to whether defendant injured her son, government presented a relatively modest amount of testimony concerning its inability to contact defendant before trial, district court declined to instruct jury on inferring guilt from defendant's bond violation, and government in closing argument did not argue directly that jury could infer consciousness of guilt from defendant's behavior. 18 U.S.C.A. § 113(a)(6).

6 Cases that cite this headnote

**[3]    Criminal Law**
          Sentencing and Punishment

For purposes of defendant's sentencing for assault resulting in serious bodily injury, any error in imposition of two-level offense level adjustment for obstruction of justice was harmless, since district court stated that defendant's 67-month sentence was the sentence the court would have imposed with or without the adjustment for obstruction of justice. U.S.S.G. § 3C1.1, 18 U.S.C.A.

**[4]    Sentencing and Punishment**
          Obstruction of justice
       **Sentencing and Punishment**
          Prior or Subsequent Misconduct

**400**

---


EXHIBIT
K1

U.S. v. Red Bird, 450 F.3d 789 (2006)

Defendant's 67-month sentence for assault resulting in serious bodily injury was not unreasonable; sentence did not represent dramatic increase over advisory sentencing guidelines range of 46-57 months, and even if defendant's violation of her conditions of pretrial release by failing to maintain contact with her probation officer did not warrant offense level increase for obstruction of justice, court properly considered it as relevant to the history and characteristics of the defendant, and to the need for the sentence imposed to promote respect for the law. 18 U.S.C.A. § 3553(a).

2 Cases that cite this headnote

**Attorneys and Law Firms**

*790 Jana M. Miner, argued, Pierre, SD, for appellant.

Mark E. Salter, argued, Asst. U.S. Attorney, Sioux Falls, SD, for appellee.

Before MELLOY, COLLOTON, and BENTON, Circuit Judges.

**Opinion**

COLLOTON, Circuit Judge.

In a prosecution based on the death of Ursula Red Bird's infant son, a jury convicted Red Bird of an assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6) and 1153. The district court * sentenced her to 67 months' imprisonment and three years' supervised release. Red Bird challenges the sufficiency of the evidence, the court's decision to admit evidence of her violation of conditions of pretrial release as evidence of flight, and the court's two-level adjustment for obstruction of justice under the advisory sentencing guidelines. We affirm.

**I.**

Red Bird is the mother of three children. On December 14, 2003, she was with her two infant sons in her apartment. Shortly before noon, Red Bird entered a neighbor's residence, saying that her baby, J.B., had fallen down the stairs, and asking to use the telephone. She called a local health clinic

to report an injury to J.B., but, according to witnesses from the clinic, she declined several offers to send an ambulance to assist. Red Bird then drove J.B. to the clinic, but J.B. died later that afternoon. When she was interviewed later, Red Bird stated that J.B. was left alone in a bathroom while Red Bird attended to another child, that Red Bird heard a loud "thud" come from the bathroom, and that Red Bird returned to the bathroom to find J.B. unresponsive with his eyes rolled back in his head.

A pathologist performed an autopsy, and concluded that J.B. died as a result of traumatic injury to the head and brain. On March 18, 2004, a grand jury returned an indictment charging Red Bird with second degree murder, in violation of 18 U.S.C. §§ 1153 and 1111. The government later filed a superseding indictment to include a count for assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1153 and 113(a)(6).

On March 24, 2004, Red Bird was arraigned and released, subject to court-ordered conditions of release. One condition of release required her to reside with her grandmother, Violet Points At Him, who was her appointed third-party custodian. Red Bird was directed to report biweekly to her probation and pretrial services officer, Linda Sack. Between March 24, 2004 and May 13, 2004, Red Bird abided by her supervised release provisions.

On May 13, Red Bird telephoned Sack and left her a voice message indicating she was traveling to Rapid City, South Dakota, for an eye appointment. Sack phoned *791 back and left a voice message for Red Bird to call back. Sack received no response, and during the next two weeks, she made about a half-dozen calls to Red Bird's home, called Red Bird's employer, mailed a letter to Red Bird's post office box with instructions to call her, and made a personal visit to Red Bird's home, where she taped a business card with instructions to call on Red Bird's door. Red Bird nonetheless made no contact with Sack. On June 4, 2004, Sack filed a Report of Apparent Bond Violation, and the court issued a warrant for Red Bird's arrest. After the warrant was issued, federal law enforcement officers and Rosebud Sioux Tribe police officers made further attempts to find Red Bird, all unsuccessful. On August 10, 2004, a Rosebud Sioux Tribe Special Agent fortuitously discovered Red Bird at the Rosebud Indian Health Service receiving treatment for a car accident. The agent, who was at the health clinic for an unrelated matter, arrested Red Bird.

