Direct Examination - Hayne                                    539

1         BY THE COURT:  -- before we proceed.  Let's take
2     about a ten-minute recess because I know that may be
3     lengthy.
4  (After a short recess, the following was made of record,
5     to-wit:)
6         BY THE COURT:   Who does the State call as your
7     next witness?
8         BY MR. HARPER:   We call Dr. Stephen Hayne, Your
9     Honor.
10        BY THE COURT:  Dr. Stephen Hayne.
11                    STEPHEN HAYNE,
12    having been duly and legally sworn, answered
13      questions on his oath as follows, to-wit:
14        BY THE WITNESS:  Good morning, Your Honor.
15        BY MR. HARPER:  May I proceed, Your Honor?
16        BY THE COURT:  Yes, sir.
17                 DIRECT EXAMINATION
18 BY MR. HARPER:
19    Q.   Would you state your name, please, sir.
20    A.   Stephen Timothy Hayne, sir.
21    Q.   And Dr. Hayne, what is your profession?
22    A.   I'm a physician practicing in the fields of
23 anatomic, clinical, and forensic pathology.
24    Q.   Okay, sir.  And do you currently have a position
25 with the state medical examiner's office?
26    A.   I do, sir.
27    Q.   And what is that position?
28    A.   State pathologist with the Department of Public
29 Safety.

                        **417**

EXHIBIT

M

1      Q.   How long have you held that position, Dr. Hayne?

2      A.   Approximately seventeen, eighteen years, sir.

3      Q.   How long have you been practicing in the area

4  in the field that you are now practicing in?

5      A.   Almost thirty years.

6      Q.   Dr. Hayne, if you would, tell us your education,

7  experience, and training that qualifies you in that field

8  of forensic pathology.

9      A.   I graduated from medical school at Brown

10 University.  I did my pathology training at Letterman Army

11 Medical Center at the Presidio at San Francisco.

12 Rotations at different institutions in the San Francisco

13 Bay area.  I worked -- I went to two duty stations.  First

14 at Fort Levinworth, Kansas, and Munsen Army Hospital

15 down -- Blachfield Army Hospital at Fort Campbell,

16 Kentucky.  I worked in the north Alabama area, the Shoals

17 medical laboratory for two years.  I worked in Mississippi

18 for going on some seventeen or eighteen years now.  I have

19 been affiliated with the medical examiner's office

20 continuously and also work as senior pathologist at Rankin

21 Medical Center.  Worked at other hospitals in the Jackson

22 metropolitan area.  I also served as the medical director

23 of the laboratory at Madison County Medical Center and

24 also at the renal laboratories in Ridgeland, Mississippi.

25     Q.   Okay, sir.  And as a forensic pathologist, Dr.

26 Hayne, what do you primarily do?  What is your primary

27 field?  What does that involve?

28     A.   The primary task is to come to conclusions as to

29 the cause and manner of death involving the death of

**418**

Direct Examination - Hayne                                    541

1   a human being.  That requires most commonly contact with

2   coroners, with other investigative agents.  Also

3   performing post mortem examinations or autopsies and

4   attempting to come to conclusions as to cause and manner

5   of death.

6        Q.   Okay, sir.  And, Doctor, approximately how many

7   autopsies have you performed since you've been practicing

8   as a forensic pathologist?

9        A.   I don't keep an exact number but about

10  twenty-five thousand.

11       Q.   And obviously a good many of those while you

12  were serving with the state medical examiner's office here

13  in Mississippi?

14       A.   Yes, sir.

15       Q.   And I'll ask you, have you been qualified to

16  testify in court before?

17       A.   Yes, sir.

18       Q.   Approximately how many times?

19       A.   Twenty-five hundred, maybe three thousand times.

20       Q.   Okay, sir.  And, in fact, have you been

21  qualified to testify as an expert in the field of forensic

22  pathology right here in this court district and in Adams

23  County before?

24       A.   Yes, sir.  In this courtroom.

25       Q.   How many times roughly?  I know it's --

26       A.   Ten or fifteen times, sir.

27            BY MR. HARPER: Your Honor, we would tender Dr.

28  Hayne as an expert in the field of forensic

29  pathology.

**419**

Direct Examination - Hayne                                    542

1        BY MR. CLARK:  We'll accept him, Your Honor.

2        BY THE COURT:  Let the record show that the

3   Court will accept the witness, Dr. Steven Timothy

4   Hayne, as an expert in the field of forensic

5   pathology.  This Court has accepted this witness

6   numerous times in the past in such field, and the

7   Court finds that by virtue of his education,

8   training, experience, skill, and knowledge, that he

9   is so qualified and will be accepted.  Now, again,

10  ladies and gentlemen, because he is accepted as an

11  expert witness, he will be allowed to give opinions

12  within his expertise.  All right.  Mr. Harper, you

13  may proceed.

14  BY MR. HARPER:

15       Q.   Dr. Hayne, I'd like to direct your attention to

16  an autopsy that -- or to the date, specifically February

17  the twenty -- I believe it was the 22nd of this year,

18  2002, and ask if you had occasion to perform an autopsy on

19  that date on a six-month old or approximately six-month-

20  old infant child by the name of Chloe Madison Britt.

21       A.   I did, sir.  And the --

22       Q.   Okay, sir --

23       A.   -- autopsy started at 6:50 in the evening.  The

24  autopsy was requested by the county coroner medical

25  examiner investigator of this county, the county of

26  jurisdiction.  Mr. Lee requested that, and that request

27  was in compliance with the Coroner's Reorganization Act of

28  1986 Amended.

29       Q.   Okay, sir.  And if you would, Dr. Hayne, just

**420**

Direct Examination - Hayne                                    543

1   tell us briefly -- or what an autopsy entails for the jury

2   and for myself.  What exactly you're talking about when

3   you're doing an autopsy on someone and what your purpose

4   for doing that is.

5        A.   An autopsy or post mortem examination is

6   essentially defined by the term autopsy.  Auto opsis, I

7   see, I observe, I look.  The primary purpose is to come to

8   a conclusion as to the cause and manner of death.  The

9   cause of death being the medical reason an individual

10  died, whether it be from a heart attack or gunshot wound

11  or literally thousands of possibilities.  While the manner

12  of death is a classification of that death, whether it be

13  suicide, homicide, accident, natural, some cases pending

14  to additional information is gathered, and in rare cases,

15  undetermined.  When one cannot come to a final conclusion.

16  An autopsy is an examination of a body, and the initial

17  step is not actually looking at the body but receiving

18  information concerning the death from the submitting

19  officer, in this case, Mr. Lee.  That's followed by an

20  external examination, looking at the external surfaces of

21  the body, and always focusing on any aspect that may be

22  associated with the cause of death and the manner of

23  death.  There is collection of evidence appropriate to

24  that step.  Photographic documentation.  I use body

25  illustration diagram sheets to document, the pieces of

26  paper, the findings that I'm observing, their locations,

27  and extent and size.  That's followed by, then, an

28  internal examination, looking at the body organs after

29  opening the body.  Looking at the head, looking at the

**421**

Direct Examination - Hayne                                      544

1   scalp, looking at the contents of the chest and abdominal
2   cavities to see if there's any evidence of injury or
3   disease at those locations, as well as collecting evidence
4   appropriate to that step of the examination.  It's
5   followed after completion of that with a discussion of the
6   case with the submitting officer.  Again, in this case,
7   Mr. Lee, county coroner medical examiner investigator.
8   Then a microscopic review of the tissues is performed.
9   Small segments of tissue are removed, and they are
10  reviewed under a microscope, and ultimately, if other
11  information is required, other agencies may be asked to do
12  certain procedures.  To assist in the generation of the
13  final document.  The cause and manner of death, the two
14  most important aspects of that document, and by the rules
15  of the attorney general of this state, the individual
16  performing a post mortem examination under the coroner's
17  office through the medical examiner's office must generate
18  a written report, must summarize the pertinent findings,
19  and also must come to a conclusion as to the cause of
20  death and the manner of death.
21       Q.   Okay, sir.  And just to clarify.  As I
22  understand what you are saying, Doctor, you examined the
23  body, but your primary focus is to what the cause of death
24  was and in examining it, you pretty much concentrate on
25  that primarily.  Would that be safe to say?
26       A.   The examination of the body is focused driven.
27  It is essentially to assist an individual in coming to a
28  conclusion as to cause of death and manner of death.
29       Q.   You might make observations about the body and

Direct Examination - Hayne                                    545

1    about other things, about other significant things but the

2    most significant thing and what you're looking for is what

3    caused the death?

4        A.    Cause of death and then the classification of

5    that death.

6        Q.    Okay.

7        A.    The medical reason that that individual died as

8    well as the classification of the death into one of six

9    possibilities.

10       Q.    Okay, sir.  And referring back to the

11   individual, the child, Chloe Madison Britt, did you, in

12   fact, do those things in your autopsy with her?

13       A.    I did, sir.

14       Q.    Okay.  Would you tell us about your autopsy.

15   What you were able to find and what your examination

16   showed you of Chloe Madison Britt.

17       A.    On the external examination, there were injuries

18   consisting predominantly of bruises or contusions

19   medically.  They were located over the forehead at several

20   sites, measuring up to approximately one inch

21   individually.  There was also a bruise located on the back

22   of the scalp, extending to the left, measuring

23   approximately two and one half inches.  There was also a

24   bruise located over the nose, measuring approximately one

25   quarter of an inch.  There was also a contusion to involve

26   the upper lip that measured approximately one half inch,

27   and there was a tear of the frenulum just inside the

28   mouth.  That piece of tissue that attaches the upper part

29   of the lip to the maxilla, the upper ridge that holds the

**423**

Direct Examination - Hayne                                    546

1  teeth, and there was a tear that measured approximately
2  one quarter of an inch located just inside the mouth.
3  There was also bruising located over the front surface of
4  the right thigh, measuring approximately one inch, and
5  there was also a bruise located over the front surface of
6  the left thigh that also measured -- or this measured
7  slightly larger, almost an inch and a half at that site.
8  So there were bruises located over the external surface of
9  the body, including the forehead, also the upper lip, the
10 nose, the back of the head, and there was also bruising
11 located to the front surfaces of both the right and the
12 left thighs, sir.
13      Q.   Okay, sir.  Did you notice anything or did you
14 observe anything concerning the rectum or rectal area?
15      A.   I would include that in the internal
16 examination.  On the internal examination, examination of
17 the lower gastrointestinal tract revealed the presence of
18 a contusion, measuring approximately one inch, and that
19 was located at approximately the nine o'clock area of the
20 rectum extending to approximately the ten o'clock to
21 eleven o'clock area, sir.
22      Q.   You would have done that during your internal
23 examination?
24      A.   Yes, sir.
25          BY MR. HARPER:  May I approach the witness, Your
26      Honor?
27          BY THE COURT:  Yes, sir.
28 (Mr. Harper hands the witness a glass of water.)
29          BY MR. HARPER:   **424** May I proceed, Your Honor?

Direct Examination - Hayne                                    547

1          BY THE COURT:  Yes, sir.

2          BY MR. SERMOS:  Excuse me, Your Honor.  One

3     moment.  May we move this back just a little bit?

4          BY THE COURT:  Absolutely.

5          BY MR. SERMOS:  We just can't see.

6          BY MR. HARPER:  I am sorry.

7  (Mr. Sermos moves the easel so the defense table can see.)

8  BY MR. HARPER:

9          Q.   Dr. Hayne, I am going to hand you what's been

10  marked as State's Exhibit 4 and ask if you'll look at that

11  and tell whether or not that -- I think that photograph

12  may be taken prior to your examination, but is that

13  consistent with what you saw when you made the examination

14  of the child?

15          A.   It shows an injury located over the front

16  surface of the left thigh on the decedent, Chloe Britt.

17  That is the injury that I described measuring

18  approximately two inches located over the front surface of

19  the left lower extremity, sir.

20          Q.   Okay, sir.  I see the right lower extremity is

21  in there.  Can you -- are you able to observe the injuries

22  that you noted there?

23          A.   There's an injury located over the front surface

24  of the right thigh, and that is slightly smaller,

25  measuring approximately one inch, and it appears to be in

26  view in this photograph, sir.

27          Q.   Okay, sir.  You mentioned several.  I'm going to

28  show you several photographs.  Can you identify this

29  photograph, Doctor?  It's State's Exhibit 6.

**425**

Direct Examination - Hayne                                    548

1     A.    State's 6 is a facial view of the decedent, and

2  it specifically shows injuries that I have described,

3  injuries located over the upper lip as well as over the

4  forehead consisting of bruises located at those sites,

5  sir.

6     Q.    Is that consistent with what you saw on that

7  date of February 22nd when you did your autopsy?

8     A.    Yes, sir.  Consistent and also documented.

9     Q.    In fact, you took this photograph or it was

10 taken while at your direction; is that right?

11    A.    That's correct, sir.

12    Q.    I'll hold this one up, Doctor, and ask if you

13 can identify this one.

14    A.    Yes, sir.  This shows the facial area of the

15 decedent, and specifically it shows the bruises located to

16 the upper lip, sir.  And in the very top of it, you can

17 see the bruises located over the forehead.

18    Q.    Okay, sir.  And, again, this photograph was

19 taken by you or at your direction?

20    A.    It was taken by me, sir.

21    Q.    And it fairly and accurately represents what you

22 saw on that particular day?

23    A.    It does, sir.

24    Q.    I hand you what's been marked as State's Exhibit

25 8 and ask if you'll look at that and tell me whether or

26 not you can identify what's in that photograph, please.

27    A.    I can, sir.

28    Q.    What is that, sir?

29    A.    It shows a tear of the frenulum, a piece of

**426**

Direct Examination - Hayne                                    549

1  tissue attaching the upper lip to the upper jaw, sir.

2      Q.    Okay.  And, again, does that fairly and

3  accurately represent the injuries that you saw on that

4  child on the date of February 22, 2002?

5      A.    It does, sir.

6      Q.    Again, this was taken by you or at your

7  direction at the autopsy.

8      A.    Taken by me, sir.

9      Q.    Okay.  I hand you what's been marked as State's

10 Exhibit 15 and ask if you'll look at that, and tell me

11 whether or not you can identify that photograph.   Yes,

12 sir.  It is the back of the head of the decedent and upper

13 part of the back of the decedent, sir.

14     Q.    And is there anything significant in that

15 photograph that you can see?

16     A.    There was a bruise located over the back of the

17 head extending towards the left ear, sir.

18     Q.    And, again, this photograph was taken by you and

19 it fairly and accurately represents that injury that you

20 saw?

21     A.    Yes, sir.

22     Q.    Would you point that one out for us.

23     A.    Right there, sir.

24         BY MR. HARPER:  Please the Court, Your Honor.

25     I don't think this photograph -- I don't think it's

26     been published to the jury.  May I publish it to the

27     jury.

28         BY THE COURT:  You'll be allowed to do so.

29     That's number --                **427**

Direct Examination - Hayne                                    550

1              BY MR. HARPER:  Number 15.

2              BY THE COURT:  You will be allowed to publish

3      Exhibit 15 to the jury.

4  (Mr. Harper passes Exhibit 15 to the jury.)

5  BY MR. HARPER:

6      Q.   I hand you now what's been marked as State's

7  Exhibit 14 and ask if you'll look at that and tell me

8  whether or not you can identify what's in that photograph?

9      A.   Yes, sir.

10     Q.   And would you tell us what that one --

11     A.   It shows the back of the head of the decedent

12  and upper part of the back and shows a bruise starting in

13  the mid back area going towards the left back of the head,

14  sir.

15     Q.   And I'll will hold that one up and ask if you

16  would point this out for us, please?

17     A.   A bruise located here.

18     Q.   Okay, sir.  And that fairly and accurately

19  represents the injury you saw on the child, Chloe Madison

20  Britt, on February 22nd at the time of your autopsy?

21     A.   Yes, sir.

22     Q.   And you took this photograph also?

23     A.   I did, sir.

24             BY MR. HARPER:  Again, Your Honor, I don't think

25      this one has been --

26             BY THE COURT:  You will be allowed to publish

27      that one to the jury also.

28  (Mr. Harper passes Exhibit 14 to the jury.)

**428**

29  BY MR. HARPER:

Direct Examination - Hayne                                      551

1      Q.    Finally I would hand you what's been marked as

2  State's Exhibit 5 and ask if you'll look at that

3  photograph and tell me whether or not you can identify

4  what's in that photograph.

5      A.    Identify what is in --

6      Q.    Yes, sir.

7      A.    What it depicts, sir?

8      Q.    Yes, sir.

9      A.    It depicts the bruise located to the rectum of

10  the decedent, sir.  That photograph was taken by me during

11  the course of the post mortem examination.

12     Q.    Okay, sir.  I'll ask you, Dr. Hayne.  What

13  would that be indicative of, the injuries that you saw to

14  the rectal area, if you can answer that question.

15     A.    It would be consistent with penetration of the

16  rectum with an object, sir.

17     Q.    Okay.  Now, I didn't mean to interrupt you, but

18  I thought it might behoove us to go ahead and go through

19  the pictures.  So you've testified about your external

20  examination and what you were able to see.  What, if

21  anything, did you do after that, Dr. Hayne?

22     A.    An internal examination was conducted.  The

23  bruise was identified in the rectal area, and of greater

24  importance, I think, was the presence of significant

25  injury to the head area.  When the scalp was reflected,

26  there were bruises located over the scalp.  There was also

27  as the calvarium or skull cap was removed.  There was also

28  a collection of blood located between the skull and the

29  brain itself, and it -- what's called the subdural space,

**429**

Direct Examination - Hayne                                552

1   collection of a volume of approximately thirty CC's which

2   would be several tablespoons of blood located at that

3   site.

4       Q.   Would that be normal for that -- for that blood

5   to be in the --

6       A.   No.  It would indicate injury.  It would

7   indicate trauma had occurred.

8       Q.   For in laymen's term if you would for me and

9   whoever else might -- would you tell us -- as I understand

10  it, Dr. Hayne, you actually take the skull, open it, and

11  where you can see inside.  Would that be correct?

12      A.   Yes, sir.  Initially you make an incision going

13  over the top of my head -- if I may use my finger --

14  behind each ear.  The scalp is moved forward and back

15  exposing the skull cap itself, and located underneath the

16  skin surface of the scalp itself, there were multiple

17  bruises as I indicated.  After removal of the skull cap

18  itself, there was a collection of blood between the inner

19  surface of the skull and outer surface of the brain.

20  There are small bridging vessels, small veins that go from

21  the inner surface of the skull to the outer surface of the

22  brain, and when the head is injured, there's transfer of

23  force.  The brain usually oscillates back and forth, and

24  it will tear these vessels, and that will allow for the

25  collection of blood in that space, the subdural space,

26  between the inner surface of the skull and the outer

27  surface of the brain.  There's also other injury to the

28  brain itself, and that is that surface of the brain had

29  extensive hemorrhage or bleeding over it called a

**430**

Direct Examination - Hayne                                    553

1   subarachnoid hemorrhage.  So when you actually held the
2   brain in your hand, that blood remained in contact with
3   the brain itself as opposed to the subdural hemorrhage
4   which was left inside the skull itself when the brain was
5   removed.  There was also other injury that was
6   identifiable and subsequently confirmed by microscopic
7   examination.  That is that the eyes when they were
8   enucleated or removed and sectioned.  There was obvious
9   blood in those in the chambers of the eye and the optic
10  nerves that run to the eye from the brain also had
11  hemorrhage that one could readily recognize at the time of
12  the autopsy.  The eye is actually part of the brain.  It's
13  an extension of the brain.  So it's included in the
14  examination of the brain, and there was, I felt,
15  significant -- there was bleeding inside the eyes called
16  retinal hemorrhages as well as bleeding over the surface
17  of the scalp, bleeding between the inner surface of the
18  skull and the brain and also bleeding over the surface of
19  the brain itself.
20      Q.   Would you term it incidental bleeding in these
21  areas that you've described or excessive bleeding?  How
22  would you term that?
23      A.   I consider them lethal.
24      Q.   Lethal.
25      A.   Lethal.  It would produce death, sir.
26      Q.   Okay, sir.  Now, you have some charts, Dr.
27  Hayne.  Did you want to show us anything in regard to
28  these -- what you told us in --
29      A.   I think it shows on that one chart the bleeding

**431**

1    over the surface of the brain.

2         Q.    Would you --

3              BY MR. HARPER:  Your Honor, if it please the

4         Court, we'd ask that he be allowed to come down and

5         show them the charts.

6              BY THE COURT:  He'll be allowed to step down if

7         he needs to testify.

8    (Witness steps down.)

9              BY MR. HARPER:  Let's move it up where the jury

10        can see it better, if I don't drop it.

11             BY THE COURT:  Again, defense counsel and the

12        defendant may move around so that they can see --

13   BY MR. HARPER:

14        Q.    Dr. Hayne, before we start, let me just ask you.

15   These diagrams are part and parcel of your autopsy report;

16   is that correct?

17        A.    Yes, sir.  They're made during the course of the

18   post mortem examination.

19        Q.    Okay, sir.   And, if you would, what does this

20   particular chart depict?

21        A.    They're several different views of the brain,

22   looking down on the top of the brain, looking at the

23   bottom of the brain upward, and looking at the left side

24   of the brain, and also looking at the right side of the

25   brain, and on the illustrations, I added notes essentially

26   indicating by the cross checks that there was extensive

27   bleeding in the subarachnoid space on the surface of the

28   brain itself.   That there were no contusions or bruises

29   and no tears of the brain itself.  Also indicated that

**432**

Direct Examination - Hayne                                        555

1   there were no fractures.  They were no breaking of the
2   bones composing of the skull, skull cap, base of the
3   skull, and other bones structures.  Also indicated that
4   there was a collection of approximately thirty CC's of
5   blood in the subdural space.  That space -- may I draw on
6   this?
7        Q.   Yes, sir.  Absolutely.
8        A.   If you look at the skull, we've opened it.  The
9   brain will sit approximately like that, and there was a
10  space between the inner surface of the skull and outer
11  surface of brain.  The subdural space and that is the
12  bleeding that I am referring to down here.  There's a
13  collection of blood in this space, and in addition, there
14  was bruising eluded to, involved the scalp in several
15  locations.  Some of which were visible on the external
16  examination.  Bruises located underneath the scalp --
17       Q.   Let me interrupt you a second.  When you got
18  into the internal examination, you found more bruising
19  than what you were able to see from the external --
20       A.   Yes, sir.
21       Q.   -- examination by eye.
22       A.   That's correct, sir.  And then on the surface
23  of the brain itself were the areas of bleeding, the
24  subarachnoid hemorrhage, and if one looks at the optic
25  tracts, part of the cranial nerves that go to the eye.
26  There was also bleeding around those structures, and when
27  one examined the eye itself and a cross section of it, the
28  several layers of the retina and they were bleeding in
29  multiple layers of the retina, inside of the eye itself,

**433**

Direct Examination - Hayne                            556

1  and extending to the optic nerve which runs back to the

2  brain.

3       Q.   Okay, sir.  All right.  Thank you, Doctor.  You

4  indicated earlier that what you observed there would be

5  lethal.  Were you able to come to a conclusion as to cause

6  of death in this particular case?

7       A.   Yes, sir.

8       Q.   What was that?

9       A.   It was consistent with the shaken baby syndrome,

10 sir.

11      Q.   And would you tell the jury what you mean by

12 that, and if want to have a seat or if you want to use

13 your diagrams.

14           BY MR. HARPER:  If the Court, please, Your

15      Honor.  I ask that he be free to get up and come to

16      the charts if he needs to, to show something.

17           BY THE COURT:  He'll have that option if he so

18      desires.

19      A.   It would be consistent with a person violently

20 shaking a small child.  Not an incidental movement of a

21 child, but violently shaking the child back and forth to

22 produce the types of injuries that are described as shaken

23 baby syndrome, which is a syndrome known for at least

24 forty-five years now.  Coined by a Dr. Coffee who analyzed

25 several of these in Denver, Colorado, and the classic

26 triad for shaken baby syndrome is one, the presence of a

27 subdural hemorrhage; and, two, the presence of retinal

28 hemorrhage; and, three, the absence of other potentially

29 lethal causes of death.  Other etiologies or causes of

**434**

1  death.  So it's inclusionary and exclusionary.  Both

2  inclusionary findings were present.   The subdural

3  hemorrhage, the retinal hemorrhage, and also there was an

4  exclusionary competent.   I did not find any other cause of

5  death, sir.

6      Q.   You indicated that it would require what you

7  call violent shaking, and I know somewhat demonstrated.

8  How violent are we talking about, Dr. Hayne?  I mean, is

9  this something --

10     A.   The type of injuries that you can see that

11 parallel these are in motor vehicle crashes, falls from

12 significant heights and the like, sir.

13     Q.   So we're talking about violent shaking?

14     A.   We're talking about very violent shaking.

15     Q.   Okay.  And that was your determination as to

16 cause of death?