At trial, the court permitted the government to introduce evidence of Red Bird's bond violation as evidence of flight

**401**

U.S. v. Red Bird, 450 F.3d 789 (2006)

from which the jury could infer consciousness of guilt. The court also allowed the government to argue to the jury that it could infer consciousness of guilt from Red Bird's bond violation, but declined to give a jury instruction on that inference. After Red Bird was convicted, the district court applied a two-level adjustment under the advisory sentencing guidelines for obstruction of justice, based on her bond violation. As a result, the advisory guideline range was 57–71 months' imprisonment, and the court imposed a term of 67 months.

## II.

**[1]**    Red Bird appeals the sufficiency of the evidence presented by the government to support her conviction. Specifically, she observes that the government's theory of prosecution was that Red Bird killed J.B. by shaking the child, but argues that the evidence failed to show that a person could have shaken J.B. with enough force to cause his injuries. Separately, she argues even if there was evidence to support a finding that J.B. may have died from a traumatic injury to the head consistent with shaken baby/shaken impact syndrome, the government did not prove beyond a reasonable doubt that Red Bird caused those injuries. When reviewing for sufficiency of the evidence, we must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt," viewing the evidence in the light most favorable to the government, *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and "accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *United States v. Blazek*, 431 F.3d 1104, 1107 (8th Cir.2005) (internal quotation omitted).

Red Bird was convicted of assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6). "Serious bodily injury" is bodily injury which involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the functions of a bodily member, organ, or mental faculty. 18 U.S.C. § 1365(h)(3); *see* 18 U.S.C. § 113(b)(2).

The evidence relied upon by the government in support of the conviction was primarily medical evidence from expert pathologists, and evidence of statements by Red Bird concerning the circumstances of the injury to J.B. We conclude that the totality of the evidence, taken in the light most favorable to the verdict, is sufficient to support the jury's conclusion.

The pathologist who conducted the autopsy, Dr. Donald Habbe, testified that J.B. had suffered traumatic injury to the brain, described as subdural hematomas and subarachnoid hemorrhaging. Dr. *792 Habbe also observed retinal hemorrhaging in both eyes, which he believed was consistent with trauma to the head, and he found no evidence of external trauma to the head which could have caused the subdural hematomas. Dr. Habbe testified that his findings concerning J.B.'s condition were consistent with the diagnosis of shaken baby/shaken impact syndrome. (T. Tr. at 466–67).

Elaborating on that condition, Dr. Habbe explained that there is difference of opinion in the medical community about whether a baby can be shaken hard enough, without any impact, to cause serious brain injuries and death. He related that some experts believe that violent shaking can cause brain injury and death. Others believe that some impact accompanying the shaking is necessary to produce such an injury, but that experts in that group believe it is possible to conclude that impact occurred even if there is no visible impact site on the child's scalp. In Dr. Habbe's opinion, J.B. suffered head trauma as a result of violent shaking, either with or without impact, and that if there was impact, he could not tell that it happened based on his physical examination of the body. (T. Tr. at 487). He opined that the head injuries suffered by J.B. were not consistent with Red Bird's explanation that she left the boy in a bathroom, heard a thud, and returned to find the boy with his eyes rolled back in his head. (*Id.* at 486–87).

An assistant medical examiner from Minneapolis, Dr. Daniel Davis, was called by the defense and also testified concerning J.B.'s injuries, based on his review of records and photographs accumulated by Dr. Habbe. Dr. Davis explained that shaken baby/shaken impact syndrome describes a case in which a "small child is violently shaken to and fro probably multiple times with the result being shearing injury to the brain itself as a result of the brain trying to catch up.... As a result of that[,] portions of the deep brain are functionally torn." (T. Tr. at 421). Dr. Davis testified that there is division in the medical community about whether serious brain injury can be caused "just by shaking," or whether "an impact is required in order to deliver that much force to the brain," but opined that "the majority of the medical community agrees that inflicted injury to the head, acceleration, deceleration trauma is very bad for the baby or infant brain." (*Id.* at 422). Because Dr. Davis also found evidence that J.B. suffered from pneumonia,

## 402

U.S. v. Red Bird, 450 F.3d 789 (2006)

he ultimately testified that he did not know whether the exact cause of death was head trauma or pneumonia. (*Id.* at 433).