17     A.   Yes, sir.

18     Q.   Okay, sir.  And did you make a determination as

19 to manner of death?

20     A.   Yes, sir.

21     Q.   And what was that?

22     A.   I thought it was consistent with homicide, sir.

23     Q.   Obviously the child was six months old.  Could

24 she do this to herself?

25     A.   No, sir.

26     Q.   Okay.  It would have to be someone else that did

27 it?

28     A.   It was another person, sir.

29     Q.   Violently shaken.

**435**

Direct Examination - Hayne                                              558

1    A.    Violently shaking, producing these injuries

2  and, of course, there were other injuries that were

3  identified on the body, but were not participatory in the

4  death of the child.

5    Q.    And, again, this is what your concentration on

6  is what caused the death.  So I would assume that your

7  examination, although thorough, was on the head injuries?

8    A.    Yes, sir.  As opposed to a clinical physician

9  who is treating an individual who obviously is alive or

10  has a potential of being resuscitated, and that, of

11  course, focuses different than a person like me who I am

12  looking at the cause and manner of death, sir.

13    Q.    Okay, sir.  Now, Dr. Hayne, after you had

14  completed -- or if you would, just go on.  You did your

15  internal examination.  I believe you talked about some

16  microscopic -- you completed the complete examination as

17  you described to us earlier that you had performed.

18    A.    Yes, sir.

19    Q.    Okay, sir.  What, if anything, else did you do

20  or if you would tell us anything of significance that you

21  were able to find during the course of your examination

22  other than what you've already described.

23    A.    The other significant findings were the

24  collection of evidence.

25    Q.    Okay, sir.

26    A.    Photograph documentation, evidence that was

27  submitted to the Mississippi State Crime Lab.

28    Q.    Okay, sir.  Would that include the extraction of

**436**

29  blood from the victim?

Direct Examination - Hayne                                    559

1        A.    Yes, sir.   There were several tubes of blood

2   extracted, removed, phlebotomized for different reasons.

3   Toxicology, DNA, serology, and the like, sir.

4        Q.    And those were transported -- transferred to the

5   crime lab --

6        A.    Yes, sir.

7        Q.    -- delivered to them?

8        A.    Under the chain of custody.

9        Q.    Yes, sir.

10        BY MR. HARPER:  The Court will indulge me just

11        one moment, Your Honor.

12   (Mr. Harper and Mr. Rosenblatt confer.)

13   BY MR. HARPER:

14        Q.    Dr. Hayne, getting back to your photographs, you

15   talked about the injury to the mouth and the frenulum, I

16   believe you called it?

17        A.    Yes, sir.

18        Q.    What would that be indicative of to you?

19        A.    It could be insertion of an object in the mouth,

20   pulling of the lip, even pushing down on the upper part of

21   the jaw to produce that.

22        Q.    Could be consistent with insertion --

23        A.    It could be.

24        Q.    Penetration?

25        A.    Yes, sir.

26        BY MR. HARPER:  The Court will indulge me one

27        more --

28   (Mr. Harper and Mr. Rosenblatt confer.)

29        BY MR. HARPER:  Your Honor, I believe that's all

**437**

Cross-Examination - Hayne                                560

1      I would have, and we tender Dr. Hayne at this time.

2           BY THE COURT:  Cross-examination.

3           BY MR. SERMOS:  One moment, please, Your Honor.

4   (Mr. Sermos and Mr. Clark confer.)

5                    CROSS-EXAMINATION

6   BY MR. SERMOS:

7       Q.   Dr. Hayne, as far as your examination and I

8   don't want to even try to put words in your mouth, but,

9   essentially, the shaken baby syndrome here and the cause

10  of death and then the manner of death, those two things,

11  especially the shaken baby syndrome, that is a totally

12  separate item from any allegations or indications of

13  rectal or sexual abuse; is that correct?

14      A.   The cause of -- yes.  The cause of death that I

15  addressed was the shaken baby syndrome.  The manner of

16  death, of course, is a product of the cause of death.  The

17  other findings were separate, sir.  They did not

18  constitute lethal injuries that would produce death in and

19  of themselves, sir.

20      Q.   And then the next question is when you use the

21  word in your report "contusion" -- excuse me one moment,

22  please, and I'll get right to.  You had used the word in

23  the rectum there would have been a contusion.  In your

24  definition from a medical expert standpoint, is a

25  contusion and a tear the same thing?

26      A.   No, sir.

27      Q.   Okay.  Would you please tell the jury what the

28  difference would be?  **438**

29      A.   A tear is a laceration most commonly whether

Cross-Examination - Hayne                                    561

1  it's a complete, full thickness disruption of the -- in

2  this case, the mucosal surface as opposed to a skin

3  surface.  A contusion is a collection of blood underneath

4  the mucosal surface.

5     Q.  Okay.

6     A.  It's a product of tearing of vessels underneath

7  the skin or mucosal surface and bleeding at that site with

8  the subsequent collection of blood.

9     Q.  So that could be caused by something different

10 than would cause a tear; is that correct?

11    A.  Could be, or it could be the same object.

12    Q.  If there were any tears down there in your

13 report when you put a contusion of the anus is noted, I

14 presume you would have also written tears were noticed

15 also; is that correct?

16    A.  If I had seen them, I would put down

17 laceration.  I did not see it in this case, and I did not

18 exclude it, but I just didn't see it.

19    Q.  The next part of that is you mentioned in your

20 report on -- actually it's page two after your cover

21 sheet.  You put well-formed stool is present within the

22 luminal space of the large bowel.

23    A.  Yes, sir.

24    Q.  Is the large bowel by what you're referring to

25 here, the descending colon?

26    A.  It would include the descending colon, yes.

27    Q.  Okay.  So where the next question comes from is

28 this.  At the time the baby was deceased, was in the

29 hospital, the other witness have testified that there was

**439**

LASER BOND FORM A ® PENGAD · 1-800-631-6989 · www.pengad.com

Cross-Examination - Hayne                                    562

1   feces coming out of the baby's anus and rectal area, and

2   that it was basically diarrhea type.  Now, is there a

3   difference in diarrhea and well-formed stool?

4        A.   Yes, sir.

5        Q.   Okay.  My next question would then be what would

6   cause -- if these witnesses testified to this that there

7   was diarrhea, loose bowels, and basically this was at the

8   time of death.  When would the well-form stool form?  Was

9   it already there?

10       A.   I think the well-formed stool is already

11  present, and that would include the ascending as well as

12  transverse colon.  Now, if there was injury to a lower

13  part of the colon that could be a transfer of fluid in

14  that site, and you can get a semi-liquid stool while you

15  have solid stool in the first part of the colon.

16       Q.   Okay.  And then that would go to the next part

17  of what you probably would have done -- it's not in your

18  report anywhere, and I don't presume it existed, but had

19  there been some damage into or of the descending colon,

20  you would have noticed that; is that correct?

21       A.   I would have, sir.

22       Q.   And when you stated that around the rectum or

23  the anular ring -- someone has talked about the anus or

24  the anular ring, the sphincter.  That there was that

25  contusion there, and that could be caused -- I believe you

26  said by an object?

27       A.   Yes.

28       Q.   If an object had -- when you state that, the

29  object merely has to come into contact with the anus and

**440**

Redirect Examination - Hayne                           563

1   it doesn't necessarily imply any massive insertion, does

2   it?

3        A.   No.   It implies force.

4        Q.   Right.

5        A.   It implies injury to the mucosal surface

6   subsequently tearing the small vessels underneath the

7   mucosal surface.

8        Q.   Okay.  And then, shall we say, and I'll ask you

9   for your expert opinion on this also.  If some object were

10  to have been inserted in that child's anus and even gone

11  into the descending colon or the rectal area and that

12  object were found, then that object should have either

13  some form of tissue, matter, blood, or feces on it.

14  Wouldn't you expect that?

15       A.   I would expect to at least see fecal material

16  on it, sir.  Maybe other items.

17       Q.   Okay.

18            BY MR. SERMOS:  One moment, please, Your Honor.

19            BY THE COURT:  Certainly.

20  (Mr. Sermos and Mr. Clark confer.)

21            BY MR. SERMOS:  We have no further questions,

22       Your Honor.

23            BY THE COURT:  All right.

24            BY MR. HARPER:  Just a few questions, Your

25       Honor.

26            BY THE COURT:   Redirect.

27                 REDIRECT EXAMINATION

28  BY MR. HARPER:

                      **441**

29       Q.   Dr. Hayne, your examination, I believe you said,

Redirect Examination - Hayne                                    564

1    was done roughly six o'clock on the 22nd?

2        A.    Yes, sir.  It was almost seven o'clock, sir.

3        Q.    Okay, sir.  Which my understanding that the

4    child came to the hospital was about 9:40 on the night

5    before.  So it was about twenty-two hours or something to

6    that effect by the time you did your examination?

7            BY MR. SERMOS:  Your Honor, we object to this

8        line of questioning.  The State had the opportunity

9        to review this with the State's witness on direct.

10           BY MR. HARPER:  Your Honor, they've asked some

11       questions.  I think -- I am trying to lay some

12       predicate to ask some questions consistent with --

13           BY THE COURT:  All right.  Keep in mind your

14       redirect will be limited to matters brought out on

15       cross-examination.

16           BY MR. HARPER:  I understand, sir.

17   BY MR. HARPER:

18       Q.    My question to you, Dr. Hayne, with that length

19   of time, would some form of rigor mortis have set in on

20   this child at that point?

21       A.    Yes, sir.  The child was in full rigors, very

22   stiff.

23       Q.    How could that affect, if at all, the rectal

24   area as far as how tight it was or loose, or could it

25   affect that?

26       A.    It would contract it, sir.

27       Q.    Okay.

28       A.    But make the luminal diameter, the actual

29   diameter of the rectum smaller, sir.

**442**

Redirect Examination - Hayne                                        565

1      Q.   And if there were a tear in that -- a slight

2  tear or whatever, as it contracted, could be less visible

3  and, in fact, almost appear to be a contusion at that

4  point if it contracts to that extent.  Would that be a

5  safe statement?

6      A.   I think the contusions would remain.  The small

7  tear, after we washed the body and after rigor has already

8  set up, we may not see that, sir.

9      Q.   And as you stated before, your examination is

10 primarily concerned with the injuries that caused the

11 death; is that right?

12     A.   Yes, sir.

13     Q.   You would have observed other injuries but --

14          BY MR. SERMOS:  Objection, Your Honor.  He's

15     going on the things he already asked him when he

16     first started direct.

17          BY THE COURT:  I'll sustain that last question.

18 BY MR. HARPER:

19     Q.   Would it be safe to say that the doctor

20 examining the child at the hospital would have looked at

21 that injury more closely than you did?

22     A.   They would have looked at it under different

23 circumstances.  I think we would look at it very

24 carefully, too.

25     Q.   I understand.

26     A.   But I think there would be alterations in the

27 body that we would see that they would not see.

28     Q.   Or that they might see that you could not see.

29     A.   That's correct, sir.

**443**

JURY OUT                                                              566

1       Q.     Thank you, sir.

2              BY MR. HARPER:  That's all I have, Your Honor.

3              BY THE COURT:   You may step down.

4              BY THE WITNESS:  Thank you, Your Honor.

5    (The witness steps down.)

6              BY MR. HARPER:  Your Honor, we'd ask that Dr.

7    Hayne be released.

8              BY THE COURT:  You'll be released.

9              BY MR. HARPER:  Oh, Your Honor, I am sorry.

10             BY THE COURT:  Okay.  Who does the State call as

11   your next witness?

12             BY MR. HARPER:  The Court indulge us just a

13   moment.

14   (Mr. Harper and Mr. Rosenblatt confer.)

15             BY MR. HARPER:  Your Honor, at this time, the

16   People of the State of Mississippi would rest our

17   case.

18             BY THE COURT:  Okay.  Ladies and gentlemen, the

19   State has rested.  The case has been moving along

20   quite satisfactorily.  It's going to be necessary to

21   take a short recess at this time.  So this will be

22   about a fifteen-minute recess.  If you will, use the

23   facilities down at the end of the hall.  Keep in mind

24   what I said about no contact with anybody involved in

25   this case, and I'm going to need to see counsel and

26   the court reporter in the jury room.  So this will be

27   about a fifteen-minute recess.

28   (The following was heard in the chambers of the Judge,

29   OUTSIDE THE PRESENCE OF THE JURY, to-wit:)

444

**Deposition of Dr. Steven Hayne**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

JEFFREY HAVARD                                    PETITIONER

VS.                          CIVIL ACTION NO. 5:08-CV-275-KS

CHRISTOPHER EPPS, et al.               RESPONDENTS


\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF DR. STEVEN HAYNE

Taken at the offices of
Watkins & Eager,
400 East Capitol Street,
Jackson, Mississippi,
on Tuesday, November 23, 2010,
beginning at approximately 8:57 a.m.

\*\*\*\*\*\*\*\*


APPEARANCES NOTED HEREIN





CATHY M. WHITE, CSR NO. 1309
PROFESSIONAL COURT REPORTING, LLC
Post Office Box 320928
Jackson, Mississippi  39232-0928
(601) 919-8662

**445**



EXHIBIT

N

# Deposition of Dr. Steven Hayne

2

```
 1                    APPEARANCES

 2

 3   MARK JICKA, ESQUIRE
     mjicka@watkinseager.com
 4   Watkins & Eager
     400 East Capitol Street, Suite 300
 5   Jackson, Mississippi  39201

 6   GRAHAM P. CARNER, ESQUIRE
     gcarner@gilliamfirm.com
 7   The Gilliam Firm
     606 Highway 80 West, Suite D
 8   Clinton, Mississippi  39056

 9         COUNSEL FOR PETITIONER

10

     PATRICK J. McNAMARA, JR., ESQUIRE
11   pmcna@ago.state.ms.us
     Office of the Attorney General
12   450 High Street
     Jackson, Mississippi  39201

13         COUNSEL FOR RESPONDENTS

14

15   VIDEO SPECIALIST:  Mr. Matthew Magee

16

17

18

19

20

21

22

23

24

25
```

**446**

## Deposition of Dr. Steven Hayne

3

1                    TABLE OF CONTENTS

2                                              PAGE

3    Title Page . . . . . . . . . . . . . . . .     1

4    Appearance Page  . . . . . . . . . . . .     2

5    Table of Contents  . . . . . . . . . .     3

6    Index of Exhibits  . . . . . . . . . .     3

7                    EXAMINATION INDEX

8    Dr. Steven Hayne
            BY MR. JICKA  . . . . . . . . . .     4
9           BY MR. McNAMARA  . . . . . . . .    33

10   Certificate Page . . . . . . . . . . .    39

11

12                    EXHIBIT INDEX

                                              MAR
13
     Exhibit                                     9
14    1    Final Report of Autopsy
                                                10
15    2    Permit
                                                14
16    3    Declaration
                                                19
17    4    Medical records
                                                30
18    5    Crime lab report
                                                33
19    6    Notice
                                                34
20    7    Photocopy of 3 photographs

21

22

23

24

25

**447**

## Deposition of Dr. Steven Hayne

```
 1            MR. MAGEE:  Good morning.  This is the
 2   videotaped deposition of Dr. Steven Hayne taken by
 3   counsel in the matter of Jeffrey Havard versus
 4   Christopher Epps, et al., in the District Court of the
 5   Southern District of Mississippi, Western Division.
 6   Today's date is November 23rd, 2010.  The time is
 7   approximately 8:57 a.m.  Counsel may now introduce
 8   themselves on record.
 9            MR. JICKA:  I am Mark Jicka, and I represent
10   Jeffrey Havard.
11            MR. CARNER:  Graham Carner, also for
12   Mr. Havard.
13            MR. McNAMARA:  Pat McNamara representing the
14   Attorney General and Christopher Epps.
15            MR. MAGEE:  The court reporter may now swear
16   in the witness.
17            (Witness sworn.)
18            THE WITNESS:  I'll waive and may I have a
19   copy?
20                 DR. STEVEN HAYNE,
21   having been duly sworn, was examined and testified as
22   follows:
23                     EXAMINATION
24   BY MR. JICKA:
25      Q.   Good morning, Dr. Hayne.
```

**448**

## Deposition of Dr. Steven Hayne

5

```
1       A.    Good morning, Counselor.

2       Q.    I'm going to ask you some questions today,

3  and if you don't understand my questions, will you

4  please let me know that?

5       A.    I will do that, sir.

6       Q.    And I will probably butcher some of these

7  terminologies and pronunciations.  So if you'll help

8  me, if I say it in the wrong way, you're certainly

9  welcome to correct my pronunciations.

10      A.    Thank you, Counselor.

11      Q.    Will you please provide the Court with your

12 professional qualifications, sir?

13      A.    I'm a pathologist.  I work in the fields of

14 anatomic, clinical, and forensic pathology.  I've

15 worked in the field for some 35 years.  I'm certified

16 in anatomic pathology, clinical pathology, forensic

17 pathology, forensic medicine, forensic physician.

18 I've worked in the state of Mississippi for some 20

19 years in different capacities in relationship to

20 medical-legal investigation of death, including acting

21 State Medical Examiner, designated State Pathologist,

22 and Chief State Pathologist.

23      Q.    And tell me a little bit about your

24 education, sir.

25      A.    I did the predominant of my undergraduate
```

**449**

# Deposition of Dr. Steven Hayne

1   work at North Dakota State, spent two years at the

2   University of North Dakota School of Medicine, and

3   transferred to Brown University in Providence, Rhode

4   Island, where I completed my medical degree, and then

5   I went to San Francisco at Letterman Army Medical

6   Center, where I trained in pathology.  I rotated at

7   numerous institutions in the San Francisco Bay area,

8   including Children's Hospital, University of

9   California Moffitt Hospital, Union Memorial Blood

10   Bank, the Medical Examiner's Office for the City and

11   County of San Francisco, as well as others, and then

12   the last six months, I spent in nuclear medicine.

13        Q.   Can you list for the Court your

14   qualifications in the area of child sexual abuse

15   investigation and diagnosis?

16        A.   It's part of the field of forensic

17   pathology.  I've also authored in the field.  I wrote

18   a paper with Dr. Hammer, also a resident at the time,

19   at -- stationed at the Presidio with Letterman Army

20   Medical Center, in conjunction with my chief, Colonel

21   Starkey, and the Chief of OBGYN, Colonel Ansbacher.

22   We published that.  It was a requirement for

23   graduation of a residency program that you submit and

24   have accepted a paper for publication.  So Dr. Hammer

25   and I were pretty good friends, so we co-authored that

**450**

## Deposition of Dr. Steven Hayne

1  paper, and published it.  And it was basically

2  identification, collection of evidence, treatment, and

3  the like.  It was a comprehensive paper, and it had a

4  long checklist, so it could be posted in an emergency

5  room somewhere, you can go right down the list.  And

6  also, when I was in the military, not by choice, but I

7  had to do a lot of sexual assault work-ups in the

8  United States Disciplinary Barracks at Fort

9  Leavenworth, which, as you know, homosexuality in a

10  military institution like that is a major offense

11  under the Uniform Code of Military Justice.  So I had

12  to go in night after night and do that work.  And many

13  times we have had cases of sexual assault involving

14  death of a human being that we've done medical-legal

15  postmortem examinations on.

16      Q.    Have you been accepted as an expert in this

17  field in courts?

18      A.    Yes, sir.

19          MR. JICKA:  Pat, I know the procedure here is

20  a little different than a typical case, and I don't

21  know if you would have any objection, but -- and I

22  don't know if you have any questions, but we would

23  tender him as an expert witness.

24          MR. McNAMARA:  He's already been accepted as

25  an expert in this case.

**451**

## Deposition of Dr. Steven Hayne

8

1          MR. JICKA:  Okay.  And I would agree with you

2  on that.

3  BY MR. JICKA:

4     Q.   Dr. Hayne, you performed an autopsy on Chloe

5  Britt; is that correct?

6     A.   Yes, Counselor.  You pronounce it Chole

7  Britt.

8     Q.   I think it's Chloe.

9     A.   Chloe?

10     Q.   But I'm not sure.

11     A.   Because it is an Hispanic name.  It would be

12  Chole (sic) if it was in Spanish.   Maybe it would be

13  Chole.

14     Q.   Why don't we call her Miss Britt?  And that

15  was part of your duties in your profession; is that

16  correct?

17     A.   That's correct.  Now, on that date of 2002,

18  actually, it was the 22nd of February when the

19  postmortem examination was conducted.

20     Q.   And do you have a copy, Dr. Hayne, of your

21  final report of autopsy with you today, sir?

22     A.   I do, Counselor.

23          MR. JICKA:  Okay.  And, Pat, I'm going to

24  mark that final report of autopsy as an exhibit to his

25  deposition.

## 452

## Deposition of Dr. Steven Hayne

```
1            (Exhibit 1 marked.)
2  BY MR. JICKA:
3     Q.   Dr. Hayne, what was the purpose for you doing
4  an autopsy on Miss Britt?
5     A.   It was to come to conclusions as to cause and
6  manner of death, cause of death being the medical
7  reason Miss Britt died, and the manner of death is the
8  classification of the death.  And one has to come to a
9  conclusion, if it's suicide, accident, homicide,
10 natural, pending, or undetermined.  Of course,
11 sometimes, cause of death, one cannot come to a
12 conclusion.
13    Q.   Okay.  And were you asked to do that by the
14 coroner of Adams County, sir?
15    A.   The county coroner, medical examiner,
16 investigator is his official title, and it was James
17 Lee.
18    Q.   And as part of his request for you to do an
19 autopsy on Miss Britt, was there documentation or a
20 permit that was issued to you by the Adams County
21 Coroner?
22    A.   Yes, Counselor, there's a State form called a
23 ME-1, Medical Examiner 1 form, and that I made part of
24 the postmortem examination as a routine practice of
25 business.
```

**453**

Professional Court Reporting, LLC
601.919.8662

## Deposition of Dr. Steven Hayne

10

1          MR. JICKA:   And I'm going to mark that, Pat,

2     as Exhibit 2, the permit from the Coroner of Adams

3     County.

4          (Exhibit 2 marked.)

5     BY MR. JICKA:

6     Q.    What is the purpose when you receive this

7     permit, as you use it in your work?

8     A.    Well, it's the request from the County in

9     writing to perform a medical-legal or forensic autopsy

10    the remains so identified on the paperwork, the ME-1

11    -- or ME-17 form.

12    Q.    And on the permit that involves Miss Britt,

13    it lists different circumstances, I believe, for you

14    to, I guess, determine or to look at as you're

15    conducting your autopsy; is that correct?

16    A.    That's correct.

17    Q.    And one of those I see there is a note about

18    sexual assault.  Do you see that located?

19    A.    I do.

20    Q.    And as part of your autopsy, even from the

21    beginning of the autopsy, was it part of your work to

22    determine whether there could be shown that there was

23    a sexual assault in this case?

24    A.    In fact, to come to a conclusion, that -- or

25    not come to a conclusion, final conclusion.

**454**

## Deposition of Dr. Steven Hayne

1    Q.    All right.  But even from the beginning of

2  your work in this case, you knew that sexual assault

3  was at least an issue, at least in the minds of the

4  coroner and the district attorney, as presented to

5  you?

6    A.    Not only from the paperwork, Counselor, but

7  also from telephonic communication from the County

8  Coroner, Medical Examiner, Investigator.

9    Q.    You did conduct an autopsy on Miss Britt; is

10  that correct?

11    A.    I did, Counselor.

12    Q.    And in the report, there's no mention of a

13  sexual battery on this child; is that correct?

14    A.    That is correct.

15    Q.    And why is that not listed as something in

16  your final report of autopsy?

17    A.    I could not come to a final conclusion as to

18  that, Counselor.

19    Q.    Okay.

20    A.    There was one injury that I indicated would

21  be consistent with the penetration of the anal area,

22  but that, in and of itself, I didn't feel was enough

23  to come to a conclusion that there was a sexual

24  assault in this particular death.

25    Q.    Okay.  When you did your autopsy, you were

**455**

# Deposition of Dr. Steven Hayne

12

1    not able to find any tearing of the anal area on this

2    child; is that right?

3        A.   No, there was not.

4        Q.   If that is something that you had noted or

5    found, then would you have noted it in your report,

6    correct?

7        A.   I would have.

8        Q.   And you also would have had photographs that

9    would have shown that on this child, correct?

10       A.   I would have.

11       Q.   All right.  And it's mentioned -- sexual

12   assault or battery is not mentioned anywhere in this

13   report; is that correct?

14       A.   No, I did not see evidence of that,

15   Counselor.  I was asked in court, but I did not see

16   evidence in the autopsy, and, therefore, did not

17   reflect it in the report.

18       Q.   You did find a one-centimeter contusion; is

19   that correct?

20       A.   That's correct.

21       Q.   Just for the record, how big is a

22   one-centimeter contusion?

23       A.   Approximately like that, Counselor.

24       Q.   Okay.  Now, but that was not listed in the

25   list on the autopsy report as a traumatic injury; is

**456**

## Deposition of Dr. Steven Hayne

1  that correct?