A third expert, Dr. Janice Ophoven, who was retained by the defense, testified that in her opinion, a child of J.B.'s age cannot suffer traumatic brain injury serious enough to develop symptoms and die by virtue of shaking alone, and that there must be evidence of impact. (T. Tr. at 531). Dr. Ophoven's written report, based on her examination of records and photographs, opined that J.B. suffered no subdural hematoma. At trial, she testified that her report was "missing a word"—"acute"—and that her opinion was that J.B. had suffered no "acute trauma," meaning that there was "no fresh hematoma." (*Id.* at 537–38).

The government also presented evidence that Red Bird gave conflicting statements concerning the circumstances of J.B.'s injury, including her statement to the neighbor that J.B. fell down the stairs, her statements to hospital workers that she left J.B. in the bathroom and then heard a "thud," and a statement to a deputy coroner that J.B. had gone into the bathroom alone and then fallen. It was also undisputed that Red Bird was the only adult in the apartment with J.B. at the time of the **\*793** incident. Addressing the death of J.B., Dr. Davis said "the findings that we have of subdural, subarachnoid hemorrhage, sudden onset in the presence of a single caretaker requiring ... hospitalization immediately after, if that is the overwhelming problem, then we really have to consider homicide." (T. Tr. at 420).

This evidence was sufficient to support the jury's verdict. The testimony of Dr. Habbe and Dr. Davis provided ample grounds to believe that J.B. suffered serious injury to the brain while in Red Bird's sole custody, and that it was caused by shaken baby/shaken impact syndrome. While there was disagreement about whether the brain injury, rather than pneumonia, could be declared definitively the cause of death, the jury convicted Red Bird only of assault causing serious bodily injury, not homicide. Evidence that Red Bird gave changing statements about the circumstances of the incident —shifting from a fall down the stairs to a "thud" in the bathroom—also supports an inference that she was seeking to develop an explanation to cover up her own misconduct in causing injury to J.B. The jury was entitled to discredit Dr. Ophoven's testimony as inconsistent with that of the other experts, and in light of impeachment evidence elicited by the government. We thus conclude that there was sufficient evidence to prove beyond a reasonable doubt the offense of assault resulting in serious bodily injury.

## III.

**[2]** Red Bird contends that even if there was sufficient evidence to sustain her conviction, the district court abused its discretion by permitting the government to present evidence at trial that she violated her conditions of pre-trial release. The government theorized that Red Bird's failure to maintain contact with her probation officer amounted to "flight," and the jury could infer consciousness of guilt from this flight. We have said that the probative value and admissibility of flight evidence depends on the degree of confidence with which the fact-finder can draw four inferences: from the defendant's behavior to flight; from flight to consciousness of guilt; from consciousness of guilt to consciousness of guilt concerning the crime charged; and from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. *United States v. Hankins,* 931 F.2d 1256, 1261 (8th Cir.1991); *see also United States v. Chipps,* 410 F.3d 438, 449–50 (8th Cir.2005).

We believe the relevance of the pre-trial release violation to Red Bird's consciousness of guilt was questionable under the circumstances of this case. Red Bird's failure to maintain contact with the probation office did not result in her absence from any court appearances, and there was no evidence that she left the general area where she was authorized to reside and work. There was not a strong inference that she was seeking to "flee" from authorities in a way that demonstrates consciousness of guilt. *Cf. United States v. Urbina,* 431 F.3d 305, 310 (8th Cir.2005) (flight from law enforcement agents during attempted controlled delivery following arrest); *United States v. Hankins,* 931 F.2d at 1261–62 (escape from jail prior to trial). Although the district court did continue the trial after Red Bird was apprehended, the stated reason for the continuance was that "despite the exercise of due diligence, defense counsel requires additional time to properly investigate and prepare for trial," not Red Bird's violation of her conditions of release.

We conclude, however, that any error in admitting the evidence was harmless, because we do not think the evidence substantially influenced the outcome of the trial. *See* **\*794** *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The bulk of the evidence involved medical testimony and circumstantial evidence as to whether Red Bird injured her son. The government presented a relatively modest amount of testimony concerning its

**403**

U.S. v. Red Bird, 450 F.3d 789 (2006)

inability to contact Red Bird between May 13 and August 10, 2004. After hearing the evidence, the district court declined to instruct the jury on inferring guilt from Red Bird's bond violation, stating "I'm just not going to highlight it by the Court's Instructions." (T. Tr. at 557). And during closing arguments, the government resorted only to rhetorical questions when framing the evidence of bond violations, not once arguing directly to the jury that it could infer consciousness of guilt from Red Bird's behavior. (*Id.* at 601–03). Under these circumstances, we think it unlikely that the evidence had a substantial influence on the outcome, *see Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239, and any error was therefore harmless.