2     A.   It wasn't, but it was listed in the body of

3  the report, and also in the illustration body diagram.

4     Q.   In other words, you noted it in your report,

5  but did not list it as a traumatic injury to this

6  child?

7     A.   That's correct.

8     Q.   And is that because there could be many

9  possible alternative causes for a contusion such as

10  this found on this child?

11     A.   It's probably a typo error, Counselor,

12  because I'm sure I dictated it, but the typist skipped

13  it.

14     Q.   All right.  The photographs we mentioned

15  didn't show any tearing; is that correct?

16     A.   That is correct.

17     Q.   All right.  And, further, no tearing was

18  listed or noted in the autopsy report?

19     A.   No lacerations or abrasions were identified,

20  only a single contusion.

21     Q.   In this case, Dr. Hayne, you had prepared

22  earlier a declaration.  Have you had an opportunity to

23  look at that?

24     A.   I have.

25        MR. JICKA:  I'm going to mark this, Pat, as

**457**

## Deposition of Dr. Steven Hayne

1   the next numbered exhibit to Dr. Hayne's deposition,

2   which will be Exhibit 3.

3           (Exhibit 3 marked.)

4   BY MR. JICKA:

5       Q.   Dr. Hayne, were you able to review this

6   declaration and correct it for any errors prior to

7   executing it on March 5th, 2009?

8       A.   Well, sir, I'm looking to see if I can find

9   in my file here what you're addressing.

10      Q.   I've got an extra copy.

11      A.   Thank you.

12      Q.   In this declaration, Dr. Hayne, it, first of

13   all, involves your work and your opinions in the

14   Jeffrey Havard matter, correct?

15      A.   That's true.

16      Q.   And you state, again, and forgive me, Pat,

17   I'm going to try not to be too redundant on this in

18   this deposition today, but, in there, you state that

19   you found no tears -- this is in paragraph seven,

20   Dr. Hayne.

21      A.   Yes, sir.

22      Q.   No tears to the rectum, anus, anal sphincter

23   or perineum; is that correct?

24      A.   That's correct.

25      Q.   And it's not possible that tears would have

**458**

## Deposition of Dr. Steven Hayne

1    healed between the time that Miss Britt was seen in

2    the emergency room and that you performed the autopsy?

3         A.    They would not.

4         Q.    I want to ask a little bit about this area of

5    the human body.  Do you agree that there's a delicate

6    tissue lining of the anus rectum that can be damaged

7    easily in a child of this age?

8         A.    It can.  It is a squamous mucosa lining, not

9    skin.

10        Q.    Okay.

11        A.    And that is more easily injured, traumatized,

12   than skin surface.

13        Q.    And an injury can occur in a child like this,

14   even by the application of a rectal thermometer; is

15   that correct?

16        A.    That could happen, but, Counselor, I think

17   that would be highly unlikely to see an injury of such

18   size as secondary to the placement of a thermometer by

19   medical personnel.

20        Q.    Okay.  All right.  And in reviewing the

21   medical records, did you see where her temperature was

22   taken by rectal thermometer on multiple occasions

23   while she was in the emergency room?

24        A.    I did see that, sir.

25        Q.    As part of the final autopsy report, there's

**459**

## Deposition of Dr. Steven Hayne

1   also a mention of a sexual assault kit.

2       A.    An RSVK 1111 kit was employed to collect

3   evidence that was subsequently submitted to the

4   Mississippi Crime Lab under chain of custody.

5       Q.    And as part of your work here, and as a

6   result of the sexual assault kit, isn't it true that

7   there was no semen found after a serological

8   evaluation conducted on this child?

9       A.    Actually, by microscopic examination, but no

10  spermatozoa were identified.

11      Q.    Okay.  And swabs -- I guess what happens is

12  that you will take swabs from different areas of the

13  child's anatomy; is that correct?

14      A.    That's correct.

15      Q.    And then you will look under a microscope for

16  any evidence that there might be sperm; is that

17  correct?

18      A.    That's correct.  We look both oral, anal, and

19  vaginal.

20      Q.    And on this, it looks like, from the oral

21  swab, the vaginal, and the rectal swab, that there was

22  no evidence found of spermatozoa; is that correct?

23      A.    That's correct.  There are additional tests

24  that can be performed, serological tests, and I

25  believe those were performed, too, and they were also

**460**

## Deposition of Dr. Steven Hayne

1  negative.

2      Q.   Okay.  And the serological evaluation was

3  done with -- from an oral standpoint, a vulvar

4  standpoint, a vaginal standpoint, and a rectal

5  standpoint; is that --

6      A.   I believe that is correct, sir.

7      Q.   Dr. Hayne, what are the signs of brain death

8  or lack of brain function in a child like this?

9      A.   If you have brain death, first, there would

10  be flaccidness.  There would be unconsciousness.

11  There would be muscle relaxation.  There would be lack

12  of breathing, unless there was artificial respiration

13  being delivered.  Body functions would essentially

14  cease, either at that time or shortly thereafter.

15  Eventually, there would be breakdown in tissue,

16  lytolisis, purification, and the like.

17      Q.   Okay.  Reviewing the medical records for

18  Miss Britt, I noted certain things, and I want to just

19  mention and ask if these are signs or could be signs

20  of lack of brain function, some of which you've

21  already mentioned.  Dilated pupils, sir?

22      A.   That would be.

23      Q.   Fixed pupils?

24      A.   That would be.

25      Q.   Lack of muscle tone?

**461**

## Deposition of Dr. Steven Hayne

1    A.    That would be, also.

2    Q.    Asystole?

3    A.    Asystole?

4    Q.    Asystole, thank you.

5    A.    Yes.  That would be if the heart is no longer

6 functioning.  You can have brain death and still have

7 functioning of the heart.  Cardiovascular

8 functionality could remain for a period of time, and

9 respiratory could for a period of time, too.

10         MR. McNAMARA:  I would have to interject and

11 object at this time based on this is outside the scope

12 of what we're here for as far as the sexual assault

13 goes, without it being tied together as it is, and I

14 would object to the continuing leading of the witness.

15         MR. JICKA:  Okay.  And I'll -- I will try not

16 to lead.  Dr. Hayne has a kind of interesting position

17 in this case, so I'm not sure exactly what witness he

18 would be considered by the Court, but I'll -- I don't

19 mind asking nonleading questions.

20    A.    May I interject one part to my -- one last

21 part to my answer?

22 BY MR. JICKA:

23    Q.    Sure.

24    A.    There are many definitions of death.  It

25 could be cardiovascular, respiratory, central nervous

**462**

## Deposition of Dr. Steven Hayne

1   system, somatic, cellular, and they all vary, you

2   know, as to response of an individual.

3       Q.   Based upon -- you've reviewed the medical

4   records for Miss Britt in this case; is that correct?

5       A.   I have, Counselor.

6            MR. JICKA:  I'm going to mark those as

7   Exhibit 4 to your deposition.

8            (Exhibit 4 marked.)

9   BY MR. JICKA:

10      Q.   Based upon the information available to you,

11  Dr. Hayne, was Chloe Britt brain dead or lacked brain

12  function at the time that her anal dilation was first

13  noted?

14      A.   It was.

15      Q.   And this was after she was successfully

16  intubated; is that correct?

17      A.   That's correct.

18      Q.   And is this an opinion within a reasonable

19  degree of medical certainty, sir?

20      A.   As reflected in the medical record, yes.

21      Q.   Okay.  Do you commonly encounter dilated anal

22  sphincters during a postmortem examination?

23      A.   It can occur, but it's not as common as I

24  think people think.

25      Q.   Is that a recognized finding in the

### 463

## Deposition of Dr. Steven Hayne

1   postmortem period?

2       A.   It can be, yes.

3       Q.   And do children who have died of brain

4   injuries have an increased likelihood of having a

5   dilated anus postmortem?

6       A.   It's possible.  I think you supplied me with

7   one article from the Orange Journal, '97, "American

8   Journal of Forensic Medicine and Pathology."  In that

9   particular article, there were 65 cases of which only

10  a handful were involving children of less than one

11  year of age, and of those --

12          MR. McNAMARA:  I object again.  This is not

13  relevant to what we're speaking about.  This is a

14  general study.  This is not the case that we're

15  talking about.

16  BY MR. JICKA:

17      Q.   Go ahead, sir.

18      A.   And of all those, only one had suffered a

19  traumatic death.  In that particular case, the anus

20  was described as slit-like.  So in that case, there

21  was no dilatation in a violent death that

22  Dr. Lauridson is referring to in his opinion of 65

23  cases published in the Orange Journal.

24          MR. JICKA:  And, Pat, I don't -- certainly

25  I'm not dismissing your objection, but this goes

**464**

## Deposition of Dr. Steven Hayne

1   directly to what we believe to be an issue in this

2   case and allowed by Judge Starrett in his order.

3   BY MR. JICKA:

4       Q.   Can resuscitation efforts result in a large

5   amount of gas accumulating in the gastrointestinal

6   tract?

7       A.   Ineffective resuscitation, cardiopulmonary

8   resuscitation.  I do not believe that was the case in

9   this particular individual, in that there was stool in

10  the large bowel, and that would have effectively

11  blocked the passage of air going down the

12  gastrointestinal tract and dilating the distal part of

13  the GI tract.

14      Q.   So can this gas, the air and the amount of

15  pressure on the bowel and colon, facilitate the

16  passage of stool?

17      A.   It's possible, yes, ineffective

18  cardiopulmonary resuscitation.

19      Q.   And isn't that what they had at the emergency

20  room here, they had an ineffective CPR with this

21  child?

22      A.   It would only be my impression.  They are

23  medically-trained personnel to deliver cardiopulmonary

24  resuscitation in an adequate manner.

25      Q.   But this child was not revived at any point

**465**

**Professional Court Reporting, LLC**
**601.919.8662**

## Deposition of Dr. Steven Hayne

1    in time that you reviewed in the medical records?

2         A.    No, sir, was not.

3         Q.    Okay.  If the gas enters into the colon,

4    could that cause distention of the colon, and the

5    rectum, and promote further dilation of the anus?

6         A.    If that had occurred, yes sir.  I saw no

7    evidence of that occurring, but if -- in a general

8    sense, if gas is pushing stool, it can dilate, pack

9    the stool, enlarging the distal bowel, yes, it could

10   do that.

11        Q.    Okay.  And could a spontaneous bowel movement

12   also contribute to anal dilation?

13        A.    Only if they're very hard stool would I

14   expect to see that, if there's enough pressure with

15   force with the chest or enema, you can -- even in

16   cases of acute appendicitis, in patients that have

17   survived.  So that can occur, but that's pushing stool

18   down into the space of the vermiform appendix, but I

19   didn't see evidence of that in this particular case.

20        Q.    If Chloe Britt was oxygen deprived for 45

21   minutes to an hour before the anal dilation, is it

22   possible that she was -- was located, is it probable

23   that she lacked brain function?

24        A.    Forty-five minutes?

25        Q.    Forty-five minutes to an hour?

**466**

## Deposition of Dr. Steven Hayne

23

1      A.    That would be reasonable that she would have

2   been dead.

3      Q.    Okay.

4      A.    You can survive for a few minutes with oxygen

5   deprivation, if it's total oxygen deprivation.  The

6   brain has a store of glucose and oxygen for

7   approximately 15 to 30 seconds, then unconsciousness

8   will commence, and shortly after that, within two to

9   three minutes, death will intervene.

10      Q.    In your autopsy report, Dr. Hayne, you note,

11   several times, congestion.  If you'll look -- you see

12   on your finding, sir?

13      A.    Yes, sir.

14      Q.    Can congestion cause contusions?

15      A.    No.

16      Q.    Okay.  The congestion that you found with

17   Chloe Britt, where was it located?

18      A.    It was in the viscera, the major organs.

19   That's not to be unexpected.  I don't think this death

20   was an immediate death, and there would be a period of

21   time, an agonal phase of death where the

22   cardiovascular activity would be diminishing, pumping

23   efficiency would also diminish, and blood would have a

24   tendency to pool in the different organs, the lungs,

25   spleen, kidneys, and the like, the liver.

**467**

## Deposition of Dr. Steven Hayne

1    Q.    The inner mucosa of rectum, is it sometimes

2  visible after death in an autopsy?

3    A.    It could be.  It's unusual.  You would have

4  to spread the buttocks to look and see that.

5    Q.    And what would it look like?  Would it have a

6  pink or red coloring to it?

7    A.    Usually be a pinkish color, where there would

8  be congestion, usually dependent from the geographic

9  or the gravitational pull of blood downward.

10   Q.    And if that inner mucosal lining was observed

11 even by physicians, could it be confused as an anal

12 injury?

13   A.    I would think not, Counselor.  I can't speak

14 for them, but a contusion is usually fairly-well

15 circumcised and outlined, while congestion would not

16 be, but I would hate to speak for them.

17   Q.    Okay.  Flaccid, that's the same as limp; is

18 that correct?

19   A.    That's correct.

20   Q.    Could a flaccid or limp muscle condition

21 contribute to anal dilation?

22   A.    That could, yes.

23   Q.    Okay.  And a dilated anal sphincter is not,

24 on its own, evidence of anal sexual abuse; is that

25 correct?

**468**

## Deposition of Dr. Steven Hayne

1    A.   It is not by itself, no.

2    Q.   Okay.   To determine that sexual abuse is a

3  probability, you would need additional evidence than

4  just the dilated anus; is this correct?

5    A.   I would like to see more evidence as to

6  traumatic injuries, also clinical history, and,

7  hopefully, by laboratory testing.

8    Q.   Okay.   And we don't have here in your

9  analysis, and your autopsy of Miss Britt, that

10  additional type of evidence; is that correct?

11    A.   Do not.   I only have a contusion, which is a

12  traumatic injury.   We do not have abrasions,

13  lacerations, presence of seminal fluid, spermatozoa,

14  and the like.

15    Q.   And, Dr. Hayne, can you say from your autopsy

16  evidence, and from the coroner's inquest, the medical

17  records that you reviewed, the photographs, and the

18  laboratory findings, that this child, Miss Britt, was

19  sexually assaulted?

20    A.   I could not come to that final conclusion,

21  Counselor.   As I remember in trial testimony, I said

22  that the contusion would be consistent with a sexual

23  abuse, but I couldn't say that there was sexual abuse,

24  and, basically, I deferred to the clinical examination

25  conducted at the hospital.

**469**

## Deposition of Dr. Steven Hayne

26

1     Q.    And so from your standpoint and from your
2  expertise, you cannot say that this child was sexually
3  abused, to a reasonable degree of medical certainty;
4  is that correct?
5     A.    I could not now and I could not then, either;
6  at the trial, or when I wrote the report, or discussed
7  the case with the coroner.
8     Q.    Okay.  Is physical sexual abuse of a child a
9  medical diagnosis?
10    A.    Well, there's a component of a medical
11 diagnosis.  You're describing also a legal issue, too.
12    Q.    Right.
13    A.    The diagnosis could come from laboratory
14 testing.  It could come from physical exam by a
15 treating physician.  It could also come from a
16 pathologist in a case where there's death, also from
17 scene investigation.  So it's a combination of things,
18 but it's also a legal, and as you notice, I never used
19 the term, "rape."  That is a legal term, not a medical
20 term.
21    Q.    Yes, sir.  Are you familiar with the
22 expertise of the doctors and nurses that treated this
23 child at the emergency room?
24    A.    I'm not.
25    Q.    Do you know --

**470**

## Deposition of Dr. Steven Hayne

1        MR. McNAMARA:  Object to anything along this

2   line.  The doctor has stated he is not familiar with

3   their qualifications.  He'd be completely incompetent

4   to answer any questions regarding that.

5   BY MR. JICKA:

6       Q.   Do you know what, if any, experience they had

7   ever treating children that had had sexual abuse?

8       A.   I don't know that, Counselor.

9       Q.   Would you agree that it takes a certain

10  medical expertise to determine whether a child has

11  ever been sexually abused?

12      A.   I would agree with that, yes.

13      Q.   And in this case, from your work, hired by

14  the State, you could not make a determination that

15  sexual abuse was a probability in this case, correct?

16      A.   I could not come to a final conclusion,

17  Counselor.  I could only come to the conclusion I so

18  testified in court, that the contusion was consistent

19  with what I've seen in a sexual abuse case.  And also,

20  just technically, I was contracted not with the State,

21  but by the County.

22      Q.   Thank you.

23      A.   Adams County.

24      Q.   And I appreciate it.  Thank you for

25  correcting that.  Dr. Hayne, you testified at Jeffrey

**471**

## Deposition of Dr. Steven Hayne

1  Havard's trial, correct?

2      A.   I did, sir.

3      Q.   And you were not asked, actually, about

4  sexual battery during that trial, were you, sir?

5      A.   Not specifically, no.

6      Q.   But you were aware, from even from the

7  coroner's permit, that that was an issue in the case,

8  correct?

9      A.   Oh, yes, and I knew before I even stepped on

10  the witness stand that was going to be an issue.

11      Q.   Okay.  And prior to the trial, you discussed

12  this with the district attorney whether you could say

13  to a reasonable degree of medical certainty or even to

14  a probability that sexual abuse occurred, correct?

15      A.   That's correct.  But all I could tell the

16  district attorney, prior to trial, was that there was

17  a contusion, and that would be consistent with sexual

18  abuse, but I'd like to see more evidence before I made

19  that next and more significant evaluation and

20  conclusion.

21      Q.   Okay.  You -- if you had been asked the same

22  questions we -- that I've been asking you today in

23  court about sexual abuse, would you have answered them

24  in the same manner, sir?

25      A.   Exact way.  I think I at least touched on

**472**

**Professional Court Reporting, LLC**
**601.919.8662**

## Deposition of Dr. Steven Hayne

1   some of those, and I have not changed my opinion, and

2   it would make no difference whether defense or

3   prosecution was asking me, the answer would be the

4   same.

5        Q.   That leads me to my next question.  Did you

6   ever meet with Gus Sermos or Robert Clark,

7   Mr. Havard's attorneys about this case?

8        A.   I don't remember that, Counselor, but I --

9             MR. McNAMARA:  And I object.  This is off the

10  subject, not relevant.

11  BY MR. JICKA:

12       Q.   If requested by them, would you have met with

13  the attorneys for Mr. Havard in this case?

14       A.   I always honor those requests, either

15  prosecution or defense.

16       Q.   And would you have answered their questions

17  in a meeting the same way you have today, if asked?

18       A.   If they were asking the same questions, I

19  would respond the same way.

20       Q.   Dr. Hayne, you can't say, or can you say,

21  that Chloe Britt was sexually penetrated to a

22  reasonable degree of medical certainty in this case?

23       A.   I cannot.  All I can say is the injury

24  sustained would be consistent with that, but that's

25  not a definitive diagnosis.  And maybe I should

**473**

## Deposition of Dr. Steven Hayne

1   explain.

2       Q.   Sure.

3       A.   I use a series of qualifiers, with reasonable

4   medical certainty, I can say exclude, suggestive of,

5   may fit, consistent with, and diagnostic of.

6       Q.   Okay.  Let's go off the record for a second.

7   Let me review my notes and see what else I have.

8       A.   Sure.

9            MR. MAGEE:  Off the record.  The time is

10  9:30.

11           (Recess.)

12           (Exhibit 5 marked.)

13           MR. MAGEE:  Back on the record.  The time is

14  9:40.

15  BY MR. JICKA:

16      Q.   Dr. Hayne, thank you for helping me through

17  this information today.  What I'd like to do is show

18  you what I've marked as Exhibit 5, and ask you if you

19  can identify what that document is, sir?

20      A.   This is a report from the Mississippi Crime

21  Lab, their facility in Jackson, concerning samples

22  that were collected.  This would be -- appears to be

23  from the hospital, including clothing, and then

24  there's also a pillow case, and there's a purple-top

25  tube of blood, and then it discusses the results of

**474**

## Deposition of Dr. Steven Hayne

1  the studies that --

2       MR. McNAMARA:  I'll have to object.  It

3  sounds like the doctor is not familiar with this

4  document.

5       MR. JICKA:  All right.

6  BY MR. JICKA:

7       Q.   Go ahead, sir.

8       A.   And then remarks that some of the specimens

9  were retained for DNA testing, also on an Eddie

10  Walker.  From an Eddie Walker, I should say.

11       Q.   And, basically, in Exhibit 5, we have some

12  results from a sexual assault evidence collection kit

13  labeled Jeffrey Havard; is that correct?

14       A.   Yes, sir.

15       Q.   And in your work, are you familiar what makes

16  up these sexual assault evidence collection kits?

17       A.   I am, sir.  We use them routinely.

18       Q.   And what is that, sir?

19       A.   RSVK 1111 kit, that would be for collection

20  of saliva, collection of vaginal in fluid, rectal

21  swabs, vaginal swabs, vulvar swabs, oral swabs, any

22  clothing, hair samples, and the like, also, DNA tube

23  of blood.

24       Q.   And in all of the evidence that you had

25  mentioned and that's shown here on Exhibit 5, was

**475**

## Deposition of Dr. Steven Hayne

1   there any evidence or DNA connecting Jeffrey Havard

2   with a sexual abuse of Miss -- of the child, Miss

3   Britt?

4       A.   In this particular one, I do not see evidence

5   of that.  This is basically clothing and other items

6   involving the defendant and the decedent.  This is not

7   the material, that I can determine, that was submitted

8   from the autopsy itself.

9       Q.   So this would be additional materials that

10  were tested with -- under the sexual assault evidence

11  kit, in addition to the swabs that you've already

12  testified about; is that correct?

13      A.   That's correct.  It indicates such items as

14  clothes removed at Natchez Community Hospital.

15          MR. McNAMARA:  And for the record, I continue

16  to object.  This is not a document that the doctor is

17  familiar with or was generated by the doctor.

18      A.   And fitted sheet beside a stove, and a used

19  baby diaper, and items like that, Counselor.

20  BY MR. JICKA:

21      Q.   Thank you, sir.  All right.  That's going to

22  be Exhibit 5.  Dr. Hayne, I usually start with this,

23  but I guess I'll end at least your direct examination

24  with this.  We had noticed your deposition and asked

25  you to bring anything that you had with you regarding

**476**

## Deposition of Dr. Steven Hayne

1   this matter.  What do you have in your possession

2   involving this Jeffrey Havard matter, sir?

3       A.    This is the complete file, and I also brought

4   a tape.  This the complete file that I have,

5   Counselor.

6           MR. JICKA:  Okay.  Thank you, sir.  All

7   right.  I'm going to make Exhibit 6 his notice of the

8   videotaped deposition.  All right.  We will tender the

9   witness, Pat.

10          (Exhibit 6 marked.)

11              EXAMINATION

12  BY MR. McNAMARA:

13      Q.    Doctor, let's start off real quickly and just

14  ask you, is your -- in your opinion, the testimony

15  that you've given today, is it consistent with the

16  testimony that you gave at trial?

17      A.    It is, sir.

18      Q.    Have you had any change of heart?  Would you

19  change your testimony?

20      A.    I've seen no new facts to change my

21  testimony, Counselor.

22      Q.    Okay.  I'll ask -- I have here -- have you

23  seen the pictures you took at the autopsy --

24      A.    Not since the trial, sir.

25      Q.    -- in review?  Okay.  I'll pass you these

**477**

## Deposition of Dr. Steven Hayne

34

1    three -- what I have here is a copy of the three, and

2    we'll ask that that be substituted as an exhibit.   And

3    can you identify those pictures or do you recall

4    those?   They have your markings on there.

5         A.   Yes, Counselor, I do recognize these.

6              (Exhibit 7 marked.)

7    BY MR. McNAMARA:

8         Q.   Okay.   One question I'd ask, as you see those

9    injuries to the child's anus there, do you find that

10   to be consistent with the insertion of a child's

11   rectal thermometer?

12        A.   I did not think that was an insertion injury

13   from a rectal thermometer by medical personnel.   I

14   could not exclude it, but I think it was unlikely,

15   Counselor.

16        Q.   Okay.   That is an abnormal anus, isn't it?

17        A.   It is, Counselor.

18        Q.   Did you -- to the question of the lack of

19   semen or DNA evidence, is there a requirement that

20   someone else's DNA or semen be present?

21        A.   No, sir.

22        Q.   They're just cause for penetration, is that

23   correct?

24        A.   That's correct, sir.   It does not necessarily

25   mean that a penis was the device used to penetrate.

**478**

## Deposition of Dr. Steven Hayne

1   It could be some other object.

2      Q.   There are several references throughout the

3   trial, something about 12 o'clock, there was an injury

4   at 12 o'clock of the anal area?

5      A.   Yes, Counselor.

6      Q.   Where exactly is 12 o'clock on that?

7      A.   May I point, Counselor?

8      Q.   That would be at the top, where --

9      A.   Yes, Counselor.

10      Q.   -- there's sort of a slender -- it's round in

11   one area, and then it goes up and it's sort of

12   slender?