### IV.

[3]   Red Bird also appeals her sentence, arguing that the district court erred in imposing a two-level adjustment for obstruction of justice pursuant to United States Sentencing Guidelines § 3C1.1 under the advisory sentencing guidelines. There is no dispute about the relevant facts, and we review *de novo* whether § 3C1.1 applies to a defendant's specific conduct. *United States v. Thomas,* 72 F.3d 92, 93 (8th Cir.1995).

We have some doubt about the government's position that Red Bird's bond violation was comparable to an "escape" from custody, for which an obstruction adjustment is authorized. *See* USSG § 3C1.1, comment. (n.4(e)). Our precedents upholding obstruction adjustments for bond violations involved flight to California between conviction and sentence, *United States v. Shinder,* 8 F.3d 633, 635 (8th Cir.1993), and a defendant who "absconded" for three-months in an undefined manner after pleading guilty, where we relied on authorities involving flight from the jurisdiction. *Thomas,* 72 F.3d at 93. We find it unnecessary to decide whether § 3C1.1 should be extended to the facts of Red Bird's bond violation, because the district court made clear that it would impose the same sentence based on the considerations in 18 U.S.C. § 3553(a), whether or not the two-level adjustment applied under the advisory guidelines. We believe such a sentence is not unreasonable with regard to § 3553(a), and we thus conclude that any error in the guideline computation was harmless. *See United States v. Hadash,* 408 F.3d 1080, 1083 (8th Cir.2005).

A review of a sentence imposed after *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621

(2005), involves a two-step inquiry: first, an examination of whether the district court applied and interpreted the guidelines correctly, and second, a determination whether the ultimate sentence was reasonable in light of 18 U.S.C. § 3553(a). *United States v. Mashek,* 406 F.3d 1012, 1016–17 (8th Cir.2005). The district court in this case calculated the advisory guideline range to be 57 to 71 months' imprisonment, counting the two-level obstruction adjustment, but 46 to 57 months' imprisonment if the adjustment were excluded. (S. Tr. at 23). Then, "taking into account the advisory sentencing guidelines and all the factors set forth in 18 United States Code, Section 3553," (*id.* at 25), the court imposed a term of 67 months' imprisonment, and said "*that's the sentence that I would have imposed whether or not I added points for obstruction of justice.*" (*Id.* at 26) (emphasis added). Assuming there was error in applying the adjustment, therefore, we must determine whether the court's 67–month sentence was reasonable with regard to § 3553(a), given an advisory guideline range of 46 to 57 months' imprisonment.

**\*795** At sentencing, the court explained that "I always take into account in the course of sentencing somebody what their pre-trial conduct has been. And in this instance, the defendant's pre-trial conduct was bad." (S. Tr. at 26). This "bad" conduct involved Red Bird's failure to contact her probation officer for approximately three months, despite a court order requiring regular contact and repeated efforts by the probation office and law enforcement officers to find her. According to the court's alternative sentence, Red Bird's pre-trial conduct warranted an upward variance of ten months from the maximum sentence under the advisory guideline range, as computed without the obstruction adjustment.

[4]   We believe the district court's consideration of Red Bird's pre-trial conduct was appropriate under § 3553(a), because it is relevant to the history and characteristics of the defendant, and to the need for the sentence imposed to promote respect for the law. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). We also conclude that a variance from a 57–month sentence at the top of the advisory range to a term of 67 months is reasonable with regard to § 3553(a). Even if Red Bird's bond violation did not amount to obstruction of justice, *Booker* permits the district court to give weight to factors under § 3553(a) that were not countenanced under the mandatory guidelines. Misconduct while on pre-trial release is relevant to whether the defendant is likely to conform to societal norms when released from prison, and it is not unreasonable for a district court to conclude that a sanction for such misconduct may promote respect for the law.