13      A.   That's correct, sir.

14      Q.   Is that normal for a child to have that --

15   that wouldn't be a tear, that would just be -- what

16   would that be?

17      A.   For what?

18      Q.   I'm sorry.  The -- at 12 o'clock, it shows --

19   the pictures you're holding, there is a picture of the

20   baby's anus?

21      A.   That's correct.

22      Q.   And it's rounded; is that correct?

23      A.   It's elliptical.

24      Q.   Well, toward the top of that 12 o'clock area,

25   does it -- it peaks, it goes up, and comes to a point;

## Deposition of Dr. Steven Hayne

1   is that -- that's how I'm looking at it.

2       A.   Yeah, it points towards the perineum, yes.

3       Q.   Is that indicative of that's not a tear, that

4   would be just a stretch?

5       A.   I did not see a tear, Counselor, no.

6       Q.   What is that indicative of, that 12 o'clock

7   injury?

8       A.   There was dilatation at that site, Counselor.

9       Q.   Okay.  But it was dilatation of the entire

10  anus, correct?

11      A.   Yes, but more pronounced at that point.

12      Q.   Okay.  In describing that in your report, you

13  say, on page 6 of your report, section F,

14  gastrointestinal system, do you see that one?  I'm

15  sorry, I may be --

16      A.   Yes.

17      Q.   You've got it?

18      A.   Yes.

19      Q.   Is it says, "A section of anus reveals

20  submucosal hemorrhage."

21      A.   Yes.

22      Q.   Where did you explain submucosal hemorrhage?

23      A.   That is in the microscopic, "A section of

24  anus reveals submucosal hemorrhage," yes, Counselor.

25  That would be the contusion.

### 480

## Deposition of Dr. Steven Hayne

1      Q.    And a contusion is?

2      A.    Located at the point that I indicated to you.

3      Q.    Okay.  The definition of a contusion, what

4  would that be?

5      A.    Contusion is a tearing of blood vessels

6  underneath the skin or mucosa with collection of blood

7  at that site manifested by an area of discoloration,

8  when one's looking at the injury, external to the

9  injury itself.  The lining, either the skin or mucosa,

10  remains intact, and usually there's no bleeding on the

11  skin or mucosal surface.

12      Q.    Okay.

13      A.    If one takes a microscopic section, you can

14  see bleeding outside the vessels into the soft tissue,

15  which would separate congestion from a traumatic

16  injury, is a contusion.

17      Q.    Okay.  Final question, so -- being redundant,

18  but you're saying, your testimony today is it's still

19  consistent with what you testified to at trial, and

20  you wouldn't change it?

21      A.    No, sir.  I would only change it if I saw

22  additional information.  And I'd like to point out, I

23  did not come to a final conclusion.

24      Q.    Okay.  But you would agree with your

25  testimony then that the injuries were consistent with

**481**

## Deposition of Dr. Steven Hayne

1    an object being inserted or penetration?

2            MR. JICKA:  Object to the form.

3       A.   Yes, they were consistent with that.

4            MR. McNAMARA:  That's all I have.

5            MR. JICKA:  Just one second.  Let's go off

6    the record.

7            MR. MAGEE:  Off the record.  The time is

8    9:53.

9            (Recess.)

10           MR. MAGEE:  This concludes the deposition.

11   The time is 9:56.

12           (Whereupon the deposition was concluded at

13   9:56 a.m., the same day.)

14

15

16

17

18

19

20

21

22

23

24

25

**482**

# Deposition of Dr. Steven Hayne

1          CERTIFICATE OF COURT REPORTER

2          I, Catherine M. White, C.S.R. and Notary

3   Public, Hinds County, Mississippi, do hereby certify:

4          That on the 23rd day of November, 2010, there

5   appeared before me, pursuant to notice and the Federal

6   Rules of Civil Procedure, Dr. Steven Hayne as a witness

7   in the above-mentioned cause;

8          That said witness was duly sworn by me to tell

9   the whole truth, and nothing but the truth in said

10  cause;

11         That counsel appeared on behalf of the

12  respective parties as hereinbefore set forth;

13         That the foregoing deposition was taken by me

14  by means of Stenograph machine and translated into

15  transcript form by me, and that the foregoing 38 pages

16  contain a full, true and correct transcription of the

17  testimony of said witness;

18         That I am not in any way associated with any of

19  the parties to said cause of action, or their counsel,

20  and that I am not interested in the event hereof.

21         IN WITNESS WHEREOF, I have hereunto set my hand

22  this the 29th day of November, 2010.

23                          _Catherine M White_

24                          Catherine M. White

                            CSR No. 1309

25                          My Commission expires: 2/1/2014

**483**

## Professional Court Reporting, LLC
## 601.919.8662

# Deposition of Dr. Steven Hayne

1 (Pages 1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

JEFFREY HAVARD                               PETITIONER
VS.                 CIVIL ACTION NO. 5:08-CV-275-KS
CHRISTOPHER EPPS, et al.            RESPONDENTS

*********

DEPOSITION OF DR. STEVEN HAYNE

Taken at the offices of
Watkins & Eager,
400 East Capitol Street,
Jackson, Mississippi,
on Tuesday, November 23, 2010,
beginning at approximately 8:57 a.m.
********

APPEARANCES NOTED HEREIN

CATHY M. WHITE, CSR NO. 1309
PROFESSIONAL COURT REPORTING, LLC
Post Office Box 320928
Jackson, Mississippi  39232-0928
(601) 919-8662

**Page 2**

APPEARANCES

MARK JICKA, ESQUIRE
mjicka@watkinseager.com
Watkins & Eager
400 East Capitol Street, Suite 300
Jackson, Mississippi 39201
GRAHAM P. CARNER, ESQUIRE
gcarner@gilliamfirm.com
The Gilliam Firm
606 Highway 80 West, Suite D
Clinton, Mississippi 39056
COUNSEL FOR PETITIONER

PATRICK J. McNAMARA, JR., ESQUIRE
pmcna@ago.state.ms.us
Office of the Attorney General
450 High Street
Jackson, Mississippi 39201

COUNSEL FOR RESPONDENTS

VIDEO SPECIALIST: Mr. Matthew Magee

**Page 3**

TABLE OF CONTENTS
PAGE
Title Page . . . . . . . . . . . . . . . . . 1
Appearance Page . . . . . . . . . . . . . . 2
Table of Contents . . . . . . . . . . . . 3
Index of Exhibits . . . . . . . . . . . . 3
EXAMINATION INDEX
Dr. Steven Hayne
BY MR. JICKA . . . . . . . . . . . . 4
BY MR. McNAMARA . . . . . . . . . . 33
Certificate Page . . . . . . . . . . . . . 39

EXHIBIT INDEX
MAR
Exhibit
1    Final Report of Autopsy                    9
2    Permit                            10
3    Declaration                       14
4    Medical records                     19
5    Crime lab report                     30
6    Notice                          33
7    Photocopy of 3 photographs               34

**Page 4**

1   MR. MAGEE: Good morning. This is the
2   videotaped deposition of Dr. Steven Hayne taken by
3   counsel in the matter of Jeffrey Havard versus
4   Christopher Epps, et al., in the District Court of the
5   Southern District of Mississippi, Western Division.
6   Today's date is November 23rd, 2010. The time is
7   approximately 8:57 a.m. Counsel may now introduce
8   themselves on record.
9       MR. JICKA: I am Mark Jicka, and I represent
10  Jeffrey Havard.
11      MR. CARNER: Graham Carner, also for
12  Mr. Havard.
13      MR. McNAMARA: Pat McNamara representing the
14  Attorney General and Christopher Epps.
15      MR. MAGEE: The court reporter may now swear
16  in the witness.
17      (Witness sworn.)
18      THE WITNESS: I'll waive and may I have a
19  copy?
20      DR. STEVEN HAYNE,
21  having been duly sworn, was examined and testified as
22  follows:
23          EXAMINATION
24  BY MR. JICKA:
25      Q. Good morning, Dr. Hayne.

**484**

# Deposition of Dr. Steven Hayne

2 (Pages 5 to 8)

Page 5

1    A.  Good morning, Counselor.
2    Q.  I'm going to ask you some questions today,
3  and if you don't understand my questions, will you
4  please let me know that?
5    A.  I will do that, sir.
6    Q.  And I will probably butcher some of these
7  terminologies and pronunciations.  So if you'll help
8  me, if I say it in the wrong way, you're certainly
9  welcome to correct my pronunciations.
10    A.  Thank you, Counselor.
11    Q.  Will you please provide the Court with your
12  professional qualifications, sir?
13    A.  I'm a pathologist.  I work in the fields of
14  anatomic, clinical, and forensic pathology.  I've
15  worked in the field for some 35 years.  I'm certified
16  in anatomic pathology, clinical pathology, forensic
17  pathology, forensic medicine, forensic physician.
18  I've worked in the state of Mississippi for some 20
19  years in different capacities in relationship to
20  medical-legal investigation of death, including acting
21  State Medical Examiner, designated State Pathologist,
22  and Chief State Pathologist.
23    Q.  And tell me a little bit about your
24  education, sir.
25    A.  I did the predominant of my undergraduate

Page 6

1  work at North Dakota State, spent two years at the
2  University of North Dakota School of Medicine, and
3  transferred to Brown University in Providence, Rhode
4  Island, where I completed my medical degree, and then
5  I went to San Francisco at Letterman Army Medical
6  Center, where I trained in pathology.  I rotated at
7  numerous institutions in the San Francisco Bay area,
8  including Children's Hospital, University of
9  California Moffitt Hospital, Union Memorial Blood
10  Bank, the Medical Examiner's Office for the City and
11  County of San Francisco, as well as others, and then
12  the last six months, I spent in nuclear medicine.
13    Q.  Can you list for the Court your
14  qualifications in the area of child sexual abuse
15  investigation and diagnosis?
16    A.  It's part of the field of forensic
17  pathology.  I've also authored in the field.  I wrote
18  a paper with Dr. Hammer, also a resident at the time,
19  at -- stationed at the Presidio with Letterman Army
20  Medical Center, in conjunction with my chief, Colonel
21  Starkey, and the Chief of OBGYN, Colonel Ansbacher.
22  We published that.  It was a requirement for
23  graduation of a residency program that you submit and
24  have accepted a paper for publication.  So Dr. Hammer
25  and I were pretty good friends, so we co-auth

Page 7

1  paper, and published it.  And it was basically
2  identification, collection of evidence, treatment, and
3  the like.  It was a comprehensive paper, and it had a
4  long checklist, so it could be posted in an emergency
5  room somewhere, you can go right down the list.  And
6  also, when I was in the military, not by choice, but I
7  had to do a lot of sexual assault work-ups in the
8  United States Disciplinary Barracks at Fort
9  Leavenworth, which, as you know, homosexuality in a
10  military institution like that is a major offense
11  under the Uniform Code of Military Justice.  So I had
12  to go in night after night and do that work.  And many
13  times we have had cases of sexual assault involving
14  death of a human being that we've done medical-legal
15  postmortem examinations on.
16    Q.  Have you been accepted as an expert in this
17  field in courts?
18    A.  Yes, sir.
19      MR. JICKA:  Pat, I know the procedure here is
20  a little different than a typical case, and I don't
21  know if you would have any objection, but -- and I
22  don't know if you have any questions, but we would
23  tender him as an expert witness.
24      MR. McNAMARA:  He's already been accepted as
25  an expert in this case.

Page 8

1      MR. JICKA:  Okay.  And I would agree with you
2  on that.
3  BY MR. JICKA:
4    Q.  Dr. Hayne, you performed an autopsy on Chloe
5  Britt; is that correct?
6    A.  Yes, Counselor.  You pronounce it Chole
7  Britt.
8    Q.  I think it's Chloe.
9    A.  Chloe?
10    Q.  But I'm not sure.
11    A.  Because it is an Hispanic name.  It would be
12  Chole (sic) if it was in Spanish.  Maybe it would be
13  Chole.
14    Q.  Why don't we call her Miss Britt?  And that
15  was part of your duties in your profession; is that
16  correct?
17    A.  That's correct.  Now, on that date of 2002,
18  actually, it was the 22nd of February when the
19  postmortem examination was conducted.
20    Q.  And do you have a copy, Dr. Hayne, of your
21  final report of autopsy with you today, sir?
22    A.  I do, Counselor.
23      MR. JICKA:  Okay.  And, Pat, I'm going to
24  mark that final report of autopsy as an exhibit to his
25  deposition.

## Deposition of Dr. Steven Hayne

3 (Pages 9 to 12)

**Page 9**

1    (Exhibit 1 marked.)
2  BY MR. JICKA:
3    Q.  Dr. Hayne, what was the purpose for you doing
4  an autopsy on Miss Britt?
5    A.  It was to come to conclusions as to cause and
6  manner of death, cause of death being the medical
7  reason Miss Britt died, and the manner of death is the
8  classification of the death.  And one has to come to a
9  conclusion, if it's suicide, accident, homicide,
10  natural, pending, or undetermined.  Of course,
11  sometimes, cause of death, one cannot come to a
12  conclusion.
13    Q.  Okay.  And were you asked to do that by the
14  coroner of Adams County, sir?
15    A.  The county coroner, medical examiner,
16  investigator is his official title, and it was James
17  Lee.
18    Q.  And as part of his request for you to do an
19  autopsy on Miss Britt, was there documentation or a
20  permit that was issued to you by the Adams County
21  Coroner?
22    A.  Yes, Counselor, there's a State form called a
23  ME-1, Medical Examiner 1 form, and that I made part of
24  the postmortem examination as a routine practice of
25  business.

**Page 10**

1    MR. JICKA:  And I'm going to mark that, Pat,
2  as Exhibit 2, the permit from the Coroner of Adams
3  County.
4    (Exhibit 2 marked.)
5  BY MR. JICKA:
6    Q.  What is the purpose when you receive this
7  permit, as you use it in your work?
8    A.  Well, it's the request from the County in
9  writing to perform a medical-legal or forensic autopsy
10  the remains so identified on the paperwork, the ME-1
11  -- or ME-17 form.
12    Q.  And on the permit that involves Miss Britt,
13  it lists different circumstances, I believe, for you
14  to, I guess, determine or to look at as you're
15  conducting your autopsy; is that correct?
16    A.  That's correct.
17    Q.  And one of those I see there is a note about
18  sexual assault.  Do you see that located?
19    A.  I do.
20    Q.  And as part of your autopsy, even from the
21  beginning of the autopsy, was it part of your work to
22  determine whether there could be shown that there was
23  a sexual assault in this case?
24    A.  In fact, to come to a conclusion, that -- or
25  not come to a conclusion, final conclusion.  **486**

**Page 11**

1    Q.  All right.  But even from the beginning of
2  your work in this case, you knew that sexual assault
3  was at least an issue, at least in the minds of the
4  coroner and the district attorney, as presented to
5  you?
6    A.  Not only from the paperwork, Counselor, but
7  also from telephonic communication from the County
8  Coroner, Medical Examiner, Investigator.
9    Q.  You did conduct an autopsy on Miss Britt; is
10  that correct?
11    A.  I did, Counselor.
12    Q.  And in the report, there's no mention of a
13  sexual battery on this child; is that correct?
14    A.  That is correct.
15    Q.  And why is that not listed as something in
16  your final report of autopsy?
17    A.  I could not come to a final conclusion as to
18  that, Counselor.
19    Q.  Okay.
20    A.  There was one injury that I indicated would
21  be consistent with the penetration of the anal area,
22  but that, in and of itself, I didn't feel was enough
23  to come to a conclusion that there was a sexual
24  assault in this particular death.
25    Q.  Okay.  When you did your autopsy, you were

**Page 12**

1  not able to find any tearing of the anal area on this
2  child; is that right?
3    A.  No, there was not.
4    Q.  If that is something that you had noted or
5  found, then would you have noted it in your report,
6  correct?
7    A.  I would have.
8    Q.  And you also would have had photographs that
9  would have shown that on this child, correct?
10    A.  I would have.
11    Q.  All right.  And it's mentioned -- sexual
12  assault or battery is not mentioned anywhere in this
13  report; is that correct?
14    A.  No, I did not see evidence of that,
15  Counselor.  I was asked in court, but I did not see
16  evidence in the autopsy, and, therefore, did not
17  reflect it in the report.
18    Q.  You did find a one-centimeter contusion; is
19  that correct?
20    A.  That's correct.
21    Q.  Just for the record, how big is a
22  one-centimeter contusion?
23    A.  Approximately like that, Counselor.
24    Q.  Okay.  Now, but that was not listed in the
25  list on the autopsy report as a traumatic injury; is

# Deposition of Dr. Steven Hayne

4  (Pages 13 to 16)

## Page 13

1  that correct?
2      A.  It wasn't, but it was listed in the body of
3  the report, and also in the illustration body diagram.
4      Q.  In other words, you noted it in your report,
5  but did not list it as a traumatic injury to this
6  child?
7      A.  That's correct.
8      Q.  And is that because there could be many
9  possible alternative causes for a contusion such as
10  this found on this child?
11      A.  It's probably a typo error, Counselor,
12  because I'm sure I dictated it, but the typist skipped
13  it.
14      Q.  All right.  The photographs we mentioned
15  didn't show any tearing; is that correct?
16      A.  That is correct.
17      Q.  All right.  And, further, no tearing was
18  listed or noted in the autopsy report?
19      A.  No lacerations or abrasions were identified,
20  only a single contusion.
21      Q.  In this case, Dr. Hayne, you had prepared
22  earlier a declaration.  Have you had an opportunity to
23  look at that?
24      A.  I have.
25          MR. JICKA:  I'm going to mark this, Pat, as

## Page 14

1  the next numbered exhibit to Dr. Hayne's deposition,
2  which will be Exhibit 3.
3          (Exhibit 3 marked.)
4  BY MR. JICKA:
5      Q.  Dr. Hayne, were you able to review this
6  declaration and correct it for any errors prior to
7  executing it on March 5th, 2009?
8      A.  Well, sir, I'm looking to see if I can find
9  in my file here what you're addressing.
10      Q.  I've got an extra copy.
11      A.  Thank you.
12      Q.  In this declaration, Dr. Hayne, it, first of
13  all, involves your work and your opinions in the
14  Jeffrey Havard matter, correct?
15      A.  That's true.
16      Q.  And you state, again, and forgive me, Pat,
17  I'm going to try not to be too redundant on this in
18  this deposition today, but, in there, you state that
19  you found no tears -- this is in paragraph seven,
20  Dr. Hayne.
21      A.  Yes, sir.
22      Q.  No tears to the rectum, anus, anal sphincter
23  or perineum; is that correct?
24      A.  That's correct.
25      Q.  And it's not possible that tears would have

## Page 15

1  healed between the time that Miss Britt was seen in
2  the emergency room and that you performed the autopsy?
3      A.  They would not.
4      Q.  I want to ask a little bit about this area of
5  the human body.  Do you agree that there's a delicate
6  tissue lining of the anus rectum that can be damaged
7  easily in a child of this age?
8      A.  It can.  It is a squamous mucosa lining, not
9  skin.
10      Q.  Okay.
11      A.  And that is more easily injured, traumatized,
12  than skin surface.
13      Q.  And an injury can occur in a child like this,
14  even by the application of a rectal thermometer; is
15  that correct?
16      A.  That could happen, but, Counselor, I think
17  that would be highly unlikely to see an injury of such
18  size as secondary to the placement of a thermometer by
19  medical personnel.
20      Q.  Okay.  All right.  And in reviewing the
21  medical records, did you see where her temperature was
22  taken by rectal thermometer on multiple occasions
23  while she was in the emergency room?
24      A.  I did see that, sir.
25      Q.  As part of the final autopsy report, there's

## Page 16

1  also a mention of a sexual assault kit.
2      A.  An RSVK 1111 kit was employed to collect
3  evidence that was subsequently submitted to the
4  Mississippi Crime Lab under chain of custody.
5      Q.  And as part of your work here, and as a
6  result of the sexual assault kit, isn't it true that
7  there was no semen found after a serological
8  evaluation conducted on this child?
9      A.  Actually, by microscopic examination, but no
10  spermatozoa were identified.
11      Q.  Okay.  And swabs -- I guess what happens is
12  that you will take swabs from different areas of the
13  child's anatomy; is that correct?
14      A.  That's correct.
15      Q.  And then you will look under a microscope for
16  any evidence that there might be sperm; is that
17  correct?
18      A.  That's correct.  We look both oral, anal, and
19  vaginal.
20      Q.  And on this, it looks like, from the oral
21  swab, the vaginal, and the rectal swab, that there was
22  no evidence found of spermatozoa; is that correct?
23      A.  That's correct.  There are additional tests
24  that can be performed, serological tests, and I
25  believe those were performed, too, and they were also

**487**

# Deposition of Dr. Steven Hayne

5 (Pages 17 to 20)

Page 17

1  negative.
2      Q.  Okay.  And the serological evaluation was
3  done with -- from an oral standpoint, a vulvar
4  standpoint, a vaginal standpoint, and a rectal
5  standpoint; is that --
6      A.  I believe that is correct, sir.
7      Q.  Dr. Hayne, what are the signs of brain death
8  or lack of brain function in a child like this?
9      A.  If you have brain death, first, there would
10  be flaccidness.  There would be unconsciousness.
11  There would be muscle relaxation.  There would be lack
12  of breathing, unless there was artificial respiration
13  being delivered.  Body functions would essentially
14  cease, either at that time or shortly thereafter.
15  Eventually, there would be breakdown in tissue,
16  lytolisis, purification, and the like.
17      Q.  Okay.  Reviewing the medical records for
18  Miss Britt, I noted certain things, and I want to just
19  mention and ask if these are signs or could be signs
20  of lack of brain function, some of which you've
21  already mentioned.  Dilated pupils, sir?
22      A.  That would be.
23      Q.  Fixed pupils?
24      A.  That would be.
25      Q.  Lack of muscle tone?

Page 18

1      A.  That would be, also.
2      Q.  Asystole?
3      A.  Asystole?
4      Q.  Asystole, thank you.
5      A.  Yes.  That would be if the heart is no longer
6  functioning.  You can have brain death and still have
7  functioning of the heart.  Cardiovascular
8  functionality could remain for a period of time, and
9  respiratory could for a period of time, too.
10      MR. McNAMARA:  I would have to interject and
11  object at this time based on this is outside the scope
12  of what we're here for as far as the sexual assault
13  goes, without it being tied together as it is, and I
14  would object to the continuing leading of the witness.
15      MR. JICKA:  Okay.  And I'll -- I will try not
16  to lead.  Dr. Hayne has a kind of interesting position
17  in this case, so I'm not sure exactly what witness he
18  would be considered by the Court, but I'll -- I don't
19  mind asking nonleading questions.
20      A.  May I interject one part to my -- one last
21  part to my answer?
22  BY MR. JICKA:
23      Q.  Sure.
24      A.  There are many definitions of death.  It
25  could be cardiovascular, respiratory, central nervous

Page 19

1  system, somatic, cellular, and they all vary, you
2  know, as to response of an individual.
3      Q.  Based upon -- you've reviewed the medical
4  records for Miss Britt in this case; is that correct?
5      A.  I have, Counselor.
6      MR. JICKA:  I'm going to mark those as
7  Exhibit 4 to your deposition.
8      (Exhibit 4 marked.)
9  BY MR. JICKA:
10      Q.  Based upon the information available to you,
11  Dr. Hayne, was Chloe Britt brain dead or lacked brain
12  function at the time that her anal dilation was first
13  noted?
14      A.  It was.
15      Q.  And this was after she was successfully
16  intubated; is that correct?
17      A.  That's correct.
18      Q.  And is this an opinion within a reasonable
19  degree of medical certainty, sir?
20      A.  As reflected in the medical record, yes.
21      Q.  Okay.  Do you commonly encounter dilated anal
22  sphincters during a postmortem examination?
23      A.  It can occur, but it's not as common as I
24  think people think.
25      Q.  Is that a recognized finding in the

Page 20

1  postmortem period?
2      A.  It can be, yes.
3      Q.  And do children who have died of brain
4  injuries have an increased likelihood of having a
5  dilated anus postmortem?
6      A.  It's possible.  I think you supplied me with
7  one article from the Orange Journal, '97, "American
8  Journal of Forensic Medicine and Pathology."  In that
9  particular article, there were 65 cases of which only
10  a handful were involving children of less than one
11  year of age, and of those --
12      MR. McNAMARA:  I object again.  This is not
13  relevant to what we're speaking about.  This is a
14  general study.  This is not the case that we're
15  talking about.
16  BY MR. JICKA:
17      Q.  Go ahead, sir.
18      A.  And of all those, only one had suffered a
19  traumatic death.  In that particular case, the anus
20  was described as slit-like.  So in that case, there
21  was no dilatation in a violent death that
22  Dr. Lauridson is referring to in his opinion of 65
23  cases published in the Orange Journal.
24      MR. JICKA:  And, Pat, I don't -- certainly
25  I'm not dismissing your objection, but this goes

**488**

## Deposition of Dr. Steven Hayne

6 (Pages 21 to 24)

Page 21

1 directly to what we believe to be an issue in this
2 case and allowed by Judge Starrett in his order.
3 BY MR. JICKA:
4     Q.  Can resuscitation efforts result in a large
5 amount of gas accumulating in the gastrointestinal
6 tract?
7     A.  Ineffective resuscitation, cardiopulmonary
8 resuscitation.  I do not believe that was the case in
9 this particular individual, in that there was stool in
10 the large bowel, and that would have effectively
11 blocked the passage of air going down the
12 gastrointestinal tract and dilating the distal part of
13 the GI tract.
14     Q.  So can this gas, the air and the amount of
15 pressure on the bowel and colon, facilitate the
16 passage of stool?
17     A.  It's possible, yes, ineffective
18 cardiopulmonary resuscitation.
19     Q.  And isn't that what they had at the emergency
20 room here, they had an ineffective CPR with this
21 child?
22     A.  It would only be my impression.  They are
23 medically-trained personnel to deliver cardiopulmonary
24 resuscitation in an adequate manner.
25     Q.  But this child was not revived at any point

Page 22

1 in time that you reviewed in the medical records?
2     A.  No, sir, was not.
3     Q.  Okay.  If the gas enters into the colon,
4 could that cause distention of the colon, and the
5 rectum, and promote further dilation of the anus?
6     A.  If that had occurred, yes sir.  I saw no
7 evidence of that occurring, but if -- in a general
8 sense, if gas is pushing stool, it can dilate, pack
9 the stool, enlarging the distal bowel, yes, it could
10 do that.
11     Q.  Okay.  And could a spontaneous bowel movement
12 also contribute to anal dilation?
13     A.  Only if they're very hard stool would I
14 expect to see that, if there's enough pressure with
15 force with the chest or enema, you can -- even in
16 cases of acute appendicitis, in patients that have
17 survived.  So that can occur, but that's pushing stool
18 down into the space of the vermiform appendix, but I
19 didn't see evidence of that in this particular case.
20     Q.  If Chloe Britt was oxygen deprived for 45
21 minutes to an hour before the anal dilation, is it
22 possible that she was -- was located, is it probable
23 that she lacked brain function?
24     A.  Forty-five minutes?
25     Q.  Forty-five minutes to an hour?