**404**

U.S. v. Red Bird, 450 F.3d 789 (2006)

A variance of ten months from the advisory guideline range, under the district court's alternative scenario, is an increase of less than 20 percent over the top of the applicable range. It is not the sort of dramatic increase that we have said requires extraordinary reasons before it will be deemed reasonable. *Cf. United States v. Kendall,* 446 F.3d 782, 784–85 (8th Cir.2006). Although the need to avoid unwarranted sentence disparities is one factor that must be considered by a district court after *Booker,* 18 U.S.C. § 3553(a)(6), we nonetheless cannot say that a variance of the magnitude adopted by the district court under the circumstances of this case is "unreasonable" with regard to § 3553(a) as a whole.

* * * * * *

For the foregoing reasons, we affirm the judgment of the district court.

Footnotes

\*   The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

End of Document        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**405**

D4

# FINAL REPORT OF AUTOPSY
## AME2-M3-02

**DECEDENT:** Chloe Britt        Authorized by: James E. Lee, CMEI Adams County

Fax #:

| Type of Death: | Rigor | Livor |
|---|---|---|
| ( X ) Violent or Unnatural ( ) Unattended by a physician | (X) Jaw   ( X) Arms | Color : Purple |
| ( ) Sudden in apparent health | (X) Neck  ( X) Chest | ( ) Ant. (X) Posterior |
| ( ) Unusual/Suspicious ( ) Custody of law | (X) Back  (X) Abdomen ( ) Lateral |
| ( ) Possibly Drug Related    ( ) Public Health | ( X) Legs | Fixed |

**Body Identified by:** Permit for autopsy by CMEI James Lee
**Persons present at autopsy:** Victor Beckley, Deaner; Jimmy Roberts, CMEI Rankin County , Delrick Charleston, Morgue Attendant, Randolph Scott, CMEI Leake County, and the Prosecutor
**************************************************************************

**AGE:** 6 months **RACE:** Caucasian **SEX:** Female **LENGTH** : 66.2 cm **WEIGHT**: 9.15 killograms
**EYES:** Blue **PUPILS:** R 0.4 /L 0.4  **HAIR:** Brown **BODY HEAT:** Absent ; **SCARS & TATTOOS:** See **Diagrams & External Exam**
**************************************************************************

| CLOTHING: | PERSONAL EFFECTS: |
|---|---|

White Diaper
Released to : Released with remains
**************************************************************************

**TRANSPORT INFO:** Morgue #: 31130 ; Driver - Tom Beard ; Company: Mississippi Mortuary Services
Date of transport - 21 February, 2002 ; Time: 154 PM hours
**************************************************************************

**EVIDENCE TO STATE CRIME LAB:**
**CRIME LAB CASE #: Not assigned at time of Provisional**
2 gray top tubes of blood, 1 gray top tube of vitreous, 1 red top tube of blood, 1 purple top tube of blood
**TRACE EVIDENCE TO STATE CRIME LAB:**
Sexual Assault Kit

**CAUSE OF DEATH:**   Consistent with Shaken Baby Syndrome
**MANNER OF DEATH:** Consistent with homicide

The facts stated herein are true and correct to the best of my knowledge and belief:

22 February, 2002; 1850 hours

STEVEN T. HAYNE, M. D.
PATHOLOGIST

DATE & TIME OF AUTOPSY



EXHIBIT
Hayne
I

**406**

EXHIBIT
L

AME2-M3-02

**GENERAL:**

The postmortem examination is requested by James Lee, Coroner Medical Examiner Investigator of Adams County. The request for the postmortem examination is made in that the decedent, Chloe Britt, died a violent death. The request for the postmortem examination is in compliance with the Coroner's Reorganization Act of 1986.

The postmortem examination is conducted at the Rankin County Morgue in Pearl, Mississippi, at 1850 hours on 22 February, 2002. The remains are identified as those of Chloe Britt by James Lee, CMEI Adams County. Individuals present and attending the postmortem examination are listed in detail on the front page of this report.

The decedent is a Caucasian female appearing to be the approximate recorded age of 6 months years. Clothing, valuables and jewelry are listed in detail on the front page of this report. The clothing is removed prior to the external and internal examinations. The clothing are released with the remains. The height, weight, and the presence or absence of rigor and livor mortis is listed in detail on the front page of this report.

**TOXICOLOGY:**

Two gray-topped tubes of blood and one gray topped tube of vitreous fluid are submitted to the Mississippi State Crime Laboratory under chain of custody for toxicological analysis. The final report reveals the presence of lidocaine and Trimethoprim in the blood specimen. The ethyl alcohol screen is pending at the time of the postmortem protocol. If and when received and if significant abnormalities are identified an addendum will be issued to the report.