Page 23

1     A.  That would be reasonable that she would have
2 been dead.
3     Q.  Okay.
4     A.  You can survive for a few minutes with oxygen
5 deprivation, if it's total oxygen deprivation.  The
6 brain has a store of glucose and oxygen for
7 approximately 15 to 30 seconds, then unconsciousness
8 will commence, and shortly after that, within two to
9 three minutes, death will intervene.
10     Q.  In your autopsy report, Dr. Hayne, you note,
11 several times, congestion.  If you'll look -- you see
12 on your finding, sir?
13     A.  Yes, sir.
14     Q.  Can congestion cause contusions?
15     A.  No.
16     Q.  Okay.  The congestion that you found with
17 Chloe Britt, where was it located?
18     A.  It was in the viscera, the major organs.
19 That's not to be unexpected.  I don't think this death
20 was an immediate death, and there would be a period of
21 time, an agonal phase of death where the
22 cardiovascular activity would be diminishing, pumping
23 efficiency would also diminish, and blood would have a
24 tendency to pool in the different organs, the lungs,
25 spleen, kidneys, and the like, the liver.

Page 24

1     Q.  The inner mucosa of rectum, is it sometimes
2 visible after death in an autopsy?
3     A.  It could be.  It's unusual.  You would have
4 to spread the buttocks to look and see that.
5     Q.  And what would it look like?  Would it have a
6 pink or red coloring to it?
7     A.  Usually be a pinkish color, where there would
8 be congestion, usually dependent from the geographic
9 or the gravitational pull of blood downward.
10     Q.  And if that inner mucosal lining was observed
11 even by physicians, could it be confused as an anal
12 injury?
13     A.  I would think not, Counselor.  I can't speak
14 for them, but a contusion is usually fairly-well
15 circumscribed and outlined, while congestion would not
16 be, but I would hate to speak for them.
17     Q.  Okay.  Flaccid, that's the same as limp; is
18 that correct?
19     A.  That's correct.
20     Q.  Could a flaccid or limp muscle condition
21 contribute to anal dilation?
22     A.  That could, yes.
23     Q.  Okay.  And a dilated anal sphincter is not,
24 on its own, evidence of anal sexual abuse; is that
25 correct?

**489**

# Deposition of Dr. Steven Hayne

7 (Pages 25 to 28)

## Page 25

1  A.  It is not by itself, no.
2  Q.  Okay.  To determine that sexual abuse is a
3  probability, you would need additional evidence than
4  just the dilated anus; is this correct?
5  A.  I would like to see more evidence as to
6  traumatic injuries, also clinical history, and,
7  hopefully, by laboratory testing.
8  Q.  Okay.  And we don't have here in your
9  analysis, and your autopsy of Miss Britt, that
10  additional type of evidence; is that correct?
11  A.  Do not.  I only have a contusion, which is a
12  traumatic injury.  We do not have abrasions,
13  lacerations, presence of seminal fluid, spermatozoa,
14  and the like.
15  Q.  And, Dr. Hayne, can you say from your autopsy
16  evidence, and from the coroner's inquest, the medical
17  records that you reviewed, the photographs, and the
18  laboratory findings, that this child, Miss Britt, was
19  sexually assaulted?
20  A.  I could not come to that final conclusion,
21  Counselor.  As I remember in trial testimony, I said
22  that the contusion would be consistent with a sexual
23  abuse, but I couldn't say that there was sexual abuse,
24  and, basically, I deferred to the clinical examination
25  conducted at the hospital.

## Page 26

1  Q.  And so from your standpoint and from your
2  expertise, you cannot say that this child was sexually
3  abused, to a reasonable degree of medical certainty;
4  is that correct?
5  A.  I could not now and I could not then, either;
6  at the trial, or when I wrote the report, or discussed
7  the case with the coroner.
8  Q.  Okay.  Is physical sexual abuse of a child a
9  medical diagnosis?
10  A.  Well, there's a component of a medical
11  diagnosis.  You're describing also a legal issue, too.
12  Q.  Right.
13  A.  The diagnosis could come from laboratory
14  testing.  It could come from physical exam by a
15  treating physician.  It could also come from a
16  pathologist in a case where there's death, also from
17  scene investigation.  So it's a combination of things,
18  but it's also a legal, and as you notice, I never used
19  the term, "rape."  That is a legal term, not a medical
20  term.
21  Q.  Yes, sir.  Are you familiar with the
22  expertise of the doctors and nurses that treated this
23  child at the emergency room?
24  A.  I'm not.
25  Q.  Do you know --

**490**

## Page 27

1  MR. McNAMARA:  Object to anything along this
2  line.  The doctor has stated he is not familiar with
3  their qualifications.  He'd be completely incompetent
4  to answer any questions regarding that.
5  BY MR. JICKA:
6  Q.  Do you know what, if any, experience they had
7  ever treating children that had had sexual abuse?
8  A.  I don't know that, Counselor.
9  Q.  Would you agree that it takes a certain
10  medical expertise to determine whether a child has
11  ever been sexually abused?
12  A.  I would agree with that, yes.
13  Q.  And in this case, from your work, hired by
14  the State, you could not make a determination that
15  sexual abuse was a probability in this case, correct?
16  A.  I could not come to a final conclusion,
17  Counselor.  I could only come to the conclusion I so
18  testified in court, that the contusion was consistent
19  with what I've seen in a sexual abuse case.  And also,
20  just technically, I was contracted not with the State,
21  but by the County.
22  Q.  Thank you.
23  A.  Adams County.
24  Q.  And I appreciate it.  Thank you for
25  correcting that.  Dr. Hayne, you testified at Jeffrey

## Page 28

1  Havard's trial, correct?
2  A.  I did, sir.
3  Q.  And you were not asked, actually, about
4  sexual battery during that trial, were you, sir?
5  A.  Not specifically, no.
6  Q.  But you were aware, from even from the
7  coroner's permit, that that was an issue in the case,
8  correct?
9  A.  Oh, yes, and I knew before I even stepped on
10  the witness stand that was going to be an issue.
11  Q.  Okay.  And prior to the trial, you discussed
12  this with the district attorney whether you could say
13  to a reasonable degree of medical certainty or even to
14  a probability that sexual abuse occurred, correct?
15  A.  That's correct.  But all I could tell the
16  district attorney, prior to trial, was that there was
17  a contusion, and that would be consistent with sexual
18  abuse, but I'd like to see more evidence before I made
19  that next and more significant evaluation and
20  conclusion.
21  Q.  Okay.  You -- if you had been asked the same
22  questions we -- that I've been asking you today in
23  court about sexual abuse, would you have answered them
24  in the same manner, sir?
25  A.  Exact way.  I think I at least touched on

# Deposition of Dr. Steven Hayne

8 (Pages 29 to 32)

Page 29

1  some of those, and I have not changed my opinion, and
2  it would make no difference whether defense or
3  prosecution was asking me, the answer would be the
4  same.
5      Q. That leads me to my next question. Did you
6  ever meet with Gus Sermos or Robert Clark,
7  Mr. Havard's attorneys about this case?
8      A. I don't remember that, Counselor, but I --
9      MR. McNAMARA: And I object. This is off the
10 subject, not relevant.
11 BY MR. JICKA:
12     Q. If requested by them, would you have met with
13 the attorneys for Mr. Havard in this case?
14     A. I always honor those requests, either
15 prosecution or defense.
16     Q. And would you have answered their questions
17 in a meeting the same way you have today, if asked?
18     A. If they were asking the same questions, I
19 would respond the same way.
20     Q. Dr. Hayne, you can't say, or can you say,
21 that Chloe Britt was sexually penetrated to a
22 reasonable degree of medical certainty in this case?
23     A. I cannot. All I can say is the injury
24 sustained would be consistent with that, but that's
25 not a definitive diagnosis. And maybe I should

Page 30

1  explain.
2      Q. Sure.
3      A. I use a series of qualifiers, with reasonable
4  medical certainty, I can say exclude, suggestive of,
5  may fit, consistent with, and diagnostic of.
6      Q. Okay. Let's go off the record for a second.
7  Let me review my notes and see what else I have.
8      A. Sure.
9      MR. MAGEE: Off the record. The time is
10 9:30.
11     (Recess.)
12     (Exhibit 5 marked.)
13     MR. MAGEE: Back on the record. The time is
14 9:40.
15 BY MR. JICKA:
16     Q. Dr. Hayne, thank you for helping me through
17 this information today. What I'd like to do is show
18 you what I've marked as Exhibit 5, and ask you if you
19 can identify what that document is, sir?
20     A. This is a report from the Mississippi Crime
21 Lab, their facility in Jackson, concerning samples
22 that were collected. This would be -- appears to be
23 from the hospital, including clothing, and then
24 there's also a pillow case, and there's a purple-top
25 tube of blood, and then it discusses the result

Page 31

1  the studies that --
2      MR. McNAMARA: I'll have to object. It
3  sounds like the doctor is not familiar with this
4  document.
5      MR. JICKA: All right.
6  BY MR. JICKA:
7      Q. Go ahead, sir.
8      A. And then remarks that some of the specimens
9  were retained for DNA testing, also on an Eddie
10 Walker. From an Eddie Walker, I should say.
11     Q. And, basically, in Exhibit 5, we have some
12 results from a sexual assault evidence collection kit
13 labeled Jeffrey Havard; is that correct?
14     A. Yes, sir.
15     Q. And in your work, are you familiar what makes
16 up these sexual assault evidence collection kits?
17     A. I am, sir. We use them routinely.
18     Q. And what is that, sir?
19     A. RSVK 1111 kit, that would be for collection
20 of saliva, collection of vaginal in fluid, rectal
21 swabs, vaginal swabs, vulvar swabs, oral swabs, any
22 clothing, hair samples, and the like, also, DNA tube
23 of blood.
24     Q. And in all of the evidence that you had
25 mentioned and that's shown here on Exhibit 5, was

Page 32

1  there any evidence or DNA connecting Jeffrey Havard
2  with a sexual abuse of Miss -- of the child, Miss
3  Britt?
4      A. In this particular one, I do not see evidence
5  of that. This is basically clothing and other items
6  involving the defendant and the decedent. This is not
7  the material, that I can determine, that was submitted
8  from the autopsy itself.
9      Q. So this would be additional materials that
10 were tested with -- under the sexual assault evidence
11 kit, in addition to the swabs that you've already
12 testified about; is that correct?
13     A. That's correct. It indicates such items as
14 clothes removed at Natchez Community Hospital.
15     MR. McNAMARA: And for the record, I continue
16 to object. This is not a document that the doctor is
17 familiar with or was generated by the doctor.
18     A. And fitted sheet beside a stove, and a used
19 baby diaper, and items like that, Counselor.
20 BY MR. JICKA:
21     Q. Thank you, sir. All right. That's going to
22 be Exhibit 5. Dr. Hayne, I usually start with this,
23 but I guess I'll end at least your direct examination
24 with this. We had noticed your deposition and asked
25 you to bring anything that you had with you regarding

491

# Deposition of Dr. Steven Hayne

## Page 33

1  this matter. What do you have in your possession
2  involving this Jeffrey Havard matter, sir?
3      A. This is the complete file, and I also brought
4  a tape. This the complete file that I have,
5  Counselor.
6      MR. JICKA: Okay. Thank you, sir. All
7  right. I'm going to make Exhibit 6 his notice of the
8  videotaped deposition. All right. We will tender the
9  witness, Pat.
10      (Exhibit 6 marked.)
11          EXAMINATION
12  BY MR. McNAMARA:
13      Q. Doctor, let's start off real quickly and just
14  ask you, is your -- in your opinion, the testimony
15  that you've given today, is it consistent with the
16  testimony that you gave at trial?
17      A. It is, sir.
18      Q. Have you had any change of heart? Would you
19  change your testimony?
20      A. I've seen no new facts to change my
21  testimony, Counselor.
22      Q. Okay. I'll ask -- I have here -- have you
23  seen the pictures you took at the autopsy --
24      A. Not since the trial, sir.
25      Q. -- in review? Okay. I'll pass you these

## Page 34

1  three -- what I have here is a copy of the three, and
2  we'll ask that that be substituted as an exhibit. And
3  can you identify those pictures or do you recall
4  those? They have your markings on there.
5      A. Yes, Counselor, I do recognize these.
6      (Exhibit 7 marked.)
7  BY MR. McNAMARA:
8      Q. Okay. One question I'd ask, as you see those
9  injuries to the child's anus there, do you find that
10  to be consistent with the insertion of a child's
11  rectal thermometer?
12      A. I did not think that was an insertion injury
13  from a rectal thermometer by medical personnel. I
14  could not exclude it, but I think it was unlikely,
15  Counselor.
16      Q. Okay. That is an abnormal anus, isn't it?
17      A. It is, Counselor.
18      Q. Did you -- to the question of the lack of
19  semen or DNA evidence, is there a requirement that
20  someone else's DNA or semen be present?
21      A. No, sir.
22      Q. They're just cause for penetration, is that
23  correct?
24      A. That's correct, sir. It does not necessarily
25  mean that a penis was the device used to perpetrate

## Page 35

1  It could be some other object.
2      Q. There are several references throughout the
3  trial, something about 12 o'clock, there was an injury
4  at 12 o'clock of the anal area?
5      A. Yes, Counselor.
6      Q. Where exactly is 12 o'clock on that?
7      A. May I point, Counselor?
8      Q. That would be at the top, where --
9      A. Yes, Counselor.
10      Q. -- there's sort of a slender -- it's round in
11  one area, and then it goes up and it's sort of
12  slender?
13      A. That's correct, sir.
14      Q. Is that normal for a child to have that --
15  that wouldn't be a tear, that would just be -- what
16  would that be?
17      A. For what?
18      Q. I'm sorry. The -- at 12 o'clock, it shows --
19  the pictures you're holding, there is a picture of the
20  baby's anus?
21      A. That's correct.
22      Q. And it's rounded; is that correct?
23      A. It's elliptical.
24      Q. Well, toward the top of that 12 o'clock area,
25  does it -- it peaks, it goes up, and comes to a point;

## Page 36

1  is that -- that's how I'm looking at it.
2      A. Yeah, it points towards the perineum, yes.
3      Q. Is that indicative of that's not a tear, that
4  would be just a stretch?
5      A. I did not see a tear, Counselor, no.
6      Q. What is that indicative of, that 12 o'clock
7  injury?
8      A. There was dilatation at that site, Counselor.
9      Q. Okay. But it was dilatation of the entire
10  anus, correct?
11      A. Yes, but more pronounced at that point.
12      Q. Okay. In describing that in your report, you
13  say, on page 6 of your report, section F,
14  gastrointestinal system, do you see that one? I'm
15  sorry, I may be --
16      A. Yes.
17      Q. You've got it?
18      A. Yes.
19      Q. Is it says, "A section of anus reveals
20  submucosal hemorrhage."
21      A. Yes.
22      Q. Where did you explain submucosal hemorrhage?
23      A. That is in the microscopic, "A section of
24  anus reveals submucosal hemorrhage," yes, Counselor.
25  That would be the contusion.

## Deposition of Dr. Steven Hayne

10 (Pages 37 to 39)

Page 37

1   Q.  And a contusion is?
2   A.  Located at the point that I indicated to you.
3   Q.  Okay.  The definition of a contusion, what ·
4   would that be?
5   A.  Contusion is a tearing of blood vessels
6   underneath the skin or mucosa with collection of blood
7   at that site manifested by an area of discoloration,
8   when one's looking at the injury, external to the
9   injury itself.  The lining, either the skin or mucosa,
10  remains intact, and usually there's no bleeding on the
11  skin or mucosal surface.
12  Q.  Okay.
13  A.  If one takes a microscopic section, you can
14  see bleeding outside the vessels into the soft tissue,
15  which would separate congestion from a traumatic
16  injury, is a contusion.
17  Q.  Okay.  Final question, so -- being redundant,
18  but you're saying, your testimony today is it's still
19  consistent with what you testified to at trial, and
20  you wouldn't change it?
21  A.  No, sir.  I would only change it if I saw
22  additional information.  And I'd like to point out, I
23  did not come to a final conclusion.
24  Q.  Okay.  But you would agree with your
25  testimony then that the injuries were consistent with

Page 38

1   an object being inserted or penetration?
2   MR. JICKA:  Object to the form.
3   A.  Yes, they were consistent with that.
4   MR. McNAMARA:  That's all I have.
5   MR. JICKA:  Just one second.  Let's go off
6   the record.
7   MR. MAGEE:  Off the record.  The time is
8   9:53.
9   (Recess.)
10  MR. MAGEE:  This concludes the deposition.
11  The time is 9:56.
12  (Whereupon the deposition was concluded at
13  9:56 a.m., the same day.)
14
15
16
17
18
19
20
21
22
23
24
25

**493**

Page 39

1       CERTIFICATE OF COURT REPORTER
2       I, Catherine M. White, C.S.R. and Notary
3   Public, Hinds County, Mississippi, do hereby certify:
4       That on the 23rd day of November, 2010, there
5   appeared before me, pursuant to notice and the Federal
6   Rules of Civil Procedure, Dr. Steven Hayne as a witness
7   in the above-mentioned cause;
8       That said witness was duly sworn by me to tell
9   the whole truth, and nothing but the truth in said
10  cause;
11      That counsel appeared on behalf of the
12  respective parties as hereinbefore set forth;
13      That the foregoing deposition was taken by me
14  by means of Stenograph machine and translated into
15  transcript form by me, and that the foregoing 38 pages
16  contain a full, true and correct transcription of the
17  testimony of said witness;
18      That I am not in any way associated with any of
19  the parties to said cause of action, or their counsel,
20  and that I am not interested in the event hereof.
21      IN WITNESS WHEREOF, I have hereunto set my hand
22  this the 29th day of November, 2010.
23
24      Catherine M. White
        CSR No. 1309
25      My Commission expires: 2/1/2014

# Deposition of Dr. Steven Hayne

**A**

able 12:1 14:5
abnormal 34:16
above-mentio...
39:7
abrasions 13:19
25:12
abuse 6:14 24:24
25:2,23,23
26:8 27:7,15
27:19 28:14,18
28:23 32:2
abused 26:3
27:11
accepted 6:24
7:16,24
accident 9:9
accumulating
21:5
acting 5:20
action 1:4 39:19
activity 23:22
acute 22:16
Adams 9:14,20
10:2 27:23
addition 32:11
additional 16:23
25:3,10 32:9
37:22
addressing 14:9
adequate 21:24
age 15:7 20:11
agonal 23:21
agree 8:1 15:5
27:9,12 37:24
ahead 20:17
31:7
air 21:11,14
al 1:5 4:4
allowed 21:2
alternative 13:9
American 20:7
amount 21:5,14
anal 11:21 12:1

14:22 16:18
19:12,21 22:12
22:21 24:11,21
24:23,24 35:4
analysis 25:9
anatomic 5:14
5:16
anatomy 16:13
Ansbacher 6:21
answer 18:21
27:4 29:3
answered 28:23
29:16
anus 14:22 15:6
20:5,19 22:5
25:4 34:9,16
35:20 36:10,19
36:24
Appearance 3:4
APPEARANC...
1:16 2:1
appeared 39:5
39:11
appears 30:22
appendicitis
22:16
appendix 22:18
application
15:14
appreciate 27:24
approximately
1:12 4:7 12:23
23:7
area 6:7,14
11:21 12:1
15:4 35:4,11
35:24 37:7
areas 16:12
Army 6:5,19
article 20:7,9
artificial 17:12
asked 9:13 12:15
28:3,21 29:17
32:24

asking 18:19
28:22 29:3,18
assault 7:7,13
10:18,23 11:2
11:24 12:12
16:1,6 18:12
31:12,16 32:10
assaulted 25:19
associated 39:18
Asystole 18:2,3
18:4
attorney 2:11
4:14 11:4
28:12,16
attorneys 29:7
29:13
authored 6:17
autopsy 3:14 8:4
8:21,24 9:4,19
10:9,15,20,21
11:9,16,25
12:16,25 13:18
15:2,25 23:10
24:2 25:9,15
32:8 33:23
available 19:10
aware 28:6
a.m 1:12 4:7
38:13

**B**

baby 32:19
baby's 35:20
Back 30:13
Bank 6:10
Barracks 7:8
based 18:11 19:3
19:10
basically 7:1
25:24 31:11
32:5
battery 11:13
12:12 28:4
Bay 6:7

beginning 1:12
10:21 11:1
behalf 39:11
believe 10:13
16:25 17:6
21:1,8
big 12:21
bit 5:23 15:4
bleeding 37:10
37:14
blocked 21:11
blood 6:9 23:23
24:9 30:25
31:23 37:5,6
body 13:2,3 15:5
17:13
bowel 21:10,15
22:9,11
Box 1:24
brain 17:7,8,9
17:20 18:6
19:11,11 20:3
22:23 23:6
breakdown
17:15
breathing 17:12
bring 32:25
Britt 8:5,7,14
9:4,7,19 10:12
11:9 15:1
17:18 19:4,11
22:20 23:17
25:9,18 29:21
32:3
brought 33:3
Brown 6:3
business 9:25
butcher 5:6
buttocks 24:4

**C**

California 6:9
call 8:14
called 9:22

capacities 5:19
Capitol 1:10 2:4
cardiopulmon...
21:7,18,23
cardiovascular
18:7,25 23:22
Carner 2:6 4:11
4:11
case 7:20,25
10:23 11:2
13:21 18:17
19:4 20:14,19
20:20 21:2,8
22:19 26:7,16
27:13,15,19
28:7 29:7,13
29:22 30:24
cases 7:13 20:9
20:23 22:16
Catherine 39:2
39:24
CATHY 1:23
cause 9:5,6,11
22:4 23:14
34:22 39:7,10
39:19
causes 13:9
cease 17:14
cellular 19:1
Center 6:6,20
central 18:25
certain 17:18
27:9
certainly 5:8
20:24
certainty 19:19
26:3 28:13
29:22 30:4
Certificate 3:10
39:1
certified 5:15
certify 39:3
chain 16:4
change 33:18,19

**494**

# Deposition of Dr. Steven Hayne

33:20 37:20,21
**changed** 29:1
**checklist** 7:4
**chest** 22:15
**chief** 5:22 6:20
6:21
**child** 6:14 11:13
12:2,9 13:6,10
15:7,13 16:8
17:8 21:21,25
25:18 26:2,8
26:23 27:10
32:2 35:14
**children** 20:3,10
27:7
**Children's** 6:8
**child's** 16:13
34:9,10
**Chloe** 8:4,8,9
19:11 22:20
23:17 29:21
**choice** 7:6
**Chole** 8:6,12,13
**Christopher** 1:5
4:4,14
**circumcised**
24:15
**circumstances**
10:13
**City** 6:10
**Civil** 1:4 39:6
**Clark** 29:6
**classification** 9:8
**clinical** 5:14,16
25:6,24
**Clinton** 2:8
**clothes** 32:14
**clothing** 30:23
31:22 32:5
**Code** 7:11
**collect** 16:2
**collected** 30:22
**collection** 7:2
31:12,16,19,20