**SEROLOGY:**

One red-topped tube of ventricular heart blood is submitted to the Mississippi State Crime Laboratory under chain of custody for serological analysis. The final report is pending.

**DNA STUDIES:**

One purple-topped tube of ventricular heart blood is co-submitted with the previously identified red-topped tube of ventricular heart blood to the Mississippi State Crime Laboratory under chain of custody for DNA analysis if and when requested by the Coroner's Office.

**SPECIAL STUDIES:**

A sexual assault kit is employed to collect samples in the usual and prescribed manner. The sexual assault kit is transferred to the custody of the Mississippi State Crime Laboratory under chain of custody for processing. The final report reveals the absence on serological evaluation for the presence of semen on the oral swab, vulvar swabs, vaginal swabs, and rectal swabs. Full body radiographs are performed. Upon development of the radiographs no acute fractures are identified. The radiographs are retained at the Rankin County Morgue.

**407**

AME2-M3-02

PHOTOGRAPHIC DOCUMENTATION:

During the course of the post-mortem examination photographic documentation of the remains is performed. The photographs are submitted to the District Attorneys Office with a copy of the postmortem protocol.

NOTIFICATION OF THE CORONER:

Upon completion of the external and internal examinations, CMEI James Lee is faxed a Provisional Report of Autopsy appraising as to the preliminary cause and manner of death.

BODY ORGANS:

Representative sections of the major body organs are retained for microscopic analysis. The remaining and preponderance of the body tissues are returned to the body cavities

INTERNAL EXAMINATION:

The body is opened via the usual "Y" incision and subcutaneous adipose tissue over the chest wall is noted to measure to a depth of 0.4 cm and over the abdomen to a depth of 0.5 cm. The anterior right and left ribs are reflected en block with the sternum in the usual manner. A small amount of clear wetting fluid is present within the right and left pleural cavities. No visceral and parietal pleural adhesions are identified. The right lung is noted to have a mass of 193rams and the left lung is noted to have a mass of 193 grams. The lungs are serially cross sectioned and a large amount of serosanguineous fluid exudes from the cut surfaces. Examination of the cross sections of the lungs fail to reveal evidence of thromboembolic material, tumor, and/or infection.

The pericardial sac is opened, and a small amount of clear wetting fluid is present within the luminal space. The take off of the great vessels is unremarkable. The heart is noted to have a mass of 38 grams and external examination of the heart is within normal limits. The coronary arteries are serially cross sectioned and are within normal limits. The heart is serially cross sectioned and the right ventricle measures up to 0.3 cm in thickness and the left ventricle measures up to 0.8 cm in thickness. Examination of the cross sections of the heart fails to reveal evidence of acute or remote infarction. The four cardiac valves are unremarkable and no evidence of congenital heart disease is found. The aorta is examined through its entire course and reveals no significant abnormalities.

The abdominal cavity is opened and a small amount of clear wetting fluid is present within the luminal space.

The vertebral column and rib cage are palpated and visually inspected and no antemortem fractures are identified of an acute nature.

**408**

AME2-M3-02

The liver assumes its usual right upper quadrant location and is noted to have a mass of 198 grams. The capsule is intact and no subcapsular contusions are appreciated. The liver is serially cross sectioned and a large amount of serosanguineous fluid exudes from the cut surfaces. Examination of the cross sections of the liver reveals no significant abnormalities. The gallbladder is found on the inferior surface of the liver and is noted to measure 3 cm in length and contains approximately 0.5 cc of bile. No gallstones are identified. The mucosal surface of the gallbladder is unremarkable. The biliary tree is patent to the duodenum.

The spleen assumes its usual left upper quadrant abdominal location and is noted to have a mass of 19 grams. The capsule is intact and no subcapsular contusions are appreciated. The spleen is serially cross sectioned and a moderate amount of serosanguineous fluid exudes from the cut surfaces. Examination of the cross sections of the spleen reveal the Malpighian corpuscles to be of normal size and number. A section of vertebral bone marrow reveals no gross abnormalities. Mesenteric lymphadenopathy is identified.

The right and left kidneys assume their usual retroperitoneal location and each is noted to have a mass of 36 grams. The capsules strip with ease revealing changes consistent with fetal lobulation. The kidneys are serially cross sectioned and a moderate amount of serosanguineous fluid exudes from the cut surfaces. The calyces are unremarkable. The ureters are single bilaterally and patent to the urinary bladder. A catheter is present within the urinary bladder. The mucosal surface of the urinary bladder is unremarkable. Examination of the corpus uterus and cervix reveal no significant abnormalities and are normal for age.