37:6
**colon** 21:15 22:3
22:4
**Colonel** 6:20,21
**color** 24:7
**coloring** 24:6
**combination**
26:17
**come** 9:5,8,11
10:24,25 11:17
11:23 25:20
26:13,14,15
27:16,17 37:23
**comes** 35:25
**commence** 23:8
**Commission**
39:25
**common** 19:23
**commonly** 19:21
**communication**
11:7
**Community**
32:14
**complete** 33:3,4
**completed** 6:4
**completely** 27:3
**component**
26:10
**comprehensive**
7:3
**concerning**
30:21
**concluded** 38:12
**concludes** 38:10
**conclusion** 9:9
9:12 10:24,25
10:25 11:17,23
25:20 27:16,17
28:20 37:23
**conclusions** 9:5
**condition** 24:20
**conduct** 11:9
**conducted** 8:19
16:8 25:25

**conducting**
10:15
**confused** 24:11
**congestion** 23:11
23:14,16 24:8
24:15 37:15
**conjunction**
6:20
**connecting** 32:1
**considered**
18:18
**consistent** 11:21
25:22 27:18
28:17 29:24
30:5 33:15
34:10 37:19,25
38:3
**contain** 39:16
**Contents** 3:1,5
**continue** 32:15
**continuing**
18:14
**contracted**
27:20
**contribute** 22:12
24:21
**contusion** 12:18
12:22 13:9,20
24:14 25:11,22
27:18 28:17
36:25 37:1,3,5
37:16
**contusions** 23:14
**copy** 4:19 8:20
14:10 34:1
**coroner** 9:14,15
9:21 10:2 11:4
11:8 26:7
**coroner's** 25:16
28:7
**correct** 5:9 8:5
8:16,17 10:15
10:16 11:10,13
11:14 12:6,9

12:13,19,20
13:1,7,15,16
14:6,14,23,24
15:15 16:13,14
16:17,18,22,23
17:6 19:4,16
19:17 24:18,19
24:25 25:4,10
26:4 27:15
28:1,8,14,15
31:13 32:12,13
34:23,24 35:13
35:21,22 36:10
39:16
**correcting** 27:25
**counsel** 2:9,13
4:3,7 39:11,19
**Counselor** 5:1
5:10 8:6,22
9:22 11:6,11
11:18 12:15,23
13:11 15:16
19:5 24:13
25:21 27:8,17
29:8 32:19
33:5,21 34:5
34:15,17 35:5
35:7,9 36:5,8
36:24
**county** 6:11 9:14
9:15,20 10:3,8
11:7 27:21,23
39:3
**course** 9:10
**court** 1:1,23 4:4
4:15 5:11 6:13
12:15 18:18
27:18 28:23
39:1
**courts** 7:17
**co-authored**
6:25
**CPR** 21:20
**Crime** 3:18 16:4

30:20
**CSR** 1:23 39:24
**custody** 16:4
**C.S.R** 39:2

---

**D**

**D** 2:7
**Dakota** 6:1,2
**damaged** 15:6
**date** 4:6 8:17
**day** 38:13 39:4
39:22
**dead** 19:11 23:2
**death** 5:20 7:14
9:6,6,7,8,11
11:24 17:7,9
18:6,24 20:19
20:21 23:9,19
23:20,21 24:2
26:16
**decedent** 32:6
**declaration** 3:16
13:22 14:6,12
**defendant** 32:6
**defense** 29:2,15
**deferred** 25:24
**definition** 37:3
**definitions** 18:24
**definitive** 29:25
**degree** 6:4 19:19
26:3 28:13
29:22
**delicate** 15:5
**deliver** 21:23
**delivered** 17:13
**dependent** 24:8
**deposition** 1:8
4:2 8:25 14:1
14:18 19:7
32:24 33:8
38:10,12 39:13
**deprivation** 23:5
23:5
**deprived** 22:20

**495**

# Deposition of Dr. Steven Hayne

described 20:20
describing 26:11
  36:12
designated 5:21
determination
  27:14
determine 10:14
  10:22 25:2
  27:10 32:7
device 34:25
diagnosis 6:15
  26:9,11,13
  29:25
diagnostic 30:5
diagram 13:3
diaper 32:19
dictated 13:12
died 9:7 20:3
difference 29:2
different 5:19
  7:20 10:13
  16:12 23:24
dilatation 20:21
  36:8,9
dilate 22:8
dilated 17:21
  19:21 20:5
  24:23 25:4
dilating 21:12
dilation 19:12
  22:5,12,21
  24:21
diminish 23:23
diminishing
  23:22
direct 32:23
directly 21:1
Disciplinary 7:8
discoloration
  37:7
discussed 26:6
  28:11
discusses 30:25
dismissing 20:25

distal 21:12 22:9
distention 22:4
district 1:1,1 4:4
  4:5 11:4 28:12
  28:16
Division 1:2 4:5
DNA 31:9,22
  32:1 34:19,20
doctor 27:2 31:3
  32:16,17 33:13
doctors 26:22
document 30:19
  31:4 32:16
documentation
  9:19
doing 9:3
downward 24:9
Dr 1:8 3:8 4:2,20
  4:25 6:18,24
  8:4,20 9:3
  13:21 14:1,5
  14:12,20 17:7
  18:16 19:11
  20:22 23:10
  25:15 27:25
  29:20 30:16
  32:22 39:6
duly 4:21 39:8
duties 8:15

**E**

Eager 1:10 2:4
earlier 13:22
easily 15:7,11
East 1:10 2:4
Eddie 31:9,10
education 5:24
effectively 21:10
efficiency 23:23
efforts 21:4
either 17:14 26:5
  29:14 37:9
elliptical 35:23
else's 34:20

emergency 7:4
  15:2,23 21:19
  26:23
employed 16:2
encounter 19:21
enema 22:15
enlarging 22:9
enters 22:3
entire 36:9
Epps 1:5 4:4,14
error 13:11
errors 14:6
ESQUIRE 2:3,6
  2:10
essentially 17:13
et 1:5 4:4
evaluation 16:8
  17:2 28:19
event 39:20
Eventually
  17:15
evidence 7:2
  12:14,16 16:3
  16:16,22 22:7
  22:19 24:24
  25:3,5,10,16
  28:18 31:12,16
  31:24 32:1,4
  32:10 34:19
Exact 28:25
exactly 18:17
  35:6
exam 26:14
examination 3:7
  4:23 8:19 9:24
  16:9 19:22
  25:24 32:23
  33:11
examinations
  7:15
examined 4:21
examiner 5:21
  9:15,23 11:8
Examiner's 6:10

exclude 30:4
  34:14
executing 14:7
exhibit 3:12,13
  8:24 9:1 10:2,4
  14:1,2,3 19:7,8
  30:12,18 31:11
  31:25 32:22
  33:7,10 34:2,6
Exhibits 3:6
expect 22:14
experience 27:6
expert 7:16,23
  7:25
expertise 26:2
  26:22 27:10
expires 39:25
explain 30:1
  36:22
external 37:8
extra 14:10

**F**

F 36:13
facilitate 21:15
facility 30:21
fact 10:24
facts 33:20
fairly-well 24:14
familiar 26:21
  27:2 31:3,15
  32:17
far 18:12
February 8:18
Federal 39:5
feel 11:22
field 5:15 6:16
  6:17 7:17
fields 5:13
file 14:9 33:3,4
final 3:14 8:21
  8:24 10:25
  11:16,17 15:25
  25:20 27:16

37:17,23
find 12:1,18 14:8
  34:9
finding 19:25
  23:12
findings 25:18
Firm 2:7
first 14:12 17:9
  19:12
fit 30:5
fitted 32:18
Fixed 17:23
flaccid 24:17,20
flaccidness
  17:10
fluid 25:13
  31:20
follows 4:22
force 22:15
foregoing 39:13
  39:15
forensic 5:14,16
  5:17,17 6:16
  10:9 20:8
forgive 14:16
form 9:22,23
  10:11 38:2
  39:15
Fort 7:8
forth 39:12
Forty-five 22:24
  22:25
found 12:5
  13:10 14:19
  16:7,22 23:16
Francisco 6:5,7
  6:11
friends 6:25
full 39:16
function 17:8,20
  19:12 22:23
functionality
  18:8
functioning 18:6

**496**

## Deposition of Dr. Steven Hayne

18:7
functions 17:13
further 13:17
22:5

___ **G** ___
gas 21:5,14 22:3
22:8
gastrointestinal
21:5,12 36:14
gcarner@gilli...
2:6
general 2:11
4:14 20:14
22:7
generated 32:17
geographic 24:8
GI 21:13
Gilliam 2:7
given 33:15
glucose 23:6
go 7:5,12 20:17
30:6 31:7 38:5
goes 18:13 20:25
35:11,25
going 5:2 8:23
10:1 13:25
14:17 19:6
21:11 28:10
32:21 33:7
good 4:1,25 5:1
6:25
graduation 6:23
Graham 2:6
4:11
gravitational
24:9
guess 10:14
16:11 32:23
Gus 29:6

___ **H** ___
hair 31:22
Hammer 6:18
6:24

hand 39:21
handful 20:10
happen 15:16
happens 16:11
hard 22:13
hate 24:16
Havard 1:3 4:3
4:10,12 14:14
29:13 31:13
32:1 33:2
Havard's 28:1
29:7
Hayne 1:8 3:8
4:2,20,25 8:4
8:20 9:3 13:21
14:5,12,20
17:7 18:16
19:11 23:10
25:15 27:25
29:20 30:16
32:22 39:6
Hayne's 14:1
healed 15:1
heart 18:5,7
33:18
help 5:7
helping 30:16
hemorrhage
36:20,22,24
hereinbefore
39:12
hereof 39:20
hereunto 39:21
High 2:12
highly 15:17
Highway 2:7
Hinds 39:3
hired 27:13
Hispanic 8:11
history 25:6
holding 35:19
homicide 9:9
homosexuality
7:9

honor 29:14
hopefully 25:7
hospital 6:8,9
25:25 30:23
32:14
hour 22:21,25
human 7:14 15:5

___ **I** ___
identification
7:2
identified 10:10
13:19 16:10
identify 30:19
34:3
illustration 13:3
immediate 23:20
impression
21:22
including 5:20
6:8 30:23
incompetent
27:3
increased 20:4
Index 3:6,7,12
indicated 11:20
37:2
indicates 32:13
indicative 36:3,6
individual 19:2
21:9
ineffective 21:7
21:17,20
information
19:10 30:17
37:22
injured 15:11
injuries 20:4
25:6 34:9
37:25
injury 11:20
12:25 13:5
15:13,17 24:12
25:12 29:23

34:12 35:3
36:7 37:8,9,16
inner 24:1,10
inquest 25:16
inserted 38:1
insertion 34:10
34:12
institution 7:10
institutions 6:7
intact 37:10
interested 39:20
interesting
18:16
interject 18:10
18:20
intervene 23:9
introduce 4:7
intubated 19:16
investigation
5:20 6:15
26:17
investigator
9:16 11:8
involves 10:12
14:13
involving 7:13
20:10 32:6
33:2
Island 6:4
issue 11:3 21:1
26:11 28:7,10
issued 9:20
items 32:5,13,19

___ **J** ___
J 2:10
Jackson 1:11,24
2:5,12 30:21
James 9:16
Jeffrey 1:3 4:3
4:10 14:14
27:25 31:13
32:1 33:2
Jicka 2:3 3:8 4:9

4:9,24 7:19 8:1
8:3,23 9:2 10:1
10:5 13:25
14:4 18:15,22
19:6,9 20:16
20:24 21:3
27:5 29:11
30:15 31:5,6
32:20 33:6
38:2,5
Journal 20:7,8
20:23
JR 2:10
Judge 21:2
Justice 7:11

___ **K** ___
kidneys 23:25
kind 18:16
kit 16:1,2,6
31:12,19 32:11
kits 31:16
knew 11:2 28:9
know 5:4 7:9,19
7:21,22 19:2
26:25 27:6,8

___ **L** ___
lab 3:18 16:4
30:21
labeled 31:13
laboratory 25:7
25:18 26:13
lacerations
13:19 25:13
lack 17:8,11,20
17:25 34:18
lacked 19:11
22:23
large 21:4,10
Lauridson 20:22
lead 18:16
leading 18:14
leads 29:5
Leavenworth

**497**

## Deposition of Dr. Steven Hayne

7:9
Lee 9:17
legal 26:11,18,19
Letterman 6:5
6:19
let's 30:6 33:13
38:5
likelihood 20:4
limp 24:17,20
line 27:2
lining 15:6,8
24:10 37:9
list 6:13 7:5
12:25 13:5
listed 11:15
12:24 13:2,18
lists 10:13
little 5:23 7:20
15:4
liver 23:25
LLC 1:23
located 10:18
22:22 23:17
37:2
long 7:4
longer 18:5
look 10:14 13:23
16:15,18 23:11
24:4,5
looking 14:8
36:1 37:8
looks 16:20
lot 7:7
lungs 23:24
lytolisis 17:16

**M**

M 1:23 39:2,24
machine 39:14
Magee 2:15 4:1
4:15 30:9,13
38:7,10
major 7:10
23:18

manifested 37:7
manner 9:6,7
21:24 28:24
MAR 3:13
March 14:7
mark 2:3 4:9
8:24 10:1
13:25 19:6
marked 9:1 10:4
14:3 19:8
30:12,18 33:10
34:6
markings 34:4
material 32:7
materials 32:9
matter 4:3 14:14
33:1,2
Matthew 2:15
McNAMARA
2:10 3:9 4:13
4:13 7:24
18:10 20:12
27:1 29:9 31:2
32:15 33:12
34:7 38:4
mean 34:25
means 39:14
medical 3:17
5:21 6:4,5,10
6:20 9:6,15,23
11:8 15:19,21
17:17 19:3,19
19:20 22:1
25:16 26:3,9
26:10,19 27:10
28:13 29:22
30:4 34:13
medically-trai...
21:23
medical-legal
5:20 7:14 10:9
medicine 5:17
6:2,12 20:8
meet 29:6

meeting 29:17
Memorial 6:9
mention 11:12
16:1 17:19
mentioned 12:11
12:12 13:14
17:21 31:25
met 29:12
ME-1 9:23 10:10
ME-17 10:11
microscope
16:15
microscopic
16:9 36:23
37:13
military 7:6,10
7:11
mind 18:19
minds 11:3
minutes 22:21
22:24,25 23:4
23:9
Mississippi 1:1
1:11,24 2:5,8
2:12 4:5 5:18
16:4 30:20
39:3
mjicka@watk...
2:3
Moffitt 6:9
months 6:12
morning 4:1,25
5:1
movement 22:11
mucosa 15:8
24:1 37:6,9
mucosal 24:10
37:11
multiple 15:22
muscle 17:11,25
24:20

**N**

name 8:11
**498**

Natchez 32:14
natural 9:10
necessarily
34:24
need 25:3
negative 17:1
nervous 18:25
never 26:18
new 33:20
night 7:12,12
nonleading
18:19
normal 35:14
North 6:1,2
Notary 39:2
note 10:17 23:10
noted 1:16 12:4
12:5 13:4,18
17:18 19:13
notes 30:7
notice 3:19
26:18 33:7
39:5
noticed 32:24
November 1:11
4:6 39:4,22
nuclear 6:12
numbered 14:1
numerous 6:7
nurses 26:22

**O**

OBGYN 6:21
object 18:11,14
20:12 27:1
29:9 31:2
32:16 35:1
38:1,2
objection 7:21
20:25
observed 24:10
occasions 15:22
occur 15:13
19:23 22:17

occurred 22:6
28:14
occurring 22:7
offense 7:10
Office 1:24 2:11
6:10
offices 1:9
official 9:16
Oh 28:9
Okay 8:1,23
9:13 11:19,25
12:24 15:10,20
16:11 17:2,17
18:15 19:21
22:3,11 23:3
23:16 24:17,23
25:2,8 26:8
28:11,21 30:6
33:6,22,25
34:8,16 36:9
36:12 37:3,12
37:17,24
one's 37:8
one-centimeter
12:18,22
opinion 19:18
20:22 29:1
33:14
opinions 14:13
opportunity
13:22
oral 16:18,20
17:3 31:21
Orange 20:7,23
order 21:2
organs 23:18,24
outlined 24:15
outside 18:11
37:14
oxygen 22:20
23:4,5,6
o'clock 35:3,4,6
35:18,24 36:6

**Professional Court Reporting, LLC**
**601.919.8662**

# Deposition of Dr. Steven Hayne

**P**

P 2:6
pack 22:8
page 3:2,3,4,10
36:13
pages 39:15
paper 6:18,24
7:1,3
paperwork
10:10 11:6
paragraph
14:19
part 6:16 8:15
9:18,23 10:20
10:21 15:25
16:5 18:20,21
21:12
particular 11:24
20:9,19 21:9
22:19 32:4
parties 39:12,19
pass 33:25
passage 21:11,16
Pat 4:13 7:19
8:23 10:1
13:25 14:16
20:24 33:9
pathologist 5:13
5:21,22 26:16
pathology 5:14
5:16,16,17 6:6
6:17 20:8
patients 22:16
PATRICK 2:10
peaks 35:25
pending 9:10
penetrate 34:25
penetrated
29:21
penetration
11:21 34:22
38:1
penis 34:25
people 19:24

perform 10:9
performed 8:4
15:2 16:24,25
perineum 14:23
36:2
period 18:8,9
20:1 23:20
permit 3:15 9:20
10:2,7,12 28:7
personnel 15:19
21:23 34:13
PETITIONER
1:3 2:9
phase 23:21
Photocopy 3:20
photographs
3:20 12:8
13:14 25:17
physical 26:8,14
physician 5:17
26:15
physicians 24:11
picture 35:19
pictures 33:23
34:3 35:19
pillow 30:24
pink 24:6
pinkish 24:7
placement 15:18
please 5:4,11
pmcna@ago.s...
2:11
point 21:25 35:7
35:25 36:11
37:2,22
points 36:2
pool 23:24
position 18:16
possession 33:1
possible 13:9
14:25 20:6
21:17 22:22
Post 1:24
posted 7:4

postmortem
7:15 8:19 9:24
19:22 20:1,5
practice 9:24
predominant
5:25
prepared 13:21
presence 25:13
present 34:20
presented 11:4
Presidio 6:19
pressure 21:15
22:14
pretty 6:25
prior 14:6 28:11
28:16
probability 25:3
27:15 28:14
probable 22:22
probably 5:6
13:11
procedure 7:19
39:6
profession 8:15
professional
1:23 5:12
program 6:23
promote 22:5
pronounce 8:6
pronounced
36:11
pronunciations
5:7,9
prosecution 29:3
29:15
provide 5:11
Providence 6:3
Public 39:3
publication 6:24
published 6:22
7:1 20:23
pull 24:9
pumping 23:22
pupils 17:21,23

purification
17:16
purple-top
30:24
purpose 9:3 10:6
pursuant 39:5
pushing 22:8,17

**Q**

qualifications
5:12 6:14 27:3
qualifiers 30:3
question 29:5
34:8,18 37:17
questions 5:2,3
7:22 18:19
27:4 28:22
29:16,18
quickly 33:13

**R**

rape 26:19
real 33:13
reason 9:7
reasonable
19:18 23:1
26:3 28:13
29:22 30:3
recall 34:3
receive 10:6
Recess 30:11
38:9
recognize 34:5
recognized
19:25
record 4:8 12:21
19:20 30:6,9
30:13 32:15
38:6,7
records 3:17
15:21 17:17
19:4 22:1
25:17
rectal 15:14,22
16:21 17:4

31:20 34:11,13
rectum 14:22
15:6 22:5 24:1
red 24:6
redundant 14:17
37:17
references 35:2
referring 20:22
reflect 12:17
reflected 19:20
regarding 27:4
32:25
relationship
5:19
relaxation 17:11
relevant 20:13
29:10
remain 18:8
remains 10:10
37:10
remarks 31:8
remember 25:21
29:8
removed 32:14
report 3:14,18
8:21,24 11:12
11:16 12:5,13
12:17,25 13:3
13:4,18 15:25
23:10 26:6
30:20 36:12,13
reporter 4:15
39:1
REPORTING
1:23
represent 4:9
representing
4:13
request 9:18
10:8
requested 29:12
requests 29:14
requirement
6:22 34:19

**499**

# Deposition of Dr. Steven Hayne

residency 6:23
resident 6:18
respective 39:12
respiration
  17:12
respiratory 18:9
  18:25
respond 29:19
RESPONDEN...
  1:5 2:13
response 19:2
result 16:6 21:4
results 30:25
  31:12
resuscitation
  21:4,7,8,18,24
retained 31:9
reveals 36:19,24
review 14:5 30:7
  33:25
reviewed 19:3
  22:1 25:17
reviewing 15:20
  17:17
revived 21:25
Rhode 6:3
right 7:5 11:1
  12:2,11 13:14
  13:17 15:20
  26:12 31:5
  32:21 33:7,8
Robert 29:6
room 7:5 15:2
  15:23 21:20
  26:23
rotated 6:6
round 35:10
rounded 35:22
routine 9:24
routinely 31:17
RSVK 16:2
  31:19
Rules 39:6

**S**

saliva 31:20
samples 30:21
  31:22
San 6:5,7,11
saw 22:6 37:21
saying 37:18
says 36:19
scene 26:17
School 6:2
scope 18:11
second 30:6 38:5
secondary 15:18
seconds 23:7
section 36:13,19
  36:23 37:13
see 10:17,18
  12:14,15 14:8
  15:17,21,24
  22:14,19 23:11
  24:4 25:5
  28:18 30:7
  32:4 34:8 36:5
  36:14 37:14
seen 15:1 27:19
  33:20,23
semen 16:7
  34:19,20
seminal 25:13
sense 22:8
separate 37:15
series 30:3
Sermos 29:6
serological 16:7
  16:24 17:2
set 39:12,21
seven 14:19
sexual 6:14 7:7
  7:13 10:18,23
  11:2,13,23
  12:11 16:1,6
  18:12 24:24
  25:2,22,23
  26:8 27:7,15

27:19 28:4,14
28:17,23 31:12
31:16 32:2,10
sexually 25:19
  26:2 27:11
  29:21
sheet 32:18
shortly 17:14
  23:8
show 13:15
  30:17
shown 10:22
  12:9 31:25
shows 35:18
sic 8:12
significant 28:19
signs 17:7,19,19
single 13:20
sir 5:5,12,24
  7:18 8:21 9:14
  14:8,21 15:24
  17:6,21 19:19
  20:17 22:2,6
  23:12,13 26:21
  28:2,4,24
  30:19 31:7,14
  31:17,18 32:21
  33:2,6,17,24
  34:21,24 35:13
  37:21
site 36:8 37:7
six 6:12
size 15:18
skin 15:9,12
  37:6,9,11
skipped 13:12
slender 35:10,12
slit-like 20:20
soft 37:14
somatic 19:1
sorry 35:18
  36:15
sort 35:10,11
sounds 31:3
**500**

Southern 1:1 4:5
space 22:18
Spanish 8:12
speak 24:13,16
speaking 20:13
SPECIALIST
  2:15
specifically 28:5
specimens 31:8
spent 6:1,12
sperm 16:16
spermatozoa
  16:10,22 25:13
sphincter 14:22
  24:23
sphincters 19:22
spleen 23:25
spontaneous
  22:11
spread 24:4
squamous 15:8
stand 28:10
standpoint 17:3
  17:4,4,5 26:1
Starkey 6:21
Starrett 21:2
start 32:22 33:13
state 5:18,21,21
  5:22 6:1 9:22
  14:16,18 27:14
  27:20
stated 27:2
States 1:1 7:8
stationed 6:19
Stenograph
  39:14
stepped 28:9
Steven 1:8 3:8
  4:2,20 39:6
stool 21:9,16
  22:8,9,13,17
store 23:6
stove 32:18
Street 1:10 2:4

2:12
stretch 36:4
studies 31:1
study 20:14
subject 29:10
submit 6:23
submitted 16:3
  32:7
submucosal
  36:20,22,24
subsequently
  16:3
substituted 34:2
successfully
  19:15
suffered 20:18
suggestive 30:4
suicide 9:9
Suite 2:4,7
supplied 20:6
sure 8:10 13:12
  18:17,23 30:2
  30:8
surface 15:12
  37:11
survive 23:4
survived 22:17
sustained 29:24
swab 16:21,21
swabs 16:11,12
  31:21,21,21,21
  32:11
swear 4:15
sworn 4:17,21
  39:8
system 19:1
  36:14