The esophagus is unremarkable. The stomach is empty. The mucosal surface is unremarkable. The small bowel, vermiform appendix and large bowel are essentially unremarkable. Well formed stool is present within the luminal space of the large bowel. A contusion of the anus is noted and a section is taken for microscopic review. The mesentery and omentum are unremarkable. No adhesions are identified to involve the organs of the abdominal cavity.

The pancreas assumes its usual retroperitoneal location and is noted to have a mass of approximately 12 grams. The tan structure is serially cross sectioned and no abnormalities are identified. The right and left adrenal glands assume their usual suprarenal location and each is noted to have a mass of approximately 3 grams. The structures are serially cross sectioned and no abnormalities are identified. The thyroid gland assumes its usual location on the anterior surface of the trachea and is noted to have a mass of approximately 3 grams. The structure is serially cross sectioned and no abnormalities are identified.

The scalp is reflected and a diffuse subarachnoid hemorrhage is identified. The calvarium is removed and approximately 30 cc of blood is identified within the subdural space and a subdural hemorrhage is identified to involve the right and left cerebral hemispheres. A multifocal cephalohematoma is identified that measures up to 3 cm. The right and left eyes are enucleated. Upon serially cross sectioning the eyes changes consistent with retinal hemorrhage are identified. Perioptical nerve hemorrhage is noted bilaterally. The brain has a mass of 749 grams. The Circle of Willis and supportive vascular structures are

**409**

AME2-M3-02

unremarkable. The ventricular system is unremarkable. The dura is stripped and no evidence of fracture to involve the calvarium or base of the skull is found.

EXTERNAL EXAMINATION:

A.    HEAD & NECK: Examination of the scalp reveals the scalp to be covered with blonde hair. The eyes are blue, the sclera clear and the pupils are fixed bilaterally at 0.4 cm. No evidence of remote injury is appreciated to involve the head or neck. No evidence of acute medical intervention is identified. A 6 cm contusion is identified over the posterior aspect of the scalp. Contusions are identified over the forehead that measure up to 2 cm. A 0.5 cm contusion on the furrow of the bridge of the nose is identified. A 1 cm contusion is identified over the upper lip. An intra-oral examination reveals a 0.5 cm tear of the frenulum. The facial bone are palpated and no fractures are identified.

B.    RIGHT UPPER EXTREMITY: Examination of the right arm, forearm, and hand reveals no evidence of remote injury. Two 0.1 cm iatrogenic puncture sites are identified over the proximal anterior surface of the forearm. The fingernails are intact and no tears to the fingernails are identified and no foreign tissue is identified underneath the fingernails. No acute contusions, abrasions, or lacerations are identified to involve the extremity. The long bones are palpated and no fractures are identified.

C.    LEFT UPPER EXTREMITY: Examination of the right am and forearm reveal no evidence of remote injury. An intravenous catheter is inserted over the dorsal surface of the hand and held in apposition with tape. The fingernails are intact and no tears to the fingernails are identified and no foreign tissue is identified underneath the fingernails. No acute contusions, abrasions, or lacerations are identified to involve the extremity. The long bones are palpated and no fractures are identified.

D.    RIGHT LOWER EXTREMITY: Examination of the right leg and foot reveals the presence of contusions identified over the anterior surface of the thigh that measure up to 2 cm. No evidence of remote injury is appreciated. Two 0.1 cm iatrogenic puncture sites are identified over the anterior surface of the thigh that measure up to 2 cm. No evidence of remote injury is appreciated. Two 0.1 cm iatrogenic puncture sites are identified over the instep of the foot and a 0.3 cm iatrogenic puncture site is identified adjacent to the heel of the foot. The long bones are palpated and no fractures are identified.

E.    LEFT LOWER EXTREMITY: Examination of the left leg and foot reveals no evidence of remote injury. No evidence of acute medical intervention is appreciated. A 4 cm contusion is identified over the anterior surface of the thigh. The long bones are palpated and no fractures are identified.

F.    CHEST & ABDOMEN: Examination of the chest and abdomen reveals no evidence of remote injury. The external genitalia is unremarkable. A urinary catheter is inserted in the usual manner. No acute contusions, abrasions, or lacerations are identified to involve the chest or abdomen.