**T**

Table 3:1,5
take 16:12
taken 1:9 4:2
  15:22 39:13
takes 27:9 37:13

# Deposition of Dr. Steven Hayne

talking 20:15
tape 33:4
tear 35:15 36:3,5
tearing 12:1
 13:15,17 37:5
tears 14:19,22
 14:25
technically
 27:20
telephonic 11:7
tell 5:23 28:15
 39:8
temperature
 15:21
tendency 23:24
tender 7:23 33:8
term 26:19,19,20
terminologies
 5:7
tested 32:10
testified 4:21
 27:18,25 32:12
 37:19
testimony 25:21
 33:14,16,19,21
 37:18,25 39:17
testing 25:7
 26:14 31:9
tests 16:23,24
thank 5:10
 14:11 18:4
 27:22,24 30:16
 32:21 33:6
thermometer
 15:14,18,22
 34:11,13
things 17:18
 26:17
think 8:8 15:16
 19:24,24 20:6
 23:19 24:13
 28:25 34:12,14
 three 23:9 34:1,1
tied 18:13

time 4:6 6:18
 15:1 17:14
 18:8,9,11
 19:12 22:1
 23:21 30:9,13
 38:7,11
times 7:13 23:11
tissue 15:6 17:15
 37:14
title 3:3 9:16
today 5:2 8:21
 14:18 28:22
 29:17 30:17
 33:15 37:18
Today's 4:6
tone 17:25
top 35:8,24
total 23:5
touched 28:25
tract 21:6,12,13
trained 6:6
transcript 39:15
transcription
 39:16
transferred 6:3
translated 39:14
traumatic 12:25
 13:5 20:19
 25:6,12 37:15
traumatized
 15:11
treated 26:22
treating 26:15
 27:7
treatment 7:2
trial 25:21 26:6
 28:1,4,11,16
 33:16,24 35:3
 37:19
true 14:15 16:6
 39:16
truth 39:9,9
try 14:17 18:15
tube 30:25 31:22

Tuesday 1:11
two 6:1 23:8
type 25:10
typical 7:20
typist 13:12
typo 13:11

**U**

unconsciousness
 17:10 23:7
undergraduate
 5:25
underneath 37:6
understand 5:3
undetermined
 9:10
unexpected
 23:19
Uniform 7:11
Union 6:9
United 1:1 7:8
University 6:2,3
 6:8
unusual 24:3
use 10:7 30:3
 31:17
usually 24:7,8
 24:14 32:22
 37:10

**V**

vaginal 16:19,21
 17:4 31:20,21
vary 19:1
vermiform
 22:18
versus 4:3
vessels 37:5,14
VIDEO 2:15
videotaped 4:2
 33:8
violent 20:21
viscera 23:18
visible 24:2
V**501**

vulvar 17:3
 31:21

**W**

waive 4:18
Walker 31:10,10
want 15:4 17:18
wasn't 13:2
Watkins 1:10
 2:4
way 5:8 28:25
 29:17,19 39:18
welcome 5:9
went 6:5
West 2:7
Western 1:2 4:5
we'll 34:2
we're 18:12
 20:13,14
we've 7:14
WHEREOF
 39:21
White 1:23 39:2
 39:24
witness 4:16,17
 4:18 7:23
 18:14,17 28:10
 33:9 39:6,8,17
 39:21
words 13:4
work 5:13 6:1
 7:12 10:7,21
 11:2 14:13
 16:5 27:13
 31:15
worked 5:15,18
work-ups 7:7
wouldn't 35:15
 37:20
writing 10:9
wrong 5:8
wrote 6:17 26:6

**Y**

Yeah 36:2

year 20:11
years 5:15,19
 6:1

**1**

1 3:3,14 9:1,23
10 3:15
1111 16:2 31:19
12 35:3,4,6,18,24
 36:6
1309 1:23 39:24
14 3:16
15 23:7
19 3:17

**2**

2 3:4,15 10:2,4
2/1/2014 39:25
20 5:18
2002 8:17
2009 14:7
2010 1:11 4:6
 39:4,22
22nd 8:18
23 1:11
23rd 4:6 39:4
29th 39:22

**3**

3 3:5,6,16,20
 14:2,3
30 3:18 23:7
300 2:4
320928 1:24
33 3:9,19
34 3:20
35 5:15
38 39:15
39 3:10
39056 2:8
39201 2:5,12
39232-0928 1:24

**4**

4 3:8,17 19:7,8

## Deposition of Dr. Steven Hayne

**400** 1:10 2:4
**45** 22:20
**450** 2:12

---

**5**

**5** 3:18 30:12,18
  31:11,25 32:22
**5th** 14:7
**5:08-CV-275-...**
  1:4

---

**6**

**6** 3:19 33:7,10
  36:13
**601** 1:25
**606** 2:7
**65** 20:9,22

---

**7**

**7** 3:20 34:6

---

**8**

**8:57** 1:12 4:7
**80** 2:7

---

**9**

**9** 3:14
**9:30** 30:10
**9:40** 30:14
**9:53** 38:8
**9:56** 38:11,13
**919-8662** 1:25
**97** 20:7

**502**

J Neurosurg 99:143–150, 2003

# Anthropomorphic simulations of falls, shakes, and inflicted impacts in infants

MICHAEL T. PRANGE, PH.D., BRITTANY COATS, B.S., ANN-CHRISTINE DUHAIME, M.D., AND SUSAN S. MARGULIES, PH.D.

*Department of Bioengineering, University of Pennsylvania, Philadelphia; and Division of Neurosurgery, Children's Hospital of Philadelphia, Pennsylvania*

*Object.* Rotational loading conditions have been shown to produce subdural hemorrhage and diffuse axonal injury. No experimental data are available with which to compare the rotational response of the head of an infant during accidental and inflicted head injuries. The authors sought to compare rotational deceleration sustained by the head among free falls, from different heights onto different surfaces, with those sustained during shaking and inflicted impact.

*Methods.* An anthropomorphic surrogate of a 1.5-month-old human infant was constructed and used to simulate falls from 0.3 m (1 ft), 0.9 m (3 ft), and 1.5 m (5 ft), as well as vigorous shaking and inflicted head impact. During falls, the surrogate experienced occipital contact against a concrete surface, carpet pad, or foam mattress. For shakes, investigators repeatedly shook the surrogate in an anteroposterior plane; inflicted impact was defined as the terminal portion of a vigorous shake, in which the surrogate's occiput made contact with a rigid or padded surface. Rotational velocity was recorded directly and the maximum (peak–peak) change in angular velocity ($\Delta\dot{\Theta}_{max}$) and the peak angular acceleration ($\ddot{\Theta}_{max}$) were calculated.

Analysis of variance revealed significant increases in the $\Delta\dot{\Theta}_{max}$ and $\ddot{\Theta}_{max}$ associated with falls onto harder surfaces and from higher heights. During impacts against rigid surfaces, the $\Delta\dot{\Theta}_{max}$ and $\ddot{\Theta}_{max}$ were significantly greater than those measured under all other conditions.

*Conclusions.* Vigorous shakes of this infant model produced rotational responses similar to those resulting from minor falls, but inflicted impacts produced responses that were significantly higher than even a 1.5-m fall onto concrete. Because larger accelerations are associated with an increasing likelihood of injury, the findings indicate that inflicted impacts against hard surfaces are more likely to be associated with inertial brain injuries than falls from a height less than 1.5 m or from shaking.

KEY WORDS • brain injury • child abuse • diffuse axonal injury • subdural hematoma • children

TRAUMATIC brain injury is the most common cause of death in children.[3] Brain injuries resulting in hospitalization or death occur in at least 150,000 children per year, at a rate of more than 200 per 100,000 children. Head injury in infancy results in higher incidences of morbidity and mortality than those seen in older children, and it has become increasingly clear that the significant incidence of nonaccidental injury in the youngest patients is, in large part, responsible for this difference.[5,11,28,39]

The majority of serious traumatic brain injuries in infants and toddlers is due to child abuse, and abused children with brain injury have a worse outcome than children who sustain an accidental brain injury.[5,13] The actual mechanism of injury responsible for subdural hemorrhage, retinal hemorrhage, axonal injury, and skeletal trauma that characterize abusive head injury has been debated for decades. Caffey[6,7] first proposed the term "whiplash shaken infant syndrome" to describe the occurrence of subdural and retinal hemor-

rhages in response to presumed inflicted angular acceleration of the head. Others have followed with reports of subdural hemorrhage, retinal hemorrhage, and death occurring in the absence of contact injury (skull fracture, cranial bruising, or scalp swelling).[2,20] Regardless, contact head trauma remains a frequent finding in abusive head injury.[17]

Accidental falls are also a common cause of trauma found in the pediatric population, with falls accounting for 25 to 34% of hospital admissions for pediatric trauma and 6% of deaths in children due to trauma.[21,34] Nevertheless, accidental falls are a common history given by caregivers in suspected abuse cases. The suspicion of abuse often arises when the event history appears not to correspond to the injury in the child. The differentiation between causes of accidental and abusive head injury is hindered by the controversy regarding fall heights associated with serious head injures in children. Evidence exists to support the hypothesis that short falls do not cause serious injury and the critical height for a fall to cause death is substantial (> 10 ft).[4,10,34,36,49,55] Simultaneously, however, others contend that relatively short falls can occasionally cause injuries associated with high mortality rates, such as SDHs, epidural hematomas, and skull fractures.[8,18,19,21,40,43,44,46,54] Because the mechanical responses experienced by the head and the in-

---

*Abbreviations used in this paper:* ANOVA = analysis of variance; DAI = diffuse axonal injury; SDH = subdural hematoma; TAI = traumatic axonal injury; $\Delta t$ = duration of the maximum change in angular velocity; $\Delta\dot{\Theta}_{max}$ = maximum (peak–peak) change in angular velocity; $\ddot{\Theta}_{max}$ = peak angular acceleration.

503



EXHIBIT

M. T. Prange, et al.

TABLE 1
*Comparison between body measurements in infant and surrogate*

| Body Measurement | Infant | Surrogate |
|---|---|---|
| head weight (kg) | 0.77–0.87* | 1.13 |
| head circumference (transverse plane [cm]) | 39.5† | 40.5 |
| head height (inferior to superior [cm]) | 13.5† | 12.6 |
| head breadth (right to left [cm]) | 10.5† | 11.4 |
| head length (anterior to posterior [cm]) | 14.1† | 12.6 |
| distance from shoulder to top of head (cm) | 14.7† | 15.1 |
| distance from axis of rotation (C5–6) to top of head (cm) | 15.4‡ | 14.7 |
| distance from axis of rotation (C5–6) to center of gravity of the head (cm) | 9.5‡ | 9.2 |
| distance from axis of rotation (C5–6) to base of skull (cm) | 3.3* | 4.5 |
| distance from axis of rotation (C5–6) to transducers (cm) | not applicable | 18.0 |
| total body weight (kg) | 3–4*  4.8§ | 4.83 |
| breadth of shoulders (cm) | 17.6† | 17.8 |
| head/body weight ratio | 0.23*  0.24‖ | 0.23 |

* Weight of 1-month-old infant according to Duhaime, et al., 1987.
† Measurements obtained in an infant 0 to 3 months of age according to Schneider, et al.
‡ Distance according to Swishchuk.
§ Weight of average male or female 6-week-old infant according to Kuczmarski, et al.
‖ Ratio in a 6-week-old infant according to Jensen.

jury tolerances associated with shaking, shaking with impact, and falls have not yet been established, the differentiation between accidental and inflicted head injury is problematic. Objective information regarding these parameters is needed to determine if some circumstances are more hazardous than others during accidental and inflicted traumatic situations.

Previously, dolls that were anthropomorphically matched to human infants were shaken with and without impact;[12] investigators reported that during an inflicted impact the angular deceleration of the head is 45 times that observed during a vigorous shake, exceeding scaled thresholds for concussion, subdural hemorrhage, and DAI. In that study, however, the angular (rotational) motions were calculated on the assumption that there was a fixed center of rotation, and were not measured directly. Moreover, falls were not simulated, only inflicted shakes and impacts. In this study, we have created an improved anthropomorphic surrogate of a 1.5-month-old infant, and directly measured the rotational velocities experienced by the head of the surrogate during shakes, inflicted impacts, and short-distance falls. This research also extends that of previously published studies by examining the effect of different contact surfaces on the rotational response of the infant's head during both abusive and accidental injury scenarios. By comparing the responses, our findings are an important step toward distinguishing the potential for head injuries caused by rotational motion during contact and purely inertial events, and during accidental and inflicted injury scenarios.

## Materials and Methods

*Construction of the Anthropomorphic Dummy of an Infant*

*Head Design.* A dummy was designed, constructed, modified, and improved to create a more biofidelic and durable anthropomorphic surrogate of a 1.5-month-old infant than that used previously. The head of a live doll (Lil' Baby; JC Toys Group, Inc., Miami, FL) was used to represent the head of the anatomically correct 1.5-month-old anthropomorphic surrogate. Because the center of gravity and the majority of an infant's body mass are located in the head and torso, the distribution of the weight of the arms and legs of the infant were incorporated into the weight of the torso. The surrogate's total body weight, 4.8 kg (10.6 lb), was matched to that of a 1.5-month-old infant whose body weight lies within the 50th percentile.[25] Using previously reported measurements, the distributed masses of the head and body were adjusted to mimic those of 1.5-month-old infant by creating a head/total body weight ratio of 0.235[12,25] (1.13-kg head mass). The breadth, length, and width of the head were measured and are in good agreement with those obtained in a 0- to 3-month-old infant in the 50th percentile (Table 1).

*Neck Design.* One-month-old infants have very compliant necks with little muscle tone and control of head movement.[9] The weak flexor and extensor muscles of the neck allow a significant lag between the head and torso when raising the infant to a sitting position and lowering him or her back to a lying position.[9] The normal movement of the neck has been described in the context of qualitative neurological examinations and developmental assessments in children; however, no quantitative information is available on the biomechanics of the human infant neck. In light of the absence of detailed quantitative information about the kinematics of infant necks in the literature, we fashioned a hinged neck with negligible resistance for the dummy, as previously published.[12] In this way, measurements would reflect a worst-case scenario of no resistance provided by the neck, so that we could ascertain the greatest possible velocities and accelerations that can be generated by these mechanisms. One end of a heavy-duty stainless-steel strap hinge was rigidly attached to the skull material on the surrogate's head; the other end was rigidly attached to the torso. The hinge was used as the neck joint in the surrogate to allow resistance-free motion in extension and flexion with no movement in other directions. The center of rotation of the hinge was located 9.2 cm inferior to the center of the mass of the head, and corresponded to the junction between C-5 and C-6 measured by magnetic resonance imaging.[51] Although the fixed center of rotation in the dummy would result in an overestimation of rotational acceleration because the actual centers of rotation are likely to be higher in the cervical spine, the relatively short cervical spine, compared with the head size of a typical young infant, minimizes the influence of this idealization. Regardless, this simplification once again errs on the side of a worst-case scenario.

*Skull and Scalp Material.* Another design consideration was the representation of the stiff skull with a flexible scalp. Experiments were performed to determine appropriate "skull" and "scalp" materials to use in the construction of the dummy. The mechanical properties of the orthopedic-grade copolymer polypropylene (2.25 mm thick; American Plastics, Fort Worth, TX) were tested and determined to lie between those of infant skull and suture.[31,32] The plastic was heated and molded to the head of the surrogate and allowed to cool to room temperature. The instrumentation mounting bracket was attached securely to the skull, creating a rigid connection among the instrumentation, surrogate skull material, and head. A latex rubber material (Mold Builder [1.25 mm thick]; ETI, Fields Landing, CA) with properties similar to scalp[3,43,41] was used to cover the occipital portion of the polypropylene skull; this material remained adherent throughout the tests.

### Head Instrumentation

An angular rate sensor (model ARS-01; ATA Sensors, Albuquerque, NM) was securely attached to the top of the dummy's head via a lightweight bracket, and was adjusted to measure rotations with an axis of rotation oriented perpendicular to the sagittal plane. This transducer location was selected to be remote from the impact site, so as not to damage the transducer in the impact and fall experiments. Any similar location on the head and transducer orientation would have yielded the same rotational velocity data. The velocity channel was sampled at 10,000 scans per second and filtered using a digital Butterworth low-pass filter (DADiSP/2000; DSP Develop-

**504**

## Anthropomorphic simulations



FIG. 1. Graph showing a representative angular velocity and acceleration trace for the impact produced from a 0.9-m (3-ft) fall onto concrete.



FIG. 2. Graph showing a representative angular velocity and acceleration trace for a shaking event.

ment Corp., Newton, MA) as specified by the Society of Automotive Engineers.[50] Simulations of falls and inflicted impacts that involved contacting hard materials (carpet pad, concrete, or lab bench) were processed through a low-pass filter with a cutoff frequency of 1000 Hz, according to the standard SAE J211-1 channel frequency Class 1000 used for measuring head accelerations during automotive crash tests.[50] Because shakes and impacts against the foam mattress have pulse durations much longer than impacts against hard surfaces, these signals were processed through a low-pass filter with a cutoff frequency of 250 Hz to eliminate the noise from the velocity signal.

### Abuse and Accident Reconstruction

A custom-designed drop-test apparatus was constructed to allow the dummy to be dropped consistently from 0.3-m (1-ft), 0.9-m (3-ft), and 1.5-m (5-ft) heights. The surrogate was suspended supine from three points (two on the body, one on the head) with the height of the dummy's head placed slightly lower (< 3 cm) than the body to ensure that the surrogate's occiput was the first point to contact the surface. To reproduce the shaking of an infant, the surrogate was grasped firmly by its torso and held at chest level. The dummy was then shaken back and forth, making sure that during each shake the head went through a complete range of motion from full extension to full flexion. Each episode included at least five shakes, with the final shake concluding with an inflicted impact of the surrogate's occiput against one of three materials located at approximately the volunteer's waist level (0.9 m from floor). The sequence was divided into two segments, the "shaking event" and the "inflicted impact event," for analysis. Volunteers were instructed to use maximum effort during vigorous shaking and impact, and not to release or throw the dummy during impact.

Three materials were used in the fall and inflicted impact simulations: a piece of 10.2-cm (4-in)–thick foam from a crib mattress, a section of 6.35-mm (0.25-in)–thick carpet pad, and a hard surface (concrete floor for falls, stone bench top for inflicted impacts). These materials were tested and the average linear elastic moduli of the foam and carpet pad were measured and found to be 24.8 and 621 kPa, respectively,[12] whereas the elastic modulus of concrete in compression has been documented to range from approximately 20 to 60 GPa.[41] These data demonstrate the wide range of contact surface characteristics that were used in the household fall situations.

### Statistical Analysis

After filtering the measured angular velocity for each event, angular acceleration was calculated by taking the derivative of the angular velocity–time history trace. Only the rotation caused by the initial impact was analyzed in traces for falls and inflicted impacts. For each shaking event, only the shake with the greatest angular acceleration was analyzed out of the series of shakes in the episode. Each event was analyzed to find the $\Delta\dot{\Theta}_{max}$, the $\Delta t$, and the $\ddot{\Theta}_{max}$ during this interval.

A total of 134 fall events were reconstructed from various heights

onto different surfaces with at least 14 falls for each height–surface combination. A representative trace of the measured angular velocity and calculated angular acceleration during a fall is shown in Fig. 1.

Sixty-one shaking and impact sequences were performed by six different adult volunteers (four male and two female volunteers ranging in weight from 50–100 kg). Nearly all shaking episodes (60 of 61) consisted of a shake and an inflicted impact segment in which the surrogate's occiput made contact with one of three surfaces (foam in 18 episodes, carpet pad in 20 episodes, and a composite bench top in 22 episodes). Typical angular velocity and angular acceleration measurements from a series of shakes and inflicted impacts are shown in Figs. 2 and 3, respectively.

To determine overall differences between falls from different heights and onto different surfaces, three separate two-way ANOVAs were used to analyze the $\Delta\dot{\Theta}_{max}$, $\ddot{\Theta}_{max}$, and $\Delta t$ individually. A Tukey test for multiple comparisons was also performed to determine the differences between each individual type of fall. The measurements from shakes were compared with inflicted impacts against different surfaces by using one-way ANOVA to determine the significance of the test mode and the Tukey test to determine differences between each pair of test modes. A Dunnet test for multiple comparisons to a control was used to compare the $\Delta\dot{\Theta}_{max}$, $\ddot{\Theta}_{max}$, and $\Delta t$ from all falls, comparing the effects of the various surface materials by using shakes as the control or standard in the Dunnet test. The same analysis was repeated in a sequence of Dunnet tests by using inflicted impacts against foam, carpet pad, or bench top as the control group in each evaluation. Statistical significance was defined at a probability value of 0.05 or less for each analysis.

## Results

### Falls Onto Padded and Unpadded Surfaces

A two-way ANOVA revealed a significant overall increase in $\Delta\dot{\Theta}_{max}$ and $\ddot{\Theta}_{max}$ ($p < 0.001$; Fig. 4 upper and center) and a decrease in $\Delta t$ with falls onto harder surfaces and from greater heights ($p < 0.001$; Fig. 4 lower). A Tukey test revealed no significant effect of the height of the fall in the measured $\Delta\dot{\Theta}_{max}$ or $\ddot{\Theta}_{max}$ during falls onto foam and showed that both kinematic measurements at a given height were significantly less for falls onto foam than for those onto carpet pad or concrete. Falls from a given height onto the carpet pad and concrete were indistinguishable, except for the $\ddot{\Theta}_{max}$ during 1.5-m falls. For a particular surface, no significant difference between 0.9- and 1.5-m falls was found in the measurements of $\Delta\dot{\Theta}_{max}$ or $\ddot{\Theta}_{max}$; however, measurements of $\Delta t$ were significantly different when comparing fall heights onto foam, with the $\Delta t$ decreasing as the height of the fall increased.

M. T. Prange, et al.



FIG. 3. Graph demonstrating representative angular velocity and acceleration trace for an inflicted impact against a bench top.

### Shakes and Inflicted Impacts

Averaged across volunteers, the values of $\Delta\dot{\Theta}_{max}$ and $\ddot{\Theta}_{max}$ during inflicted impacts against foam were greater than, although not significantly different from, those measured during shaking events (Fig. 5 *upper* and *center*). Inflicted impacts against foam, however, had a significantly shorter average $\Delta t$ than shaking events (Fig. 5 *lower*). Inflicted impacts against the carpet pad and rigid bench surface were indistinguishable. Taken together, inflicted impacts against these two hard surfaces resulted in an approximately 39 times greater $\ddot{\Theta}_{max}$, a three times greater $\Delta\dot{\Theta}_{max}$, and a 53 times shorter $\Delta t$ than the response measured during shaking.

Shakes had a statistically similar $\Delta\dot{\Theta}_{max}$ to those of 0.3-m falls onto concrete and carpet pad, and a similar $\ddot{\Theta}_{max}$ to that of falls onto a foam mattress. Shaking resulted in a significantly longer $\Delta t$ than any fall events. Inflicted impacts against foam had a similar $\ddot{\Theta}_{max}$ to that of falls onto a foam mattress and a similar $\Delta\dot{\Theta}_{max}$ to that of falls onto concrete. Inflicted impacts against a hard surface resulted in a similar $\Delta t$ to those of falls onto carpet pad and concrete, and had a significantly greater $\Delta\dot{\Theta}_{max}$ and $\ddot{\Theta}_{max}$ than all fall scenarios.

### Discussion

The focus of this study was to determine the rotational response of the head of an infant that is experienced during low-height falls and inflicted head injuries. Rotational motions have been shown to cause a diffuse pattern of strains and injury throughout the brain, whereas translational motion causes more focal damage.[37] For this reason, with the exception of epidural hematoma, falls have often been considered benign, because they are assumed to be essentially translational events. Nevertheless, although a fall may have predominantly translational components, its terminus (contact with an often immobile object) may produce significant rotational events and the brain may also experience rapid changes in rotational velocity and deceleration. It was the purpose of this study to measure these rotational events and to compare them with those created by shaking, impacts after free falls, and inflicted impacts.

In the impacts against carpet pad and concrete simulated in this study, the occiput made contact before the torso and then rotated, producing a significant angular motion of the







FIG. 4. Bar graphs showing the $\Delta\dot{\Theta}_{max}$ (*upper*), $\ddot{\Theta}_{max}$ (*center*), and $\Delta t$ (*lower*) for falls from different heights onto different surfaces. The bars depict mean values and the error bars indicate standard errors.

head relative to the thorax. We found that the rotational accelerations and changes in rotational velocity experienced by the head during impact increased with the height of the fall. These larger rotational responses can be attributed to the higher linear velocities reached as drop height (and thus potential energy) increases. Harder surfaces absorb less energy than deformable materials during contact, causing the head to rebound more; the head thus experienced significantly larger rotational accelerations during contact with the concrete and the carpet pad, compared with contact with foam, during falls and inflicted impacts. Conversely, when the head contacted the foam it was pocketed in the foam, such that both torso and head moved together, producing only a very small rotational response. It should be emphasized that the foam material used in these tests was unencased, and the addition of a plastic or other covering might alter the deceleration pattern. For this reason, one cannot extrapolate tests performed using unencased foam to impacts against a covered mattress or padded furniture.