**410**

AME2-M3-02

G.   BACK: Examination of the back reveals no evidence of remote injury.  No evidence of acute medical intervention is appreciated.  No acute contusions, abrasions, or lacerations are identified to involve the back.

MICROSCOPIC ANALYSIS:

A.   RESPIRATORY SYSTEM: Sections of lung reveal pulmonary vascular congestion with focal atelectasis.  Evidence of infection, tumor, and/or thromboembolic phenomenon is not appreciated to involve the cross sected segments of the lungs reviewed microscopically.  A section of trachea is unremarkable.

B.   CARDIOVASCULAR SYSTEM: Sections of myocardium are unremarkable.  Evidence of inflammation or fibrosis is not appreciated.  A section of coronary artery is unremarkable as is a section of aorta.

C.   HEPATOBILIARY SYSTEM: A section of liver reveals acute congestion.  Evidence of acute or chronic hepatitis is not seen.  The limiting plate is intact.  No evidence of biliary stasis is appreciated.  No evidence of focal necrosis is found.  A section of gallbladder reveals autolytic change.

D.   RETICULOENDOTHELIAL SYSTEM: A section of spleen reveals acute congestion and the germinal centers are unremarkable.  A section of mesenteric lymph node reveals reactive lymphoid hyperplasia.  A section of vertebral bone marrow reveals normal cellularity in maturation and no atypical cells are identified for age.  A section of thymus is unremarkable.

E.   GENITOURINARY SYSTEM: Sections of kidney reveal acute congestion.  The glomeruli, interstitium, tubules, and blood vessels are unremarkable.  A section of urinary bladder is unremarkable.

F.   GASTROINTESTINAL SYSTEM: Sections of esophagus, stomach, small bowel, vermiform appendix, and large bowel are unremarkable.  A section of anus reveals submucosal hemorrhage.

G.   ENDOCRINE SYSTEM: Sections of pancreas, adrenal gland and thyroid gland are essentially unremarkable.

H.   CENTRAL NERVOUS SYSTEM: Sections of cerebral cortex reveal subarachnoid hemorrhage as does sections of cerebellum and brainstem.  Changes of mild cerebral edema are concurrently identified.  Sections of enucleated eyes reveals bilateral retinal hemorrhage as well as perioptic nerve hemorrhage bilaterally.

CAUSES OF DEATH & PATHOLOGIC FINDINGS:

A.   IMMEDIATE CAUSE OF DEATH:
   1.   Changes consistent with shaken baby syndrome and closed head injuries.

**411**

AME2-M3-02

B.   ACUTE TRAUMATIC INJURIES:
1.   Cephalohematoma.
2.   Subdural hemorrhage.
3.   Subarachnoid hemorrhage.
4.   Retinal hemorrhage, bilateral.
5.   Contusions of the forehead.
6.   Contusion of the bridge of the nose.
7.   Contusion of the upper lip.
8.   Tear of the frenulum.
9.   . Contusion of the posterior aspect of the scalp.
10.  Contusion of the anterior surface of the right thigh.
11.  Contusion of the anterior surface of the left thigh.

C.   OTHER PATHOLOGIC FINDINGS:
1.   Pulmonary vascular congestion and edema.
2.   Atelectasis of the lungs.
3.   Acute hepatic congestion.
4.   Acute splenic congestion.
5.   Reactive lymphoid hyperplasia of the perihilar lymph nodes.
6.   Acute renal congestion, bilateral.
7.   Persistence of fetal lobulation of the kidneys.

MANNER OF DEATH: Homicide.

DISCUSSION OF THE CASE: The decedent was noted to succumb secondary to a combination of closed head injury and changes consistent with Shaken Baby Syndrome.  The manner of death is ruled homicide.

**412**

### Rankin County Morgue
### 150 Concourse Drive
### Pearl, Mississippi

**BODY DIAGRAM**



2-M3v2   Front                                    Back

**413**

Decedent's
Height _____ inches

Name *Chloe Britt*

### Rankin County Morgue
### 150 Concourse Drive
### Pearl, Mississippi

**BODY DIAGRAM**



Front

Back

414

Decedent's Height _____ inches

Name *Chloe Britt*

### Rankin County Morgue
### 150 Concourse Drive
### Pearl, Mississippi

PERINEUM — FEMALE



condom 1cm

Name _Chloe Britt_          Case No. _2M02_

**415**              Date _22 Aug_

**416**