**506**

## Anthropomorphic simulations

Head rotations during shakes occurred over significantly longer time periods than any other event. Thus, although shakes had a similar $\Delta\dot{\Theta}_{max}$ to that of a 0.3-m (1-ft) fall onto concrete and carpet pad, this change in velocity occurred over a much longer time period, producing a significantly lower $\ddot{\Theta}_{max}$. Furthermore, shakes had a similar $\ddot{\Theta}_{max}$ to that of falls onto the mattress foam, but because the $\Delta t$ is longer, shakes had significantly higher $\Delta\dot{\Theta}_{max}$ values.

There has been much debate on whether shaking alone is sufficient to cause the typical primary brain injuries seen in inflicted neurotrauma in infancy, specifically, SDH and/or TAI, or whether impact is necessary. Recent evidence suggests that injury to the cervicomedullary junction may be found in some cases of fatal inflicted head injury, and the role of this finding in the pathophysiology of apnea, hypoxia, and secondary cellular events is, at present, incompletely understood. Regardless, the focus of this study was to investigate the biomechanical causes of primary brain injuries by using rotational forces as a benchmark for the incidence of acute intracranial events such as failure of parasagittal bridging veins or axonal tears. To mimic inflicted impacts, the shaking scenarios described earlier were concluded with an impact of the surrogate's occiput against one of three surfaces. Our results demonstrate that measurements made during inflicted impacts against a carpet pad were not significantly different from those made during impacts against a rigid surface (lab bench top). Although the pad was less stiff than the bench top, the carpet pad used was only 6.35 mm (0.25 in) thick and the force of the inflicted impact completely compressed the pad during impact. During impact the carpet pad therefore exhibited the same properties as the underlying bench top during the later stages of contact. Inflicted impacts against carpet pad and bench top produced a significantly greater $\Delta\dot{\Theta}_{max}$ and $\ddot{\Theta}_{max}$ than those experienced under all other conditions simulated in this study. In contrast, the inflicted impact against the thicker (10-cm) foam mattress did not fully compress the foam, resulting in a $\Delta\dot{\Theta}_{max}$ and $\ddot{\Theta}_{max}$ that were lower than those associated with inflicted impacts against harder surfaces and similar to those associated with shaking. To summarize, inflicted impacts against the carpet pad and bench top had a three times greater $\Delta\dot{\Theta}_{max}$ and a 39 times greater $\ddot{\Theta}_{max}$ than shaking. These results suggest a higher likelihood of injury from inflicted impacts against hard surfaces than from vigorous shaking, or from falls of 1.5 m or less.

Sixteen years ago, we published results found using a less sophisticated anthropomorphic dummy of a 1-month-old infant,[12] and found similar $\Delta\dot{\Theta}_{max}$ and $\ddot{\Theta}_{max}$ ratios between shakes and impacts to those in the current study. In the current study, we constructed a more biofidelic 1.5-month-old dummy by using skull and scalp material with properties similar to those in infants. We measured rotational velocity directly and expanded the study to include falls and a wide variety of contact materials. Despite these improvements, the current study has several limitations. The dummy designed for this study included a simplified representation of the infant skull and neck that potentially influenced loads during falls and impact events. First, the dummy's skull was made from a solid homogeneous 2.25-mm-thick sheet of copolymer polypropylene. The actual braincase of an infant consists of bone plates connected by compliant sutures that allow substantial deformation of the skull. The compliant skull deforms during the birthing process and permits nor-







FIG. 5. Bar graphs showing the inflicted $\Delta\dot{\Theta}_{max}$ *(upper)*, $\ddot{\Theta}_{max}$ *(center)*, and $\Delta t$ *(lower)* for shakes and impacts against different surfaces.

mal expansion of the brain and soft tissues during infancy and childhood; it also allows large changes in shape during impact loading.[31] These skull deformations would slow the period of contact during an impact, and decrease the resulting angular accelerations. The solid plastic "skull" of the dummy is therefore not an exact representation of the separate bone and suture material of an infant, and it could cause an overestimate of the response measured during impact events. Studies in........ accurate skull and suture representations, which can also be used to measure skull contact forces, are now underway; the important data obtained in these studies will be crucial for computational simulations of skull and brain injuries caused by these focal loads experienced during impacts.

A second limitation of the current study is the inability of the surrogate's neck to mimic the properties of a real infant's neck. At present, no detailed quantitative information is available to validate the biomechanical properties of the human infant r....... ...vely, as a child matures, the neck stiffness inc....uses, ....ing more resistance to a rotational motion of the head relative to the torso. Nevertheless,

young infants (< 2 months old) have little muscle tone in their necks and cannot support the weight of their heads.[9] Thus, the low-resistance hinge representation may be appropriate for a newborn but not an older child. Furthermore, the cervical spine consists of a series of vertebrae, allowing for rotation of the neck in different locations and directions; the hinge used to model the neck motion in the dummy has a fixed point of rotation, only allowing anteroposterior flexion and extension. The hinge does not provide resistance to motion or dampen responses between the torso and neck. More accurate kinematics of the infant neck would allow for translation as well as rotation of the head, and a moving center of rotation. These differences in the kinematics of the neck result in an overestimation of the rotational motions experienced during falls and inflicted events. Although the biofidelity of the surrogate has not been established, these experiments do provide an upper boundary for the measured head response to shaking, inflicted impact, and falls. When data are available on properties of the neck, a more biofidelic model should be created to ensure accurate measurements during inflicted and accidental injury scenarios.

A third limitation of the study is that the model represents a child in the 50th percentile for body and head mass. A heavier child with the same neck development would experience higher impact energy in a fall or inflicted impact due to the larger mass, and likely would experience a concomitant larger rotational velocity and acceleration than a smaller child. It is difficult to speculate, however, whether the volunteers could have generated the same peak acceleration with a heavier child. Considering that each sequence was a maximum effort, it is likely that the shakes would have resulted in a lower acceleration and velocity in a heavier dummy. Thus we would anticipate a greater disparity among the data obtained during shakes, impacts, and falls with increasing body and head mass.

Subdural hematoma and TAI are among the most common findings in serious head injuries in infancy and in those associated with nonaccidental causes. Both these injury types have been produced by, and correlated to, the angular velocity or angular acceleration of the head.[1,15,16,32] Rotational motions have been shown to cause a diffuse pattern of strains and injury throughout the brain, whereas translational (linear) motion causes more focal damage.[24,37] Although the anthropomorphic dummy test data are useful to evaluate the rotational response of the head caused by falls and inflicted injury events, the results of the dummy tests cannot be used to predict whether such rotations are sufficient to cause injury. Regional tissue thresholds specific to the infant would be required to predict injury on the basis of local intracranial stresses or strains produced by the rapid rotations. Such thresholds are currently unavailable for the pediatric population. In lieu of this information, we used a more qualitative approach to determine injuries likely to occur during simulated events. Specifically, we correlated measured accelerations and changes in velocity with injuries documented from controlled cadaver, animal, and human experiments in which the response is often measured directly and the exact details of the injury event are carefully recorded. Using dimensional analysis, angular velocities and accelerations from the different animal, human, and cadaver experiments were scaled to the infant as a function of brain mass (420 g).[38] These results were compared with the different rotational responses measured in the minor fall and inflicted impact events simulated in the dummy experiments performed in this study.

Impacts from falls from 0.3, 0.9, and 1.5 m onto mattress foam, and from 0.3 m (1 ft) onto carpet pad produced the lowest rotational accelerations and changes in velocity of all falls examined in this study. Weber[54] found only a 10% chance of skull fracture when infant cadavers were dropped from a similar height onto a similar surface. No data have been collected from animal and human experiments that were conducted at the low levels of $\ddot{\Theta}_{max}$ and $\Delta\dot{\Theta}_{max}$ measured during falls onto foam. Values of $\ddot{\Theta}_{max}$ and $\Delta\dot{\Theta}_{max}$ similar to those measured during 0.3-m falls onto carpet pad were recorded from head rotations of instrumented models of boxers with no occurrence of concussion, skull fracture, SDH, or TAI of the brain.[39] All cases of SDH and DAI in human cadaver studies and primate (rhesus monkey and baboon) rotational inertial experiments[1,15,32] had considerably greater angular accelerations and velocities when scaled to a human infant than an average $\ddot{\Theta}_{max}$ and $\Delta\dot{\Theta}_{max}$ produced by falls onto foam. Correlating these experimental data, it is highly unlikely that serious or fatal injuries occur during falls onto an unencased foam mattress from a height of 1.5 m or less, or from 0.3 m falls onto a carpet pad.

At the rotational responses calculated during impacts after 0.3-m (1-ft) falls onto concrete and 0.9-m (3-ft) falls onto carpet pad, it is not clear if serious injuries occur. The experimental evidence shows both the absence and occurrence of serious head trauma. Specifically, although human infant cadaver drop test studies have demonstrated an 80 to 100% occurrence of skull fractures,[44,53] subhuman primate inertial studies[1,15,32] and adult cadaver studies[35] have shown both the presence and absence of intracranial hemorrhage and acute SDH.

No experimental data could be found with a $\ddot{\Theta}_{max}$ and $\Delta\dot{\Theta}_{max}$ similar to those of the most severe falls, that is, 1.5-m (5-ft) and 0.9-m (3-ft) falls onto concrete and 1.5 m (5 ft) falls onto carpet pad. At lower values of $\ddot{\Theta}_{max}$, however, impacts to the cadaver head caused intracranial bleeding, and nonhuman primates experienced SDH and DAI. The absence of data at this highest tier underscores our uncertainty regarding the occurrence of serious injury at these levels. These falls represent an extreme limit, producing the maximum rotation because of the hinge neck, the occipital contact site, and the purely sagittal rotation. In reality a fall is likely to include mixed rotational directions that would decrease the actual acceleration in the sagittal plane and the potential for SDH. For these idealized situations of falls onto hard surfaces, experimental data thus support at least the possibility of intracranial injuries caused by these most severe falls measured in this study.

There were no experimental data at values of $\ddot{\Theta}_{max}$ and $\Delta\dot{\Theta}_{max}$ similar to those measured during shaking or inflicted impacts against foam. For example, shakes and inflicted impacts against foam each had a $\Delta\dot{\Theta}_{max}$ similar to that associated with noninjurious head rotation in boxers,[39] but these human tests produced a significantly greater $\ddot{\Theta}_{max}$. The most severe inflicted impact against foam approached, but was still less than, the values of $\Delta\dot{\Theta}_{max}$ and $\ddot{\Theta}_{max}$ that produced SDH in adult rhesus monkeys and cadavers.[1,15,32] To summarize, there are no data demonstrating that the $\Delta\dot{\Theta}_{max}$ and $\ddot{\Theta}_{max}$ experienced during shaking and inflicted impact against foam cause SDH or TAI in infants.

148

**508**

## Anthropomorphic simulations

Finally, although the $\dot{\Theta}_{max}$ and $\Delta\dot{\Theta}_{max}$ measured during inflicted impacts against carpet pad and rigid bench top were significantly greater than those associated with all other scenarios tested in this study, no animal, human, or cadaver experiments at these levels of $\dot{\Theta}_{max}$ have been published. The majority of inflicted impacts against these hard surfaces produced a $\Delta\dot{\Theta}_{max}$ and $\dot{\Theta}_{max}$ greater than the scaled rotational responses that produced fatal acute SDH in adult primates and intracranial bleeding in adult cadavers.[1,15,33] Approximately half of these inflicted impacts also exceeded the scaled $\Delta\dot{\Theta}_{max}$ and $\dot{\Theta}_{max}$ that produced axonal injury in adult baboons.[32] Given this experimental data, angular velocities and accelerations measured during inflicted impacts against hard surfaces would likely produce SDH and, possibly, TAI in an infant.

These injury projections should be interpreted with caution, because differences in species, age, material properties, geometry, and direction make scaling experimental angular acceleration and velocity measurements to infants problematic when based on differences in brain mass alone. To avoid the limitations of using scaled loads from animal and cadaver experiments to investigate real life events, case studies of minor falls in infants were also used to examine injuries that occur as a result of falling from different heights. Unfortunately, these falls are rarely witnessed, load measurements of the event are lacking, contact surface information is rarely given, and the population studied generally includes a broad age range, rather than just newborns. To increase the specificity of our comparisons, we included only case studies of children reported to be younger than 3 years old.

Skull fracture has been reported as a result of minor falls in children younger than 3 years.[11,18,19,23,27,47,52,55] Reports of falls 0.6 m or less note an absence of skull fracture.[44,48,53,55] Studies have documented cases of skull fracture from minor falls from heights estimated to be 0.9 m (3 ft)[18,19,47,52] and 1.2 to 1.5 m (4–5 ft)[55] with no fatalities. Importantly, several studies have also shown an increase in the risk of skull fracture with the increased hardness of surfaces contacted after a free fall.[27,54] To summarize, these case study data provide evidence that minor falls (< 1.5 m) can cause skull fracture, especially if the impact occurs on a hard surface.

Case studies of infants younger than 3 years old have shown that SDH, TAI, and death are rarely caused by impact from falls from 1.5 m (5 ft) or less. In a 3.5-year retrospective study, Chadwick and colleagues[8] found no fatalities resulting from 1.5- to 2.75-m (5–9-ft) falls. In that study the authors did find three to seven deaths in children younger than 3 years of age with a history of falling from approximately 0.6 to 1.2 m (2–4 ft), but the majority of these cases had associated injuries attributed to abuse. Cases of playground falls reported by Plunkett[40] revealed only six fatal falls ranging from 0.6 to 1.8 m during an 11.5-year period. The causes of death in all six children were determined to be SDH or cerebral edema. Studies of falls occurring in hospitals from an estimated height of 0.61 to 1.2 m (2–4 ft) do not show any case of SDH or death.[22,30,36] Other case studies have shown no incidence of SDH or death caused by falls from 0.9 m (3 ft).[46,55] To our knowledge, no case study contains a report of serious brain injuries or death caused by falls from 0.3 m (1 ft) or less. Similar to the results of the animal and cadaver experimental data, these data show that, although the possibility exits, SDH and death from minor falls are unlikely.

## Conclusions

This paper presents the rotational response of the head of an infant, measured using an anthropomorphic dummy, during minor falls, shakes, and inflicted impacts. In general, the $\dot{\Theta}_{max}$ and $\Delta\dot{\Theta}_{max}$ increased with increasing fall height and surface hardness. The measured angular velocity and acceleration during minor falls were similar to those associated with shaking; however, inflicted impacts against hard surfaces produced a significantly greater $\dot{\Theta}_{max}$ and $\Delta\dot{\Theta}_{max}$ than a 1.5-m fall onto concrete. Because larger rotational acceleration and velocities are associated with a higher likelihood of injury, these findings suggest that inflicted impacts against hard surfaces may be more frequently associated with clinically significant inertial brain injuries than vigorous shaking or falls from less than 1.5 m. In addition, there are no data showing that the $\Delta\dot{\Theta}_{max}$ and $\dot{\Theta}_{max}$ of the head experienced during shaking and inflicted impact against unencased foam is sufficient to cause SDHs or primary TAIs in an infant.

## References

1. Abel JM, Gennarelli TA, Segawa H: Incidence and severity of cerebral concussion in the rhesus monkey following sagittal plane angular acceleration, in **Proceeding of 22nd Stapp Car Crash Conference.** Warrendale, PA: SAE, 1978, pp 35–53
2. Alexander R, Sato Y, Smith W, et al: Incidence of impact trauma with cranial injuries ascribed to shaking. **Am J Dis Child 144:** 724–726, 1990
3. Anonymous: Childhood injuries in the United States. Division of Injury Control, Center for Environmental Health and Injury Control, Centers for Disease Control. **Am J Dis Child 144:**627–646, 1990
4. Barlow B, Niemirska M, Gandhi RP, et al: Ten years of experience with falls from a height in children. **J Pediatr Surg 18:**509–511, 1983
5. Billmire ME, Myers PA: Serious head injury in infants: accident or abuse? **Pediatrics 75:**340–342, 1985
6. Caffey J: On the theory and practice of shaking infants. Its potential residual effects of permanent brain damage and mental retardation. **Am J Dis Child 124:**161–169, 1972
7. Caffey J: The whiplash shaken infant syndrome: manual shaking by the extremities with whiplash-induced intracranial and intraocular bleedings, linked with residual permanent brain damage and mental retardation. **Pediatrics 54:**396–403, 1974
8. Chadwick DL, Chin S, Salerno C, et al: Deaths from falls in children: how far is fatal? **J Trauma 31:**1353–1355, 1991
9. Cole CH: **The Harriet Lane Handbook: A Manual for Pediatric House Officers,** ed 10. Chicago: Year Book Medical Publishers, 1984
10. Cummins BH, Potter JM: Head injury due to falls from heights. **Injury 2:**61–64, 1970
11. Duhaime AC, Alario AJ, Lewander WJ, et al: Head injury in very young children: mechanisms, injury types, and ophthalmologic findings in 100 hospitalized patients younger than 2 years of age. **Pediatrics 90:**179–185, 1992
12. Duhaime AC, Gennarelli TA, Thibault LE, et al: The shaken baby syndrome. A clinical, pathological, and biomechanical study. **J Neurosurg 66:**409–415, 1987
13. Ewing-Cobbs L, Kramer L, Prasad M, et al: Neuroimaging, physical, and developmental findings after inflicted and noninflict-

**509**

149

ed traumatic brain injury in young children. **Pediatrics 102:** 300–307, 1998

14. Galford J, McElhaney J: A viscoelastic study of scalp, brain, and dura. **J Biomech 3:**211–221, 1970

15. Gennarelli T, Thibault L, Adams J, et al: Diffuse axonal injury and traumatic coma in the primate. **Ann Neurol 12:**564–574, 1982

16. Gennarelli TA, Thibault LE: Biomechanics of acute subdural hematoma. **J Trauma 22:**680–686, 1982

17. Gilliland M, Folberg R: Shaken babies—some have no impact injuries. **J Forensic Sci 41:**114–116, 1996

18. Greenes D, Schutzman SA: Infants with isolated skull fracture: what are their clinical characteristics, and do they require hospitalization? **Ann Emerg Med 30:**253–259, 1997

19. Gruskin KD, Schutzman SA: Head trauma in children younger than 2 years: are there predictors for complications? **Arch Pediatr Adolesc Med 153:**15–20, 1999

20. Hadley MN, Sonntag VK, Rekate HL, et al: The infant whiplash-shake injury syndrome: a clinical and pathological study. **Neurosurgery 24:**536–540, 1989

21. Hall JR, Reyes HM, Horvat M, et al: The mortality of childhood falls. **J Trauma 29:**1273–1275, 1989

22. Helfer RE, Slovis TL, Black M: Injuries resulting when small children fall out of bed. **Pediatrics 60:**533–535, 1977

23. Hobbs CJ: Skull fracture and the diagnosis of abuse. **Arch Dis Child 59:**246–252, 1984

24. Holbourn AHS: Mechanics of head injuries. **Lancet 2:**438–441, 1943

25. Jensen RK: Body segment mass, radius and radius of gyration proportions of children. **J Biomech 19:**359–368, 1986

26. Kuczmarski RJ, Ogden CL, Grummer-Strawn LM, et al: CDC Growth Charts: United States, in **Advance Data From Vital and Health Statistics, no. 314.** Hyattsville, MD: National Center for Health Statistics, 2000

27. Laforest S, Robitaille Y, Lesage D, et al: Surface characteristics, equipment height, and the occurrence and severity of playground injuries. **Inj Prev 7:**35–40, 2001

28. Luerssen T: General characteristics of neurologic injury, in Eichelberger M (ed): **Pediatric Trauma: Prevention, Acute Care, Rehabilitation.** St. Louis: Mosby Year Book, 1993, pp 345–352

29. Luerssen TG, Huang JC, McLone DG, et al: Retinal hemorrhages, seizures, and intracranial hemorrhages: relationships and outcomes in children suffering traumatic brain injury, in Marlin AE (ed): **Concepts in Pediatric Neurosurgery.** Basel: Karger, 1991, Vol 11, pp 87–94

30. Lyons TJ, Oates RK: Falling out of bed: a relatively benign occurrence. **Pediatrics 92:**125–127, 1993

31. Margulies SS, Thibault KL: Infant skull and suture properties: measurements and implications for mechanisms of pediatric brain injury. **J Biomech Eng 122:**364–371, 2000

32. Margulies SS, Thibault LE, Gennarelli TA: Physical model simulations of brain injury in the primate. **J Biomech 23:**823–836, 1990

33. McElhaney JH, Roberts VL, Hilyard J: **Handbook of Human Tolerance.** Tokyo: Japan Automobile Research Institute, 1976

34. Musemeche CA, Barthel M, Cosentino C, et al: Pediatric falls from heights. **J Trauma 31:**1347–1349, 1991

35. Nahum AM, Smith RW: An experimental model for closed head impact injury, in **Proceedings of 20th Stapp Car Crash Conference.** Dearborn, MI: SAE, 1976, pp 783–814

36. Nimityongskul P, Anderson LD: The likelihood of injuries when children fall out of bed. **J Pediatr Orthop 7:**184–186, 1987

37. Ommaya AK: Head injury mechanisms and the concept of preventive management: a review and critical synthesis. **J Neurotrauma 12:**527–546, 1995

38. Ommaya AK, Yarnell P, Hirsch AE, et al: Scaling of experimental data on cerebral concussion in sub-human primates to concussion threshold for man, in **Proceedings of 11th Stapp Car Crash Conference.** Los Angeles: SAE, 1967, pp 73–80

39. Pincemaille Y, Trosseille X, Mack P, et al: **Investigation of the Relationships Between Physical Parameters and Neuro-physiological Response to Head Impact.** Nanterre, France: Laboratory of Physiology and Biomechanics, 1988

40. Plunkett J: Fatal pediatric head injuries caused by short-distance falls. **Am J Forensic Med Pathol 22:**1–12, 2001

41. Popov EP: **Introduction to Mechanics of Solids.** Englewood Cliffs, NJ: Prentice-Hall, 1968

42. Prange MT: **Biomechanics of Traumatic Brain Injury in the Infant. Dissertation.** Philadelphia: University of Pennsylvania, 2002

43. Reiber GD: Fatal falls in childhood. How far must children fall to sustain fatal head injury? Report of cases and review of the literature. **Am J Forensic Med Pathol 14:**201–207, 1993

44. Root I: Head injuries from short distance falls. **Am J Forensic Med Pathol 13:**85–87, 1992

45. Schneider LW, Lehman RJ, Pflug MA, et al: **Size and Shape of the Head and Neck From Birth to Four Years.** Washington, DC: Consumer Product Safety Commission, 1986

46. Schutzman SA, Barnes PD, Mantello M, et al: Epidural hematomas in children. **Ann Emerg Med 22:**535–541, 1993

47. Shane SA, Fuchs SM: Skull fractures in infants and predictors of associated intracranial injury. **Pediatr Emerg Care 13:**198–203, 1997

48. Smith GA, Dietrich AM, Garcia CT, et al: Injuries to children related to shopping carts. **Pediatrics 97:**161–165, 1996

49. Smith MD, Burrington JD, Woolf AD: Injuries in children sustained in free falls: an analysis of 66 cases. **J Trauma 15:** 987–991, 1975

50. Society of Automotive Engineers: **Surface Vehicle Recommended Practice: J211-1: Instrumentation for Impact Test—Part 1—Electronic Instrumentation.** Warrendale, PA: SAE, 1995

51. Swischuk LE: **Imaging of the Newborn, Infant and Young Child, ed 4.** Baltimore: Williams & Wilkins, 1997

52. Tarantino CA, Dowd MD, Murdock TC: Short vertical falls in infants. **Pediatr Emerg Care 15:**5–8, 1999

53. Weber W: Experimentelle Untersuchungen zu Schädelbruchverletzungen des Sauglings. **Z Rechtsmed 92:**87–94, 1984

54. Weber W: Zur biomechanischen Fragilität des Sauglingsschadels. **Z Rechtsmed 94:**93–101, 1985

55. Williams RA: Injuries in infants and small children resulting from witnessed and corroborated free falls. **J Trauma 31:**1350–1352, 1991

Manuscript received November 22, 2002.
Accepted in final form March 21, 2003.
This work was supported by National Institutes of Heath Grant No. NS39679 and Centers for Disease Control and Prevention Grant No. R49/CCR312712 to Dr. Margulies.
Address for Dr. Duhaime: Dartmouth Hitchcock Medical Center, Lebanon, New Hampshire.
*Address reprint requests to:* Susan Margulies, Ph.D., Department of Bioengineering, University of Pennsylvania, 3320 Smith Walk, 105 Hayden Hall, Philadelphia, Pennsylvania 19104-6392. email: margulies@seas.upenn.edu.

**511**